# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| Roxie Sibley, et al. | ) | |
| on behalf of themselves and similarly | ) | |
| situated employees, | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | NO. 2:08-cv-02063-KHV/JPO |
| v. | ) | |
| | ) | |
| | ) | |
| Sprint Nextel Corporation, et al. | ) | |
| | ) | |
| **Defendants.** | ) | |

### AFFIDAVIT OF JANET R. THORNTON, Ph.D.

| | |
|---|---|
| **STATE OF FLORIDA** | ) |
| | ) ss. |
| **COUNTY OF LEON** | ) |

Dr. Janet R. Thornton, affiant, affirms under oath as follows:

1.    I am a labor economist with a Ph.D. in Economics (1992) from Florida State University.   I am currently a Managing Director at ERS Group, where I have been employed since 1986.   ERS Group is a consulting firm that engages in research on economic issues.   My fields of special interest include computer analysis of large databases, applied econometrics and statistical analysis.   I have provided expert testimony in arbitration hearings and before federal and state courts and regulatory agencies at the request of both plaintiffs and defendants.   No court has rejected me as an expert qualified to testify in my fields.   My curriculum vitae and list of testimony in the past four years are contained in Appendix A.

1


EXHIBIT
B

2.      Counsel for the Defendant in the above captioned matter asked ERS Group to provide an assessment on two topics:  (a) the time and burden of pulling the volume of data that would be produced on a class-wide basis and (b) given this time and burden whether some number less than a class-wide data pull would be optimal for both parties to determine the commissions paid and product sold by retail employees subject to the commission plans from August 2005 to the present.

## A.  Extracting and Processing Commission Data for Approximately 45,000 Class Members[1]

3.      To extract the volume of data to be produced for the certified class, it is our understanding that Sprint will have to add employees who would be dedicated to this task.  These employees will be overseen by the Sprint commission personnel who have the day-to-day responsibility for the real-time processing of the commission systems for current business purposes.  Based on the information provided by Sprint, it is estimated that with 6 additional personnel working at least 45 hours a week in addition to the oversight of the subject matter experts, the minimum amount of time just to extract the data for the 45,000 individuals would be 24 weeks, or approximately 7,500 man-hours. The estimated 24-week extraction period includes an estimate of the time required to accommodate computer system constraints, i.e., the extraction of the data will have to occur when Sprint's computer systems are able to execute the scripts without interfering with the day-to-day operation of the commissions processing.   After the data are extracted, it will need to be reviewed for completeness to ensure that the data were accurately extracted.  With the inclusion of the review process, it is estimated to extract

---

[1] It is our understanding that an end date for membership in the class has not yet been set.  Therefore, additional class members will be added until the end date is established.

and produce the data for approximately 45,000 class members[2] will require a minimum of 7 to 9 months.

4.      To provide context for this length of time, in a letter dated June 3, 2010, the parties agreed to use a random sample to identify class members who were present in a two-year timeframe within the class period.  The parties then negotiated the specific data to be exchanged for these individuals.  For the mediation sample of 95 employees examined, it took approximately 5 months to extract, review and produce data.   The process to extract data includes, but is not limited to, the following:

        a)      design of the data query utilized in pulling the data,

        b)      code development for the data query,

        c)      unit testing,

        d)      system testing,

        e)      running the designed-and-tested process, and

        f)      reviewing the data to verify completeness and accuracy.

5.      Additionally, while the mediation sample focused on a study of the transactions of employees in non-managerial positions, the class includes managerial employees.  The commissions of managerial employees are based on the activity of the employees who report to them.  As a consequence, it will be necessary to identify the employees in each month that would have contributed to those in a managerial position. It is our understanding that additional time and effort will be required to produce this information.

---

[2] Currently, there are 42,738 class members through the end of August 2010.  It is estimated that through March 31, 2011 there would be approximately 45,000 class members.

6.      Once it has been determined that the data are accurate, the analysis of the transactions will be performed.  We estimate that a minimum of 5 to 6 months will be required to programmatically review each transaction line during the 6-year period and then analyze the transactions for each of the approximately 45,000 class members.  Given the complexity and sheer volume of data, assuming no issues during the analysis period, the computer processing of the data alone to perform the analysis will take many months.

7.      As a consequence of the time required to extract, review, and analyze the transactions, it is estimated that between 12 and 15 months of time will be required.[3]

8.      To illustrate the scope of this analysis, between July and December 2010, over 4.3 billion individual records of mediation data were produced to the Plaintiffs resulting in 2.38 terabytes of data.  To apply this to the entire class, we estimate that the analysis for the entire class will encompass over 2 billion transactional lines for the point-of-sale data alone.  This estimated number of transactional lines does not include the data from the other systems such as billing data or the Order Detail Reports received by the retail employees.  Thus, the processing time required to analyze all class members for the 6-year time period will be substantial.

**B.    A Representative Sample of the Approximately 45,000 Class Members is Sufficient**

9.      A class-wide data pull is not necessary to determine if a potential systematic underpayment of commissions occurred.  A random sampling plan can be designed to a reasonable degree of statistical certainty as a practical alternative for investigating if there was a potential systematic underpayment.

10.   The size of the sample (i.e., number of employees) is established based on a pre-determined and acceptable level of precision (i.e., "error rate"), usually less than or equal to 5%.[4]   A 5% or lower error rate is generally used in connection with a 95% confidence level when estimating the "true" proportion and is approximately equivalent to two standard deviations, a commonly used threshold for "statistical significance."[5] Researchers prefer the lowest error rate[6] possible, taking into account the cost associated with larger sample sizes.

11.   The sample size calculations are based on a widely used and accepted mathematical formula.[7]   The number of class members required to be sampled may ultimately be a large portion of the population depending on the assumed sample proportion, the desired error rate, and the confidence level.   Specifically, in order to establish the appropriate sample size for determining whether or not there was a systematic underpayment, an assumed sample proportion is determined where the sample

---

[3] The number of months required to complete the process is not definitive because there is not an end date for membership in the class nor is there an end date for providing the transaction level data.   Should additional transactions be included in the review, more time will be required to complete this process.

[4] The concept of random sampling has a natural analogy in political polling.   For example, random surveys are often taken during election season in which respondents are asked whether they plan to vote for a specific candidate.   The results of those surveys are usually accompanied by a margin of error, such as "plus or minus 3%."   The margin of error is an alternative way of expressing the error rate.   A poll with a large margin of error, e.g., plus or minus 20%, is far less useful and informative than a poll with a smaller margin of error, e.g., plus or minus 5%.

[5] Social scientists and statisticians have used criteria of "greater than two or three standard deviations" to categorize a result as "statistically significant" for over 75 years.   See, for example, Statistics by Freedman, Pisani, and Purves.   Courts adopted this standard in voting rights cases (e.g., Castaneda v. Partida, 430 U.S. 482, 97 S. Ct. 1272 (1977)) and carried the standard over to equal employment issues in such cases as Hazelwood School District v. U.S., 433 U.S. 299, 308 n.14 (1977) and Teamsters v. U.S., 431 U.S. 324; 97 S. Ct. 1843 (1977).

[6] According to Deming, a sample is valid, in part, when "the limit of sampling variation is sufficiently small to be innocuous." See: W. Edwards Deming (1960).   Sample Design in Business Research.   Wiley Interscience: New York, page 57.

[7] More specifically, these calculations are based on the statistical formula used to derive sample sizes for a test of whether a specific proportion of the population shares a particular characteristic.   See: David Levine, Mark Berenson, and David Stephan (1999).   Statistics for Managers Using Microsoft Excel, 2nd Edition. Prentice-Hall:  Upper Saddle River, NJ, pages 453-454.

proportion is indicative of the proportion with an underpayment. The sample proportion that results in the largest sample size is 50% and is often viewed as the most conservative proportion, i.e., the proportion to use when the researcher does not want to make assumptions regarding the proportion. Once the sample proportion is designated, the desired margin of error and level of confidence dictate the necessary sample size for a statistically sound sample to make inferences about the population. Depending on the desired margins of error and the level of confidence, the number of retail employees required to be sampled may ultimately be a large portion of the population.

12.     Assuming a 50% proportion with a 95% confidence interval and margins of errors ranging between +/-2.5% and +/-5%, the number of employees to sample from the population of class members, would range between 1,486 and 381.[8] Of course, with a lower or higher assumed proportion, the necessary sample size will be reduced.

13.     To illustrate the effect of reducing the examination from 45,000 to a smaller number of employees, it is our understanding that for a sample of approximately 1,500 employees, based on information provided by Sprint, it is estimated that with 3 additional personnel working at least 45 hours a week in addition to the oversight of the subject matter experts, the minimum amount of time to extract the data would be 10 weeks, or approximately 1,500 man-hours. With the inclusion of the review process before data production, it is estimated that between 4 and 5 months will be required to complete the process. Once it has been determined that the data are accurate, the analysis of the transactions will be performed. After the data are produced, we estimate that a

---

[8] The sample will need to be designed such that a smaller proportion is initially identified because some of the sampled employees will be managers. In order to calculate the commissions for managers, the employees who report to them will also need to be included in the sample.

minimum of 3 to 4 months will be required to prepare the analysis that includes the programmatic review of each transaction line during the 6-year period for the sample.

14.    For a sample of 1,500, to complete the entire process including the extraction, review for accuracy and the analysis of the transactions, it is estimated that between 7 and 9 months of time will be required. This is a reduction of nearly 40% in the estimated time. Of course, if a smaller sample size is agreed upon for a margin of error less than +/-5%, the time frame could be further reduced.

15.    The mediation inquiry focused on 95 employees who held a non-managerial retail sales position between April 2006 and March 2008. For the 95, we analyzed over 5 million transactional lines of data from the Retail Management System (the point-of-sale system for Sprint). These transactional lines are returns, exchanges, and sales of phones and accessories, as well as sales of contracts and service changes (e.g., add-ons and phone service plans). We would estimate that the number of lines of point-of-sale data alone to be reviewed for a sample of 1,500 employees would be in excess of 75-100 million individual transactional lines due to the increased number of employees analyzed and the expanded time frame for analysis.

16.    Given the individual circumstances of each of these transactions, individual investigation is required. For example, for contract renewals, it is necessary to determine the customer's prior contract term and effective date to determine if the renewal is commissionable. Therefore, each contract renewal credited to a sales representative must be assessed with respect to the history of the particular customer.

17.    Additionally, Sprint maintains a system whereby a sales representative can request a review of certain types of transactions to determine if the employee received the

appropriate commission credit. Sprint then reviews the transaction that is the subject of the appeal. Sprint may determine by a review of the circumstances surrounding the transaction that the transaction was not commissionable. Alternatively, based on its review, Sprint may determine that the particular transaction is commissionable and that it has already been paid or that the transaction is commissionable and was not paid on. If the last situation occurs, Sprint pays the commission to the retail sales employee. Sprint also makes global adjustments to the commissions paid to retail sales employees. If Sprint pays on an appealed transaction and makes a global adjustment that also pays on the transaction, the same transaction could have been paid on twice. As a consequence, a review of the circumstances for each transaction must be made in the context of the different commissions plans, the customer's transactional history, and the transaction level commission review conducted by Sprint. These examples are just a highlight of the individual transaction analysis that will have to be conducted for every individual over a 6-year period.

18.    In conclusion, we estimate that the extraction, review and analysis of the transactions for the approximately 45,000 class members over the entire 6-year time period will require approximately 12 to 15 months of time to complete. Even if there are no issues with the analysis, the sheer computer processing time will require months given the enormity and complexity of the task at-hand. For a sample of approximately 1,500 class members, we estimate that the extraction, review and analysis of the transactions will require between 7 and 9 months of time, a reduction of nearly 40%. A sample size of 1,500 is ideal as it retains a low margin of error and reduces the time and resources considerably.

I have read the foregoing statement consisting of 18 paragraphs and swear that it

is true and accurate to the best of my knowledge and belief.

FURTHER THE AFFIANT SAYETH NOT.

Janet R. Thornton, Ph.D.

Subscribed and sworn to before me
this 29ᵗʰ day of April, 2011.

TRACY L. JOHNSTON
Notary Public - State of Florida
My Comm. Expires Nov 18, 2014
Commission # EE 14870
Bonded Through National Notary Assn

APPENDIX A



Tallahassee, FL
4901 Tower Court
Tallahassee, FL 32303

(850) 562-1211
(850) 562-3838  FAX

www.ersgroup.com

## Janet R. Thornton, Ph.D.
4901 Tower Court • Tallahassee, FL 32303 • (850) 562-1211, ext. 142
jthornton@ersgroup.com

## PROFESSIONAL EXPERIENCE:

**ERS GROUP**
- Director, ERS Group (April 2004 to present)

  Dr. Thornton specializes in analyzing employment, insurance, and credit decisions and has testified as an expert witness in federal court, state court, and administrative hearings.

  Dr. Thornton has prepared economic and statistical analyses involving allegations of gender, race, ethnicity, religious, and age discrimination in a variety of employment practices including selection, termination, and compensation.  She has prepared analyses for employers both proactively and in response to litigation and OFCCP audits.

  Dr. Thornton estimates economic damages and provides analysis of wage and hour claims as they relate to overtime (including misclassification), calculation of the regular rate of pay, and off-the-clock work issues including donning and doffing time.  She has provided expert witness testimony in wage and hour matters including a class action involving a large restaurant/retail chain.

  Dr. Thornton has provided expert witness testimony regarding simple and complex random sampling designs, has analyzed survey data, and has calculated and incorporated statistical error rates associated with sampling designs.  This expertise and her knowledge of complex databases has been used to help organize, manage, and process data for litigation including the use of sampling to identify anomalies in the organizations data processes.

  Dr. Thornton's expertise in the analysis of lending practices has led her to design monitoring software specifically tailored to meet her clients' needs.  She has prepared several reports and testified in class action lawsuits related to credit pricing issues.

- Vice President and Senior Research Economist (1998-2004)
- Senior Research Economist (1997-1998)
- Research Economist (1986-1997)
- Research Assistant (Summer 1985)
- Research Assistant (Summer 1984)

**ACADEMIC EXPERIENCE:**

**Florida State University**
- Instructor, Quantitative Methods for Business Decisions (2010)
- Instructor, Quantitative Methods and Statistics (2000-2001)
- Instructor, Economics (1984-1985)
- Instructor and Teaching Assistant, Economics (1982-1984)

**Georgia Southwestern College**
- Part-time Instructor (1985-1986)

**University of Central Florida**
- Research Assistant (1981)

## EDUCATION:

Ph.D., Florida State University, Economics, 1992.

M.S., Florida State University, Economics, 1985.

B.A., University of Central Florida, Economics and Political Science, 1981.

**HONORS AND AWARDS:**

Omicron Delta Epsilon (Economics)
Omicron Delta Kappa (National Leadership)
Pi Sigma Alpha (Political Science)
Phi Kappa Phi Honor Society
Scholarship to attend the Conference on Public Choice at the Center for Public Choice in Blacksburg, Virginia, 1983

**SPECIALIZATION:**

Labor and Natural Resource Economics

## PUBLICATIONS AND RESEARCH PAPERS:

"New Tools for the Calculation of Infringement Damages," (with Roy Weinstein and Paul White). Prepared for The Center of American and International Law, Plano, TX, October 2010.

"Weathering the Economic Downturn: Economic and Statistical Analysis for Layoffs," (with Fredrick Holt), EEO Insight, Vol. 1, Issue 3, 2009.

"Recent Developments in the Analysis of Employment Practices," (with Joan Haworth and Paul White), Developments in Litigation Economics, Eds. Patrick Gaughan and Robert Thornton.  Vol. 87 of Contemporary Studies in Economic and Financial Analysis.  Amsterdam: Elsevier, 2005.

"Minority and Female Owned Business Opportunity in Atlanta," (with Joan G. Haworth).  Prepared for the City of Atlanta, October 2000.



"Cohort Analysis and the Determination of Economic Damages Resulting from Employment Discrimination," (with Michael J. Piette).  Journal of Forensic Economics, Vol. VIII, No. 1, Winter 1995.

"Using New Labor Force Participation Rates When Computing Economic Damage and Loss: A Methodological Note," (with Michael J. Piette).  Journal of Legal Economics, Vol. 4, No. 2, Summer 1994.

"A Human Capital Approach to School Retention," Ph.D. Dissertation, Department of Economics, Florida State University, April 1992.

"The Use of Cohort Analysis in the Litigation Context," (with Michael J. Piette). Presented at the American Economic Association Meeting, New Orleans, LA, January 1992.

"Changes in Labor Force Participation Rates Over Time:  Some New Evidence From Census Data," (with Michael J. Piette).  Presented at the Southern Economic Association Meeting, Washington, D.C., November 1992.

## PRESENTATION AND TRAINING ENGAGEMENTS:

"Compensation Analyses and Pay Equity," presented at the Central/Space Coast Florida Industry Liaison Group Conference, March 2010.

"Basic Statistics and Applications in AA Plan Development, Adverse Impact and Compensation," a course for the American Association for Affirmative Action's PDTI training 2010, February 2010.

"Demystifying Compensation Analysis: Concepts & Challenges, Part II," a webinar for the American Association for Affirmative Action's PDTI 2009 Webinar Series, September 2009.

"Tools for Analyzing and Monitoring Compensation," presented at the Jacksonville Industry Liaison Group Conference, May 2009.

"Tools for Analyzing and Monitoring Compensation," presented at the Central/Space Coast Florida Industry Liaison Group Conference, April 2009.

"Demystifying Compensation Analysis: Concepts & Challenges," a webinar for the American Association for Affirmative Action's PDTI 2009 Webinar Series, March 2009.

"Weathering the Economic Downturn: Economic and Statistical Analysis for Layoffs," presented at the Jacksonville Industry Liaison Group Conference, "Preparing for Change: Hot Topics for 2009 and Beyond," February 2009.

"Tools for Analyzing and Monitoring Compensation," presented at the Southwest and Rocky Mountain Regional Industry Liaison Group Conference, "Fairness and Inclusion in a Changing Workforce," November 2008.

Presented at the Proskauer Rose LLP seminar "Navigating Wage and Hour Issues in California," Los Angeles, April 2008.



**ERS GROUP SEMINAR PRESENTATIONS:**

"2010 Compensation Tune-up: Are Your Pay Practices Ready for Challenges?" an ERS Group webinar, January 2010.

"Weathering the Economic Downturn: Economic and Statistical Analysis for Layoffs," an ERS Group webinar, January 2009 and December 2008.

"Compensation Tune-Up for 2007: Tools for Analyzing and Monitoring Compensation," an ERS Group webinar, February 2007.

"Analyzing and Monitoring Compensation in Today's Regulatory Environment," an ERS Group seminar, Washington, D.C. and San Francisco, 2005.

"Employment Discrimination:  Economic and Statistical Evidence," an ERS Group seminar.  Presented the following topics: "Commonly Used Statistical Techniques" and/or "Advanced Statistical Techniques: Compensation Analysis" and/or "Statistical Concepts: Modeling & Data Issues" and/or "Exposure and Liability: Calculating Damages." Washington, D.C. and New York, 2009; Washington, D.C. and New York, 2006; Washington, D.C. and New York, 2004; Washington, D.C. and New York, 2003; Chicago and New York, 2002; Dallas, 2001; New York and Los Angeles, 2000; Atlanta, Chicago, San Francisco, 1999; and Los Angeles, 1998.

## PROFESSIONAL ASSOCIATIONS AND MEMBERSHIPS:

American Economic Association

National Association of Forensic Economics

North Florida Committee on Foreign Relations

## COMPUTER LANGUAGES AND STATISTICAL PACKAGES:

Extensive knowledge and use of FORTRAN, SAS, and SPSS on mainframe and personal computers

Knowledge and use of FOCUS, BMDP, COBOL, and Pascal

Knowledge and use of Atlas Pro Software to construct thematic maps

## COMPUTER SYSTEMS:

IBM RS6000 Model 58H, operating in an IBM UNIX environment

IBM 3090-400 VM-CMS environment at the University of Florida, Gainesville, Florida

Concurrent Corporation/Perkin-Elmer at Economic Research Services, Inc., Tallahassee, Florida

Control Data Cyber 850 at the Florida State University, Tallahassee, Florida



# Janet R. Thornton, Ph.D.

## Testimony*

Gwen D. Carlson, et al. v. C.H. Robinson Worldwide, Inc. and Trevor Johnson, et al. v. C.H. Robinson Worldwide, Inc.; Case Nos. CV-02-3780 and CV-02-4261, U.S. District Court, District of Minnesota, Fourth Division. [declarations, depositions]

United States of America v. Alabama State Personnel Director, et al.; Case No. 68-T-2709-N, US District Court, Middle District of Alabama, Northern Division. [depositions, affidavit]

Clifford L. Whitaker, et al. v. 3M Company; Court File No. C4-04-12239, State of Minnesota District Court, County of Ramsey, Second Judicial District. [affidavits, deposition, hearing testimony]

Fannie Archer, et al. v. Nissan Motor Acceptance Corporation, et al.; Case No. 3:03cv 00906-HTW, U.S. District Court, Southern District of Mississippi. [deposition, declaration]

James W. Johnson v. The District Board of Trustees of Broward Community College, et al.; Case No. 06-60372-CIV-DIMITROULEAS, U.S. District Court, Southern District of Florida, Broward Division. [affidavit]

John H. Pinkowski, et al. v. 3M Company; Case No. 05-5668, U.S. District Court, District of New Jersey. [declaration]

Anna Diaz, et al. v. Schering Plough Corporation and Schering Corporation; Case No. UNN-L-1462-05, Superior Court of New Jersey, Law Division Union County. [deposition]

Carolyn Millender v. H. Councill Trenholm State Technical College and Anthony Molina; Case No. 2:07-cv-145-MHT, U.S. District Court, Middle District of Alabama, Northern Division. [affidavit]

Mirna E. Serrano, et al. v. Cintas Corporation, Case No. 04-CV-40132 consolidated for pre-trial proceedings with Blanca Nelly Avalos v. Cintas Corporation, Case No. 06-CV-12311, U.S. District Court, Eastern District of Michigan, Southern Division. [declarations, deposition]

Ahmed Elmaghraby, et al. v. Home Depot, U.S.A. and Edward Novak, et al. v. Home Depot, U.S.A. (consolidated); Case No. 04-cv-4100 (PGS), U.S. District Court, District of New Jersey. [affidavit]

Michael Richards v. Johnson & Johnson, Inc. and Johnson & Johnson Consumer Products Companies; Case No. 05-CV-3663 (KSH), U.S. District Court, District of New Jersey. [affidavit]

United States of America v. Jefferson County, Alabama, et al.; Case No. CV-75-S-666-S, U.S. District Court, Northern District of Alabama, Southern Division. [deposition, affidavit]

Dennis Ham, et al. v. City of Atlanta, et al. and Russell E. Martin, et al. v. City of Atlanta, et al.; Case Nos. 1:07-CV-0309-BBM and 1:07-CV-00326-BBM, U.S. District Court, Northern District of Georgia, Atlanta Division. [deposition]

Johnny Reynolds, et al. v. Alabama Department of Transportation, et al.; Case No. CV-85-T-665-N, U.S. District Court, Middle District of Alabama, Northern Division. [affidavits]

Lee Lewis, et al. v. Smithfield Packing Company, Inc. and Jerry Parker, Wilbert Tatum, Dannie King, Jr. and Alexander Herring, et al. v. Smithfield Packing Company, Inc.; Case Nos. 7:07-CV-00166-H and 7:07-CV-00176-H, U.S. District Court, Eastern District of North Carolina, Southern Division.  [deposition, declarations]

Carol Bell v. Lockheed Martin Corporation; Case No. 08-6292, U.S. District Court, District of New Jersey. [declaration]

Melissa C. Butterworth v. Laboratory Corporation of America Holdings; Case No. 3:08-CV-411-J-33JRK, U.S. District Court, Middle District of Florida, Jacksonville Division. [deposition]

Greater New Orleans Fair Action Housing Center, et al. v. United States Department of Housing and Urban Development, et al.; Case No. 1:08-cv-1938-HHK, U.S. District Court, District of Columbia. [declaration]

Shirley Craig, et al. v. Rite Aid Corporation and Eckerd Corporation d/b/a Rite Aid; Case No. 4:08-CV-02317, U.S. District Court, Middle District of Pennsylvania. [declarations]

Pamalon Rollins, et al. v. Alabama Community College System, et al.; Case No. 2:09-cv-636-WHA, U.S. District Court, Middle District of Alabama, Northern Division.  [deposition]

Shana L. Kennedy, et al. v. Virginia Polytechnic Institute and State University; Case No. 7:08-cv-00579, U.S. District Court, Western District of Virginia. [hearing testimony, trial testimony]

Ginger Hooper and Larry Marshall v. Total System Services, Inc.; Case No. 4:08-cv-159, U.S. District Court, Middle District of Georgia. [deposition]

Justin Bell, et al. v. Citizens Financial Group, Inc., RBS Citizens, N.A. (d/b/a/ Citizens Bank), and Citizens Bank of Pennsylvania (d/b/a/ Citizens Bank); Case No. 10-CV-00320-GLL, U.S. District Court, Western District of Pennsylvania. [affidavit]