IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

|  |  |
|---|---|
| ROXIE SIBLEY, JEANNE NOEL, ERNESTO BENNETT, JAMIE WILLIAMS, GREG ST. JULIEN, TRACIE HERNANDEZ, JOHN JASINSKI, JAY RICHIE, and TEISHA KING, individually and on behalf of a class of others similarly situated,<br><br>      Plaintiffs,<br><br>      v.<br><br>SPRINT NEXTEL CORPORATION, a Kansas corporation<br><br>      and<br><br>SPRINT/UNITED MANAGEMENT COMPANY, a Kansas corporation<br><br>      Defendants. | Case No. 02:08-CV-02063-KHV/JPO |

**AFFIDAVIT OF JANET R. THORNTON, Ph.D.**

**STATE OF NEW YORK**    )
              ) ss.
**COUNTY OF NEW YORK**   )

Dr. Janet R. Thornton, affiant, affirms under oath as follows:

1. I am a labor economist with a Ph.D. in Economics (1992) from Florida State University. I am currently a Managing Director at ERS Group,[1] where I have been employed since 1986. ERS Group is a consulting firm that engages in research on economic issues. My fields of special interest include computer analysis of large databases, applied econometrics and

---

[1] ERS Group (ERS) is a SourceHOV company and provides quantitative analysis of economic decisions to a variety of clients, including individuals, corporations, universities and government agencies. If additional information is obtained that is relevant to this affidavit, it may need to be modified or supplemented.

1

statistical analysis, particularly in the field of labor economics. I have provided expert testimony in arbitration hearings and before federal and state courts and regulatory agencies at the request of both plaintiffs and defendants and no court has rejected me as an expert qualified to testify in my fields. My billing rate is $475 an hour. I previously provided my curriculum vitae and list of testimony for the prior four years.

2.  I make this declaration on personal knowledge, after review of <u>Plaintiffs' Memorandum in Opposition to Defendants' Motion for Summary Judgment</u> including the underlying exhibits. Specifically, I have been asked to review and respond to the declaration of plaintiffs' expert, Nile L. Nickel,[2] regarding his review of my affidavit.[3]

### Approach Used for Analysis of Named Plaintiffs' Commissions

3.  Mr. Nickel's declaration states, without supporting documents and data, that when I conducted the analysis of the transactions relevant to the named plaintiffs, that I "simply selected transactions from the RMS Point-of-Sale system that contained the employee identifiers for those individuals."[4] He further states, without supporting documents and data, that because "RMS Point-of-Sale data is missing transactions and employee identifiers...data from Defendants' other commissions-related systems must be searched for evidence of transactional data that potentially relates to the named-plaintiffs and the class."[5] Mr. Nickel concludes, without supporting documents and data, that I "did not do this, and therefore [my] damages calculation is not accurate, but simply repeats the errors and omissions that lead to the underpayments in the first place."[6]

---

[2] Doc. No. 292-18, N. Nickel Decl., dated Jan. 11, 2012, hereafter "Nickel Declaration."
[3] Doc. No. 282-2, J. Thornton Aff., dated Dec. 16, 2011, hereafter "Thornton Affidavit."
[4] Nickel Declaration, ¶ 13.
[5] Ibid., ¶¶ 18 and 19.
[6] Ibid., ¶ 20.

4. Mr. Nickel is misinformed as to the methodology that I used to determine the commissions for each of the named plaintiffs. I did not rely solely on the RMS point-of-sale system for my study nor did I ignore the data from the other commissions-related systems as he asserts.

5. Instead, my affidavit clearly states that I relied on the other commissions-related data to prepare my study of the named plaintiffs' commissions. Specifically, in paragraph 61 of my affidavit, I describe the process of comparing the information contained in each plaintiff's Order Detail Report ("ODR") to the RMS information.[7]

> Additionally, I matched the transactions in RMS to the Order Detail Report ("ODR") which is utilized by employees to review the transactions processed by the commission system. This comparison allowed us to determine *if there were transactions in the ODR not in RMS* [emphasis added] and vice versa. Individual review of transactions that did not readily match was required in order to determine if there were transactions that were not included in RMS or, alternatively, did not appear in ODR. My calculations considered the transactions in RMS as well as the transactions in ODR in order to be *potentially overly inclusive in my calculations* [emphasis added] of the commissions.[8]

As a consequence, Mr. Nickel's conclusions regarding the employee identifier and the processes I used to calculate commissions are inaccurate and misinformed.

**Agent Codes**

6. Plaintiffs' expert states, without supporting documentation and data, that I ignore the documented problems associated with agent codes when preparing my analysis for the nine named plaintiffs.[9] First, I have reviewed the exhibits to Ms. Fisher's declaration and the agent code referenced in these documents is the agent/dealer code used in the Ensemble billing system, not RMS. Second, for retail customer transactions, the agent code[10] refers to the store location

---

[7] It should be noted that a review of the underlying information I produced in connection with my affidavit shows that before making the comparison from RMS to ODR, I matched the data from Valid Transactions to ODR to prepare a complete set of transactions from Sprint's commissions system.
[8] Thornton Affidavit, ¶ 61.
[9] Nickel Declaration, ¶ 16.
[10] The agent code in Ensemble is the "dealer code".

3

and *not* the employee id. Thus, the agent code referred to in the exhibits is the store location in the Ensemble billing system for retail customer transactions.

7. The approach that I used to match RMS transactions with Ensemble in order to identify upgrades and activations for the nine named plaintiffs did not rely upon the agent code. Rather, I relied on the customer information for the matching.[11] As a consequence, Mr. Nickel's statements regarding the agent code and employee identifiers, made without supporting documents and data, are not relevant to my analyses of the nine named plaintiffs.

**Adjustments to Commissions**

8. The exhibits cited by plaintiffs describe the volume of appeals and the payment of the upgrades, contract renewals, and other transactions that were found to be commissionable. When there is a delay between the sale and the month of payment or when there is a recalculation, the details of the adjustment will not appear on a named plaintiff's ODR. Instead there will be a single line-item on the monthly compensation statement, indicating an adjustment.[12] The following information summarized from my affidavit,[13] shows that each of the named plaintiffs received adjustments that were not itemized on their ODR. The sales reps averaged over $700 in adjustments while the managers averaged over $3,200 in adjustments.[14]

---

[11] Thornton Affidavit, ¶ 62.
[12] Thornton Affidavit, ¶ 54.
[13] Ibid., ¶ 72 Table 12, ¶ 79 Table 14, ¶ 85 Table 16, ¶ 91 Table 18, ¶ 97 Table 20, ¶ 103 Table 22, ¶ 109 Table 23, ¶ 118 Table 24, and ¶ 125 Table 26.
[14] My affidavit (Thornton Affidavit) did not include 2005 plan year adjustments because a review indicated that these were primarily related to events other than commissionable transactions. For example, Ernesto Bennett received a $1,625 Hurricane Katrina guarantee adjustment in Fall 2005.

**Adjustments of Named Plaintiffs Not Appearing on ODR**

| Plaintiff | Plan Year | Adjustment Amount |
|---|---|---|
| Ernesto Bennett | 2006 | $613 |
| | **Total** | **$613** |
| Teisha King | 2006 | $426 |
| | 2007 | $513 |
| | 2008 | $303 |
| | **Total** | **$1,242** |
| Roxie Sibley | 2006 | $485 |
| | 2007 | $456 |
| | 2008 | $422 |
| | **Total** | **$1,363** |
| Jeanne Noel (Guidry) | 2006 | $21 |
| | 2007 | $812 |
| | 2008 | $142 |
| | **Total** | **$975** |
| Gregory St. Julien | 2007 | $71 |
| | **Total** | **$71** |
| Jamie Williams | 2006 | $170 |
| | **Total** | **$170** |
| Jay Richie | 2006 | $3,684 |
| | 2007 | $281 |
| | **Total** | **$3,965** |
| John C. Jasinski | 2006 | $430 |
| | 2007 | $644 |
| | 2008 | $1,422 |
| | **Total** | **$2,496** |
| Tracie Guthrie Hernandez | 2006 | $1,039 |
| | 2007 | $4,110 |
| | 2008 | $1,243 |
| | **Total** | **$6,392** |

**Appeals of Named Plaintiffs**

9. Plaintiffs also rely on exhibits that cite to the volume of appeals made by sales reps. These same documents show that 8% of the appeals were valid. Further, from these valid appeals, 80% of the resulting adjustments to commissions were less than $50.[15] A review of the named plaintiff appeals shows that no appeals were submitted from November 2008 forward. Thus, for the period from November 2008 through the end of the 2008 plan year, September 2009, no appeals were submitted by the named plaintiffs.[16]

10. Ms. Hernandez, who managed many of the named plaintiff sales reps, has a pattern of appeals that suggests that she did not submit appeals in every month, contrary to her testimony.[17] Additionally, her appeals appear to occur in particular months and in the vast majority of the months, she did not have an appeal.[18]

---

[15] Doc. No. 292-10, Sales Operations Commissions Project, Initiative Impact Analysis at SPRSIB-2645074; Doc. No. 292-3, Sales Compensation Program Diagnostic at SPRSIB-0009974.
[16] Thornton Affidavit, ¶ 69 Table 11, ¶ 76 Table 13, ¶ 82 Table 15, ¶ 88 Table 17, ¶ 94 Table 19, ¶ 100 Table 21, and ¶ 123 Table 25.
[17] Doc. No. 284-2, N. Eichberger Decl., Ex. Y, T. Hernandez Deposition, dated Jan. 20, 2010, page 243, lines 8-11.
[18] Thornton Affidavit, ¶ 123 Table 25.

**Ms. Hernandez's Appeals by Year/Month**

| Year/Month of Appeal | Number of Appeals | Year/Month of Appeal | Number of Appeals |
|---|---|---|---|
| 2006-September | 0 | 2008-April | 23 |
| 2006-October | 0 | 2008-May | 19 |
| 2006-November | 0 | 2008-June | 0 |
| 2006-December | 0 | 2008-July | 15 |
| 2007-January | 0 | 2008-August | 0 |
| 2007-February | 0 | 2008-September | 7 |
| 2007-March | 0 | 2008-October | 21 |
| 2007-April | 0 | 2008-November | 0 |
| 2007-May | 0 | 2008-December | 0 |
| 2007-June | 0 | 2009-January | 0 |
| 2007-July | 41 | 2009-February | 0 |
| 2007-August | 0 | 2009-March | 0 |
| 2007-September | 19 | 2009-April | 0 |
| 2007-October | 38 | 2009-May | 0 |
| 2007-November | 0 | 2009-June | 0 |
| 2007-December | 0 | 2009-July | 0 |
| 2008-January | 42 | 2009-August | 0 |
| 2008-February | 54 | 2009-September | 0 |
| 2008-March | 59 | | |
| Average Number of Appeals Per Month: 9.14 | | | |

**Conclusion**

11. I have reviewed the declaration of Mr. Nickel and <u>Plaintiffs' Memorandum in Opposition to Defendants' Motion for Summary Judgment</u> as well as the supporting exhibits. Based on this review, my conclusions remain unchanged, i.e., the named plaintiffs were overpaid commissions during the time period examined.[19]

---

[19] The exhibits cited by the named plaintiffs state "Net overpayments for all channels is $27,940,866, the majority of which is unrecoverable." Doc. No. 292-3, Sales Compensation Program Diagnostic at SPRSIB-0010013.

I have read the foregoing statement consisting of 11 paragraphs and swear that it is true and accurate to the best of my knowledge and belief.

FURTHER THE AFFIANT SAYETH NOT.

_____
Janet R. Thornton, Ph.D.

Subscribed and sworn to before me
this 26 day of January, 2012.         _Caroline Ross Huber_____

CAROLINE ROSS HUBER
Notary Public, State of New York
No. 01HU6236811
Qualified in New York County
Commission Expires March 7, 2015