# Exhibit 3

# ROGERS & HARDIN

**ATTORNEYS AT LAW**
A LIMITED LIABILITY PARTNERSHIP

J. TIMOTHY MC DONALD
DIRECT: (404) 420-4621
DIRECT FAX: (404) 230-0955
EMAIL: JTM@RH-LAW.COM

2700 INTERNATIONAL TOWER, PEACHTREE CENTER
229 PEACHTREE STREET, N.E.
ATLANTA, GEORGIA 30303-1601
(404) 522-4700
FACSIMILE: (404) 525-2224

February 13, 2009

VIA ELECTRONIC MAIL

Michele R. Fisher, Esq.
Nichols Kaster PLLP
4600 IDS Center
80 South 8th Street
Minneapolis, MN 55402

    Re:    Sibley, et al. v. Sprint Nextel Corporation and
                  Sprint/United Management Company

Dear Michele:

       Thank you for your e-mail of February 9, 2009, regarding Defendants' upcoming production of data pursuant to the Court's Amended Scheduling Order (Doc. No. 114). I write in response to that e-mail, as well as in advance of our call scheduled for today, February 13, 2009. This letter sets forth Defendants' proposal regarding the commission-related data that Defendants' will produce at the end of this month. (See Doc. No. 114 ¶ 2.e ("By February 27, 2009, defendants shall produce to plaintiffs the commission related data the parties agree is necessary for the six named plaintiffs who held non-supervisory positions.").) It also responds to the points raised in your February 9th e-mail. Nothing in this letter is intended to waive any of Defendants' general or specific objections to Plaintiffs' discovery requests. It represents instead a significant production well beyond the scope of the issues to be litigated.

**The Court-Ordered Discovery Plan**

       As you know, the Amended Scheduling Order sets forth the following three-stage plan for discovery of commission-related data in this case:

        Stage 1:    By February 27, 2009, Defendants will produce the commission-related data for the six non-manager named Plaintiffs (the "Production Plaintiffs") that "the parties agree is necessary";

        Stage 2:    Plaintiffs then have until June 15, 2009, to review the data produced by

# ROGERS & HARDIN
A LIMITED LIABILITY PARTNERSHIP

Michele R. Fisher, Esq.
February 13, 2009
Page 2

> Defendants and to specify the commission-related data that they think they will need to analyze commissions for the entire class; and
>
> Stage 3: Defendants then have until September 21, 2009, to produce commission-related data that "the parties agree is necessary for the entire class."

(See Doc. No. 114 ¶¶ 2.e-g.)

By giving Plaintiffs an opportunity to review commission-related data for the Production Plaintiffs *before* Defendants commence production of class-wide data, this plan was intended to minimize the substantial time and cost that class-wide discovery in this case will impose. The entire purpose of Stage 2—when Plaintiffs have three-and-a-half months to review the data produced for the Production Plaintiffs—is to allow Plaintiffs to review the data to identify the particular data sets that "they believe they will need to perform their analysis for the entire class." (Doc. No. 114 ¶ 2.f.) Stage 2, therefore, was not intended to be the period during which Plaintiffs would complete an analysis of whether any commissions that allegedly should have been paid were not paid, but rather was intended to be the period during which Plaintiffs review the sample data for the Production Plaintiffs to identify exactly what data they think they will need "to perform their analysis." (Id.) The Court, in other words, envisioned Plaintiffs' analysis of the commission-related data produced by Sprint happening *during Stage 3*.

Requiring Defendants to produce any commission-related data for the entire class before Stage 3 would defeat the purpose of the Court-ordered discovery plan. The sheer size of what Plaintiffs have asked for at Stage 1 bears this out, as we will explain in more detail below.

### Defendants' Proposed Production of Stage 1 Data

Defendants propose producing the following data by February 27, 2009[1]:

**(1) Order Data:** To the extent that Defendants have not already produced it, Defendants will produce order data for the Production Plaintiffs. This data will include the point-of-sale, walk-in, service-change, and contract feeds from RMS; data from the GERS point-of-sale system; and data from the Daily Sales Collector.

Plaintiffs do not need order data for anyone other than the Production Plaintiffs at Stage 1 of discovery because Plaintiffs can accomplish the purpose of Stage 2—identifying the data sets that Plaintiffs think they will need to perform their analysis of Sprint's commission payments—

---

[1] For most of the data sets that Defendants produce, the data will go through September 30, 2008. That is not because Defendants contend that data from after September 30, 2008, is not relevant to this case, but rather is a result of the process through which Defendants have pulled the data. In any event, data through September 30, 2008, will give Plaintiffs enough information to determine what data sets they think they will need to analyze commissions for the entire class.

## ROGERS & HARDIN
A LIMITED LIABILITY PARTNERSHIP

Michele R. Fisher, Esq.
February 13, 2009
Page 3

using only data for the Production Plaintiffs. Nevertheless, Defendants are willing to consider producing order data for the stores in which the Production Plaintiffs worked, but for such a production to be possible, Plaintiffs would have to agree to an extension of the February 27th deadline for Stage 1.

It appears that Plaintiffs misunderstand what the RMS data does and does not contain. You stated in your February 9th e-mail that Plaintiffs "provided [Defendants] with information about how [Plaintiffs'] data experts can link [RMS] data to [the] Plaintiffs even if the [RMS] records do not contain their agent id code." I assume you are referring to your December 29, 2008 letter, in which you described your expert's "matching" process. Setting aside the fact that in both of the hypothetical "matching" examples described in your December 29th letter the transactions would have been processed correctly (they showed up in the ODR records of hypothetical salesperson 123456, after all), many of the RMS "fields" described in your letter simply do not exist or, if they do exist, do not contain the data that your letter suggests they may contain. For example, your letter includes an "Act Date" field in the table of RMS fields. But there is no activation-date field in Sprint's RMS system, as Sprint records activations in the billing system, not in RMS.[2] Similarly, the "Trans Type" field in your letter has a value of "Activation." The actual "Transaction Type" field in RMS, however, would only contain one of three values: 100 (which indicates a sale), 200 (which indicates a return), or 600 (which indicates an exchange).[3]

In light of these misunderstandings, the Court's three-stage discovery process is particularly appropriate. Stages 1 and 2 of that process is meant to give Plaintiffs an opportunity to try to become familiar with Sprint's commissions-related data, including the RMS data. The order data that Defendants have produced to produce at Stage 1 will fulfill that purpose by allowing Plaintiffs to correct some of their misunderstandings about the RMS data, as well as any misunderstandings they may have about the other data sets.

**(2) Billing Data:** Your February 9th e-mail indicates that Plaintiffs do not want us to provide any billing data at this time. While that is fine with us, that choice may eventually lead to unnecessary delay, so we will continue to work towards providing some billing data in case Plaintiffs have a change of heart. Plaintiffs' position may also be based on your understanding of what I said during our telephone call on Monday, February 9, 2009, but your February 9th e-mail does not reflect what I said we were doing regarding billing data.

During our February 9th call, I indicated to you that we were still trying to figure out the best way to provide Plaintiffs with a sample of the billing data, and that we were working from

---

[2] For reference purposes, see, for example, the "RMS Results" tab of SPRSIB-0000001, which (as we previously explained in our September 24, 2008 letter to you) shows the fields in the RMS system.
[3] We also explained this in our September 24th letter (on page 7).

# ROGERS & HARDIN
A LIMITED LIABILITY PARTNERSHIP

Michele R. Fisher, Esq.
February 13, 2009
Page 4

the *entire universe* of billing data to do so. The set of billing data from which we are working is very large—the data is approximately 1.7 terabytes in size and consists of approximately 3.4 billion records—and Defendants are not physically capable of filtering that data down to a set of billing data from the relevant time period for any particular employees or stores by February 27, 2009. Defendants cannot produce employee- or store-specific billing data by this deadline because of the manner in which the historical billing data is stored: by time period—for Ensemble, the data is stored in files that contain approximately one day of data; and for P2k, the data is stored in files that contain approximately one month of data.

Defendants can, however, readily produce billing data from a limited time period. Defendants therefore propose producing (i) all billing data nation-wide from the Ensemble billing system for one discrete two-week period, and (ii) all billing data nation-wide from the P2K billing system for one discrete one-month period. (These productions would be without regard to whether the billing data relates to a Production Plaintiff.) Sprint should be able to process, review, and produce this limited set of data by February 27, 2009. These limited sets of billing data will be more than sufficient for Plaintiffs to determine whether they think they will need additional billing data to perform their class-wide analysis.

Of course, if, as previously noted, Plaintiffs do not want any billing data at this time, that is acceptable, but we are prepared to make the above production.

**(3) Order Detail Report Data:** To the extent that Defendants have not already produced it, Defendants will produce ODR data from the relevant time period for the Production Plaintiffs.

Plaintiffs have no need for ODR data for anyone other than Production Plaintiffs at Stage 1 of the discovery plan. Plaintiffs certainly do not need nation-wide ODR data, and it would be unduly burdensome for Defendants to have to collect and produce nation-wide ODR data. Based on the size of the ODR data sets that Defendants have already produced to Plaintiffs, our current estimate is that a nation-wide production of ODR data from the relevant time period for the approximately 35,000 class members would measure 2.6 terabytes in size and contain over 3 billion records.[4] In light of the limited purpose of Stage 2, collecting, reviewing, and producing a data set of that size would be per se unduly burdensome.

As for the suggestion that your "data experts" need to talk to Defendants' "data folks" to "look at the maps for the ODR system," we do not understand your reference to "maps." Plaintiffs have already seen the fields in the ODR data that Defendants have produced to date, and Plaintiffs will see those fields again in the data that Defendants produce by February 27,

---

[4] This is an estimate based only on the size of the ODR data files Defendants have already produced. If we are able to get a more precise estimate of the size of the ODR data, we will provide it to Plaintiffs.

**ROGERS & HARDIN**
A LIMITED LIABILITY PARTNERSHIP

Michele R. Fisher, Esq.
February 13, 2009
Page 5

2009. Based on those fields, Plaintiffs can identify for Defendants what fields they would like to be produced on a class-wide basis.

If Plaintiffs have questions about the ODR data different from those described here, please let us know. One of the problems that we have had in responding to Plaintiffs' requests is that we often need to talk to different people at Sprint to get answers to Plaintiffs' questions, which means that it is not a simple matter of putting Sprint's "data folks" on the phone. To facilitate this, we have had on each call two of our firm's data experts, who know the path to the answers to most questions efficiently.

(4) **Valid Transaction Data:** Defendants will produce the Valid Transaction data from the relevant time period for the Production Plaintiffs. Defendants are investigating how burdensome it would be to produce the Valid Transaction data from the relevant time period for the stores in which the Production Plaintiffs worked.

(5) **Quota Data:** To the extent that Defendants have not already produced it, Defendants will produce quota records from the relevant time period for the Production Plaintiffs.

(6) **Appeals Data:** To the extent that Defendants have not already produced it, Defendants will produce records of appeals by the Production Plaintiffs.

(7) **Compensation Data:** To the extent that Defendants have not already produced it, Defendants will produce records of commission-related compensation paid to the Production Plaintiffs during the relevant time period.

(8) **Human Resources Data:** To the extent that Defendants have not already produced it, Defendants will produce records of the job code(s) that applied to the Production Plaintiffs, as well as the date(s) on which the code(s) became effective. If a class member held more than one job code, Plaintiffs will be able to determine when the class member's time in each job code ended by reference to the effective date of the member's next job code. For example, if a class member held job code X and job code Y in succession during the relevant time period for this case, and job code Y has an effective date of June 15, 2007, then the last date that the class member held job code X would have been June 14, 2007.

Regarding the leave-of-absence data, I said that I did not know why you asked for it or why it would be needed, given the scope of Plaintiffs' claims, as articulated by Plaintiffs. I did not say that the data was definitely not needed in this case.

**Security Issues**

In the Stage 1 production, Defendants will be producing very sensitive customer information that, in some instances, is protected by federal law. We therefore need to know the security policies that Plaintiffs (and their consultants) will have in place to safeguard the data. In

**ROGERS & HARDIN**
A LIMITED LIABILITY PARTNERSHIP

Michele R. Fisher, Esq.
February 13, 2009
Page 6

particular, we would like to know the following:

(1) Where will the data be stored and what physical security will be in place to prevent unauthorized access to both the media on which the data will be transferred to Plaintiffs and the computers or other media on which the data will be housed by Plaintiffs?

(2) What encryption, password policy, and other security measures will Plaintiffs have in place for any computers (portable or otherwise) or databases on which the data will be housed?

(3) Will the data be accessible through the internet or other means of remote access? If so, what policy will Plaintiffs have in place to prevent unauthorized remote access to the data?

**********************

Thank you again for e-mail of February 9, 2009. If Plaintiffs agree to Defendants' proposed production of data for Stage 1, as described herein, please let us know at your earliest convenience. If Plaintiffs have any counter-proposals in advance of our call on February 13, 2009, please forward those proposals to us. Otherwise, we will plan to answer questions about this proposal during the February 13th call.

Very truly yours,

*[signature]*

J. Timothy Mc Donald