IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

ROXIE SIBLEY, et al.,                          )
                                               )
                    Plaintiffs,                )
                                               )
v.                                             )          Case No. 08-2063-KHV
                                               )
SPRINT NEXTEL CORPORATION,                     )
et al.,                                        )
                                               )
                    Defendants.                )

## ORDER

Plaintiffs in this class action are current and former employees of defendants' retail stores.  Plaintiffs complain that problems with defendants' computer systems led to the failure by defendants to pay plaintiffs' earned commissions in violation of the Kansas Wage Payment Act and various breach-of-contract theories.  Plaintiffs have filed a motion asking the court to enter a protective order quashing a deposition notice implicitly directed to plaintiffs' expert before his expert report has been produced **(doc. 311)**.  Because the court finds the deposition notice to be premature, plaintiffs' motion is granted.[1]

---

[1]Defendants have filed a motion for leave to file a surreply to briefing on the instant motion **(doc. 321)**.  Defendants state that they wish to inform the court of an offer of compromise made to plaintiffs but which plaintiffs rejected.  The local rules do not contemplate the filing of surreplies.  *See* D. Kan. Rule 7.1(c).  Surreplies are disfavored and will only be permitted in exceptional circumstances, such as when new material is raised for the first time in the movant's reply.  *See Locke v. Grady Cnty.*, 437 F. App'x 626, 633 (10th Cir. 2011); *Drake v. Cox Commc'ns, Inc.*, No. 10-2671, 2011 WL 2680688, at *5 (D. Kan. July 8, 2011).  Defendants have pointed to no new material raised in plaintiffs' reply brief

This case is in the third phase of discovery. Pursuant to the Fourth Amended Scheduling Order (doc. 227), defendants produced commission-related data for the 42,000 to 45,000 class members at the end of December, 2011. Plaintiffs hired experts to analyze the class-wide data and to reach a damages calculation for each class member. The reports of the parties' experts are due by May 21, 2012.

Plaintiffs have represented on a number of occasions that their experts are creating an automated system to analyze the massive amount of class-wide data produced by defendants. In response to a previously filed motion, plaintiffs submitted the declaration of their retained expert Nile Nickel, president of Balance Engines LLC. Mr. Nickel explained the creation of the automated system as follows:

> Because of the missing data and other problems with Defendants' commission system, we have created automated processes to search not only the Point-of-Sale system data for commissionable transactions, but to also search Defendants' various other systems' classwide data for fragments of transactions that do not appear in the Point-of-Sale system. . . . We have developed an automated process to analyze all data related to a transaction found throughout Defendants' various systems to determine if the transaction is commissionable or not, whether Defendants paid the commission properly, and whether additional compensation is due. We tested this automated process on the mediation sample and have spent considerable time refining and preparing it and our systems to handle the data for the entire class . . . . The system we have built is set up to search class-wide data to find, for instance, transactions that relate to one another but may not have the correct employee identification numbers. We have set up our systems to standardize, process, and import the class-wide data, have developed intricate coding to

nor any other exceptional circumstance that would justify a surreply. Thus, defendants' motion for leave to file a surreply is **denied**. In any event, the arguments in defendants' proposed surreply would not alter the court's ruling on plaintiffs' motion.

analyze and search the class-wide data, and have prepared a reporting mechanism to explain our results.[2]

On March 7, 2012, defendants served plaintiffs with a deposition notice listing five topics related to the automated system created by Mr. Nickel and his staff.  Defendants seek to depose the "person(s) most knowledgeable concerning the following topics:"

(1)  The "automated system," or "mechanical" process, Plaintiffs have purportedly created to "standardize, process, and import the class-wide data." (Doc. No. 224, pp. 7-8; see also Doc. No. 292, pp. 17-20 & 24-27.)

(2)  The "automated system," or "mechanical" process, Plaintiffs have purportedly created to search, analyze, and review commission-related data in this litigation in order to "produce a report identifying the amount of damages for each class member," including, but not limited to, the design, development, costs, components, coding, assumptions, connections, processes, reporting mechanisms, implementation (including, but not limited to, implementation of the compensation plans), and functions of this "automated system." (Id.)

(3)  The "automated system," or "mechanical" process, Plaintiffs have purportedly created and its relationship and its implementation with respect to Plaintiffs' trial plan set forth in Plaintiffs' July 29, 2011, Supplemental Responses to Defendants' Interrogatories, Set III, Nos. 3 & 4.

(4)  The design, development, and revisions of Plaintiffs' deposition exhibits Rassette Exhibit 1 and McKinney Exhibit 1, including, but not limited to, the relationship of the exhibits' design, development and revisions with respect to Paragraphs 1, 2, and 3.[3]

_____

[2]May 10, 2011 declaration of Nile Nickel, doc. 224-2 at 2–3.  See also Jan. 11, 2012 declaration of Nile Nickel, doc. 292-18 at 2 ("I have spent several years setting up a system to analyze commissions data for the entire class to determine commissions due.")

[3]The exhibits referenced are versions of a diagram prepared by Mr. Nickel that represents his understanding of defendants' commission systems.  Plaintiffs state that they have modified the diagram several times as they learn more about how defendants' systems functioned.  Doc. 312 at 10.

(5) The underlying basis and foundation for the Declaration of Nile L. Nickel, dated January 11, 2012 and purportedly submitted pursuant to Rule 56(d) in support of Plaintiffs' Memorandum in Opposition to Defendants' Motion for Summary Judgment (Doc. No. 292-18), which Plaintiffs maintain "is not an expert report as contemplated either by Rule 26(a)(2) or the scheduling order." (Doc. No. 305, pp. 2-4 & 7-9.)[4]

Plaintiffs ask the court to enter a protective order that quashes the deposition notice. Plaintiffs assert that the notice "is directed to Mr. Nickel and information pertaining to his forthcoming expert analysis."[5] Plaintiffs do not object to the topics in the notice, but rather to the timing of the deposition, i.e., before Mr. Nickel provides his expert report.

Fed. R. Civ. P. 26(b)(4)(A) governs the timing of expert depositions.  It states,

A party may depose any person who has been identified as an expert whose opinions may be presented at trial.  If Rule 26(a)(2)(B) requires a report from the expert, *the deposition may be conducted only after the report is provided*.[6]

The advisory committee notes to Rule 26 suggest that requiring "a complete and detailed report of the expected testimony" first may eliminate the need for—or at least reduce the length of—some depositions.[7]

Defendants assert that Rule 26(b)(4)(A) does not apply because their deposition notice is not specifically directed at Mr. Nickel and "does not seek expert analysis or

---

[4]Doc. 312-2.

[5]Doc. 312 at 10.

[6]Fed. R. Civ. P. 26(b)(4)(A) (emphasis added).

[7]Fed. R. Civ. P. 26, 1993 advisory committee notes.

testimony."[8]  Defendants note that the deposition notice is directed to "the person(s) most knowledgeable" and argue that it seeks testimony "on various factual issues regarding Plaintiffs' general 'automated system' ('model data system') and 'mechanical process.'"[9] According to defendants, they "seek the underlying factual information regarding the set-up, creation, and functions of Plaintiffs' already-created model data system—the building of the model data system and the manner in which it operates (non-expert factual discoverable information), as opposed to conclusions/results regarding the analyzed data after the data is put into the model data system (expert opinion)."[10]

The error in defendants' analysis, however, is in characterizing the building and operation of the automated data system as purely "factual."   Labeling the information sought as "non-expert factual discoverable information" does not make it so.   To the contrary, the court agrees with plaintiffs that each of the noticed topics directly pertains to Mr. Nickel's work in his capacity as plaintiffs' expert.

Mr. Nickel was hired by plaintiffs in 2008 to process and analyze the commissions data produced by defendants, and to provide a damages calculation.[11]  Due to the large volume of data involved, Mr. Nickel developed, and continues to refine, a computer system

---

[8]Doc. 314 at 1.

[9]*Id.* at 2.

[10]*Id.* at 2–3.

[11]Doc. 292-18.

to perform the calculations.  As explained in his January 11, 2012 declaration, Mr. Nickel created plaintiffs' automated system by "reviewing Defendants' document production, analyzing Defendants' compensation plans, creating commissions matrices, coding our system to implement the commission rules for our analysis, and setting up our system to analyze the voluminous Stage 3 class data and produce the damages report."[12]  Mr. Nickel states that he has refined the automated system after analyzing sample data and gaining a better understanding of the case.[13]  This explanation makes it clear that plaintiffs' automated system itself—including why and how it was created and how it functions—is part and parcel of Mr. Nickel's expert opinions.  In creating the automated system, Mr. Nickel made decisions about how the system should function (in his opinion) to properly account for the commissions owed class members.[14]  Thus, plaintiffs' automated system necessarily reflects Mr. Nickel's methodology for performing the damages calculations.[15]

Defendants analogize the discovery sought in their notice to defendants' Rule 30(b)(6) depositions in which they gave testimony regarding their data systems.  This

---

[12]*Id.* at 3.

[13]*Id.* at 4.

[14]For this reason, the court rejects defendants' suggestion that plaintiffs' automated system could have been created by a "non-expert."  Doc. 314 at 16.

[15]*See Duncan v. Chevron U.S.A., Inc.*, Nos. 10-0298, 10-1455, 2011 WL 2457652, at *3 (E.D. La. June 16, 2011) (entering protective order and quashing as premature a deposition notice seeking "data, measurements, and calculations" used by an expert in preparing his expert report even though the notice did not directly seek the expert's opinion).

comparison fails.  Defendants' commission data system is the heart of this case—liability will turn on whether it functioned correctly.  Defendants' system was in existence long before this case was filed.  Unlike plaintiffs' automated system, it was not created by a retained expert in preparation for giving his expert opinion at trial, nor is it  being refined as new information is learned in this case.

The court also rejects defendants' argument that it is plaintiffs, not defendants, who are construing the notice as being directed to Mr. Nickel.  It is true that the notice broadly seeks deposition testimony from the "person(s) most knowledgeable" about the automated data system developed by plaintiffs' expert.  But the person most knowledgeable about a processing system being developed by plaintiffs' expert is, of course, the expert.  Defendants surely understood this when serving their notice, and in all likelihood, would protest if plaintiffs presented someone other than Mr. Nickel for the deposition.

The court therefore finds that defendants' deposition notice seeks expert testimony.  As noted above, Rule 26(b)(4)(A) mandates that the time for deposing experts is after their opinions are thoroughly disclosed in expert reports.  Accordingly, defendants' deposition notice is premature and is hereby quashed.

Even if the court were to find that the noticed deposition topics pertain only to factual matters, the court sees no reason why Mr. Nickel should be subject to two depositions.  The expert disclosure deadline is less than a month away, after which defendants may freely depose Mr. Nickel.  Gathering the necessary participants to depose Mr. Nickel in two

separate depositions is a waste of time and money. The court rejects defendants' vague and conclusory argument that they will suffer "unnecessary delay and prejudice" by having to delay by a few weeks the determination of "their potential decertification strategy."[16] Thus, the court would exercise its discretion under Fed. R. Civ. P. 26(c)(1) and nonetheless grant the motion for protective order.[17]

IT IS THEREFORE ORDERED that plaintiffs' motion for a protective order quashing defendants' deposition notice is granted.

Dated April 24, 2012, at Kansas City, Kansas.

s/ James P. O'Hara
James P. O'Hara
U.S. Magistrate Judge

---

[16]Doc. 314 at 17.

[17]Fed. R. Civ. P. 26(c)(1) provides that "[t]he court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." The rule provides a means of judicial oversight whereby discovery may be prescribed or limited to prevent abuse. *See Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 34–35 (1984) (discussing the Washington rules of civil procedure, which the Court noted were virtually identical to their federal counterparts); *Herbert v. Lando*, 441 U.S. 153, 176–77 (1979) ("There have been repeated expressions of concern about undue and uncontrolled discovery, and voices from this Court have joined the chorus. But until and unless there are major changes in the present Rules of Civil Procedure, reliance must be had on what in fact and in law are ample powers of the district judge to prevent abuse.") (footnote omitted). *See also* Fed. R. Civ. P. 1 (requiring that the rules "be construed and administered to secure the just, speedy, and inexpensive determination of every action").