## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

ROXIE SIBLEY, JEANNE NOEL,
ERNESTO BENNETT, JAMIE WILLIAMS,
GREG ST. JULIEN, TRACIE HERNANDEZ,
JOHN JASINSKI, JAY RICHIE, and TEISHA
KING, individually and on behalf of a class of
others similarly situated,

                 Plaintiffs,

v.

SPRINT NEXTEL CORPORATION,
a Kansas corporation,

and

SPRINT/UNITED MANAGEMENT
COMPANY, a Kansas corporation,

                 Defendants.

Case No. 02:08-CV-02063-KHV/JPO

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION TO STRIKE DEFENDANTS' EXPERT REPORT

Pursuant to Rule 37 of the Federal Rules of Civil Procedure, the District of Kansas Local

Rules 37.1, and to the Court's amended scheduling order, (Am. Sch. Order, ECF No. 114),

Plaintiffs' submit the following memorandum of law in support of Plaintiffs' motion to strike

Defendants' expert report under Rule 37(c)(1) for its failure to comply with Rule 26(a)(2)(B):

### INTRODUCTION

This is a case about Defendants' failure to calculate commissions accurately for the class

of retail store employees.  The parties retained experts to analyze Defendants' commissions-

related data and testify as to whether Defendants' commission system paid the class members

correctly.  The parties recently exchanged expert reports.  Plaintiffs' experts found a commission

shortage to the class of over $200 million.  Defendants, in contrast, provided an expert report—

along with 8.62 Terabytes of data—that is filled with iterations of the same three primary and unsupported conclusions:  (1) Defendants correctly paid (or overpaid) 98.5% of this class of retail channel representatives; (2) Defendants did not experience systematic computer problems; and (3) "individualized issues" prohibit a meaningful analysis of the underpayments experienced by the remaining 1.5% of the class.

While there is no shortage of permeations on these three themes, the report is missing some important and substantial items required by Rule 26(a)(2)(B):  identification of the methodology, procedures, and underlying data that form the basis of these conclusions.  The report is devoid of any real explanation as to how Defendants' expert Janet R. Thornton ("Thornton") arrived at her conclusions, and it does not provide any citations to relevant data or information that could assist Plaintiffs in understanding her methodology, process, and underlying calculations.

Because of this deficiency, Defendants' report directly violates Rule 26.  Such a violation is neither harmless nor substantially justified.  Defendants' lack of disclosure is forcing Plaintiffs to expend considerable time, resources, and money reviewing Thornton's massive data in order to understand her undisclosed processes and methodologies before they can fully analyze the soundness of her procedures in preparation for expert depositions and rebuttal reports.  Plaintiffs put Defendants on notice of this issue, and Defendants declined to remedy the situation. Defendants have no excuse for their failure to provide the requisite information, and instead argue that their vague references to a data analysis and computer programs is sufficient to satisfy the rule.  They are not.  Thus, the report should be stricken pursuant to Rule 37(c)(1).

## BACKGROUND

This is a nationwide class action in which Plaintiffs allege Defendants did not pay them all their commissions due.  (Am. Compl. ¶ 1, ECF No. 8.)  Defendants' failure to pay timely and

accurate commissions was caused by "problems with Defendants' computer systems that occurred subsequent to Sprint's merger with Nextel."  (*Id.* ¶ 3.)  Plaintiffs intend to prove deficient payments at trial, in part, through their testifying experts.

After certifying this class action, the Court entered a Scheduling Order that provided a three-stage discovery process for the production of voluminous sales and commission related data.  (Am. Sch. Order, ECF No. 114.)  During the final stage, "Stage 3," Defendants produced three hard drives containing 1.7 Terabytes[1] of data.  (Nickel Decl. ¶ 5.)  The parties' experts used the Stage 3 data to calculate damages for the class.  (*Id.*)

In compliance with the Court's operative amended scheduling order, (7th Am. Sch. Order 2, ECF No. 355), the parties exchanged their expert disclosures and accompanying reports on October 15, 2012.  (Fisher Decl. ¶ 2.)  Defendants provided a report signed by Thornton. (Affidavit of Janet R. Thornton, Fisher Decl. Ex. A [*hereafter* "Thornton Aff."].)  The next day, Defendants produced five hard drives in connection with her report.  (Fisher Decl. ¶ 3.)  These hard drives contained approximately 8.62 Terabytes of data spanning almost 15,000 files. (Nickel Decl. ¶ 7.)

In her report, Thornton proffers her conclusions that "1) 98.5% of the employees were paid correctly and/or were overpaid under the terms of the operative commission plans[,] . . . 2) individual issues predominate as to the 1.5% of the employees with underpayments[, and 3)] there was no systematic commission system problems."  (Thornton's Aff. ¶ 3.)

Thornton further explains that she "developed computer programs to process Sprint's data and to examine each transaction in order to reach the conclusions outlined in [her]

---

[1] A Terabyte is a unit of measurement for disk storage.  One Terabyte is the equivalent of 1,000 Gigabytes.  (Nickel Decl. ¶ 6.)  Approximately 333,333 MP3 songs can fit onto one Terabyte. (*Id.*)  A typical, mid-level office computer purchased in this year cannot hold a single Terabyte. (*Id.*)

affidavit." (*Id.* ¶ 4, n.7.)  Thornton does not explain how she developed these programs or how they processed Defendants' data, except to generally state that they totaled up the commissions earned per person per month and compared these amounts to the amounts Defendants paid.  (*Id.* ¶ 6.)

Thornton's explanation of how she calculated damages is so basic and lacking in detail that it spans only four paragraphs of her fifty-five paragraph affidavit.  (*See id.*)  Nowhere in these four paragraphs (or elsewhere) does Thornton give any explanation sufficient for any data/commissions expert to understand what she did, or relied on, in reaching her conclusions. Clearly, she relied on the Stage 3 data, as the parties agreed that their experts would use it to calculate damages.  However, that voluminous data had to be imported, processed, and analyzed in order for Thornton to reach her conclusions.  Thornton should have, and could have, disclosed how she performed these processes.

Thornton's report does not even reference the five hard drives of data that Defendants produced with her report, or explain what is on them.  Plaintiffs have generally reviewed these hard drives in search for an overview of how Thornton calculated damages and reached her conclusions.  (Dunham Decl. ¶ 7.)[2]  However, it appears that such an overview or explanation does not exist.  (*Id.*)

In addition to providing an overview as to her methodologies and procedures used to calculate damages in this case, Thornton should have provided in her report information about how she handled various issues related to the calculations.  For example, her report does not explain how she:

- Extracted and uploaded the Stage 3 data for her calculations;

---

[2] Thornton does provide programming logs, but these only explain certain calculations, and do not explain where each program fits into the larger process.  (Dunham Decl. ¶ 11.)

- Verified the integrity and the completeness of the data;
- Addressed the data quality problems that permeated the Stage 3 production;
- Identified the relevant class members;
- Identified all of the relevant employee identifiers for the class members;
- Identified the relevant SKUs and SOCs to apply;
- Searched the data for transactions related to the class members;
- Determined if the transactional data was complete and included all class member transactions;
- Decided which transactions should be associated with which class members;
- Determined if the transactions were paid correctly;
- Determined which payroll adjustments, credits, or debits to include or exclude from her calculations;
- Handled the commission components where Defendants failed to produce the information necessary to calculate them;
- Calculated damages due to the class; and
- Tested her programs and results.

(Nickel Decl. ¶ 12.)   In contrast, Plaintiffs' expert reports provide considerable detail of their methodologies, processes, and how they handled these issues, and moreover, cite to, and explain the data they produced.   (*See generally* Balance Engines Rept., Nickel Decl. Ex. A; Dunham Rept., Dunham Decl. Ex. A.)

In addition to failing to explain her methodology and processes relating to damages, Thornton also fails to cite to any support for the broad legal conclusions she asserts.   She opines that "individual issues predominate as to the 1.5% of the employees with underpayments" and that "no systematic commission system problems" existed.    Though, her report merely states that she came to these conclusions based on her "observations."   (Thornton Aff. ¶ 7.)

The report does not articulate in any detail what she "observed," what data she reviewed, or what analysis she performed, if any, to support these statements.   Nor does the report explain the meaning that Thornton associated with the phrases "individualized issues" (similarly "individualized review," "individualized exercise," and/or "individualized analysis") or "systematic commission systems problems."   (*Id.* ¶¶ 4, 6, 9, 27, 48, 51–52, 55.)   Having no idea how she reached these conclusions makes any rebuttal based on the data and information she

provided difficult.  (Nickel Decl. ¶ 14.)

Knowledge of Thornton's methodologies and processes, as well as an explanation of the facts and data on which she relied are essential to Plaintiffs' experts' ability to meaningfully prepare their rebuttal reports due on February 14, 2013.  (7th Am. Sch. Order 2, ECF No. 355; Nickel Decl. ¶ 15.)  Without this requisite information, Plaintiffs' experts are forced to comb through thousands of programming and data files to attempt to piece together the puzzle so that they can uncover how she calculated commissions and if the data supports her numerous conclusions.  This effort will require a trial and error approach and will be excruciatingly burdensome, time consuming, incomplete, and expensive.  (Nickel Decl. ¶¶ 16–17; Dunham Decl. ¶¶ 15–16.)  Plaintiffs' expert Nile Nickel estimates that such a data review, just to identify Thornton's process, could take at least eight to ten weeks.  (Nickel Decl. ¶ 18.)  If Plaintiffs were to depose Thornton now, the deposition would be to discover generally what she did to calculate damages and reach her conclusions—information that should be provided in her initial expert report.  Plaintiffs would then need a subsequent deposition to question her in more detail after they review and analyze her calculations.  (Fisher Decl. ¶ 7.)

This is the not the first expert report Defendants have produced.  On December 22, 2011, Thornton created another report in conjunction with Defendants' motion for summary judgment. In that report, she similarly asserted that she analyzed certain data and concluded that none of the nine class representatives were underpaid.  (Thornton Aff. 2, ECF No. 282-2.)  The Court declined to rule on Defendants' motion, finding it premature.  (Order, ECF No. 334.)  A review of that expert report provides little to no additional guidance on the methodologies and processes Thornton used to calculate damages for the entire class.  Thornton admits this by stating in her current report:  "The methodology for calculating the differences for the nine Named Plaintiffs is

necessarily different than the methodology used to analyze the over 30,000 employees. . . .  For example, different computer programs were used to process all of the data."  (Thornton Aff. ¶ 3 n.6.)  Though, Thornton does not provide any explanation as how these methodologies differ.

On October 26, 2012, Plaintiffs objected to Thornton's report as failing to comply with the Federal Rules of Civil Procedure 26(a)(2)(B).  (Fisher Decl. ¶ 5.)   The Court's amended scheduling order requires the parties to submit these "technical," (non-*Daubert*, non-evidentiary) objections to expert disclosures within eleven days.  (Am. Sch. Order 9–10, ECF No. 114.) Technical objections are defined by the amended scheduling order as those questioning "whether all of the information required by Rule 26(a)(2)(B) has been provided."  (*Id.*)

The parties met and conferred to discuss Plaintiffs' objections on November 1, 2012. (Fisher Decl. ¶ 6.)  Defendants disagreed with Plaintiffs' objections and refused to remedy the deficiencies outlined by Plaintiffs.  (*Id.*)   Thus, Plaintiffs now move the Court for an order striking Thornton's report.

## LEGAL STANDARD

Federal Rule of Civil Procedure 37(c)(1) requires that, "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless."[3]  Rule 37(c)(1) is a "self-executing" sanction, which is meant to provide a "strong inducement for disclosure of material."  Fed. R. Civ. P. 37 committee note (1993).  The sanction is <u>automatic</u> unless "the sanctioned party can show that its violation of Rule 26(a) was either justified or harmless."  *Salgado v. Gen. Motors Corp.*, 150 F.3d 735, 742 (7th Cir. 1998); *see also Nguyen v. IBP, Inc.*, 162 F.R.D. 675, 679–80 (D. Kan.

---

[3] Rule 37 also permits Plaintiffs to seek an award of reasonable expenses, including attorneys' fees, incurred as a result of Defendants' failure to comply with Rule 26, and/or to impose other sanctions.  *Id.*  Plaintiffs request this sanction to the extent the Court deems it appropriate.

1995) ("The burden . . . is upon the party who is claimed to have failed to make the required disclosure.").  The district court has broad discretion when determining whether a violation of Rule 26 is harmless or lacks substantial justification.

## LEGAL ANALYSIS

Federal Rule of Civil Procedure 26(a)(2)(B) requires that parties submit with their expert disclosures, "a written report—prepared and signed by the witness—if the witness is one retained . . . to provide expert testimony in the case . . . ."  Fed. R. Civ. P. 26(a)(2)(B).  Rule 26 also requires that this report be "detailed and complete."  Fed. R. Civ. P. committee note (1993).

A sufficiently detailed report is one that eliminates surprise, avoidable costs, and unnecessary depositions."  *Reed v. Binder*, 165 F.R.D. 424, 429 (D.N.J. 1996); *see also* Fed. R. Civ. P. committee note (1993) (explaining that the report cannot be "so sketchy and vague that it rarely dispensed with the need to depose the expert" or that is "of little help in preparing for a deposition of the witness").  It provides the opposing party with "a reasonable opportunity to prepare for effective cross examination and perhaps arrange for expert testimony from other witnesses."  *Id.*; *see also Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 953 (10th Cir. 2002).

Thornton's report lacks the requisite detail because it does not explain the methodologies, processes, or underlying facts or data that form the bases of her opinions as required by Rule 26(a)(2)(B). In failing to provide this information, Defendants put Plaintiffs at a substantial disadvantage in preparing for rebuttal and ultimately preparing for trial, and thus this report should be stricken.

## I)      THORNTON'S REPORT DOES NOT COMPLY WITH RULE 26(A)(2)(B).

A sufficiently "detailed and complete" report is one that contains all of information delineated in Rule 26(a)(2)(B).  This includes (1) the "opinions the witness will express and the basis and the reasons for them," as well as (2) "the facts or data considered by the witness in

forming them."  Fed. R. Civ. P. 26(a)(2)(B)(i), (ii).

In requiring disclosure of "the basis and the reasons" for the expert's opinions, the Rule seeks to expose the "how" and "why" the expert reached her particular result.  *Reed*, 165 F.R.D. at n.5 428; *see also*; *Cohlmia v. Ardent Health Servs., LLC*, 254 F.R.D. 426, 430 (N.D. Okla. 2008).  Similarly, in requiring disclosure of the "the facts or data considered," the Rule seeks to expose "what" the expert "saw, heard, considered, read, thought about or relied upon in reaching the conclusions and opinions to be expressed."  *Reed*, 165 F.R.D. at n.6 428.

The information required for the "how," "why," and "what," is more clearly illustrated in *Cohlmia*, 254 F.R.D. 426.  There, a plaintiff submitted three expert reports, two from experts who opined as to whether a doctor "received a fair peer review" and one from an expert who calculated economic damages.  *Id.* at 430–32.  The defendant moved to strike all reports as failing to comply with Rule 26.  *Id.* at 429.  In granting the defendant's motion, the court observed that the reports offered "little or no explanation of the basis of the opinions or the methodology by which they were reached."  *Id.* at 430.  The court further noted that the damage expert concluded that damages were worth $9.5 million without providing the "data or methodology he used" to come up with his number.  *Id.* at 431.

Additionally, the court held that the peer review experts espoused conclusory opinions as to the fairness of the reviews without explaining how they reached their conclusions.  *Id.* at 431–32.  While the experts referenced testimony and evidence in their reports, they did not "cite to anything specific in the record or transcript" or offer any particular "detail as to what in [the] testimony [they] relie[d] on or how that testimony factored into any of [their] preliminary conclusions."  *Id.*  at 432 ("[The expert] offers seven opinions, but no explanation or suggestion of what informs those opinions—how he reached his conclusions and what he based them on.");

*see also Hilt v. SFC Inc.*, 170 F.R.D. 182, 185 (D. Kan. 1997) ("To satisfy Fed. R. Civ. P. 26(a)(2)(B) the report must provide the substantive rationale in detail with respect to the basis and reasons for the proffered opinions.  It must explain factually why and how the witness has reached them.").

Likewise, Thornton's report merely consists of opinions and unsupported conclusions with no explanation of the basis for them or the methodologies used in forming them.  For instance, she concludes that 98.5% of the class was "paid correctly" or "overpaid," that "individualized issues exist,"[4] and that there were no systematic computer issues.  How she used the data to calculate damages and arrive at her proffered 98.5% figure, what led her to conclude "individualized issues" persist, and how she can claim that there were not significant issues with Defendants' computer systems remains a mystery.

Thornton only vaguely reveals that she somehow analyzed "millions of sales transactions," "billions of billing transactions," and commission payment transactions and compared them to the "operative commission plans" using computer programs.  (Thornton Aff. ¶ 4, n.7.)  The report is devoid of any description of what computer programs she used, how these computer programs worked, and how they "examined" the transactions to calculate damages.  *See Reed*, 165 F.R.D. at 430 (holding "vague terms" with "few specific references" are not sufficient).  As set forth in detail on page 5 of this Memorandum, there are many questions left

---

[4] The blanket assertion that "individualized issues exist" is tantamount to a legal conclusion and not an expert opinion.  These statements, (Thornton Aff. ¶ 4, 6, 9, 27, 48, 51–52, 55), should be stricken on this basis alone.  *Conrad v. Westport Marine, Inc.*, No. 09-CV-49-BBC, 2009 WL 3226288, at *2 (W.D. Wis. Oct. 1, 2009) (striking expert report when the expert "fails to explain his reasoning and cites absolutely no data or information supporting his [conclusions.]");  *Goodbys Creek, LLC v. Arch Ins. Co.*, No. 3:07-CV-947-J-34HTS, 2009 WL 1139575, at *2 (M.D. Fla. Apr. 27, 2009) ("Upon review, the report prepared by Mr. Petitta obviously fails to meet the requirements of Rule 26(a)(2)(B). His brief rendition consists primarily of legal conclusions.").

unanswered, ranging from how she initially extracted and uploaded the data to how she calculated damages and ultimately tested her programs and results.  (Nickel Decl. ¶ 12.)  The impact of these decisions on her conclusion could be material.  For example, her decision on which SKUs and SOCs to include in her calculation could hypothetically be responsible for the gap in damages between the parties' calculations.  (*Id.* ¶ 10.)  The same may be true of her handling of adjustments and "other debits/credits" and "other credits/debits," more specifically, which payments or deductions she considered and which she ignored.  (*Id.* ¶ 11.)  Yet, her report does not explain how she handled these components.

To compound the problem, Thornton's report does not direct the reader to any particular, external data or documents that further articulate her process.  In fact, her report does not reference or cite to any of the data produced with it.  While Thornton did provide five hard drives with 8.62 Terabytes worth of data, spanning over approximately 15,000 files, there is no overview provided in the data to explain what any of the data is, how it was used it, how it applies to Thornton's analysis and conclusions, how the programs work, or in what order the programs were implemented.  (Nickel Decl. ¶ 7; Dunham Decl. ¶ 7.)

Without this information, Plaintiffs must engage in a fishing expedition, within the massive data Thornton produced, to try to discover the possible bases for her conclusions.  It will be time consuming and burdensome, will cause undue delay, will create additional and unnecessary expert costs, and will not be entirely reliable.  (Nickel Decl. ¶¶ 16–17; Dunham Decl. ¶ 15–16.)  If tasked with this project, it will likely take Plaintiffs' experts many months to do adequately.  (Nickel Decl. ¶ 18.)

Like the reports in *Cohlmia*, Thornton's report is deficient pursuant to Rule 26(a)(2)(B) because it fails to identify her methodologies, procedures, assumptions, and applicable data.

## II) DEFENDANTS' PRODUCTION OF AN INADEQUATE EXPERT REPORT LACKS SUBSTANTIAL JUSTIFICATION AND IS NOT HARMLESS.

The failure to comply with Rule 26 results in the striking of the report when the failure is neither "substantially justified" nor "harmless." Fed. R. Civ. P. 37(c)(1). Courts in the Tenth Circuit look to the following factors to determine whether a nondisclosure is "substantially justified" or "harmless": "(1) the prejudice or surprise to the party against whom the testimony is offered; (2) the ability of the party to cure the prejudice; (3) the extent to which introducing such testimony would disrupt the trial; and (4) the moving party's bad faith or willfulness." *Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co.*, 170 F.3d 985, 993 (10th Cir. 1999). (citations omitted). Courts need not find all four factors present, but instead look to the "totality of the circumstances." *Kern River Gas Transmission Co. v. 6.17 Acres of Land*, 156 F. App'x 96, 102 (10th Cir. 2005) ("under the totality of the circumstances presented here, JMS-Meadow did not show that its violation of Rule 26(a) was either justified or harmless). Under this standard, the Court should strike Thornton's report.

### A) The Report is Prejudicial to Plaintiffs.

The rules require that expert reports be "detailed and complete" so to avoid prejudice or surprise to the opposing party. Courts in this circuit have found prejudice where the failure to comply with Rule 26(a)(2)(B) puts a party at a disadvantage. *Prien v. AM Gilardi & Sons, Inc.*, No. CIV-01-1020-F, 2003 WL 25764896, at *5 (W.D. Okla. June 11, 2003). As this Court has previously explained:

> The adverse party should not be placed at a disadvantage or be deprived of the full benefits of Rule 26 by the selection of an expert who cannot or will not make the required disclosures. The selection and retention of an expert witness is within the control of the party employing the expert. To the extent that there is a disadvantage created by the expert's failure to disclose it must be borne by the party retaining the expert witness.

*Nguyen*, 162 F.R.D. at 681.

Thornton's report's deficiencies certainly cause substantial hardship to Plaintiffs. As already explained, Plaintiffs' experts will have to engage in the burdensome and time consuming (and thus expensive) process of attempting to piece together the "how," "why," and "what" of Thornton's calculations and conclusions proffered. This process will detract from the time they had planned to prepare for and draft their rebuttal reports. Indeed, Plaintiffs' experts should be spending this time analyzing whether Thornton calculated damages correctly and whether the procedures she used were sound data practices. This distraction results in prejudice. *Prien*, 2003 WL 25764896, at *5 (holding "the absence of a report which provides, or at least summarizes, the underlying data relied upon by [the expert] obviously prejudices" the other party's ability to prepare their own expert for rebuttal).

Courts even find prejudice where a deficient report would hinder a parties' ability to "effectively depose" the expert. *Id.* As the case stands now, Plaintiffs need a deposition of Thornton to simply understand what she did to calculate damages and to get an explanation of the data programs and files she produced—information that should have, and could have easily, been provided in her report. Only after Plaintiffs understand her processes and have an opportunity to review her data and programs files with that knowledge, will they be prepared to take the traditional expert deposition where they challenge what they found during their review.

Prejudice is especially obvious when the report (as is the case here) does not contain a "complete statement of the bases and reasons" for the expert's opinions, but the report "is based upon an apparently massive body of information which is not summarized or tabulated." *Id.* at *4 (emphasis added). Defendants here produced 8.62 Terabytes of data without any information about the calculation process, or the primary assumptions or decisions made in implementing the programs. The size of this data only adds to the prejudice experienced by Plaintiffs if they are

forced to identify Thornton's methodologies for themselves.  Plaintiffs' experts will have to review every file, hypothesize based on what they observe, and then test those hypotheses through trial and error in an effort to determine how Thornton calculated damages.  (*Id.*)  This will have to be done hundreds of times for all of Thornton's programs.  This will cause considerable delay, additional costs, and will infringe on the time that Plaintiffs' experts should be performing their rebuttal analysis and writing their rebuttal reports.

Meanwhile, as Plaintiffs are combing through that data, Defendants undoubtedly will be engaging in a thorough review of Plaintiffs' experts' analyses in an effort to attack them on rebuttal.  Defendants are able to do so because Plaintiffs' experts explained their methodologies and processes and cited to precisely where Defendants can find them within Plaintiffs' expert data production.

There should be no doubt that Thornton's failure to disclose the requisite information in her report has prejudiced Plaintiffs.

### B)      Defendants Cannot Adequately Cure the Prejudice.

The second factor courts contemplate when deciding when to strike is whether Defendants can cure the prejudice.  In considering opportunities to cure, courts also look to whether the party had the opportunity to do so, but did not.  *See Kern River Gas*, 156 F. App'x at 102 ("In light of the many extensions of time it received, JMS-Meadow had ample opportunity to cure, but it failed to do so.").

Defendants were ready to file their expert report in September, more than one month before the final deadline.  (*See generally* Defs.' Resp. to Pls.' Mot. to Extend, ECF No. 354 (opposing Plaintiffs' request for an extension of thirty-five days)), *infra* Analysis Part II.D. Thus, they certainly had the occasion to at least attempt to comply fully with Rule 26, but chose not to do so.  Then, after the exchange of disclosures, Plaintiffs put Defendants on notice of the

deficiency in their October 26th objection.  Defendants again did not seize this opportunity to cure.

It is too late at this juncture to cure the deficiency through supplementation.  Expert reports were due one month ago.  By the time Defendants respond to this motion, Plaintiffs reply, the Court rules, and Defendants subsequently supplement if ordered to do so—or the parties prepare for and take Thornton's deposition to try to understand at least the basics of her analysis—substantial time will be lost that should have been spent preparing the rebuttal reports, working on *Daubert* and summary judgment motions, and preparing for the August trial.  Between this case, and the related *Harlow* case, Plaintiffs and their experts are on a tight timeline.  (*See* 7th Am. Sch. Order, ECF No. 355); 4th Am. Sch. Order, Harlow v. Sprint Nextel Corp., Civ. No. 2:08-2222 (KHV/DJW) (D. Kan.), ECF No. 168.  Because of these deadlines, Plaintiffs do not have time to wait for an expert report that should have been produced a month ago, or prepare for multiple depositions of the same expert, nor should they be required to do so simply to extract information that Defendants should have initially provided in the report.  There is simply no way to adequately cure the prejudice that Defendants' inadequate report causes to Plaintiffs.

More importantly, however, the rules do not contemplate a supplementation that would include a substantial amount of newly disclosed information—explaining methodologies, procedures, and facts and data relied on—after the expert disclosure deadline.  *Cohlmia*, 254 F.R.D. at 433 ("A party cannot offer a mere litany of opinions, devoid of rationale, and contend that the report will be 'supplemented' later with the basis and reasons.").  Rule 26(e) does not envision "a second bite at the apple" or "an opportunity to correct fatal defects" in submitted reports.  *Id.*  (stating Rule 26(e) "does not give license to sandbag one's opponent").  Thus, no

adequate cure exists.

       **C)**      **Failure to Strike the Report Could Disrupt Trial.**

      Courts also consider whether the failure to comply with Rule 26 could disrupt trial plans. This includes both the actual trial and the pretrial process. *Dixie Steel Erectors, Inc. v. Grove U.S., LLC*, No. CVI-04-390-F, 2005 WL 3558663, at *10 (W.D. Okal. Dec. 29, 2005).[5]  If the Court does not strike Thornton's report as inadequate, any alternative could delay trial and/or put Plaintiffs at a disadvantage at trial.

      First, any scenario where the Court orders Defendants to provide a more complete report, or orders multiple depositions of Thornton, will cause delay.  Rebuttal reports are due February 14, 2013.  (7th Am. Sch. Order, ECF No. 355.)  The parties' pretrial order is due just a few weeks later on March 4, 2013.  (*Id.*)  Dispositive and *Daubert* motions are due March 25, 2013. (*Id.*)  Plaintiffs cannot adequately prepare for these motions and for trial if they are still working on expert rebuttal reports beyond the February 14, 2013 deadline.  Any changes to the expert deadlines will inevitably impact or delay the subsequent deadlines, trial preparations, and the trial date.  Through this domino effect, Defendants' nondisclosure will delay and disrupt trial.

      Second, if Thornton's report is not stricken, Defendants will have an unfair advantage at trial.  Defendants will have several months to scrutinize Plaintiffs' experts' analyses and reports and attack them, while Plaintiffs' experts will spend the next two months simply trying to piece together what Defendants' expert did to reach her conclusions.  In contrast, Plaintiffs' experts will not have the time to attack Thornton since her methodologies have never been explained. This will put Plaintiffs at a disadvantage at trial because their rebuttal will not be as strong or as complete as it would have been had Thornton provided the detail in her report required by the Rules.

---

[5] Sometimes this factor is not considered if the case is not currently in trial.  *Id.*

Consideration of this factor warrants striking Thornton's report.

**D)      Defendants Negligently, and Perhaps Willfully, Refused to Provide the Requisite Information.**

Lastly, courts look at whether the party's failure to supply the required information was willful or the result of bad faith.  Though, a showing of bad faith is not required for a court to strike an expert report.  *Kern River Gas*, 156 F. App'x at 102 ("At no time has Kern River argued that JMS-Meadow acted in bad faith.  Even without bad faith, the totality of the circumstances show no abuse of discretion."); *see also Fresquez v. Baldwin*, 2010 WL 5934891, No. 08-CV-01233, 2010 WL 5934891 (D. Colo. Dec. 15, 2010), *adopted*, 2011 WL 830082 (D. Colo. Mar. 4, 2011) ("[T]he lack of bad faith alone may not be enough to overcome the other elements of the *Woodworker*'s test.  Plaintiff should not be permitted to ignore his disclosure obligations and then avoid sanctions simply by claiming his deficiencies were not willful." (internal citation omitted)); *Dixie Steel Erectors,*, 2005 WL 3558663, at *10.  Given this, some courts have found this factor satisfied if the failure to disclose was the result of "negligence which bordered on wilful [sic] negligence" when there was "no excuse" for the failure to comply.  *Prien*, 2003 WL 25764896 at *6.  Defendants here have no excuse for their nondisclosures.

First, Defendants and their attorneys were fully aware of the requirements outlined in Rule 26(a)(2)(B) and they chose not to comply.  Similar to the case in *Prien*, this knowledge and inaction is, at a minimum, evidence of negligence.

Second, Defendants had ample time to prepare their expert report fully and in compliance with the rules.  Indeed, the Court granted several requests by the parties to extend the expert deadlines.  (*See* ECF Nos. 327, 342, 355.)

Third, shortly after the parties provided filed expert disclosures, Plaintiffs objected to Thornton's report, citing its lack of explanation of methodologies and procedures.  (Fisher Decl.

¶ 5.)  This put Defendants on notice of the issue.  The parties then met and conferred, and Defendants refused to supplement with the missing information.  All of the above circumstances evidence willful action (or inaction) on Defendants' part, or at the very least willful negligence.

Moreover, it is worth noting that Defendants' refusal to disclose Thornton's methodologies permits Defendants to conceal vulnerabilities in her report, potentially with the hope that Plaintiffs' review of the data does not uncover them.  This potential motivation to limit transparency could evidence bad faith.  Though, a showing of bad faith is not required under the analysis.

Together, all four factors are satisfied.  In other words, Defendants cannot establish that the failure was "harmless" or that it was "substantially justified" as required by Rule 37.  Therefore, the Court should strike Thornton's report.[6]

## CONCLUSION

Defendants failed to accurately pay commissions to the class.  Although there were no rules requiring that Defendants explain to their employees how their systems calculated, or miscalculated for that matter, their commissions, there are specific rules in litigation that require any testifying experts disclosed by Defendants to do so.

Because Defendants failed to comply with those rules, and because Defendants cannot show that their failure to do so is harmless or substantially justified, it is in the interest of fairness to the class that the Court strike Thornton's report.

---

[6] In the alternative, Plaintiffs request the Court consider the other sanctions provided under Rule 37(c)(1).

Dated:  <u>November 14, 2012</u>                    **STUEVE SIEGEL HANSON LLP**

<u>/s/Ashlea G. Schwarz</u>
Ashlea G. Schwarz, KS Bar No. 23491
Email: ashlea@stuevesiegel.com
George A. Hanson, KS Bar No. 16805
Email: hanson@stuevesiegel.com
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
Tel: (816) 714-7100
Fax: (816) 714-7101

**NICHOLS KASTER, PLLP**

<u>/s/Rebekah L. Bailey</u>
Michele R. Fisher, MN Bar No. 303069*
Email: fisher@nka.com
Paul J. Lukas, MN Bar No. 22084X*
Email: lukas@nka.com
Rebekah L. Bailey, MN Bar No. 389599*
4600 IDS Center, 80 South 8th Street
Minneapolis, MN 55402
Tel: (612) 256-3200
Fax: (612) 215-6870
*admitted *pro hac vice*

ATTORNEYS FOR PLAINTIFFS