# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| ROXIE SIBLEY, et al, <br><br> Plaintiffs, <br><br> v. <br><br> SPRINT NEXTEL CORPORATION, and SPRINT/UNITED MANAGEMENT COMPANY, <br><br> Defendants. | Case No. 02:08-CV-2063-KHV/JPO |

## SECOND SUPPLEMENTAL EXPERT REPORT OF BALANCE ENGINES LLC

### I.  INTRODUCTION

1. Nile Nickel and Barry Ezell of Balance Engines LLC ("BE") provide this report as a supplement to BE's October 15, 2012 Expert Report (the "Initial Expert Report") and BE's December 12, 2012 First Supplemental Expert Report (the "First Supplemental Report").

2. In supplementing the Initial Expert Report and the First Supplemental Report, BE also relies on, and incorporates by reference, the Second Supplemental Expert Report of Dr. Margaret H. Dunham. Professor Dunham performed a technical review of BE's system and processes.

### II.  SUPPLEMENTATION

3. Following the parties' rebuttal expert reports and expert depositions, BE discovered information about its calculations that led it to believe that making certain revisions to its code would result in more accurate commissions calculations for the class. The following sections detail these refinements made.

### A. Guarantees

4. The parties agreed not to calculate commissions for the months that employees were on Guarantee status. Whether a class member was on Guarantee is indicated in both the compensation statement and quota files data Sprint produced. BE relied on Sprint's quota files to determine whether a class member was on Guarantee, which is consistent with the expert stipulation entered by the parties in this case. However, BE learned that there are discrepancies in Sprint's Guarantee data between its quota files and its compensation statements. Upon further research, BE found that from August 2005 through May 2007 the number of employees Sprint identified as being on Guarantee was an average difference of 745 employees between the two data sets. A change occurred in June 2007 that continued until the end of the data analysis in September 2009. The average difference between the data sets for this timeframe was 42 employees. *Guarantee_Source_Comparison Chart.pdf* located at 2d Supp. App. D, 400 illustrates this difference.

5. In light of these discrepancies, rather than using either the compensation statement or the quota files data alone to determine if an employee should be excluded from the calculations because he/she was on Guarantee, BE excluded each employee identified as being on Guarantee by either data set. This conservative approach resulted in commissions calculations for fewer periods than were excluded by making this determination from the quota files data alone.

6. Further, BE set up its code to find the employee quota file data for periods that had a quota value of "0" or "1" and was not identified by Sprint's compensation statements or quota files through the process described above. BE found 57,326 periods (months) with a quota value of "0" or "1" through this process. BE excluded these periods from its calculations.

7.  In sum, to be overly inclusive regarding the exclusion of Guarantee months from the calculations, BE excluded employee periods where any of the following were true: (a) Sprint's quota files showed them as being on guarantee; (b) the compensation statements showed an entry for "Guarantee Dollars;" or (c) the quota files showed an "actual_quota" of 0 or 1.

8.  Even with these additional steps in place to identify employees on Guarantee within Sprint's conflicting data, BE found some employees with extremely large monthly commissions calculations. During its review, BE found that these were due to low quota values in Sprint's compensation statements that were causing larger commissions calculations than expected. For instance, employee Giovanni Monterroso had a calculated commission due of $350,871.92 in period 145 because his Total Revenue quota value in Sprint's data was set to $0.04. This low value, when combined with accelerators that must be applied according to the terms of the commission agreements, caused a high Total Revenue component calculation. While these large calculations were subsequently capped by BE's process, this is an example of an issue that Sprint's inconsistencies in its data cause.

9.  The revisions in the code BE made to work around the inconsistencies in Sprint's data resulted in the exclusion of some class members from its second supplemental damages calculation who were included in its earlier version. This is because the revision it made broadened the number of Guarantee months where commissions would not be calculated. This decreased the number of employees for whom BE calculated commissions from 33,102 to 33,072.

B.     Roll Up

10.     BE made revisions to its calculations for commissions that "roll up" from retail employees to their store managers and store hosts.  It made these revisions to make their calculations more accurate, after finding certain problems and inconsistencies in Sprint's data

11.     A value called an "SCID" is important in determining which sales from which employees should roll up to whom when calculating commissions consistent with the commission agreements.  Sprint did not provide an SCID list with the Stage 3 data production.  Initially, BE performed this roll up by simply using the SCID information from the hierarchy table and compensation statement data Sprint provided.  However, as described below, this data was not complete and had conflicting SCID information.  Therefore, BE reviewed SCIDs from compensation statements, hierarchy data, RMS, Valid Transactions, and discovery data Sprint produced.  BE created a single list of SCIDs, entitled *SCID_Mapping Table*, where various SCIDs were associated with a store location, and had its code refer to that table in performing its commissions calculations.  (2d Supp. App. D, 399).  In making this revision to its calculations, BE did not update the underlying tables that contain relevant SCID information ("comp_statements" and "hierarchies") but rather, revised the code in the commissions programs to look up the standard SCID.

12.     For example, during this process BE standardized the pre-merger SCID for a Nextel store in Knoxville, TN, "LA0NK02X," with the post-merger SCID "N2511KNOXVILLE."  BE had to standardize other SCIDs because of inconsistencies or misspellings in Sprint's data.  For example, BE standardized "00389MANHATTENBEACH" to "00389MANHATTANBEACH."   BE also found unique SCIDs in each of the data sets mentioned.  For instance, it found 48 additional SCIDs in the compensation statements that were

not identified elsewhere.  Of these, 12 appear to be for another sales channel, corrupt data, or clearly are not SCIDs.  BE also found 148 additional SCIDs in the hierarchy table not identified elsewhere.

13. BE also examined similar SCIDs to determine if they were for the same location. For example, 00007LOSANGELES was one of the SCIDs BE found that is unique to the hierarchy data.   A search of all the other SCIDs shows a similar one, SCID 00187LOSANGELES.   BE then examined the data to see if these two values existed simultaneously in the compensation statement or hierarchy data.  Both SCIDs only co-exist in period 143, whereas the other periods only contained the 00007LOSANGELES SCID.  This seems to indicate that both SCIDs represent the same location.  BE found identical results for SCIDs  00012OLATHE vs. 00771OLATHE, 00022DURHAM vs. 00721DURHAM, 00024PLANO vs. 00770PLANO, 00029PHILADELPH vs. 00177PHILADELPH, 00030PHILADELPH vs. 00177PHILADELPH, 00046INDEPENDENCE vs. 00188INDEPENDENCE, and  00058INDEPENDENCEOH vs. 00188INDEPENDENCE.

**C.     Addons**

14. BE addressed a few issues with Addons in its second supplemental calculations. First, in BE's previous calculations, there were rare instances of Addons being counted more than once.  BE discovered an intermediate cause of this error to be fragments of a single RMS transaction being present in more than one of BE's Potentially Commissionable Transaction (PCT) files.  The root cause was poor data standards in Sprint's underlying data such as blank or "placeholder" values populated in critical fields such as MDN, Serial Number, and Subscriber ID.  BE performed a PCT merging step that searched for common MDN, Serial Number, or Subscriber ID across the PCTs and then merged two or more PCT files into a single file when

5

common values were found.  Following this change, BE found a very small number of Addons in the subcategory files that had the same MDN, SOC, and period.  After researching several examples, BE determined these were caused by inconsistencies in Sprint's RMS transactions.  BE deduplicated the Addon subcategory files in memory before they were used by the final commission programs to ensure the issue was addressed.

15.     Second, to address an infrequent calculation issue of deactivated Addons being counted with a quantity of 0, BE updated the Addon logic to calculate the 14 or 180 day charge back period based on transaction date rather than initial activation date.

16.     Third, in BE's First Supplemental Report, it addressed an issue in the data that affected SOCs with the "$" symbol in them in the Valid Transactions and ODR records.  BE found that the ultimate cause of this problem in the data was a little-known effect of using the linux "echo" command for file processing.  Due to time constraints, BE was not able to fix this data problems the P2K data.  BE has now addressed this data quality issue, which results in a larger number of Addon transactions being counted in the calculations that were previously missed.

### D.     Net Activations

17.     Sprint's ODR records coded certain transactions as "13 Postpaid Return Activation Reconciliation."  BE processed these as activations in its calculations.  Sprint's expert contends that these are deactivations, even though Sprint's data does not identify them as "Deactivations."

18.     BE does not agree that these should automatically be assumed to be valid deactivations.  In performing its analysis, BE found that Sprint's billing data did not identify these transactional lines as deactivated.  As a result, BE modified its contract renewal and net

6

activation code to count ODR records with "13 Postpaid Return Activation Reconciliation" as neither an activation nor a deactivation. In cases where the billing data reflects that these lines were deactivated, BE's programs would count them as such.

### E.  Contract Renewals

19.   In BE's previous calculation it did not verify that a potential contract renewal had no contract activity within a look back period because Sprint did not produce sufficient historical billing data to make this determination for all contract renewals. However, BE updated its logic in its code to perform this check when the relevant historical data exists.

### F.  Accessories

20.   BE addressed two issues related to accessories in its second supplemental calculations. First, Sprint's Stage 3 data contained both a suggested retail price (a/k/a "sku_price") and an actual sale price for accessories (the field name for which varied across systems as "unit price," "actual price," "value," and "numtransactionamount"). BE revised its calculations to use "unit_price."

21.   Next, BE revised its code logic to address revenue targets being incorrectly calculated as accessory sales. This issue was happening, not to an error by BE, but rather because Sprint added revenue target numbers to Valid Transactions as a line item which was then propagated to Sprint's ODR data with a "2 Commissionable Event" label, indicating it was a valid item to be paid.

### III. REVISED DAMAGES

22. After making the above revisions, BE reached the following results:

| Description | Figure | Citation |
|---|---|---|
| Total damages owed by Sprint | $181,020,078.65 | 2d Supp. App. D, 400.[1] |
| Average damages per class member with overall underpayments | $6,038.43 | 2d Supp. App. D, 400.[2] |
| Average shortage per month (retail consultant position- position that makes up most of class) | $264.83 | 2d Supp. App. D, 400. |
| % of class underpaid overall | 90.64% | 2d Supp. App. D, 400. |
| % of class paid incorrectly overall (under and over payments) | 96.63% | 2d Supp. App. D, 400. |
| % of class members underpaid at least one month | 94.75% | 2d Supp. App. D, 400. |

---

[1] BE calculated commissions due to the class. It did not perform any calculations related to any interest or penalties due pursuant to law in addition to commissions owed. BE leaves calculating any interest or penalties to the parties if damages are awarded.

[2] This figure is calculated by dividing the total damages owed, by the 29,978 class members underpaid overall.

23.     The commissions damages calculation by month is reflected below:



(2d Supp. App. D, 401).

24. The average commissions damages per month by job position are reflected below:



(2d Supp. App. D, 401).

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: 4-17-2013

Nile Nickel

Dated: 4/17/13

Barry Ezell

10

## SECOND SUPPLEMENTAL APPENDIX C
### Additional Materials Reviewed or Relied Upon By Balance Engines

| App. # | Document Name | Bates Label Start | Prod. Date |
|---|---|---|---|
| 512 | Anticipatory Risk11.xls | SPRSIB-6932665 | Dec. 30, 2011 |
| 513 | Commission Free Trial Store Listing.xls | SPRSIB-6259481 | Dec. 30, 2011 |
| 514 | Deployments 9-19.xls | SPRSIB-6517211 | Dec. 30, 2011 |
| 515 | hier.sps | SPRSIB_DATA_00007 | Oct. 16, 2012 |
| 516 | June Stores & SCIDS.xls | SPRSIB-6879576 | Dec. 30, 2011 |
| 517 | Legacy Nextel Store List.xls | SPRSIB-8446203 | Mar. 6, 2012 |
| 518 | May Stores & SCIDS.xls | SPRSIB-7635806 | Jan. 27, 2012 |
| 519 | May stores and agent codes.xls | SPRSIB-6671975 | Dec. 30, 2011 |
| 520 | Proxy Scid A2 count.xls | SPRSIB-6235658 | Dec. 30, 2011 |
| 521 | Retail Store List (9-24-2009).xls | SPRSIB-8980291 | Mar. 6, 2012 |
| 522 | Rollout 10-20-2006.xls | SPRSIB-16576745 | Aug. 2, 2012 |
| 523 | SCIDS with multiple Managers.xls | SPRSIB-15534365 | July 23, 2012 |
| 524 | Converted Stores SCID mappings | SPRSIB-2541865 | Aug. 21, 2008 |
| 525 | STORE_TIER_TEMPLATE - MAR (version 2).xls | SPRSIB-2543168 | Aug. 29, 2008 |
| 526 | Ubiquitel Retail Store List 7-5-06.xls | SPRSIB-2543194 | Aug. 29, 2008 |
| 527 | FINAL Store Info TCKT 66243.xls | SPRSIB-2543423 | Aug. 29, 2008 |
| 528 | 31750045_RMS__DEALER_CODES_W_STORE_NUMBERS_SET_UP_IN_RMS_2007_12_20.xls | SPRSIB-2654356 | Jan. 15, 2010 |

## SECOND SUPPLEMENTAL APPENDIX D
### Additional Balance Engines Materials

| App. # | Document Name | Bates Label |
|---|---|---|
| Documents Cited Directly in Report | | |
| 398[1] | [INTENTIONALLY LEFT BLANK] | |
| 399 | Guarantee_Source_Comparison Chart.pdf | NKA1401180 |
| 400 | Sibley_All_Capped_VerS2_Analysis_r1.xlsx | NKA1401237 |
| 401 | Sibley_S2_Charts.xlsx | NKA1401178 |
| Other Documents | | |
| 402 | 2d Supp. Employee Directories | NKASIB_EXPTDTA_0015-16 |
| 403 | All Store Information Combined 03-21-2013.xlsx | NKA1401181 |
| 404 | All Stores List(nln mods).xlsx | NKA1401239 |
| 405 | Analysis_of_commissions_differences_r2 | NKA1401218-NKA1401235 |
| 406 | Duplicated SCIDs from Thornton's HIER_WINDOWS SPS File.xlsx | NKA1401182 |
| 407 | guarantee_report.txt | NKA1401183 |
| 408 | Guarantee_Source_Comparison Chart.xlsx | NKA1401184 |
| 409 | Guarantee_Source_Comparison.xlsx | NKA1401186 |
| 410 | Heirarchy SCID Outlyers.xlsx | NKA1401187 |
| 411 | HIER_WINDOWS SPS File (Thornton) (NLN Comments).doc | NKA1401189 |
| 412 | HIER_WINDOWS SPS File (Thornton).doc | NKA1401197 |
| 413 | Hierscid.xlsx | NKA1401188 |
| 414 | OTHEARN_D_SLL_TAB.fmp12 | NKA1401236 |
| 415 | Rollup Problems Due to Bad Hierarchy Data.xlsx | NKA1401205 |
| 416 | SCID_Mapping Table.xlsx | NKA1401238 |
| 417 | SCID_Master.txt | NKA1401209 |
| 418 | SCID_Master_bte.xlsx | NKA1401210 |
| 419 | SCID_Master_bte_Rev01.xlsx | NKA1401211 |
| 420 | SCID_Master_bte_Rev02.xlsx | NKA1401212 |

[1] After the production of the First Supplemental Expert Report of Balance Engines LLC, Plaintiffs noticed documents produced were inadvertently omitted from the First Supplement Appendix D, or were produced subsequently. The following appendix numbers have been assigned to those previously produced documents:

| App. # | Doc. Name | Bates Start | Prod. Date |
|---|---|---|---|
| 395 | sibley_code_20121212.tar.gz | NKA1306158 | Dec. 12, 2012 |
| 396 | comp_statements_20121212.sql.gz | NKA1306154 | Dec. 12, 2012 |
| 397 | First Supplemental Employee Directories | NKASIB_EXPTDTA_0010-13 | Jan. 18, 2013 |

| 421 | SCIDs_All_Rms_CompStm_Hierarchy.xlsx | NKA1401207 |
| --- | --- | --- |
| 422 | SCIDs_All_Rms_CompStmt.xlsx | NKA1401206 |
| 423 | SCIDs_All_VTT.xlsx | NKA1401208 |
| 424 | Server_logs.tar | NKA1401213 |
| 425 | Sibley_All_Capped_VerS2_Analysis.xlsx | NKA1401177 |
| 426 | Sibley_code_20130416.tar | NKA1401214 |
| 427 | Sprint_Sibley_Store_Information.xlsx | NKA1401215 |
| 428 | stage3_e.txt | NKA1401216 |
| 429 | Total Commission by Period.xlsx | NKA1401217 |