# EXHIBIT 1

```
                                                          Page 1

 1            IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF KANSAS
 2
 3   ROXIE SIBLEY, JEANNE
     NOEL, ERNESTO BENNETT,
 4   JAMIE WILLIAMS, GREG ST.
     JULIEN, TRACIE HERNANDEZ,
 5   JOHN JASINSKI, JAY
     RICHIE, and TEISHA KING,
 6   individually and on
     behalf of a class of
 7   others similarly
     situated,
 8                                     CASE NO.
        Plaintiffs,                    2:08-CV-02063-KHV/JPO
 9
            vs.
10
     SPRINT NEXTEL
11   CORPORATION, a Kansas
     corporation,
12
            and
13
     SPRINT/UNITED MANAGEMENT
14   COMPANY, a Kansas
     corporation,
15
        Defendants.
16   _____/
17
     VIDEOTAPED
18   DEPOSITION OF:           Margaret H. Dunham
19   DATE:                    March 1, 2013
20   TIME:                    8:54 a.m. to 12:48 p.m.
21   LOCATION:                Proskauer Rose
                              2255 Glades Rd
22                            Boca Raton, FL
23   TAKEN BY:                Defendants
24   REPORTER:                Lori L. Bundy,
                              RMR, FPR, RPR, CRR, CLR
25      Job No. NJ1614276
```

Page 46

1 compensation are actually now associated with this one.
2  Q.  Did you look at any information or documents in
3 connection with the case or in connection with what
4 Balance Engines was doing to assure yourself that the way
5 Balance Engines was constructing its files was accurate?
6  A.  The way it was constructing its files?
7  Q.  Like, for example, the -- you said if there were
8 duplicate employees, what information did you use to
9 conclude whether the records were appropriately assigned
10 to a particular employee?
11  A.  As I indicated, I looked at counts, the number of
12 records should be the same and did some spot checking to
13 look at to see were those records -- the records that had
14 been for the second employee that is no longer there, were
15 they still there for the first employee.
16  Q.  When you were looking at results, were you
17 looking at the -- were you confirming the accuracy of
18 Balance Engines' ultimate conclusions as to the amount of
19 commissions that had been paid to any particular employee?
20  A.  No, I was not asked to do that.
21  Q.  So sitting here today, you don't know whether the
22 conclusions reached by Balance Engines were accurate or
23 not?
24     MS. FISHER:  Objection.  Vague.
25     THE WITNESS:  I have no opinion on that or

Page 47

1 whether Dr. Thornton's were accurate.
2 BY MS. BLOOM:
3  Q.  If you look at conclusion number three on the
4 second page, you say that "Balance Engines followed
5 adequate design, implementation, and testing to validate
6 the correctness of the product.  Balance Engines' damage
7 calculations are the product of reliable principles and
8 methods applied to the development of the product."
9 That's your conclusion?
10  A.  Yes, it is.
11  Q.  And based on your testimony a minute ago, is it
12 fair to say that you're not -- by reaching that
13 conclusion, you're not in any way opining over whether
14 their calculations are accurate or not?
15  A.  No, I'm not.
16  Q.  Did you look at whether or not the way they were
17 performing their calculations complied with the operative
18 commission plans?
19  A.  No, I did not.
20  Q.  Did you understand that the commission plans were
21 a component of any damage calculation in this case?
22  A.  Yes, I was.
23  Q.  So why did you -- for what reason did you not
24 look at the plans?
25  A.  You didn't ask did I look at them.  Can you go

Page 48

1 back and rephrase -- tell me what her question was.
2  Q.  I'll ask you the question again.
3  A.  Okay.
4  Q.  You're concluding here that Balance Engines
5 followed adequate design, implementation and testing to
6 validate the correctness of the product.  How are you
7 defining the product?
8  A.  That wasn't your question.  Excuse me.
9  Q.  I'm asking you a new question.  How are you
10 defining the product?
11  A.  Do you want me to answer the earlier question?
12  Q.  No, I want you to answer this question.  How are
13 you defining the product?
14  A.  I believe I said earlier, the product is
15 software, the log, their documentation, the -- may I look
16 at another point --
17  Q.  Absolutely.
18  A.  -- in here?
19  Q.  Absolutely.
20  A.  If you look at figure one down the center line,
21 the rectangles are all of the general processes, each one
22 of those phases involve many programs, so that would be
23 part of the product.  The product has output data from
24 each phase, this is not necessarily the final result.  The
25 output of phase six are the comparison results, but the

Page 49

1 others are intermediate results.  That's all part of the
2 product.  The input data on the left side is stage three
3 data with the exception of the skew in the soft tables, so
4 that the enhancement to the skew of the softs that they
5 made would have been part of their work product.
6     There's a table in here that actually shows for
7 the verification and validation steps, there are -- based
8 upon the standards there are required output at each
9 stage.  On page 35, table four, it's clearly labeled --
10 the product files are clearly labeled, that came from that
11 figure one as well, so that's clearly part of the product.
12 What I'm looking for the test and design documents.
13 They're back here in the table somewhere.  Those documents
14 are also part of the product as well; that's at page 33,
15 table three, verification and validation documents.
16     To develop a complicated software system like
17 this, it's -- I can't imagine how you can do it without
18 documentation describing what was to be done, that it was
19 done and that what you did was tested.  So the documents
20 for the verification and validation are in table three,
21 that's also part of their work product.
22  Q.  What, if anything, did you do to verify that in
23 doing their damage calculation Balance Engines was
24 following the terms of the operative commission plans?
25  A.  I looked at -- first of all, that was not my

13 (Pages 46 - 49)

Page 58

1 guarantee or ramp-up?
2     MS. FISHER: I'm going to object to the extent it
3     calls for a legal conclusion and an interpretation of
4     the stipulation and what the parties actually agreed
5     to. But if you understand her question, you can
6     answer.
7     THE WITNESS: The question was, would it change
8     my opinion?
9 BY MS. BLOOM:
10  Q.  Correct.
11  A.  And the answer is no because my opinion is based
12 upon the standards associated with software development
13 and testing. Anyone that has performed software
14 development and testing is aware that these are done to
15 mitigate problems. The old adage that testing does not
16 show the absence of bugs but the presence of bugs is true
17 in this case. And so the fact that someone follows
18 procedures helps remove the chance, removes many bugs, but
19 may not remove all of them. So I can -- I was not asked
20 to comment on the specific calculations themselves.
21  Q.  What was the methodology that you used to vet
22 their process?
23  A.  Would you please define what you mean by vet
24 specifically?
25  Q.  Well, did you -- what was the methodology that

Page 59

1 you used that you base your conclusion in number three on
2 that they followed adequate design implementation and
3 testing to validate the correctness of the product?
4  A.  I believe it's clearly outlined in my report.
5 What I did is I did two things. I performed a -- on page
6 eight, and following that I performed a technical review.
7 Had they produced -- if you look at page eight, I
8 identified the actual input that I used for my review and
9 then I performed an analysis of various components,
10 specifically the input data validation, data quality, and
11 the verification and validation, which is the testing.
12     And then when you get -- if you look on page 12
13 within the input data validation review, I show you
14 specifically the things I did in each area. And that goes
15 on for the rest of that.
16     And then I looked at the data quality, what are
17 data quality best practices, did they follow those best
18 practices? And I look at some specific examples that in
19 my review came up, such as lack of unique employee
20 identifiers, inconsistent data formatting and class list,
21 et cetera.
22     And then I spent quite a bit of time dealing with
23 the verification and validation. Any time you develop a
24 product, you need to perform sufficient testing, and the
25 evaluation of that testing and its results are as much a

Page 60

1 part of the work product as the final results itself.
2     So in terms of the verification and validation, I
3 looked at the standard, IEEE, 2012 and I looked at what
4 are the requirements for appropriate verification and
5 validation and did they provide those -- did they satisfy
6 those requirements, and I did an analysis of all of those.
7 So that's what I did to come up with the conclusions. I
8 would be happy to go through any of them in more detail,
9 if you wish.
10  Q.  Well, you conclude on page 17 that the skew and
11 SOCs list provided by Sprint were incomplete. What do you
12 base that conclusion on?
13  A.  Based upon the information in the log file that
14 Balance Engines had created and the fact that there were
15 some records that I observed that did not have billing
16 records that had -- did not have specific skews and SOCs
17 that I could see in the table that I had.
18  Q.  Did you look at any of the raw data?
19  A.  Raw data? The only data I had was stage three
20 data, so what do you mean by raw data?
21  Q.  Did you look at the data as it was received by
22 Sprint before it was processed by Balance Engines?
23  A.  I looked at -- and that was the very first thing
24 we discussed, the input data validation. I looked at the
25 data as it was provided on the disk and looked at the

Page 61

1 input to their system, the storage.
2  Q.  So you looked just to make sure that it all went
3 from the disk to their storage system?
4  A.  Yes.
5  Q.  Once it went to their storage system and once
6 Balance Engines had created whatever logs they had
7 created, did you go back to check the accuracy of those
8 logs?
9     MS. FISHER: Objection. Vague.
10     THE WITNESS: Yes.
11 BY MS. BLOOM:
12  Q.  And where did you --
13  A.  I did spot checks. It was too big to look at all
14 of it on a daily, I don't know, semi-daily basis I would
15 go back to the log and see what are they working on now.
16 Remember, I was analyzing this while they were developing
17 it, so they were developing it and I would periodically
18 log into their system and see what are they working on
19 today, without talking to them. And then if something
20 caught my eye on the log, then I would go back and
21 investigate it. If there was a problem or whatever they
22 were working on.
23  Q.  How can you conclude that they followed best
24 practices without actually examining whether or not the
25 conclusions that they reached are supported by the terms

16 (Pages 58 - 61)

Page 126

1 report is the product of reliable principles and methods.
2    A.  Yes.
3    Q.  And that they had applied those principles and
4 methods reliably to the data; correct?
5    A.  Yes.
6    Q.  So the conclusions that you reached in your
7 report, which has been marked as Exhibit 1, mirror the
8 purpose or the goal that was set out for you by
9 Mr. Frohman in his March 1st, 2012, e-mail to you;
10 correct?
11    A.  Yes.
12    Q.  Are you planning to do any additional analysis in
13 this case?
14    A.  At this point in time, my future plans in this
15 case are unclear to me, so I have no plans along that
16 line.  I mean, I may.  I don't know.
17    Q.  Did anything that Dr. Thornton -- well, strike
18 that.
19       You were here during Dr. Thornton's deposition
20 yesterday; correct?
21    A.  Yes.
22    Q.  Are you planning to attend Balance Engines'
23 depositions next week?
24    A.  I have been asked to, and, yes, I am planning to.
25    Q.  Is there anything that Dr. Thornton testified to

Page 127

1 which as a result of which you're going to go back and
2 check any of the work that you've already done?
3    A.  You mean before next week or at any time?
4    Q.  Let's start with before next week.
5    A.  At this time I'm not planning on doing anything
6 before next week.  It's my birthday, I'm going to go home
7 and celebrate my birthday and see my daughter.
8    Q.  Is there anything that Dr. Thornton testified to
9 yesterday that you believe will cause you to go and check
10 at some point in the future?
11    A.  There are questions that were raised yesterday
12 and today, and I'm sure will be raised in discussions that
13 I may investigate at some point.  But I'm not sure what
14 those are now.  I just know there were some questions
15 raised about this event or the other.
16    Q.  Anything in particular?
17    A.  Well, some that you mentioned today, analyzing,
18 for example, did Dr. Thornton actually use stage two data.
19 That was an interesting question.  Analyzing tracing in
20 employees through her system, that would be interesting to
21 do.  Whether I will or not, I don't know.
22    Q.  You testified earlier today that the contract and
23 the commission plans were black-and-white.  Do you
24 remember that testimony?
25    A.  I said that's my feeling, yes, my opinion.

Page 128

1    Q.  And I just want to make sure that I'm clear.  You
2 did not go back and check Balance Engines' methodology
3 against the commission plans or the operative commission
4 plans; correct?
5    A.  I didn't check to see are they applying the
6 operative commission plans.
7    Q.  Or if they're applying them correctly?
8    A.  I did verify that they did apply them.  They did
9 use them, and overall analysis of their table seemed to be
10 okay.
11    Q.  But you didn't check to see whether they actually
12 applied them correctly in terms of their ultimate output;
13 correct?
14       MS. FISHER:  Objection.  Asked and answered
15    several times.
16       THE WITNESS:  I was not asked to do that.  I
17    didn't do it.
18       MS. BLOOM:  Thank you very much.  I have nothing
19    further.
20       THE WITNESS:  At all?
21       MS. BLOOM:  Well, subject to and I get the
22    additional documents if I have anything else.
23       MS. FISHER:  It's because it's your birthday,
24    Maggie.
25       THE WITNESS:  It's not really my birthday.  You

Page 129

1 didn't ask how old I was.
2       MS. BLOOM:  Did you think I would ever ask you
3    that question?
4       THE WITNESS:  Are we off the record?
5       VIDEOGRAPHER:  Going off the record.  The time is
6    12:48 p.m.

8       (Deposition concluded at 12:48 p.m.)