# EXHIBIT 2

```
                                                              Page 1
 1              IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF KANSAS
 2

 3
    _____/
 4  ROXIE SIBLEY, JEANNE NOEL, ERNESTO
    BENNETT, JAMIE WILLIAMS, GREG
 5  ST. JULIEN, TRACIE HERNANDEZ,
    JOHN JASINSKI, JAY RICHIE, and
 6  TEISHA KING, individually and on
    behalf of a class of others similarly
 7  situated,

 8            Plaintiffs,

 9  v.                   Case No. 02:08-CV-02063-KHV/JPO

10  SPRINT NEXTEL CORPORATION, a Kansas
    corporation,
11
    and
12
    Sprint/united management company,
13  A Kansas corporation,

14            Defendants.
    _____/
15

16  VIDEOTAPED DEPOSITION OF:  JANET R. THORNTON

17  DATE TAKEN:                FEBRUARY 28, 2013

18  TIME:                      9:00 A.M. - 6:04 P.M.

19  PLACE:                     PROSKAUER ROSE, LLP
                               2255 GLADES ROAD, SUITE 421
20                             BOCA RATON, FLORIDA  33431

21

22

23
         Taken on behalf of the Plaintiffs before Shari
24  Grimsgaard, Notary Public in and for the State of Florida
    at Large, pursuant to a Notice of Taking Deposition filed
25  in the above cause.
```

JANET R. THORNTON
2/28/2013

Page 18

1  Q.  Similarly the same question for
2  preprocessors, do you have any experience or expertise
3  in preprocessors or how they work or operate?
4       MS. BLOOM:  Object to the form of the
5  question.
6  A.  In terms of, again, my experience is working
7  with the data and understanding how data flow.
8  Q.  But not actually analyzing the system
9  itself, correct?
10      MS. BLOOM:  Object to the form of the
11 question.
12 A.  If I'm understanding your question in terms
13 of the system, no, my experience is --
14 Q.  With the data?
15 A.  -- with the data and understanding how data
16 flow.
17 Q.  Well, did you have any experience with
18 preprocessors prior to working on this case against
19 Sprint?
20      MS. BLOOM:  Object to the form of the
21 question.
22 A.  Preprocessors can mean many different things
23 in terms of data, so would you please define what --
24 where -- how you want to define preprocessors?
25 Q.  Sure.  You understand there are

Page 19

1  preprocessors involved in this case, right?
2  A.  Yes.
3  Q.  Have you ever dealt with data first from
4  preprocessors related to other cases other than this
5  case?
6  A.  I don't know.
7  Q.  Have you ever gone into a preprocessor's
8  system and analyzed the system, itself, or has the work
9  that you've done related to preprocessing just been
10 analyzing the data?
11      MS. BLOOM:  Object to the form of the
12 question.
13 A.  Based on my memory, I believe I've analyzed
14 data and understand how -- and have understood how the
15 data flow.
16 Q.  But no analysis of the actual preprocessor
17 system, itself, correct?
18      MS. BLOOM:  Object to the form of the
19 question.  Are you talking about the hardware again?
20      MS. FISHER:  Yes.  The system, yes.
21      MS. BLOOM:  Okay.  Object to the form of
22 the question because I'm unclear as to what you mean
23 when you say "system".
24      MS. FISHER:  The hardware, the software.
25      MS. BLOOM:  Okay.  Object to the form of

Page 20

1  the question and ask that you ask those questions
2  separately.
3  Q.  Have you ever analyzed preprocessor
4  hardware?
5  A.  No.
6  Q.  Have you ever analyzed preprocessor
7  software?
8  A.  No.  In terms of the actual software, no; in
9  terms felt data, yes.
10 Q.  Okay.  The same question for commission
11 calculations systems.  Has -- has your analysis related
12 to commission calculations systems been strictly just an
13 analysis of the data from that type of system?
14      MS. BLOOM:  Object to the form of the
15 question.
16 A.  Based on my memory I believe so, yes.
17 Q.  Have you ever done any analysis of
18 commission, any data from commission calculation systems
19 other than the data in the Sprint cases?
20 A.  As I've stated previously, I have analyzed
21 the commissions from various employers.
22 Q.  You don't know if that data actually came
23 from a commission calculation system, or if it was
24 provided to you through payroll?
25      MS. BLOOM:  Object to the form of the

Page 21

1  question.
2  A.  I'm not sure.
3  Q.  Have you ever worked in the
4  telecommunications industry?
5  A.  Yes.
6  Q.  Describe for me that work experience?
7  A.  We have worked on other matters involving
8  the telecommunications industry in the past.
9  Q.  Tell me about those matters.
10 A.  We've worked on matters involving billing
11 systems and the billing of certain transactions to
12 consumers.
13 Q.  When you say "we" do you mean yourself, you
14 have?
15 A.  I've worked on that project, yes.
16 Q.  Who is the company?
17 A.  Alltel.
18 Q.  What was that work?  You said it related to
19 the billing of certain customers.  Tell me what the work
20 was --
21 A.  Yes.
22 Q.  -- that you did?
23 A.  Our firm worked on this -- a matter
24 involving the roadside assistance charges to consumers.
25 Q.  And what was the ERS's role though in that

6 (Pages 18 to 21)

JANET R. THORNTON
2/28/2013

Page 26

1  companies as a firm, but I don't know all of those off
2  the top of my head.
3      Q.   And what I'm most interested in, since
4  you've been identified as the expert in this case, the
5  work that you've actually done.  So, do you recall any
6  work that you've done for a wireless communication
7  company, if you've ever set up a system to process data
8  for one in the past?
9      A.   I don't recall any others.
10     Q.   Have you ever programmed or coded a system
11 to process and/or calculate commissions?
12          MS. BLOOM:  Object to the form of the
13 question.
14     A.   I don't believe so.
15     Q.   Prior to your employment with ERS did you
16 have, ever have any IT related jobs, were you a computer
17 programmer, computer coder, any of those types of jobs?
18     A.   In my prior graduate work I did programming
19 for professors in graduate school and in undergraduate
20 school.
21     Q.   What kind of programming did you do?
22     A.   I wrote programs to analyze hierarchical
23 data and develop file databases and then prepared
24 statistical analyses of those data.
25     Q.   What type of language did you use to write

Page 27

1  those programs?
2      A.   I do not remember.
3      Q.   Have you ever worked as a computer system
4  analyst, a computer system designer, computer help desk,
5  any types of those jobs?
6           MS. BLOOM:  Object to the form of the
7  question.
8      A.   I don't believe so.
9      Q.   What makes you qualified to testify as an
10 expert as to whether Sprint systems paid accurate
11 commissions to the class?
12          MS. BLOOM:  Object to the form of the
13 question.
14     A.   Based on my prior experience and training
15 and education I have the skills to prepare a
16 methodology, design a methodology to independently
17 review data from disparate sources, review the
18 information provided, and design a methodology to
19 analyze the information to come -- to arrive at a
20 conclusion.
21     Q.   Did you do that in this case?
22          MS. BLOOM:  Object to the form of the
23 question.  Did she do what?
24          MS. FISHER:  What she just stated.
25          MS. BLOOM:  Well, what she just stated

Page 28

1  was in response to your question which characterized
2  the issue -- which framed the issue in a particular
3  way, and I -- I object to the form of the question
4  and also to the mischaracterization of the issue in
5  this case.
6      Q.   So, what makes you qualified to testify as
7  an expert in this case?
8      A.   Based on my experience, my education, my
9  training and my skills I have the ability and the
10 experience to review the information in each of the
11 disparate data sources and design a methodology to
12 independently address the allegation at hand.
13     Q.   What do you mean by independently address
14 the allegation at hand?
15     A.   To independently take the data from
16 disparate sources, review the information, understand
17 the information and design a methodology to analyze the
18 data.
19     Q.   Did you design a methodology to analyze the
20 data in this case?
21     A.   I reviewed the data and designed the process
22 to analyze it which I worked through with my team.
23     Q.   So, you stated that you reviewed the data in
24 this case and you designed a process to analyze it; is
25 that correct?

Page 29

1      A.   I did.
2      Q.   Did you have any help in doing that?
3      A.   I worked with my team, yes.
4      Q.   Who is your team?
5      A.   I worked with a group of individuals who I
6  supervised on this project.
7      Q.   Who?
8      A.   Dr. Carrie Amidon, Dr. Beau Shipman, Dr.
9  Jill Fitzpatrick, Doreen Pettus, June Dickie, Judy
10 Massey, Kevin Weisman, Jennifer Lambdin.  There may have
11 been others.
12     Q.   Are all of these people from ERS Group?
13     A.   Yes.
14     Q.   Why did you have so many people assisting
15 you or -- with this project for Sprint?
16     A.   The -- given the numerous data sources and
17 given the programming involved that required vetting and
18 review, it was necessary to have individuals do a
19 thorough job of reviewing the programming.
20     Q.   Who designed the process to analyze the data
21 with you?
22     A.   At a high level I designed the process.
23     Q.   What does that mean at a high level you
24 designed the process?
25     A.   I would start with the overall flow and then

8 (Pages 26 to 29)

JANET R. THORNTON
2/28/2013

Page 30

1  I would describe in detail how we wanted to go about the
2  process. But as we were working through the process, we
3  would work together as a team to design the best method
4  for, for example, for processing the data.
5      Q.   Did anyone from Sprint have any role in that
6  design process?
7      A.   No.
8      Q.   Was there anyone from Sprint that you were
9  communicating with to discuss questions that you had
10 about the data or the flow of the data?
11          MS. BLOOM: Object to the form of the
12 question.
13     A.   I may have had -- I would have had
14 conversations from time to time to confirm my
15 understanding.
16     Q.   Conversations with who from Sprint?
17     A.   Venu Muluka, M-U-L-U-K-A, and Raj
18 Kotomoraju, I believe it's K-O-T-O-M-R-A-J-U.
19     Q.   Is there anyone else that you would
20 communicate with Sprint related to this case?
21     A.   There may have been other individuals from
22 time to time, but those would have been the key
23 individuals.
24     Q.   When you were first hired to work on this
25 case, did you know how Sprint processed their

Page 31

1  transactions?
2      A.   No.
3      Q.   Did you know how they calculated commissions
4  when you were first hired for the case?
5      A.   No.
6      Q.   How did you learn that?
7      A.   I obtained -- I obtained the CAFs and the
8  MICT and I believe at that time there may have been
9  Stage 1 data.
10     Q.   Uh-huh.
11     A.   So, I would have reviewed the stage 1 data.
12     Q.   Was there anyone from Sprint that explained
13 the CAFs or the MICG stage 1 data to you?
14     A.   I don't believe so. I believe we would have
15 asked questions after reviewing the information.
16     Q.   How did your relationship with Sprint form?
17 How were you hired for this case?
18          MS. BLOOM: Object to the form of the
19 question.
20     A.   I was contacted by outside counsel.
21     Q.   You had worked for Ms. Bloom in the past,
22 correct?
23     A.   She -- yes, I have been retained by Ms.
24 Bloom in the past.
25     Q.   Were you contacted by Ms. Bloom about being

Page 32

1  an expert in the Sprint case?
2      A.   She contacted me about the project.
3      Q.   Was she the first one to contact you about
4  the project?
5      A.   Yes.
6      Q.   And you've worked with Ms. Bloom on how many
7  other cases?
8      A.   A few.
9      Q.   How many is that, two, three? You've worked
10 on a couple of RBS Citizens cases; is that right?
11     A.   Yes.
12     Q.   Are there any others you've worked on with
13 her for her firm?
14     A.   There would have been a few others in the
15 past.
16     Q.   Which cases were those?
17     A.   The one I recall was a project involving SMH
18 USA.
19     Q.   Have you worked with Ms. Bloom or Proskauer
20 on any other cases?
21     A.   There would have been a few others. There
22 may have been a Morton's Project.
23     Q.   When were you first contacted about working
24 on this case?
25     A.   I believe it was the fall of 2009.

Page 33

1      Q.   Were there any other experts working on the
2  case at the time?
3      A.   Not -- I don't know.
4      Q.   Nobody passed the baton to you and said,
5  here, you're taking over for me?
6      A.   Not that I know of, no.
7      Q.   Okay. Did you sign a contract to be an
8  expert on this case?
9           MS. BLOOM: Object to the form of the
10 question.
11     A.   I don't believe so.
12     Q.   Had you ever done any work for Sprint or
13 Nextel before?
14     A.   I believe I worked on a project involving
15 Nextel years ago.
16     Q.   What was that project?
17     A.   I believe it was a damages case.
18     Q.   I don't know what that means.
19     A.   I believe it was a case involving the
20 calculation of damage -- economic damages and there may
21 have been some other aspects of the case but I just do
22 not remember it.
23     Q.   Was that an individual case?
24     A.   I believe so.
25     Q.   A discrimination case?

9 (Pages 30 to 33)

JANET R. THORNTON
2/28/2013

Page 42

1    A.   On a white board.
2    Q.   And nobody maintained any of the information that was diagrammed on that white board?
4    A.   No, it was a process.
5    Q.   Well, how did you guys remember what you agreed to do for your design if you didn't write it down anywhere?
8    A.   We had a white board that stayed up there until we went step by step through our process.
10   Q.   No one ever took a picture of the white board?
12   A.   No.
13   Q.   That's clever. All right. So, you have no documentation that identifies the process you went through to come up with your design?
16   A.   No, the programming code that we provided is a reflection of that process.
18   Q.   Who did the programming code?
19   A.   My team.
20   Q.   Who?
21   A.   The individuals I identified previously.
22   Q.   All of them?
23   A.   They would have had a role in the programming.
25   Q.   Who actually did the programming though?

Page 43

1    A.   Ah, each of those individuals would have had a role in some component of the programming.
3    Q.   So, did they split it up by component?
4    A.   No. They split it up by the -- the piece of the process that we were working on. Additionally, there was review of the programming code by more than one member of the group.
8    Q.   So, each of these individuals that you identified you identified -- you identified specifically eight different people, they all know how to do computer programming?
12   A.   Yes.
13   Q.   Do any of them have computer science degrees?
15   A.   Yes.
16   Q.   Who?
17   A.   June Dickie does, and I believe that Judy Massey has a computer science technical degree. And I believe I failed to mention Norm Pettus, and he's an engineer who taught computer programming.
21   Q.   Who -- who did most of the computer programming for this project?
23       MS. BLOOM: Object to the form of the question.
25   Q.   And actually I'm going to rephrase it. Who

Page 44

1 did most of the programming for the analysis you did of the stage 3 data for your actual expert report?
3       MS. BLOOM: Object to the form of the question.
5    A.   It was probably four of those individuals, five of those individuals.
7    Q.   Who?
8    A.   Beau Shipman, Doreen Pettus, Carrie Amidon, Jennifer Lambdin. There may have been others. It's difficult for me to identify because there was so much review that many individuals were involved with a particular program.
13   Q.   And I was talking about the actual programming though.
15   A.   And more than one person may have worked on the programming.
17   Q.   Sure. But these four that you identified did most of the computer programming?
19   A.   I wouldn't want to say most, but they did quite a bit of it.
21   Q.   What computer programming background does Beau Shipman have?
23   A.   He is a Ph.D., economist and he has computer background -- computer programming in his experience and background and training and he teaches SAS at Forest

Page 45

1 State University.
2    Q.   What about Doreen Pettus?
3    A.   She's -- has a degree in mathematics and intense background in computer programming.
5    Q.   Carrie Amidon?
6    A.   She has a Ph.D. in economics and has in her background and training, computer programming experience and took course work as well.
9    Q.   And what about Jennifer Lambdin?
10   A.   She has a degree in statistics, an MBA and she's an industrial engineer, and she has experience both work experience and school experience in computer programming.
14   Q.   Has anyone on your team ever set up a system or programmed a system to process transactions to determine if they're commissionable or not?
17       MS. BLOOM: Object to the form of the question.
19   A.   I don't know.
20   Q.   You don't know?
21   A.   I don't know. I don't believe so.
22   Q.   Did you guys put the design on the white board so that you could erase it and there wouldn't be a record of it to produce in the case?
25       MS. BLOOM: Object to the form of the

12 (Pages 42 to 45)

Page 46

1  question.
2      A.  Not at all.
3          MS. FISHER:  Let's take a break.
4          THE VIDEOGRAPHER:  Off the record at
5  10:04.
6          (Recess is taken.)
7          THE VIDEOGRAPHER:  We'll start tape
8  number II on the video record at 10:19.
9      Q.  We were talking about --
10         MS. HALLER:  Could you un-mute it when
11 you get started again.
12         MS. FISHER:  There you go.  Can you hear
13 us?
14         MS. HALLER:  Yeah, thanks.
15     Q.  Sorry about that.  We were talking about
16 your team, meaning -- and talking about the design of
17 this system that your team recreated to calculate
18 commissions in this case.  And you mentioned that the
19 design was on a white board in a room somewhere,
20 correct?
21         MS. BLOOM:  Well, just object to the
22 question.  To the extent that it mischaracterizes her
23 testimony with regard to what she described they were
24 doing.  You characterize it as to calculate
25 commissions.  I'm not sure that's exactly what her

Page 47

1  testimony was.
2      Q.  Okay.  So, you and your team drew something
3  on a white board; what was it?
4      A.  What I did was from a high level, based on
5  our experience of working with the information, in part
6  through the mediation process and applying our knowledge
7  or my knowledge of the data and the processes, I
8  designed a methodology that provided a -- steps at a
9  high level as to how we would go about in preparing an
10 analysis of the data.
11     Q.  Okay.  You said through your knowledge the
12 data and the processes you designed at a high level the
13 process that would be used; is that what you put on the
14 white board?
15     A.  Yes.
16     Q.  Okay.  And that was the first time that you
17 had written it down anywhere?
18     A.  Yes.
19     Q.  And you designed this process at a high
20 level on your own based on your prior experience in the
21 case?
22     A.  Yes.
23     Q.  And you said it was through your knowledge
24 that the data and the processes, where did that
25 knowledge of the data and the processes come from?

Page 48

1      A.  It started from initially the receipt of the
2  stage 1 data and then through the mediation process and
3  reviewing the information that was provided on stage 3
4  as well as having worked with information for the
5  analysis of the name plaintiffs, nine named plaintiffs.
6      Q.  And you also received knowledge of data and
7  processes from Sprint?
8      A.  The data itself, yes, as well as knowledge
9  of the CAFs, me and my staff.
10     Q.  You received that information from
11 individuals at Sprint, correct?
12         MS. BLOOM:  Object to the form of the
13 question.  Mischaracterizes her testimony.
14     A.  The CAFs and the MICTs?
15     Q.  No, I understand that those are paper
16 documents that Sprint gave you or Sprint's lawyers gave
17 you, but I'm wondering you can't develop all your
18 knowledge of the data and the processes and what it
19 means just by looking at the CAFs in the Master
20 Incentive Compensation Guides, correct?
21     A.  Sure.
22     Q.  You need to actually look at the data?
23     A.  And --
24     Q.  And try to understand the data and what it
25 means, right?

Page 49

1      A.  Yes.
2      Q.  And you had some contacts at Sprint that you
3  used to contact when you had questions about the data or
4  what it meant?
5      A.  To confirm our understanding of the data,
6  yes.
7      Q.  And those individuals were Venu Muluka and
8  Raj, I'm not even going to try to pronounce his last
9  name, correct?
10     A.  That's my recollection.
11     Q.  Let's go back to setting up a system to
12 analyze the data prior to mediation.  Who was involved
13 in that?  Because you set up a system or mediation to
14 analyze the stage 1 data, correct, or not?
15     A.  Mediation was not a stage 1 data.
16     Q.  I'm sorry.  The sample data.
17     A.  I worked on that design.  I -- I'm sorry --
18 I'm -- maybe I'm not understanding the question.
19     Q.  Sure.  I'm going to make it easier.  I'm
20 going to go back to when you first started on the case
21 because you didn't just come into the case knowing how
22 to process and calculate commissions for Sprint, right,
23 you had to learn it?
24     A.  I did not know about the information from
25 Sprint when I was retained, that's correct.

Page 54

1  with Venue Muluka or your team during this process?
2      A.   No.
3      Q.   Why not?
4      A.   I don't believe I would have had notes.
5      Q.   You don't take notes when you go to
6  meetings?
7      A.   I generally take in the information.  If I
8  have notes, once I've digested them, I have difficulty
9  reading my writing, and once I've incorporated the
10 information I move on.
11     Q.   So, you don't typically take notes?
12     A.   Or I take limited notes.
13     Q.   Do you have notes from your meetings with
14 your team or with any Sprint employees related to how
15 you set up your system, any of your systems?
16     A.   No.
17     Q.   Do you have any notes related to how
18 commissions were going to be calculated by your team?
19     A.   No.
20     Q.   Did any of your team members take notes
21 during these meetings about how the system would be
22 designed or set up or how it would work?
23     A.   I don't -- I don't believe so.
24     Q.   Does ERS have a practice that nobody can
25 take notes?

Page 55

1      A.   No, we take notes.  But once we've
2  incorporated the information in our programming
3  language, the programming language is the record of our
4  thought processes.  And as you're working on a project
5  and working on the programming, we would have meetings
6  and would review the code and so as we were making
7  modifications to the code and debugging the code and
8  vetting the code, it would get incorporated in the
9  programming code.
10     Q.   What happened to the notes that people took?
11     A.   I would suspect that they would not retain
12 them because it would get incorporated in the code.
13     Q.   Do you know that for a fact though?
14     A.   I don't know it for a fact, but I would
15 suspect it's true.
16     Q.   Is -- is that a practice though of ERS not
17 to retain notes?
18     A.   No.  It's the practice of that as you're
19 working on a project those notes can be confusing
20 because it's -- as you're working on developing a
21 program and debugging it, those notes to the extent they
22 exist, may be confusing because we may have moved on
23 from what we originally discussed.
24     Q.   But your team might communicate in an e-mail
25 or in some sort of written form about different issues

Page 56

1  that are going on, different things that might need to
2  be modified in your programs, right?
3      A.   From time to time there could be.
4      Q.   Are those e-mails destroyed?
5           MS. BLOOM:  Object to the form of the
6  question.
7      A.   I don't know.
8      Q.   Does ERS have a policy on how long it
9  maintains e-mails?
10     A.   I don't know.
11     Q.   Do you know if e-mails exist between you and
12 your staff members or between them unrelated to this
13 project?
14     A.   I don't know who would generally, as I said
15 meet, because we were looking at programming code.
16     Q.   How many years have you been writing, would
17 you call it SAS or S-A-S programs?
18     A.   Umm, the first time I wrote a SAS program
19 would have been in the 1980s.
20     Q.   Is that the common program that you use in
21 doing your job?
22     A.   It's one of them.
23     Q.   What others do you use commonly?
24     A.   Currently in addition to SAS I may use SPS,
25 I may use Stata.  Sometimes we work on a project or

Page 57

1  projects where the information is provided in COBAL
2  language or FORTRAN and we may use that.
3      Q.   There are three FORTRAN programs that were
4  used related to the analysis of the stage 3 data; is
5  that right?
6      A.   There could be.
7      Q.   Are you familiar with the programs that were
8  used by you and your team to analyze the stage 3 data?
9      A.   I am familiar with them all.  I've reviewed
10 them, but it's been a year's time so I may not remember
11 each and every program without looking at them.
12     Q.   Did you write any of the FORTRAN programs?
13     A.   I don't believe I wrote the FORTRAN
14 programs.  I reviewed them.
15     Q.   There are 14 SPSS programs that were used in
16 ERS stage 3 analysis; were you aware of that?
17     A.   I know that there were SPSS programs; the
18 number, I don't recall the number.
19     Q.   Did you write any of those?
20     A.   I may have.
21     Q.   You don't recall?
22     A.   I probably did.
23     Q.   Did you write all of them?
24     A.   Probably not.
25     Q.   Why was it necessary to write programs in

15 (Pages 54 to 57)

Page 118

1  Q.  Was it your understanding that you would
2  actually go in and look within Sprint's systems to
3  figure out if these computer problems existed or that
4  you would just analyze the data to see if there were
5  underpayments?
6     A.  I was, as I stated before, asked to
7  independently prepare a methodology to analyze whether
8  or not there was an underpayment in terms of what was
9  owed.
10    Q.  By analyzing the data though, correct?
11    A.  Yes.
12    Q.  You were never asked to analyze Sprint's
13 actual systems, themselves?
14    A.  No.
15    Q.  And you didn't analyze Sprint's actual
16 systems, themselves, you just analyzed the data,
17 correct, I think we established that earlier?
18        MS. BLOOM:  Object to the form of the
19 question.  Also mischaracterizes her testimony.  If
20 you're asking about whether she analyzed the
21 physical, like the hard drives, is that your
22 question?
23        MS. FISHER:  No, because you can't
24 really define a system as the hard drive or the
25 software because they're all connected.  It's an

Page 119

1  entire process from start to finish, from POS through
2  the commission system.  And I know you analyzed the
3  data from those systems, we've already talked about
4  that, it was the stage 3 data.
5     Q.  But I'm wondering if you actually went and
6  analyzed anything more than the data, like you went into
7  Sprint's actual systems --
8     A.  And what do you mean by that?
9     Q.  -- to perform an analysis?  Do you
10 understand what a system is?
11    A.  Well, yes, but I'm trying to figure out what
12 it is exactly you're asking me.
13    Q.  Did you do anything other than analyze the
14 data in determining whether there were problems in
15 Sprint's systems, the stage 3 data?
16    A.  Well, I independently reviewed all the
17 information and designed a methodology to analyze the
18 data.  So, I think it's more than analyzing the data,
19 because in order to analyze the data you have to have an
20 understanding.
21    Q.  Everything that you analyzed though has been
22 identified in your report, correct?
23    A.  I believe so, to the --
24    Q.  Okay.
25    A.  -- best of my knowledge.

Page 120

1     Q.  And as a result of your analysis of the
2  stage 3 data, you reached four conclusions that you
3  identify on page three; is that correct?
4     A.  That is correct.
5     Q.  Your first conclusion was that there were no
6  systematic computer problems affecting Sprint's
7  commission system; is that correct?
8     A.  Yes, as it relates to we're not finding an
9  underpayment of commissions.
10    Q.  That's what that means?
11    A.  Yes.
12    Q.  Number two, none of the nine named
13 plaintiffs was underpaid commissions from August, 2005
14 through September of 2009; was that the conclusion that
15 you reached?
16    A.  Yes.
17    Q.  And I'll talk in more detail with you about
18 that further in your report.  Number three, 98.5 percent
19 of the employees were paid correctly and/or were
20 overpaid under the terms of the operative commission
21 plans.  That was your third conclusion; is that right?
22    A.  That is correct.
23    Q.  And fourth, individual issues predominate as
24 to the 1.5 percent of employees with underpayments
25 because there were no systematic computer system

Page 121

1  problems; that is what you concluded?
2         MS. BLOOM:  Systematic commission
3  systems problems.
4         MS. FISHER:  Yes.  Thank you.
5     Q.  Is that what you concluded?
6     A.  Yes.
7     Q.  And in paragraph five you state that to
8  reach these conclusions I analyzed each of the millions
9  of sales transactions entered into Sprint's point of
10 sale system, the billions of billing transactions and
11 the transactions with commission payments made by Sprint
12 to determine if each individual was paid according to
13 the terms of the operative commission plans.  And you
14 did this analysis in an automated fashion through the
15 system that you set up that you described earlier,
16 correct?
17        MS. BLOOM:  Object to the form of the
18 question.
19    A.  It was done through a set of programs with
20 manual review.
21    Q.  What manual review?
22    A.  As we were testing programs we tested the
23 accuracy.
24    Q.  Okay.  Like manual spot checking to insure
25 that your processes were working correctly?

31 (Pages 118 to 121)

JANET R. THORNTON
2/28/2013

Page 122

1  A.  I would say that it was more than spot
2  checking.
3  Q.  Okay.  But it was testing, it was vetting?
4  A.  It was a lot of vetting.
5  Q.  On the next page, page four at paragraph six
6  you say that during the class period there were over 350
7  million activities for which a commission was paid
8  resulting from over 260 million sales and/or service
9  related transactions.  The 350 million activities you
10 refer to, that includes more than just retail, correct?
11 A.  No.
12 Q.  Okay.  What does that mean?
13 A.  I believe, and I'd have to go back and
14 review, but my recollection was that would have been
15 based on commissionable ODR activities.
16 Q.  You think there were 350 million
17 commissionable ODR activities on the ODR for retail?
18 A.  Yes, that is my recollection.
19 Q.  And then you say -- what do you mean by 260
20 million sales and/or service related transactions then?
21 A.  My recollection there is that this would
22 have been in relation to the RMS data.
23 Q.  And the reason for the difference may be
24 that what, there was -- there were commissions paid on
25 C-SAT, for instance, that wouldn't be considered a sale

Page 123

1  or service?
2  A.  No.
3  Q.  Okay.  Well, why -- why the difference in
4  numbers?
5  A.  Well, for a given RMS transaction, and I
6  might note that footnote 11 states among the 260 million
7  are service-related transactions that are not
8  potentially compensable -- are not commissionable.  So,
9  there is a subset of the 260 million that would be
10 potentially commissionable, but from a transaction you
11 can have more than one activity that's commissionable.
12 Q.  I see.  And then you say from the -- from
13 this transaction by transaction review, there you're
14 referring to the review that your system did, right?
15 A.  Yes.
16 Q.  You --
17 A.  Based on the -- all of the work that was
18 done.
19 Q.  Okay.  You say I applied the rules as
20 outlined in the written commission plans and then you
21 say I determined whether the transaction was eligible
22 for a commission, the amount of commission to be paid,
23 whether the commission was paid, and to whom it was
24 paid; is that correct?
25 A.  That's correct.

Page 124

1  Q.  Did you analyze to whom it should have been
2  paid?
3  A.  Yes.  In terms of tracing the transaction
4  through from RMS, yes.  And the end of the plan
5  commissionable transactions generally had to be placed
6  through RMS.
7  Q.  Okay.  Were there any transactions that you
8  found that were paid or categorized as relating to
9  another channel, for instance the business channel, that
10 were not credited to the retail employees that should
11 have been?
12 A.  Are you asking through RMS?
13 Q.  Through anywhere.
14 A.  I'm not aware of that.
15 Q.  Are you aware of that happening with respect
16 to the A pound sign identifier?
17 A.  Because I did not rely on the dealer code, I
18 would not have limited myself to a particular
19 transaction.
20 Q.  Well, were you aware of the situation where
21 Care or NNS got involved in a transaction that a retail
22 employee sold, touched the transaction in some way and
23 then a different identifier was put on the transaction
24 that didn't belong to the retail employee?
25 A.  I may have read something --

Page 125

1  Q.  Uh-huh.
2  A.  -- about a pound.  However, in terms of my
3  analysis to the extent that occurred, if it occurred, it
4  would not have had any impact on my analysis.
5  Q.  Okay.  Are you saying with respect to those
6  transactions that ended up with an A pound sign code on
7  them the actual employee identifier was still maintained
8  on the transaction that you were able to use to
9  associate the transaction with the correct retail
10 employee?
11 A.  If I'm understanding your question, because
12 I am going back to the source of who made the sale and
13 I'm relying on that information, if there was any
14 information in billing regarding an A pound, it would
15 not have impacted my counting of that transaction.
16 Q.  Okay.  Let's turn to page 29 of Exhibit 1
17 where you start describing these four conclusions that
18 you reached, okay.
19     All right.  Let's talk about the first
20 conclusion that 98.5 percent of the employees were
21 paid correctly and/or were overpaid according to the
22 terms of the operative commission plan, and that was
23 your finding, correct?
24 A.  That is correct.
25 Q.  You concluded that overall there was not an

32 (Pages 122 to 125)

JANET R. THORNTON
2/28/2013

Page 126

1  underpayment of commissions from August of 2005 through
2  September of 2009, right?
3      A.  That is correct.
4      Q.  But you did find underpayments, right?
5      A.  I found potential underpayments, yes.
6      Q.  Why do you use the word "potential"?
7      A.  Because having reviewed some of them
8  individually, I think one needs to research them because
9  of the ones I reviewed, they were potential
10 underpayments, but I do not believe they were
11 underpayments.
12     Q.  So, you're not sure if your system
13 calculated commissions accurately for those?
14     A.  Oh, I think it calculated correctly, but I
15 believe that there is -- they need to be reviewed for
16 other potential -- for other potential review.
17     Q.  Why?
18     A.  Well, for example, in looking at some of the
19 outliers, the reason for the calculation of an
20 underpayment was that the quota may have been one, which
21 under the term -- under the terms of these plans is
22 highly unlikely that the quota was one.  And so for
23 those types of reasons one would need to review them.
24     Q.  Sprint calculated commissions every month in
25 an automated manner; isn't that correct?

Page 127

1      A.  They did so with a lot of checks and
2  balances, yes.
3      Q.  But the system calculated the commissions
4  for all the employees, right?
5      A.  It calculated it, yes.
6      Q.  Do you believe that Sprint should have done
7  a manual calculation for each of the employees every
8  month so that their calculations would be accurate?
9      A.  From a business perspective that would
10 probably be impossible because of the volume of
11 employees.
12     Q.  Was your system that you set up able to
13 calculate commissions in an automated and accurate
14 manner for the class?
15     A.  Yes, it was.
16     Q.  What about the overpayments that you found,
17 do those need to be analyzed manually or individually in
18 order for us to determine if there actually was an
19 overpayment?
20     A.  Well, I have reviewed some of those
21 manually.
22     Q.  Uh-huh.
23     A.  And I've determined that in those instances
24 there were -- there is the appearance of an overpayment.
25 And again, one could go back and manually review them.

Page 128

1      Q.  But do you think that's necessary with
2  respect to your overpayments or do you think that your
3  calculations related to overpayments are accurate?
4      A.  In terms of asking the question for
5  individuals paid what were those owed, then the answer
6  is, no, I do not believe that one needs to go back and
7  review each and every instance.
8      Q.  You found that overall there was an
9  overpayment during the class period to the 30,000
10 employees that you analyzed of over $72 million,
11 correct, on page 30?
12     A.  Yes.
13     Q.  And with respect to these 30,000,
14 approximately 30,000 employees that you analyzed, is it
15 your understanding that you analyzed all of the class
16 members that should be analyzed who should be included
17 in the class and have commissions calculated for them?
18     A.  Per the stipulation.
19     Q.  Okay.  And the ones that you left out are
20 ones that you don't think per the stipulation should
21 have damages calculated for them?
22         MS. BLOOM:  Well, objection.  Object to
23 the use of the term "damages".
24         MS. FISHER:  Commissions calculated in
25 this case.

Page 129

1          MS. BLOOM:  Well, for purposes of the
2  expert report.  There is an expert stipulation and so
3  I don't want you to mischaracterize what that is or
4  what the impact or use of that is on the case.
5          MS. FISHER:  Sure.
6      Q.  There were over 39,000 class members, if I
7  recall correctly; does that sound right?
8      A.  Approximately, yes.
9      Q.  Okay.  Are you of the understanding, I know
10 you calculated a little over 30,000 of them, are you of
11 the understanding that the rest of those individuals
12 should have damages calculated for them or commissions
13 calculated for them related to this case, or that they
14 should be excluded under the expert stipulation?
15     A.  I can't speak to whether calculations should
16 or should not be calculated for them.  What I can
17 testify to is what I've identified at footnote three.
18 And footnote three identified who I included per the
19 stipulation, and it also refers to the point that I did
20 not include employees who were employed in a store for
21 which the RMS system had not been implemented.
22     Q.  I see.  Did you exclude anybody else from
23 your calculations simply because you did not have
24 compensation statement data for these individuals
25 because it was missing for some reason or another?

33 (Pages 126 to 129)

JANET R. THORNTON
2/28/2013

Page 130

1  A. Not to the -- to the best of my knowledge,
2  no.
3  Q. Okay. So, you calculated commissions for
4  everybody who you believed you should calculate
5  commissions for as you described in footnote three?
6  A. Yes. And additionally, based on my review
7  of the data I analyzed, I'm restating what you said, I
8  analyzed who I believe should be analyzed under the
9  expert review process.
10  Q. Okay. And you believe that you had all the
11  data that you needed for those individuals that you
12  believed should be analyzed?
13  A. That is correct.
14  Q. We were talking earlier about, you know,
15  your role in this case was to analyze the data from
16  Sprint's systems, and I'd asked you some questions about
17  whether you actually looked in the systems which we've
18  already talked about.
19      But my question for you is is if, based
20  on your understanding of computers and computer
21  programming and what not, would it be your
22  understanding that if we actually went back to Sprint
23  and tried to look within Sprint's actual systems to
24  try and figure out if there were problems within
25  those systems during the class period, that those

Page 131

1  problems would still be there? I'm not saying you're
2  saying there were problems, but would -- would they
3  still be there if there were problems?
4  A. I don't understand the question.
5  Q. Sure. If we went back and tried to look in
6  Sprint's systems to see if we could find the reasons for
7  problems processing commission transactions or paying
8  accurately on commissions, is it your understanding that
9  we would be able to find those problems, or is it your
10  understanding that things often change within systems so
11  it may not look the same as it did, you know, four to
12  eight years ago during the class period?
13      MS. BLOOM: Well, object to the form of
14  the question. Also, object to the characterization
15  of the claim in this case. The claim isn't the
16  accurate payment, the claim is whether people were
17  paid what they were owed.
18  Q. You can answer.
19  A. I don't know the answer to your question.
20  Q. Okay. You understand though that people
21  change their programming within systems, right? You
22  guys did it. You guys changed and modified your
23  programming as you found things that needed to be
24  modified, right?
25  A. Certainly.

Page 132

1  Q. Okay. Do you have any understanding as to
2  whether Sprint does the same within its systems that
3  handle commissions?
4  A. Well, my understanding is they would change
5  code because, for example, the commission plans changed.
6  So, there would be changes --
7  Q. Okay.
8  A. -- along the way.
9  Q. So, would you agree that the best way for
10  you as an expert to figure out if the class was paid
11  correctly is to look at the data and analyze it yourself
12  as opposed to going and looking at Sprint's systems to
13  try and figure out if there were problems within those
14  systems during the class period?
15      MS. BLOOM: Objection to the form of the
16  question, specifically to the use of the word "paid
17  accurately". She defined what she was asked to do
18  and that was based on the allegations and the class
19  order and class notice in this case.
20  Q. You can go ahead and answer with your own
21  answer.
22  A. To do an independent review, in my opinion
23  it is to independently design a process for determining
24  whether or not there is a class wide underpayment of
25  commissions.

Page 133

1  Q. And that's what you did?
2  A. That is what I did.
3  Q. Is it fair to say that the experts in this
4  case, including yourself, will not necessarily know the
5  precise problem, to the extent there was one, within
6  Sprint's systems that caused transactions not to be
7  processed or paid correctly?
8      MS. BLOOM: Object to the form of the
9  question. It presumes that there was a problem.
10      MS. FISHER: I just ask that you stop
11  making speaking objections and coaching the witness.
12  But you can go ahead and answer the question.
13      MS. BLOOM: Well, I'm not coaching the
14  witness. I'm objecting to the form of the question
15  and --
16      MS. FISHER: Then you can say I object
17  to the form of the question.
18      MS. BLOOM: -- part of a form objection
19  is -- and I've been very careful, but some of your
20  questions in my opinion go way beyond what is
21  reasonable in terms of taking license with the
22  allegations in the case. And if I feel that that's
23  what's going on, I am going to state my objection.
24  Q. You can go ahead and answer if you even
25  remember the question.

34 (Pages 130 to 133)

JANET R. THORNTON
2/28/2013

Page 138

1  something --
2      Q.  Speak up.
3      A.  Pardon me.  Five percent is -- I'm using
4  margin of error here in terms of a range but because of
5  the realtime versus looking at it many years later, I
6  would not expect it to necessarily match exactly.  I
7  wanted to use a five percent margin of error around the
8  outcomes.
9      Q.  So, you don't think the data that Sprint
10 produced in its stage 3 data is the same as it was
11 originally during the class period?
12     A.  That's not what I testified about.
13     Q.  Okay.  That's what it sounded like so why
14 don't you clarify that.
15     A.  It's a timing issue.
16     Q.  Why does that matter?
17     A.  It would matter because when Sprint receives
18 the data, it's receiving it in individual feeds.
19 Whereas, I'm looking at it as one large piece as though
20 it almost occurred all at one time.
21     Q.  So, your commission calculations are not
22 necessarily accurate?
23     A.  No, that's not what I'm stating.  What I'm
24 stating is I have, in a sense, more information today
25 than Sprint had in a realtime environment.

Page 139

1      Q.  So, your calculation is more accurate than
2  Sprint's calculation?
3      A.  I believe it would be.  Ultimately in terms
4  of having all data from several years at one point in
5  time as opposed to Sprint processing the data as it
6  received it in its individual feeds.
7      Q.  Okay.  We can easily remove the margin of
8  error so that we can see what percentages you actually
9  found because right now you have 98 five percent --
10 point five percent were either correctly paid or
11 overpaid.  You have two groups in one set, but we can
12 break that out into three different groups and I think
13 your program does that.  You have correctly paid,
14 underpaid and overpaid, right, within your analysis?
15     A.  I -- I would like to characterize it as
16 underpaid and then paid correctly or overpaid.  In other
17 words, there's -- under the terms of the plans.
18     Q.  What do you mean under the terms of the
19 plans?
20     A.  In other words, applying the commission
21 plans this is what I found.
22     Q.  So, there are three categories, overpaid,
23 underpaid and correctly paid under the terms of the
24 commission plans?
25     A.  Yes.  But I group the two together in the

Page 140

1  98.5 percent.
2      Q.  But in your calculations you broke them out?
3      A.  Sure.
4      Q.  Yeah.  The calculation that you performed
5  and the analysis that you performed was not performed on
6  a sample, right, you actually did a calculation for the
7  entire 30,000 some class members that you thought should
8  have calculations, right?
9      A.  For the months for which I calculated it,
10 yes.
11     Q.  Aren't margins of errors, they're typically
12 used in sampling?
13     A.  In -- in terms of the statistical concept a
14 margin of error, yes.  What I am using here is the
15 notion of applying some range to my outcome and five
16 percent is a range that is often used in looking at some
17 measure of potential error.  And to the extent here I
18 have -- I'm looking at things after the fact, I've
19 applied that plus or minus five percent.
20     Q.  Are you aware of margin of error being
21 applied in any other case like you're applying it here?
22     A.  I believe I may have in other cases in the
23 past.
24     Q.  Can you tell me what cases those were?  I
25 haven't seen any.

Page 141

1      A.  I'd have to go back.
2      Q.  Who made the decision to apply margin of
3  error in this case?
4      A.  I did with my team.
5      Q.  When was that decision made, after you saw
6  the results?
7      A.  No, as we were working through the
8  programming and we felt that it would be misleading to
9  not include some measure of a margin, or some measure of
10 potential error.
11     Q.  You don't think it's misleading to lump
12 overpaid and correctly paid together?
13     A.  Not at all.  I -- I thought that this was --
14 was a more appropriate way of reporting the outcomes, to
15 answer your question.  Certainly I could have removed
16 the plus or minus five percent.  It doesn't change the
17 outcome by very much because it is a very narrow margin
18 of error.  But given the type of analysis prepared here,
19 I believe that it was a far more reliable way of
20 reporting the outcomes.
21     Q.  Is it normal in your industry to apply a
22 margin of error when you calculated damages for everyone
23 in the group?
24         MS. BLOOM:  Objection to the form of the
25 question.  It also mischaracterizes her testimony,

36 (Pages 138 to 141)

JANET R. THORNTON
2/28/2013

Page 142

1  mischaracterizes what she was doing.
2       A.   Well, I'm not preparing the damage
3  calculation here.
4       Q.   Well, you prepared a commission calculation.
5  I don't know what the problem is with the term
6  "damages".  What's your problem with the term "damages"?
7       A.   Well, because here I wasn't asked to
8  calculate damage.  I was asked to determine whether
9  there was a systematic underpayment of commissions
10 impacting the class.
11      Q.   What do you call it then what you did,
12 calculating commissions that are overpaid or underpaid
13 or correctly paid instead of calling it damages
14 calculation, what term would you like me to use?
15      A.   I view it as developing a process to analyze
16 the flow of transactions to determine whether there was
17 an underpayment of commissions across the class members.
18      Q.   Is it normal in your industry to apply a
19 margin of error when you calculated commissions for
20 everyone in your group?
21      A.   I don't know one way or the other.
22      Q.   Okay.
23      A.   In this circumstance I felt that it was the
24 appropriate way to report the results.
25      Q.   Do you have any authority for what you did?

Page 143

1       A.   Well, I believe using a five percent measure
2  of error is a standard measure.  And here I'm applying
3  it based on the form of the analysis.
4            MS. FISHER:  Do you have ten?
5            (Exhibit 2 is marked for
6  identification.)
7       Q.   All right.  You have in front of you Exhibit
8  No. 2.  This is the rebuttal report of Dr. Margaret
9  Dunham.  It's dated February 14th of 2013.  Have you
10 seen this document before?
11      A.   Yes.
12      Q.   Turn to page eight, please.  All right.  In
13 the middle of page eight we remove your plus or five
14 percent margin of error from your counts four program
15 and come up with the percentage who you concluded were
16 underpaid, correctly paid and overpaid.  Do you see that
17 in the center of the page?
18      A.   I do.
19      Q.   Okay.  Do you understand that to be an
20 accurate -- accurate reflection of the numbers that your
21 calculations reached when you removed the plus or --
22 plus or minus five percent margin of error?
23      A.   I'm sorry.  What was the question?
24      Q.   Sure.  You don't have any reason to believe
25 that these numbers are inaccurate, do you, once the plus

Page 144

1  or minus five percent margin of error is removed from
2  your programs?
3       A.   I don't know.  I did not receive the back up
4  to Dr. Dunham's analyses.
5       Q.   You never took the plus or five percent
6  margin of error out of your calculations to see what
7  your calculations actually were?
8       A.   I don't know if I did that on the final
9  analysis.
10      Q.   Do you have any reason to believe these
11 numbers are inaccurate though based on your -- your
12 calculations?
13      A.   I don't believe that they're inaccurate.
14      Q.   When we remove the plus or minus five
15 percent margin of error that you applied to your
16 calculations we came up with underpaid 3.98 percent,
17 correctly paid .04 percent and overpaid 95.99 percent of
18 the time; do you see at that?
19      A.   That's what this states.
20      Q.   Okay.  And your calculations found that
21 Sprint did not accurately pay commissions over 99
22 percent of the time; is that correct?
23      A.   I would restate it and say that --
24      Q.   No, I --
25      A.   -- the calculation showed if you take out

Page 145

1  the margin of error --
2       Q.   Uh-huh.
3       A.   -- that 3.98 percent were potentially
4  underpaid and the remainder were paid what was due.
5       Q.   Actually, you found that 99.97 percent of
6  the time the class members were either overpaid or
7  underpaid, correct?
8       A.   There is a potential, yes.
9       Q.   Do you have any knowledge from your
10 processing of the data or the analysis of the data as to
11 the reasons why Sprint paid commissions inaccurately
12 99.97 percent of the time --
13           MS. BLOOM:  Object --
14      Q.   -- according to your calculations?
15           MS. BLOOM:  Object to the form of the
16 question.
17      A.   My understanding was that Sprint was paying
18 what was owed.  And in terms of accuracy I -- I didn't
19 look to that question.  Instead, I was looking to
20 determine whether they were underpaid under the terms of
21 the plan.
22      Q.   Did you find it statistically significant
23 that Sprint paid inaccurate commissions 99.97 percent of
24 the time?
25      A.   I don't know what statistical test you're

37 (Pages 142 to 145)

JANET R. THORNTON
2/28/2013

Page 146

1  referring to.
2  Q.  Oh, sure.  I can refer you to your own
3  information that you cited in other affidavits.  Tell me
4  if this sounds like your understanding because that's
5  where I pulled it from.  If the probability of chance
6  occurrence is five percent or one percent or less,
7  statisticians consider that statistically significant.
8  Is that true?
9  A.  In the context of what you're writing.
10  Q.  Uh-huh.
11  A.  It -- that you're talking about based on the
12  statistic -- a statistical test, an inference and based
13  on a test of inference whether an outcome is
14  statistically significant.
15  Q.  Do you find it statistically significant
16  that Sprint did not pay accurate commissions over 99.97
17  percent of the time or not?
18  A.  I don't think this is a statistical test
19  here.
20  Q.  Okay.  Are you aware of there being a margin
21  of error mentioned anywhere in the commission agreements
22  that these employees had with Sprint or that the company
23  can pay within plus or minus five percent of what these
24  employees were actually due?
25  A.  I don't believe I read that.

Page 147

1  Q.  So, based on your application of a margin of
2  error in this case, if an employee was owed $2,100, you
3  would assume they were paid correctly if they were only
4  paid $2,000, right?
5  A.  I don't believe that's a correct
6  characterization of what I did.
7  Q.  Do you need a calculator to figure out if
8  that's within plus or minus five percent of the $2,100
9  that they were owed?  Do you want to figure that out?
10      Say that they're owed $2,100.  Would you
11  assume that they were paid correctly if they were
12  only paid $2,000, would that fall within your margin
13  of error of plus or minus five percent that you
14  applied in this case?
15  A.  I'm sorry.  The way you're stating the
16  question I just need to think about it a minute.
17  Q.  Okay.  Go ahead.
18  A.  If the difference between what was paid and
19  what I calculated should have been paid is it within
20  five percent of what they were paid, then if it's within
21  that then there's -- it would have been within the
22  margin of error.  If it's outside of that then it would
23  fall in one of the other categories.
24  Q.  So, going back to my example, if you found
25  that the employee was owed commissions of $2,100, would

Page 148

1  you assume that they were paid correctly if they were
2  paid only $2,000 by Sprint?
3  A.  Based on the margin of error, that is
4  correct.  May I -- may I restate that in terms of
5  they're in that category.  They're within that margin of
6  error.
7  Q.  Okay.  Let's go to page 30 of your report.
8  Actually, let's go to page 32, please.  This is in the
9  section of your report -- we're still talking about your
10  conclusion that 98.5 percent of the employees were paid
11  correctly or overpaid applying that margin of error.
12  And then you have a section on -- there is no
13  underpayment by employee type, and then on page 32 you
14  have a little graph there at the top of the page showing
15  underpaid, correctly paid and overpaid by employee type
16  and you divide it by sales reps, managers and store
17  hosts; is that correct?
18  A.  I believe so.
19  Q.  These figures on here, are these the figures
20  that you came up with when you were applying the plus or
21  minus five percent margin of error?
22  A.  Yes.
23  Q.  So, if we removed that plus or five percent
24  margin of error, the number of correctly employed or
25  correctly paid employees would go down and the number of

Page 149

1  overpaid employees and underpaid employees would go up,
2  right, that's how the margin of error works as you used
3  it here?
4  A.  As I used it here, yes.
5  Q.  Okay.  So, for instance, you have on this
6  chart, this figure two on page 32, with respect to the
7  sales reps that you analyzed, you have 88.6 percent were
8  paid inaccurately, 10.1 percent were paid correctly, and
9  1.3 percent were paid -- underpaid, right?
10      MS. BLOOM:  Objection.  That's not what
11  the chart shows.  88.6 percent were overpaid.
12      MS. FISHER:  What did I say, underpaid?
13      MS. BLOOM:  Inaccurately.
14      MS. FISHER:  Oh, sorry.  Are you on the
15  same -- oh, okay.  Yeah, you're on the same chart.
16      MS. EICHBERGER:  Just real quick.
17  Michele, for the official record, yours is in color.
18  The reports were generated in color and the exhibits
19  are not going to be in color.  Can we just have a
20  stipulation we'll substitute them out in color?
21      MS. FISHER:  Sure.  They're easier to
22  read when they're in color.  Sorry about that.  I
23  think yours are -- are yours in color?
24      MS. EICHBERGER:  No.
25      MS. FISHER:  Oh, I didn't do that on

38 (Pages 146 to 149)

JANET R. THORNTON
2/28/2013

Page 206

1  submitted on December 20th of 2012, correct?
2      A.  That's correct.
3      Q.  And it's a little weird to navigate, but go
4  to Appendix E then, is that where you're at?
5      A.  Yes.
6      Q.  The Appendix E has your affidavit that is
7  signed on December 16th, 2011 and it has attachments to
8  it as well as Appendices A through C, right?  Your
9  affidavit is 75 pages long.  It also has an Appendix A
10 which is your cv, and then it has Appendix B which is a
11 summary of commission plan components by plan year, and
12 then it has Appendix C which has some more tables and
13 summaries by plan year and month.  And then it has in
14 Appendix D which is your materials relied upon, right?
15     A.  I believe so.
16     Q.  Okay.  I think we have everything.  So,
17 going to your affidavit.  Okay, in this document this is
18 where you do an analysis or explain your analysis that
19 you did for the nine named plaintiffs, correct?
20     A.  That's correct.
21     Q.  And you came up with calculations for those
22 nine named plaintiffs on or around December of 2011 in
23 conjunction with a summary judgment motion that was
24 filed by Sprint; is that right?
25     A.  Yes, I submitted this report in 2011 on the

Page 207

1  nine named plaintiffs.
2      Q.  And this was -- is this -- was an analysis
3  that you did of commissions for the nine named
4  plaintiffs, right?
5      A.  Yes.
6      Q.  And in this analysis you found certain
7  amounts that were underpaid, overpaid and perhaps
8  correctly paid for the nine named plaintiffs, right?
9      A.  It -- it summarizes these calculations, yes.
10     Q.  The calculations that you came up with for
11 the nine named plaintiffs and whether they were
12 underpaid, overpaid or correctly paid in this case, in
13 conjunction with this analysis you did for, what is
14 this, Exhibit No. 1 -- oh, I'm sorry.  In conjunction
15 with this affidavit you submitted in December of 2011,
16 your calculations were different than the calculations
17 you came up with for the nine named plaintiffs when you
18 did your calculation for the entire class; is that
19 right?
20     A.  There were differences, yes.
21     Q.  Okay.  Why were there differences?
22     A.  Well, a year had passed and we learned more
23 information.  And while the process was, the
24 methodological process was similar, we improved upon it
25 and we incorporated the information as we learned it.

Page 208

1      Q.  Okay.  So, which damages calculation or
2  calculation that you did is more correct for the nine
3  named plaintiffs, the calculation you did in December of
4  2011, or the calculation you provided to us in December
5  of 2012?
6      A.  I believe while the conclusions are the
7  same, I would rely on the calculations that I most
8  recently prepared as they reflect the additional
9  information that we learned as we were working with the
10 information.
11     Q.  What additional information did you learn
12 that caused you to have these differences in the
13 calculations that you did from one report to the other
14 for the same individuals?
15     A.  In part that we did -- we approved upon our
16 matching with RMS and we, umm, also improved upon, in
17 the same light, the processing of recurring revenue.
18     Q.  How so?
19     A.  I'd have to go back and look at the
20 programming, but here we did it in the -- the program
21 for the programming for the class members it was more
22 seamless as opposed to with the nine named plaintiffs it
23 was broken apart.  And so while the process in a sense
24 was similar, as I described in my report on the class,
25 we improved on that process for the recurring revenue.

Page 209

1      Q.  The differences between your calculations
2  for the nine named plaintiffs in 2011 versus 2012 is in
3  2012 you found many more under -- or overpayments for
4  the nine named plaintiffs; isn't that correct as a
5  whole?
6      A.  That may be the case.
7      Q.  And improving upon your matching and RMS
8  wouldn't cause more overpayments, would it?
9      A.  Not necessarily but here twofold, one, if
10 you compare by each component we have more matching on
11 activations.  And in terms of recurring revenue, we
12 improved upon our process.
13     Q.  But how would making those two changes that
14 you've identified result in you finding more
15 overpayments to these nine individuals?
16     A.  I'd have to go and look at it step by step,
17 but in terms of our review, we found it to be more
18 accurate.
19     Q.  Did you ever review the analysis that Ms.
20 Franzen did in this case for the named plaintiffs?
21     A.  A number of years ago.
22     Q.  And do you understand that she reached
23 different calculations for the nine named plaintiffs
24 than you did in your December of 2011 analysis and your
25 December of 2012 analysis?

53 (Pages 206 to 209)

Merrill Corporation

877-489-0367                                                www.merrillcorp.com/law

JANET R. THORNTON
2/28/2013

Page 250

1  Q.  Did you meet with anybody to discuss
2  anything other than the rebuttal reports to prepare for
3  your testimony?
4     A.  I think that would have been the primary set
5  of discussions and I can't recall anything other than
6  that.  There may have been, but that's my recollection.
7     Q.  When we talked about adjustments, I know you
8  explained your process generally for handling
9  adjustments, and you incorporated certain adjustments
10 into your calculations and not others.  And if I recall
11 correctly, you didn't incorporate all of the adjustments
12 because some of them clearly weren't related to anything
13 that we were calculating, right?
14    A.  I believe that's the gist of what I
15 testified to earlier.
16    Q.  Is it possible that there are some
17 adjustments that you included that were for transactions
18 that you didn't necessarily include in your
19 calculations?
20    A.  There is that possibility.  And that is why
21 I also calculated that robustness check of the
22 alternative difference that doesn't include the
23 adjustments.
24        MS. FISHER:  All right.  I have no
25 further questions.

Page 251

1        MS. BLOOM:  I have no questions.
2        MS. FISHER:  Okay.  Thank you.
3        THE VIDEOGRAPHER:  No more questions.
4  We'll go off the video record, 6:04.
5        (Video-taped Deposition of JANET R.
6  THORNTON is concluded at 6:04 p.m. with reading and
7  signing not waived.)

Page 252

ERRATA SHEET

IN RE:  Sibley, et al, versus Sprint, et al
CASE NO.: 02:08-CV-02063-KHV/JPO
DATE:  Thursday, February 28, 2013
DEPONENT:  JANET R. THORNTON

DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE
PAGE# LINE#   CORRECTION            REASON
_____
_____
_____
_____
_____
_____
_____

State of Florida   )
County of Palm Beach)

Under penalty of perjury, I declare that I have read my
deposition and that it is true and correct subject to any
changes in form or substance entered here.

DATE:_____

SIGNATURE OF
JANET R.
THORNTON:_____

Page 253

CERTIFICATE OF OATH

STATE OF FLORIDA   )
                    ) SS:
COUNTY OF PALM BEACH)

   I, SHARI GRIMSGAARD, Registered Professional

Reporter, Certified Court Reporter, (NJ), Certified

Realtime Reporter, Florida Professional Reporter, Notary

Public in and for the State of Florida at Large, certify

that the witness, JANET R. THORNTON, personally appeared

before me on February 28, 2013 and was duly sworn by me.

   WITNESS my hand and official seal this 4th day of

March, 2013.


           _____
           Shari Grimsgaard
           Notary Public, State of Florida
           My Commission #EE70087
           Expires March 3, 2015

64 (Pages 250 to 253)