## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   X

ROXIE SIBLEY, JEANNE NOEL, ERNESTO : 
BENNETT, JAMIE WILLIAMS, GREG ST. : 
JULIEN, TRACIE HERNANDEZ, JOHN : 
JASINSKI, JAY RICHIE, and TEISHA KING, : 
individually and on behalf of a class of others : 
similarly situated, : 
                                        : 
             Plaintiffs, : 
                                          : 
             v. :   Case No. 02:08-CV-02063-KHV/JPO
                                          : 
SPRINT NEXTEL CORPORATION, a Kansas : 
corporation, : 
                                          : 
            and : 
                                          : 
SPRINT/UNITED MANAGEMENT : 
COMPANY, a Kansas corporation, : 
                                          : 
            Defendants. : 

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   X

## DEFENDANTS' REPLY MEMORANDUM OF LAW
## IN SUPPORTOF THEIR *DAUBERT* MOTION TO EXCLUDE
## TESTIMONY OF BALANCE ENGINES LLC AND MARGARET DUNHAM

**TABLE OF CONTENTS**

**TABLE OF AUTHORITIES** ................................................................................................. ii

**PRELIMINARY STATEMENT** ........................................................................................... 1

**ARGUMENT** ..................................................................................................................... 2

      I.      PLAINTIFFS' EXPERTS CONCEDED THAT THEIR ANALYSES DID NOT
                PROPERLY INCORPORATE THE GOVERNING CONTRACTUAL TERMS. ........................ 2

      II.     BE'S INABILITY TO WORK WITH THE DATA PRODUCED BY SPRINT DOES
                NOT EXCUSE THEIR METHODOLOGICAL ERRORS AND GROSSLY INFLATED
                DAMAGES ESTIMATE. .............................................................................................. 8

      III.    PLAINTIFFS CANNOT WITHSTAND THE DAUBERT CHALLENGE BY
                RESORTING TO UNTIMELY SUPPLEMENTAL REPORTS THAT FAIL TO
                CORRECT THE FUNDAMENTAL FLAWS IN THEIR CURRENT REPORTS. .................... 10

**CONCLUSION** ................................................................................................................ 14

# TABLE OF AUTHORITIES

**CASES**                                                                                                 **PAGE(S)**

*Bitler v. A.O. Smith Corp.*,
    400 F.3d 1227 (10th Cir. 2005) ...................................................................................7

*Comcast Corp. v. Behrend*,
    133 S. Ct. 1426 (2013).............................................................................................14

*Daubert v. Merrell Dow Pharm., Inc.*,
    509 U.S. 579 (1993)..................................................................................................7

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137 (1999)..................................................................................................7

*Pries v. Honda Motor Co.*,
    31 F.3d 543 (7th Cir. 1994) ......................................................................................6

*Story Parchment Co. v. Paterson Parchment Paper Co.*,
    282 U.S. 555 (1931)................................................................................................10

*Werth v. Makita Elec. Works, Ltd.*,
    950 F.2d 643 (10th Cir. 1991) ..................................................................................7


**OTHER AUTHORITIES**

*Fed. R. Evid.* 702.................................................................................................................7, 9

Local Rule 16.2(c) .............................................................................................................8, 9

Local Rule 56.1 .....................................................................................................................6

**PRELIMINARY STATEMENT**

Defendants' *Daubert* motion should be granted because plaintiffs do not dispute

that the reports served by Balance Engine LLC ("BE") contain material errors, and that

Margaret Dunham's reports failed to identify, let alone correct, these errors.  Instead,

plaintiffs try to discount the importance of these methodological flaws by characterizing

them as mere errors in calculation.  These gross errors, however, reflect a fundamentally

flawed methodology because plaintiffs' experts failed to incorporate key terms of the

underlying compensation plans into their analyses.  Accordingly, the proposed testimony

is unhelpful to the fact finder in resolving plaintiffs' class-wide breach of contract and

KWPA claims and should be excluded as failing *Daubert's* standards for admissibility.

Plaintiffs try to excuse some – but not all – of the errors in BE's reports by

attributing them to alleged flaws in the underlying data.[1]  These suggestions ignore that

plaintiffs' experts reviewed and approved the data prior to its production in 2011.

Moreover, plaintiffs' never asked for "better" data during discovery and this issue was

not raised in the Pretrial Order.  Plaintiffs' untimely data gripes are in any event belied by

the fact that defendants' expert, Dr. Janet Thornton, using the same data, was able to

generate reports that properly applied the contractual terms.  Regardless of the reasons for

the methodological errors in BE's reports, the simple fact remains that this proposed

testimony is not based on the governing contractual terms and contains numerous gross

errors, making it both unreliable and unhelpful.

Plaintiffs' alternative suggestion, that the Court should grant them leave to serve

new expert reports, is untimely and prejudicial.  Discovery has closed and defendants

---

[1]  Insofar as plaintiffs purport to respond to defendants' *Daubert* motion with irrelevant attacks on the quality of the report issued by Dr. Thornton, *see* Dkt. #461, pp. 4-6 & 9-11, these assertions have already been addressed and proven false.  Dkt. #463.

1

filed their decertification, *Daubert*, and dispositive motions.  But even if considered, these new reports do not cure the principal deficiency in the current reports:  the collective failure to insure that all of the material contractual terms were properly incorporated into BE's methodology.  Indeed, the large spreadsheets that plaintiffs filed conventionally into the record, *see* Dkt. #470 & 471, list BE's calculations for each individual class member and disprove plaintiffs' suggestion that these new reports correct certain, discrete errors.  As detailed below, BE failed to address or correct the extreme outliers in their current report, and despite purporting to reduce their damages estimate by $16 million, the new methodology resulted in dramatic and unexplained increases to the amounts allegedly owed to numerous individual class members.  The new reports are thus no more aligned with the terms of the underlying contracts than the current reports, and cannot save plaintiffs' experts from exclusion.

In short, plaintiffs have offered no reason for withstanding defendants' *Daubert* challenge, as plaintiffs' experts have not generated *any* reports that are useful to the fact finder in adjudicating the underlying contractual and statutory claims.  Their proffered expert testimony should thus be excluded.

## ARGUMENT

### I.  PLAINTIFFS' EXPERTS CONCEDED THAT THEIR ANALYSES DID NOT PROPERLY INCORPORATE THE GOVERNING CONTRACTUAL TERMS.

In their responding brief, plaintiffs concede that the expert reports previously submitted by BE, and allegedly "audited" by Dunham, contain numerous, material failures to properly calculate the commissions allegedly owed by Sprint to the class members under the terms of the contracts, and that these failures resulted in a massively inflated damages estimate.  Instead, plaintiffs try to discount the significance of these

2

methodological errors by characterizing them as mere calculation mistakes that can be corrected in untimely and prejudicial supplemental reports.  Dkt. #461, pp. 12-17.  These errors, however, are attributable to BE's fundamental and pervasive failure to properly incorporate the contractual terms into its underlying methodology and Dunham's failure to "audit" BE's work product in light of the contractual terms.  These collective failures render the reports submitted by plaintiffs' experts completely useless to resolving the underlying breach of contract and derivative KWPA claims.

In their depositions, BE's representatives, Nile Nickel and Barry Ezell, conceded several material errors in their analyses that directly contravened the terms of the commissions contracts.  *See* Dkt. #446, pp. 7-11.  For example, Ezell testified that BE deviated from the terms of the contracts when counting Add-on transactions.  The compensation plans clearly excluded Add-on sales (*e.g*., text messaging bundles) from the category of commissionable events when these services were deactivated within a prescribed "look back" period.  *See* Dkt. #446, p. 8.  Because BE failed to properly account for the "look back" period, they substantially over counted the number of Add-on sales qualifying as commissionable events under the governing compensation plans:

> **A:**  There were a couple of issues that we noted from Dr. Thornton's report that we're looking to.
>
> **Q:**  Which issues are those?
>
> **A:**  I would have to again look at my notes to know, to be precise.  The one that I know of offhand is the add-on de-act . . . there were some cases where a charge-back within the charge-back period was not honored.
>
> **Q:**  When you say it wasn't honored, you mean it wasn't honored by you in your calculations?
>
> **A:**  Yes, that's correct.

Dkt. #452-62, Deposition of B. Ezell Tr. 124:15-125:4.

Similarly, Nickel conceded that BE failed to follow the terms of the contracts by

double-counting Net Activations:

> **Q:** Do you recognize Exhibit 87?
>
> **A:** Yes, I do.
>
> **Q:** Now, this is one of your report files?
>
> **A:** Uh-huh.
>
> **Q:** Is that correct?
>
> **A:** Yes, it is.
>
> **Q:** And if we look at your report file, we see that what you actually did was you counted this as four activations?
>
> **A:** It appears that is correct.
>
> **Q:** Now, even assuming that you discounted the deactivation, what would be your basis -- well, you would agree with me that under the terms of the plan, under any reading, the most this would be is two activations as opposed to four, correct?
>
> **A:** I would agree with you.

Dkt. #452-60, Deposition of N. Nickel ("Nickel Dep.") Tr. 149:8-25.  Additionally, and

as plaintiffs have conceded, BE failed to follow the terms of the contracts when they

analyzed Accessory sales, such as car chargers and carrying cases, by systematically

over-pricing these transactions, thereby erroneously inflating their damages estimate.

Dkt. #452-13, p. 37 at § 1.5 (noting commissions for Accessory sales are calculated on

the "actual sale price"); *see also* Dkt. #461, p. 14 (admitting that BE erred by failing to

use "the actual sales price to calculate commissions for accessories"); Dkt. #449, pp. 49-

50 at ¶312 & #468, pp. 47-48 at ¶312.

BE's representatives also ignored the terms of the governing contracts when including newly hired employees, *i.e.*, those employees on Ramp-up or Guarantee status, into their calculations.  It is undisputed that new hires were paid set monthly amounts, not commissions, for the period of time that they enjoyed Guarantee or Ramp-up status.  *See* Dkt. #452-3, p. 12 at § 1.6(b) & #357, p. 3 at ¶¶5-6.  As such, these employees should have been excluded from commissions calculations under both the terms of the contracts and the stipulation entered into by the parties.  Dkt. #357, p. 3 at ¶¶5-6.  In their responding brief, plaintiffs suggest that their experts' calculations were defensible because they were based on Quota data.  Dkt. #461, pp. 12-13.  This suggestion is without merit and does not excuse their errors.  The stipulation between the parties clearly required examination of the Compensation Statement data (not the Quota data) to identify class members on Guarantee or Ramp-up status.  The Stipulation provided in relevant part:

> the parties agree that if a class member has zero/no-at risk compensation amount in the **Compensation Statement data** for a given month, then the parties' respective experts are unable to analyze that class member's commissions for that corresponding month.

Dkt. #357, p. 3 at ¶7 (emphasis added).  BE's decision to ignore the clear terms of the stipulation to generate an alleged "conflict" within Sprint's data should be rejected as an excuse for their inflated, erroneous, and unreliable damages estimate.

There is also no disputing that, despite her alleged role as the "auditor" of BE's calculations, Dunham made no effort to determine whether the calculations were consistent with the contractual terms:

> **Q:**  But you did nothing to confirm that they actually applied the terms of the MICGs and CAFS correctly in their ultimate output; correct?

5

> **A:** I believe that's the third time you've asked that, and,
> no, I did not.

Dkt. #452-61, Deposition of M. Dunham Tr. 55:4-8; *see also id*. 128:1-17 (same).

Plaintiffs' response to defendants' Rule 56.1 Statement similarly concedes that Dunham's

"audit" failed to check whether BE properly applied the terms of the compensation plans

or whether BE's calculations were accurate measures of commissions due.  Dkt. #449, p.

47 at ¶305 & #468, p. 45 at ¶306.

As demonstrated in Dr. Thornton's rebuttal report, Declaration of Nicole A.

Eichberger in Support of Defendants' Reply , there are at least nine discrete, systematic

failures on BE's part to properly account for and apply the governing contractual terms.

Of these nine, only two are disputed; the rest are purportedly addressed by plaintiffs'

untimely, prejudicial proffer of new expert reports.  Dkt. #461, pp. 12-17; *see also infra*,

Section III (showing that BE's new report also fails to accurately apply the contractual

terms).  In contrast to plaintiffs' suggestion that plaintiffs' experts properly relied on

"interpretation[s] of counsel" to reach these flawed conclusions, Dkt. #461, p. 23 n.10,

this parroting of Class Counsel's analysis is an additional reason to exclude BE's

testimony.[2] *See*, *e.g*., *Pries v. Honda Motor Co*., 31 F.3d 543, 546 (7th Cir. 1994) (noting

experts should act independently, rather than adopt theories concocted by counsel).  It is

thus undisputed that plaintiffs' experts, collectively, failed to properly apply the terms of

the governing contracts, contributing to a huge over-calculation of damages.  At the time

---

[2]  In deposition, both Ezell and Nickel stated that their methodology relied upon
"interpretation[s] of counsel," Dkt. #446, p. 14, and Class Counsel admits to acting as an
undisclosed expert by directing BE's analysis of the underlying data.  Dkt. #461, p. 23,
n.10.

that Dr. Thornton's rebuttal report was due, she demonstrated that these errors totaled

more than $117 million.[3]  *See* Dkt. #446, p. 16.

Plaintiffs' citation to authorities holding that mere calculation errors are

insufficient to exclude expert testimony, *see* Dkt. #461, pp. 20-24, are completely

distinguishable.  The errors identified here, and conceded by plaintiffs, are not merely

isolated errors in calculations, but rather are fundamental and systematic, and result from

a failure by plaintiffs' experts to design a methodology that reliably and accurately

applied the material terms of the contracts, which form the bases of plaintiffs' claims.

Dkt. #446, pp. 7-15.  These numerous identified deviations from the terms of the

contracts render their proposed testimony unhelpful and inadmissible.  *See*, *e.g*., *Fed. R.*

*Evid.* 702; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999); *Daubert v. Merrell*

*Dow Pharm*., *Inc*., 509 U.S. 579, 591-92 (1993); *Bitler v. A.O. Smith Corp*., 400 F.3d

1227, 1233-34 (10th Cir. 2005); *Werth v. Makita Elec. Works, Ltd*., 950 F.2d 643, 648

(10th Cir. 1991) (all holding that experts should be excluded when proposed testimony

fails to aid fact finder resolve material issues).

In short, plaintiffs' opposition brief does not alter the conclusion that both BE and

Dunham, collectively, made numerous, material errors and omissions when performing

their analyses.  Because BE's commission calculations are fundamentally flawed, and

---

[3]  Because plaintiffs failed to timely produce all of the data and information underlying
their experts' reports, Dr. Thornton was not able to untangle all of BE's errors by the time
her rebuttal report was due.  *See* Dkt. #400, pp. 3-8 (detailing tardiness of plaintiffs'
disclosures).  Dr. Thornton is confident, however, that given sufficient time and
resources, she could correct all of BE's methodological errors, and that after such efforts
any discrepancies between her calculations and BE's calculations would be
inconsequential.  Dkt. #452-55, p.15 at ¶27.

Dunham's opinions are divorced from the underlying facts and claims of this case, none of plaintiffs' experts serve a useful purpose, and they should be excluded under *Daubert*.

**II.      BE'S INABILITY TO WORK WITH THE DATA PRODUCED BY SPRINT DOES NOT EXCUSE THEIR METHODOLOGICAL ERRORS AND GROSSLY INFLATED DAMAGES ESTIMATE.**

Ultimately, rather than argue against the truth, *i.e.*, that their experts' reports were fatally flawed, plaintiffs seek to excuse these errors by attributing them to data quality problems.  These suggestions should be rejected out of hand because the underlying data were produced in 2011, plaintiffs did not file a motion to compel different or "better" data during the discovery period, and they did not preserve these alleged data problems in the Pretrial Order.  *See* Local Rule 16.2(c).  These complaints are, in any event, belied by the fact that plaintiffs' own experts reviewed and approved the computer queries that pulled the data from Sprint's system for analysis by the experts.  *See*, *e.g*., Dkt. #292-18, p. 2 at ¶6 (stating that BE reviewed and analyzed sample data for the Named Plaintiffs and specified the additional data needed to perform their class wide analyses); *see also* Dkt. #421, p. 2 (Order of Magistrate Judge O'Hara noting that "the parties conferred and **plaintiffs** determined the additional data necessary for the entire class") (emphasis added).  Plaintiffs cannot credibly claim at this late date that they were prejudiced by the very data productions they requested and approved.

Any doubts as to the sufficiency of the data for purposes of properly calculating the commissions owing under the terms of the contracts are removed by considering Dr. Thornton's reports.  Plaintiffs' experts have not disputed that, using the very same

8

data provided to plaintiffs,[4] Dr. Thornton was able to perform the commission

calculations consistently with the underlying commission plans.  Indeed, when pressed in

deposition, Nickel agreed that his methodology deviated from the terms of the contracts

in the ways that Dr. Thornton identified, essentially conceding that her methodology was

more accurate.  *E.g.*, Dkt. #452-60, Nickel Dep. Tr. 153:22-156:18.  Thus, whatever

difficulties BE encountered in processing the data were more likely due to BE's inability

or unwillingness to incorporate the terms of contracts into their methodology, as well as

their lack of resources – not the quality of the data.  *Id.*; *see also* Dkt. #463, p. 17, n.10

(noting that during the discovery period, BE decided not to incur $18,000 expense of

purchasing same computer software package as Dr. Thornton to analyze the data and/or

recreate her results).

Plaintiffs attempt to save their admittedly flawed expert reports by citing pre-

*Daubert* tort law cases, Dkt. #461, p. 25, for the proposition that inferences of damages

are sufficient to sustain expert testimony.  These dated cases clearly contradict *Daubert's*

"gate keeping" standards, which require expert testimony to be "based on sufficient facts

or data" to be admissible, not inferences.  *Fed. R. Evid.* 702(b).  Even if these authorities

had some persuasive value under *Daubert*, where the burden of proving admissibility of

expert testimony rests with the party offering that testimony, the cases merely stand for

the position that inferences of damages may be drawn where more direct evidence does

not exist.  Defendants do not dispute the general tort law proposition that there is a lesser

standard of proof to fix the amount of damages, once an injury is established.  Plaintiffs'

---

[4]  A review of the underlying data shows that Sprint produced all of the sales transactions
recorded by each class member during the relevant period, and all of the material
information relevant to the calculation of commissions.  Dkt. #446, pp. 3-4.

argument, however, does not alter the well-established rule that speculation and conjecture, *e.g.*, ignoring contractual terms to double-count and over-value commissionable events, cannot establish an injury in the first place.  *See*, *e.g.*, *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 562-63 (1931).

Here, the information concerning the compensation plans and the voluminous data allowed any expert with sufficient knowledge, skills, and experience – such as Dr. Thornton – to evaluate Sprint's commissions payments under the operable compensation plans with considerable precision.  Under these circumstances, there is no conceivable basis for adjudicating this case on "inferences," particularly when plaintiffs' experts conceded that their calculations deviated from the terms of the underlying compensation plans, and thus any inferences drawn from their calculations cannot be helpful to resolving this breach of contract case.

In sum, plaintiffs' data quality complaints do not provide a basis for withstanding defendants' *Daubert* challenge.

III.   **PLAINTIFFS CANNOT WITHSTAND THE *DAUBERT* CHALLENGE BY RESORTING TO UNTIMELY SUPPLEMENTAL REPORTS THAT FAIL TO CORRECT THE FUNDAMENTAL FLAWS IN THEIR CURRENT REPORTS.**

Plaintiffs assert that many – though not all – of the fundamental flaws identified by defendants' *Daubert* motion are corrected in second supplemental expert reports that they recently filed into the record (even though the Court has not granted permission to serve these untimely reports).  Dkt. #461, pp. 12-17 &  #472.  For the reasons already stated in the brief opposing plaintiffs' motion for leave to serve these untimely reports, Dkt. #437, the Court should deny this request because (i) there is no excuse for plaintiffs' untimeliness and (ii) their admission would unduly prejudice defendants.

First, in 2011, plaintiffs reviewed and approved the data produced for expert analyses.  Dkt. #292-18, p. 2 at ¶6 & #421, p. 2.  The fact that plaintiffs' served flawed expert reports in October 2012 and December 2012 does not constitute good cause to violate the Court's Scheduling Order by submitting untimely reports in April 2013. Second, admission of the new reports – without discovery and the opportunity to challenge them directly in *Daubert* briefing – is unduly prejudicial to defendants. Alternatively, re-opening expert discovery would necessarily cause a postponement of the trial date, and force defendants to incur the additional expense of re-deposing plaintiffs' experts, and revising and re-filing the pending *Daubert* and dispositive motions.

Moreover, these second supplemental reports do not constitute a basis for denying defendants' *Daubert* motion because they do not materially correct the methodological flaws in the current reports.  Dr. Thornton has demonstrated, and plaintiffs have not contested, that the numerous failures to adhere to contractual terms have generated *at least* $117 million in calculation errors.  Dkt. #446, p. 16.  Since these untimely proffered reports merely reduce the total claimed damages by approximately $16 million, Dkt. #461, pp. 9-10 (noting BE's current damages estimate is $197 million, and their revised estimate is $181 million), these new reports clearly do not correct the underlying methodological flaws that have been identified and conceded.

Even a cursory review of the materials accompanying these untimely reports, recently filed into the record by plaintiffs, confirms that the new and untimely reports failed to address or correct many – if not most – of the fundamental methodological flaws in the existing reports.  For example, the monthly "target" commissions payments for

11

retail sales representatives was $1,100.  Dkt. #452-82, p. 2 at ¶6.  The chart below

excerpts certain rows of data from plaintiffs' conventionally filed spreadsheets,

NKA1401177 and NKA1401179, and demonstrates that BE still attributes more than

$100,000 in commissions, *i.e*., more than 100 times the "target" amounts, to the

following retail sales employees for a **single month**:

| BE's UEID | Employee | Period (Month) | BE's December 2012 Calculations (NKA1401179) | BE's April 2013 Calculations (NKA1401177) |
|---|---|---|---|---|
| 8170 | Dalesio, Bryan | 145 (Mar. 2006) | $140,956.17 | $140,870.81 |
| 8310 | DaSilva, Christopher | 145 (Mar. 2006) | $70,764.54 | $140,886.31 |
| 8944 | Deniston, Brock | 144 (Feb. 2006) | $491,546.71 | $491,420.17 |
| 12549 | Garnes, Ryan | 146 (Apr. 2006) | $141,303.28 | $141,267.06 |
| 12911 | Gifford, Alan Dale | 144 (Feb. 2006) | $71,182.72 | $141,172.72 |
| 24175 | Monterroso, Giovanni | 145 (Mar. 2006) | $70,827.90 | $350,871.92 |
| 24512 | Moresi, Andreas | 143 (Jan. 2006) | $141,119.70 | $140,877.01 |
| 24673 | Mosley, Alicia | 143 (Jan. 2006) | $71,454.63 | $141,397.05 |
| 32314 | Scott, Edward | 146 (Apr. 2006) | $211,040.40 | $211,022.70 |
| 33512 | Smith, Jimmy | 146 (Apr. 2006) | $141,127.87 | $141,132.72 |
| 33518 | Smith, Jordan | 145 (Mar. 2006) | $74,028.11 | $143,883.54 |
| 34006 | Spencer, Candice | 143 (Jan. 2006) | $141,056.78 | $140,924.17 |
| 35814 | Torrell, Peter | 146 (Apr. 2006) | $71,419.32 | $141,441.87 |
| 36057 | Trang, John | 144 (Feb. 2006) | $70,927.29 | $140,883.10 |
| 38171 | White, Derrick | 146 (Apr. 2006) | $140,789.36 | $140,760.04 |

Declaration of Nicole A. Eichberger, Esq. in Support Defendants' Reply Memoranda of

Law in Support of the Following Motions:  Dkt. #445, 447 & 450, ¶2, Ex. A & ¶3,

Ex. B.[5]

Comparing BE's new calculations to their existing calculations for each

individual class member demonstrates that their analyses remain divorced from the terms

of the governing contracts.  First, for the reasons previously explained, these calculations

are completely unrealistic for retail sales representatives,[6] particularly since any **monthly**

payment above $100,000 would violate the **annual** "cap" on commissions.  *See*

Dkt. #446, p. 7 (noting annual "caps" of $75,000 or $97,500, depending on job title).

Second, BE failed to correct for the extreme outliers in its current report, *e.g*., the

calculations for Mr. Deniston ($491,000), Mr. Scott ($211,000), Mr. Dalesio, ($140,000),

Mr. Moresi ($141,000), Mr. Garnes ($141,000), Mr. Jimmy Smith ($141,000), and

Mr. White ($140,000) did not materially change.  Third, the fact that BE's new report

dramatically increased the amount of commissions allegedly due to Mr. DaSilva

($70,764.54 to $140,886.31), Mr. Gifford ($71,182.72 to $141,172.72), Mr. Giovanni

($70,827.90 to $350,871.92), Ms. Mosley ($71,454.63 to $141,397.05), Mr. Jordan Smith

($74,028.11 to $143,883.54), Mr. Torrell ($71,419.32 to $141,441.87), and Mr. Trang

($70,927.29 to $140,883.10) contradicts plaintiffs' assertion that the new reports are

designed to correct certain, discrete errors identified by Dr. Thornton and **reduce**

plaintiffs' damages estimate.  Dkt. #461, p. 10 (listing revisions to categories of BE's

---

[5]  All exhibits to defendants' Reply Memoranda supporting the *Daubert*, summary judgment, and decertification motions for are attached to the Declaration of Nicole A. Eichberger, dated April 29, 2013.

[6]  This excerpt of BE's data does not show the additional errors relating to store managers.

calculations, and stating reduced damages estimate of $181 million).  The collective

failure of BE and Dunham to detect or correct the gross errors listed in the chart above

belies plaintiffs' suggestion that these untimely and prejudicial reports constitute reliable,

admissible evidence.

Furthermore, nothing in these untimely reports alters the conclusion that the

damages claimed for each individual class member must be separately adjudicated,

calculation by calculation, for each month in which commissions are allegedly owed

because of the myriad set of disputed facts and circumstances unique to each class

member and each potentially commissionable transaction.  *See* Defendants' Briefs

Supporting Decertification.  As such, plaintiffs' own exhibits demonstrate that this matter

cannot be maintained as a class under *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013)

(holding individualized damages analyses are inconsistent with class certification).

In short, the proffer of new and untimely supplemental reports does not alter the

conclusion that plaintiffs have not, and cannot, present expert testimony that will help the

trier of fact resolve the underlying class-wide breach of contract claims in this case.

Accordingly, Defendants' *Daubert* motion should be granted.

## CONCLUSION

For all of the reasons stated in defendants' moving brief and herein, the Court

should exclude Balance Engines LLC (Nile Nickel and Barry Ezell) and Margaret

Dunham from testifying in this matter.

14

This 29th day of April, 2013.

 s/ Gregory T. Wolf

**DENTONS US LLP**
Gregory T. Wolf, KS Bar No. 17372
Adam T. Pankratz, KS Bar No. 22613
4520 Main Street, Suite 1100
Kansas City, MO  64111
Tel: 816-460-2400
Email: gregory.wolf@dentons.com
Email: adam.pankratz@dentons.com

 s/  Elise M. Bloom

**PROSKAUER ROSE LLP**
Elise M. Bloom*
Steven D. Hurd*
Nicole A. Eichberger*
Eleven Times Square
New York, NY  10036
Tel: 212-969-3410
Fax: 212-969-2900
(*Admitted *Pro Hac Vice*)

 s/ Michael L. Blumenthal

**SEYFERTH, BLUMENTHAL &
HARRIS LLC**
Michael L. Blumenthal, KS Bar No. 18582
300 Wyandotte Street, Suite 430
Kansas City, MO  64105
Tel: 816-756-0700
Fax: 816-756-3700

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on this 29th day of April, 2013, the foregoing **Defendants'**

**Reply Memorandum of Law In Support of Their *Daubert* Motion to Exclude**

**Testimony of Balance Engines LLC And Margaret Dunham** was electronically filed

with the Clerk of the Court using the CM/ECF system, which will automatically send e-

mail notification of such filing to the following attorneys of record:

> Stueve Siegel Hanson LLP
> Ashlea G. Schwarz
> Lee R. Anderson
> George A. Hanson
> 460 Nichols Road, Suite 200
> Kansas City, MO  64112
> ashlea@stuevesiegel.com
> anderson@stuevesiegel.com
> hanson@stuevesiegel.com
>
> Nichols Kaster, PLLP
> Rebekah L. Bailey
> Paul J. Lukas
> Michele R. Fisher
> 4600 IDS Center, 80 South 8th Street
> Minneapolis, MN  55402
> bailey@nka.com
> lukas@nka.com
> fisher@nka.com

Respectfully submitted,

 s/ Gregory T. Wolf
Gregory T. Wolf, KS Bar No. 17372
Adam T. Pankratz, KS Bar No. 22613
DENTONS US LLP
4520 Main Street, Suite 1100
Kansas City, MO 64111
Tel: 816-460-2400
E-mail: gregory.wolf@dentons.com