# **EXHIBIT D**

```
                                                              Page 1
 1                IN THE UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF KANSAS
 2

 3
     -------------------------------/
 4   ROXIE SIBLEY, JEANNE NOEL, ERNESTO
     BENNETT, JAMIE WILLIAMS, GREG
 5   ST. JULIEN, TRACIE HERNANDEZ,
     JOHN JASINSKI, JAY RICHIE, and
 6   TEISHA KING, individually and on
     behalf of a class of others similarly
 7   situated,

 8           Plaintiffs,

 9   v.                    Case No. 02:08-CV-02063-KHV/JPO

10   SPRINT NEXTEL CORPORATION, a Kansas
     corporation,
11
     and
12
     Sprint/united management company,
13   A Kansas corporation,

14           Defendants.
     -------------------------------/
15

16   VIDEOTAPED DEPOSITION OF:  JANET R. THORNTON

17   DATE TAKEN:                FEBRUARY 28, 2013

18   TIME:                      9:00 A.M. - 6:04 P.M.

19   PLACE:                     PROSKAUER ROSE, LLP
                                2255 GLADES ROAD, SUITE 421
20                              BOCA RATON, FLORIDA  33431

21

22

23
           Taken on behalf of the Plaintiffs before Shari
24   Grimsgaard, Notary Public in and for the State of Florida
     at Large, pursuant to a Notice of Taking Deposition filed
25   in the above cause.
```

JANET R. THORNTON
2/28/2013

Page 94

1  process to read in those data, those resulting data and
2  begin to count each component piece under the commission
3  plan.  And we would have delineated through programming
4  those that would have been everything except for add-on
5  related transactions.  So that add-on related
6  transactions would have been put into a separate program
7  in terms of processing it and counting it and adding it.
8       Q.   Then what happened?
9       A.   After we designed and vetted those programs
10  from the resulting data sets, and those data sets
11  summarize information by year and month, by rep who sold
12  the -- sold -- made the sale, as well as the SCID or the
13  store of the sale, it summarized the information by
14  month, by category.
15      Q.   For the record, SCID is S-C-I-D, correct?
16      A.   Yes.  It's the Sales Channel I.D.
17      Q.   Okay.  Then what did you do?
18      A.   From that point we then designed a
19  methodology to apply the hierarchy information.
20      Q.   Okay.
21      A.   And in terms of the hierarchy information,
22  the hierarchy contains information on individuals who
23  are paid based on the activity of others, may also
24  include the activity of themselves.  But the way the
25  hierarchy works is it looks to one of two groups, one,

Page 95

1  it identifies the Sales Channel I.D. that report to that
2  individual or are part of that individual's
3  commissionable activity for the month.
4       In addition, it identifies the
5  individuals who made sales, who may also roll up to
6  that individual.  So, for example, depending on the
7  year, store host were paid out of the activity of
8  their store and/or potentially individuals who rolled
9  up to that individual, and that doesn't mean -- it's
10  not a supervisory role, but instead the transactions
11  may have rolled up, assistant managers, managers and
12  others.
13      So, once we had processed the RMS and
14  the -- to account for at the sale level who made the
15  sale in their store where the sale was made and the
16  information, we then ran programs to apply the
17  hierarchy both based on the reporting SCID as well as
18  the reporting individuals.  And the language is that
19  there is a parent I.D. and a child I.D.  So, the
20  child I.D.'s report to the parents.  So, the
21  hierarchy is applied to determine which transactions
22  would be attributable to those individuals who have
23  their commissions based on not just their own
24  individual sales.
25      Q.   Okay.  I need to interrupt you to ask you a

Page 96

1  question here.  But you used the hierarchy valid tran
2  data for your hierarchy analysis, right?
3       A.   No, I believe you're confusing the hierarchy
4  val trans from the hierarchy.
5       Q.   Okay.  Did you use hierarchy valid tran data
6  for something?
7       A.   Umm, I believe we may have.
8       Q.   Did you use -- there were two hierarchy
9  files that we saw.  There was the hierarchy valid tran
10  data and there was a file called hierarchy reference
11  data slash stage 3 retail dash 12162011.  Which did you
12  use for doing this manager roll-up or store host roll-up
13  that you were describing?
14      MS. BLOOM:  Objection to the form of the
15  question.
16      A.   I'd have to go back and double-check.
17      Q.   Uh-huh.
18      A.   It's been a while.  But my recollection is
19  it's not the hierarchy Valid Trans file.  I believe the
20  hierarchy Valid Trans file is Valid Trans data.
21      Q.   Okay.  With respect to the Sales Channel
22  I.D.s --
23      A.   Uh-huh.
24      Q.   -- did you or your group make any
25  modifications or supplement the Sales Channel

Page 97

1  information that Sprint provided on its data?
2       MS. BLOOM:  Object to the form of the
3  question.
4       A.   Well, what we did was we looked at the Sales
5  Channel information in RMS as well as the compensation
6  statement data, as well as the hierarchy.  And we wanted
7  to insure that we were as inclusive as possible.  So, we
8  researched -- pardon me -- as inclusive as possible.  So
9  my recollection is we researched each of the -- of the
10  SCIDs and I believe we also compared it to the store
11  roll-out list.
12      Q.   Uh-huh.
13      A.   And I believe there was another file of
14  the -- of a store list and closing list.  So, I believe
15  we looked at all of that information together to be as
16  inclusive as possible.
17      Q.   Was that to make sure also that you had the
18  most accurate information possible that you were using
19  for this analysis?
20      A.   It was to insure that we were as complete as
21  possible.
22      Q.   Okay.  There -- in some of the data, for
23  instance, there were stores that had multiple store code
24  or Sales Channel I.D.s associated with them; isn't that
25  right?

25 (Pages 94 to 97)

JANET R. THORNTON
2/28/2013

Page 98

1   A.   I think in terms of it being time specific
2  that it may have -- that from one month to the next it
3  could have been modified.
4   Q.   Uh-huh.
5   A.   And therefore, again, to be overly
6  inclusive, my recollection is we tried to include all --
7  all possibilities for a store.
8   Q.   Okay.  So, after you went through this
9  hierarchy process that you were describing what was the
10 next step?
11  A.   Umm, once we applied the hierarchy we then
12 had the sales related information from the individuals
13 who had a roll up as well as the individuals who made
14 the sale.  And we combined that information with the
15 additional information we had obtained from ODR.  And
16 from that set of information we then were in a position
17 to apply the terms of each of the contracts.
18  Q.   Okay.  Then what?
19  A.   Well, in order to do that it was necessary
20 to process the compensation statement data.  And I
21 actually need to go back a step.  I apologize.  Before
22 we could work with compensation statement data, because
23 the RMS -- RMS has the CID of the individual, we then
24 appended the five digit sales rep or employee number and
25 we had processed the information from the Sibley class

Page 99

1  list to develop a lookup file containing the -- the
2  various employee identifiers.  So, that was done before
3  creating a set of data to then further process.
4   Q.   How did you handle duplicate employer
5  identifiers?
6   A.   When we were processing the employee lookup
7  file we wrote code to identify the duplicates.
8   Q.   Then what did you do, did you merge the
9  duplicates somehow or disregard them?
10  A.   No.  My recollection, and again I would have
11 to go back and look at the code, but my recollection is
12 we would have created multiple fields and it would have
13 depended on the purpose of the program as to how we
14 would have worked with the duplicates.
15  Q.   But you don't recall any specifics?
16  A.   No.  Again, as I said, it would have
17 depended on those specific circumstances of what we were
18 looking at.
19  Q.   All right.  Go ahead and describe the rest
20 of your process.  You kind of left off with processing
21 -- yeah, I have a question on that.  You processed the
22 comp. statement data, you processed the electronic comp.
23 statement data; is that right?  That's what you used in
24 your analysis?
25  A.   That's correct.

Page 100

1   Q.   Did you do any comparison between the
2  electronic comp. statement data and the PDF versions or
3  the paper versions that Sprint produced?
4   A.   No, we would have done that under the stage
5  1.
6   Q.   Do you know if they were the same?
7   A.   The ones that I looked at?
8   Q.   Uh-huh.
9   A.   A long time ago my recollection is they
10 were, but it was a small sample.
11  Q.   We've seen some that appear to be different,
12 the electronic version appears to be different from the
13 PDF version produced by Sprint.  Do you have any
14 knowledge as to why that might be the case?
15      MS. BLOOM:  Objection to the form of the
16 question.  Go ahead.
17  A.   My -- I would be speculating and I -- I
18 would -- I would have to look at it and --
19  Q.   Uh-huh.
20  A.   My understanding was under the stipulation
21 we were to use the electronic compensation data.
22  Q.   Sure.  But I'm wondering if you ever have
23 done any analysis or looked at some examples, I know
24 we've provided some, but have you done that to figure
25 out or get the answer as to why some of the PDF versions

Page 101

1  are different than the electronic comp. statements?
2       MS. BLOOM:  Object to the form of the
3  question.
4   A.   Normally in terms of given the months of
5  some of the differences, I'm -- I'm -- I would expect
6  there is an explanation for it, but I don't know and I
7  -- I'm not going to speculate.
8   Q.   You don't know any of the reasons that they
9  might be different?
10  A.   Specific reasons, no.  I've looked at --
11 I've looked at some information, but I don't want to
12 speculate.
13  Q.   Sure.  And I'm not asking you right now
14 about a specific example.  But it sounds like you've
15 looked at a few instances.  Have you determined a reason
16 why or an explanation for the ones that you've looked
17 at, why the PDF might be different than the electronic
18 version?
19  A.   I haven't confirmed my -- my review, so I
20 wouldn't want to testify as to a reason.
21  Q.   Well, I'm wondering --
22      MS. BLOOM:  Let her finish her answer.
23  A.   I would not to want to testify without
24 confirmation.
25  Q.   Well, I would like to know your thoughts as

26 (Pages 98 to 101)

REPORTER'S DEPOSITION CERTIFICATE

I, SHARI GRIMSGAARD, Registered Professional Reporter, Certified Court Reporter (NJ), Certified Realtime Reporter, Florida Professional Reporter and Notary Public in and for the State of Florida at Large, do hereby certify that I was authorized to and did report the deposition of JANET R. THORNTON, the witness herein; that the foregoing pages, numbered from 1 to 254, inclusive, constitute a true and complete record of my stenographic notes.

I further certify that I am not a relative, employee, attorney or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor financially interested in the action.

DATED this 4th day of March, 2013.

_____
Shari Grimsgaard
Notary Public, State of Florida
My Commission #EE70087
Expires 3/3/15