# EXHIBIT E

Page 2

```
0001
         IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF KANSAS

ROXIE SIBLEY, JEANNE NOEL,
ERNESTO BENNETT, JAMIE
WILLIAMS, GREG ST. JULIEN,
TRACIE HERNANDEZ, JOHN
JASINSKI, JAY RICHIE, and
TEISHA KING, individually,
and on behalf of a class of
others similarly situated,
         Plaintiffs,
vs.               Case No. 02:08-CV-2063-KHV/JPO
SPRINT NEXTEL CORPORATION,
a Kansas corporation,

and

SPRINT/UNITED MANAGEMENT
COMPANY, a Kansas corporation,
         Defendants.


       DEPOSITION OF JAY RICHIE, a Plaintiff,
taken on behalf of the Defendants, pursuant to
Notice, on the 1st day of March, 2010, at the law
offices of Seyferth, Blumenthal & Harris, LLC, 300
Wyandotte Street, Suite 430, Kansas City,
Missouri, before

             SHERYL D. BERROTH

for Westlaw Deposition Services, a Registered
Merit Reporter, Certified in Missouri and Kansas.
```

Page 3

```
 1   Appearing for the Plaintiffs
 2       DONALD H. NICHOLS (E-mail: nichols@nka.com)
 3       NICHOLS KASTER LLP
 4       4600 IDS Center
 5       80 South 8th Street
 6       Minneapolis, Minnesota 55402
 7       Phone: 612.256.3200  Fax: 612.338.4878
 8   Appearing for the Defendants
 9       CHRISTOPHER J. WILLIS (E-mail: cwillis@rh-law.com)
10       ROGERS & HARDIN LLP
11       229 Peachtree Street, NE
12       2700 International Tower
13       Atlanta, Georgia 30303
14       Phone: 404.522.4700  Fax: 404.525.2224
15
16       JACQUELINE DORN (E-mail: jdorn@proskauer.com)
17       PROSKAUER ROSE LLP
18       1585 Broadway
19       New York, New York 10036
20       Phone: 212.969.3000  Fax: 212.969.2900
21
22                  INDEX
23   WITNESS:                       PAGE:
24   JAY RICHIE
25     Examination by Mr. Willis        4
```

Page 4

```
 1                INDEX (Continued)
 2   EXHIBIT NAME   DESCRIPTION                PAGE #
 3   Exhibit 1    Daily Compensation Statement
 4                SPRSIB-0019034               54
 5   Exhibit 2    2006 Master Incentive
 6                Compensation Guide
 7                SPRSIB-0001283               65
 8   Exhibit 3    2007 Master Incentive
 9                Compensation Guide
10                SPRSIB-0001400               65
11   Exhibit 4    E-mail chain SPRSIB-1007267  100
12   Exhibit 5    E-mail chain SPRSIB-1006875  117
13   Exhibit 6    E-mail chain SPRSIB-1006906  121
14   Exhibit 7    E-mail chain SPRSIB-1006911  125
15   Exhibit 8    E-mail chain SPRSIB-1012251  130
16   Exhibit 9    E-mail chain SPRSIB-1002516  133
17   Exhibit 10   E-mail chain SPRSIB-1002524  135
18   Exhibit 11   Declaration of Jay Richie
19                NKA000026                    137
20   Exhibit 12   Answers to Interrogatories
21                NKA000483                    137
22   Exhibit 13   Supplemental Answers to
23                Interrogatories              137
24   Exhibit 14   First Amended Class Action
25                Complaint                    137
```

Page 5

```
 1         (The deposition commenced at 8:34
 2   a.m.)
 3              JAY RICHIE,
 4   a Plaintiff, being first duly sworn, testified
 5   under oath as follows:
 6              EXAMINATION
 7   BY MR. WILLIS:
 8       Q.  Hi, Mr. Richie.  My name is Chris
 9   Willis.  I'm one of the lawyers representing
10   Sprint in this lawsuit, and we're here to take
11   your deposition today.
12       A.  Okay.
13       Q.  Before we get started, I want to just
14   go over a couple of ground rules for how the
15   deposition process works.  Have you ever testified
16   before?
17       A.  No.
18       Q.  Well, there's just a couple things that
19   I want you to know about the process before we
20   start.  One thing is it's very important that we
21   try not to talk at the same time.  So I may be in
22   the middle of a question and you may figure out
23   what I'm about to ask, you may know what I'm
24   driving at, but please let me finish talking
25   before you begin talking because if we both talk
```

## Page 146

What I wanted to ask you is about that $300 figure. Where did that come from, Mr. Richie?

A. Basically I just -- some basic mathematical calculations from my 12 stores, just looking at my stores and the average commission, the average appeals that were done. I just sort of averaged it out.

Q. Do you remember the components of the math that you did in order to arrive at that figure?

A. I don't.

Q. Can you tell me -- even if you can't remember the actual numerical components of it, can you remember the method that you used to try to devise this figure?

A. Well, exactly that. I looked at how many appeals were done. And I looked at Exhibit 1 that would show my actual, and then it says 1,377 and then it says gross activations, 1,565. And I would look at that discrepancy and say, okay, well, then where are all these. Then if you do the simple math from the appeals process, there's a very large amount missing. There's 41 appeals. There's 200 some odd gross activations. Where are

## Page 147

those 150 gross activations? You take that times 20, which is what the commissions would pay. Actually, that's a very low figure. That's how I came up with it.

Q. At the time that you were creating this declaration, or when you were signing this in March of 2008, what information did you have available to you regarding the number of appeals that had been submitted at your stores while you were at Sprint?

A. I had a few of these from a few of my own that I printed out.

Q. When you say "these" --

A. Exhibit 1, daily compensation statements.

Q. Okay. And how do you know from those how many appeals the stores were lodging?

A. I don't know specifically. I know as a whole. I know all 12 stores. This gives me a generalization.

Q. Is there information on Exhibit 1 about number of appeals submitted by your stores?

A. It's not appeals. It's chargebacks and upgrade swaps. That's supposed to be in the adjustments, but you have to -- like you said

## Page 148

before, you have to click the here to enter the adjustment report. So it doesn't show on that specific page.

Q. Did you have adjustment reports that showed the number of appeals that were submitted by your stores on a monthly basis between the merger and the time you left?

A. No.

Q. Are you equating the number of chargebacks and the number of upgrade swaps to be appeals when you were doing this calculation?

A. No. No. I'm taking the basic 1,566 and then minusing the chargebacks, and then I'm assuming that the rest are appeals or issues that we had.

Q. The rest of what are issues or appeals?

A. The number.

Q. Which number?

A. The 1,566 minus 41.

Q. Okay. Now I'm confused.

A. I think that's what I did. I'll be honest with you, I'm not sure exactly what the math I did, but what I was assuming is it shows 1,565 in gross activations. It says actual, 1,377. Well, if you subtract 41 minus 1,565, you

## Page 149

get 1,520 whatever. Then you subcontract 1,377. That's the disconnect. Where are -- where are the rest of those? Do you have a calculator?

Q. Yes. I'm about to get one out right now. I want to see if I can figure this out. And really what I want to -- what I'm trying to drive at is trying to figure out how you came up with the --

A. Sure. I understand what you're trying to figure out.

Q. Let me get this calculator up and do this math. Let's see, I'm going to take 1,565 and I'm going to --

A. Minus 41. And what's that number?

Q. 1,524.

A. Okay. Minus 1,377.

Q. That's 147. Now, my reading of this document was if you add all the numbers in that column, it's going to sum to 1,377.

A. Is that what it is? Let's do it.

Q. Well, let's see. We came up with a difference of 147. So let's take 19.5 plus 1.5 minus 168, and that's minus 147.

A. Okay.

Q. So it appears from that calculation

Page 150

1  that that's how those numbers relate to one
2  another.  Now, I don't want to get too distracted
3  by that, because I still want to drive toward the
4  thing I'm asking you which is you've given an
5  estimate of $300 a month, and I'm trying to figure
6  out how you got there.  And you gave me an answer
7  about going through and reviewing numbers of
8  appeals per store per month, and I'm trying to
9  figure out where you got that number because I'm
10 not seeing it on this document.
11     A.  Right.  To be honest with you, I'm not
12 really sure how I came up with that number.
13     Q.  Did you have any document available to
14 you other than documents like Exhibit 1?
15     A.  No.
16     Q.  Okay.  Did you have any discussion with
17 any other current or former Sprint employees
18 around the issue of the estimate of the $300
19 that's in this declaration?
20     A.  No.  That's my own.
21     Q.  Okay.  So you didn't consult with
22 anybody, you just came up with it on your own?
23     A.  Yes.
24     Q.  In connection with the statements in
25 your declaration, and in general the discussion

Page 151

1  about Sprint owing you commissions that it hasn't
2  paid, have you made any effort since the lawsuit
3  was filed -- well, actually, have you made any
4  effort at any time to go back and identify
5  specific transactions that someone in one of your
6  stores sold that you didn't get credit for?
7      A.  No.
8      Q.  What information would you need in
9  order to be able to do that?
10     A.  All the commissions, how the commission
11 system works, all the subscribers, all the
12 transactions, all the activations.  It's not -- I
13 did call -- when I told you I talked to Steve
14 Marshall to see if I could get information.  I was
15 told that was proprietary information.  I couldn't
16 get any.
17     Q.  I thought what you had asked Mr.
18 Marshall for were just a description of the
19 commission plans.  What you're now talking about
20 is actual records of particular transactions.  Is
21 that what you'd asked Mr. Marshall for?
22     A.  No, I'm sorry, you're right.  I did ask
23 just for the actual how it was broken down.
24     Q.  Okay.  But to go back and do what I
25 just asked you about which is to figure out --

Page 152

1      A.  I would have to have access to the
2  system.
3      Q.  And you --
4      A.  The reporting system.
5      Q.  Is it fair to say that what you'd need
6  to do is go back through and have a list of
7  transactions that you did get credit for, and then
8  a list of transactions that were sold in the
9  stores that you supervised and compare the two and
10 see if there's anything missing?
11     A.  Yes.
12     Q.  Okay.  Is there anything more to the
13 process than that?
14     A.  That's pretty general, but, no, that's --
15 to simplify it, yes.
16     Q.  I mean, I don't want to simplify it in
17 a way that you're not comfortable with.  Is there
18 another aspect to the process that my general
19 description left out?
20     A.  Well, as it -- you know, once again,
21 you look at Exhibit 10, there's more to the
22 process than just doing simple math.  I mean,
23 there's obviously -- look at how many e-mails had
24 gone through just to find one person and how many
25 people that affected.  So to simplify it, sure.

Page 153

1      Q.  Can you think of any steps that we'd
2  need to take other than the matching of the
3  transactions?  I assume then if you found
4  transactions that you didn't get credit for, we'd
5  have to go back to what your quota was that month
6  and see how it would have affected your quota?
7      A.  Correct.
8      Q.  And then your payout under the quota,
9  correct?
10     A.  Correct.  Or if there was an
11 accelerator or a decelerator.
12     Q.  Right.
13     A.  Yeah, it would roll up.  The base --
14 you'd have to go all the way back to all the
15 employees that were under me, make sure that they
16 were all reconciled properly, and if that roll-up
17 then affected them because then that would affect
18 the manager which would then affect me which would
19 then affect the director.
20     Q.  Right.  But with regard to you, it's
21 just a matter of aggregating the individual
22 analyses for all the employees who worked under
23 you, correct?
24     A.  Yes.
25     Q.  In terms of transaction matching.

```
                                        Page 182
 1              C E R T I F I C A T E
 2
 3          I, Sheryl D. Berroth, a Certified
 4  Court Reporter of the State of Missouri, do hereby
 5  certify:
 6          That prior to being examined, the
 7  witness was first duly sworn;
 8          That said deposition was taken down by
 9  me in shorthand at the time and place hereinbefore
10  stated and was thereafter reduced to typewriting
11  under my direction;
12          That the foregoing transcript is a
13  true record of the testimony given by said witness;
14          That I am not a relative or employee
15  or attorney or counsel of any of the parties or a
16  relative or employee of such attorney or counsel
17  or financially interested in the action.
18          Witness my hand and seal this 8th day
19  of March, 2010.
20
21          _____
            Sheryl D. Berroth
22
            Missouri Supreme Court
23
            Certified Court Reporter
24
25
```