**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| ROXIE SIBLEY, JEANNE NOEL, ERNESTO BENNETT, JAMIE WILLIAMS, GREG ST. JULIEN, TRACIE HERNANDEZ, JOHN JASINSKI, and TEISHA KING, individually and on behalf of the class, | Case No. 02:08–CV–2063–KHV/JPO |
| Plaintiffs, | |
| v. | |
| SPRINT NEXTEL CORPORATION, and SPRINT/UNITED MANAGEMENT COMPANY, | |
| Defendants. | |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY
APPROVAL OF SETTLEMENT**

# TABLE OF CONTENTS

INTRODUCTION................................................................................................1

BACKGROUND................................................................................................1

I.     NATURE OF CLAIMS ASSERTED ......................................................1

II.    PROCEDURAL HISTORY ...................................................................2

III.   ATTORNEYS' TIME AND COSTS.........................................................6

IV.   MEDIATION HISTORY ......................................................................7

V.    SUMMARY OF SETTLEMENT TERMS ...............................................7

      A.  Settlement Class ......................................................................7

      B.  Monetary Relief .......................................................................8

      C.  Notice of Settlement & Release of Claims...............................10

      D.  Distribution of Settlement Funds............................................11

LEGAL ANALYSIS ........................................................................................12

I.     THE PROPOSED SETTLEMENT SATISFIES THE STANDARD FOR COURT
     APPROVAL.....................................................................................12

      A.  Standard for Settlement Approval..........................................12

            1.    The Settlement Was Negotiated Fairly and Honestly...............13

            2.    There Were Disputed Questions of Fact and Law that
               Made the Outcome of the Litigation Uncertain .......................14

            3.    The Value of the Recovery Outweighs the Mere Possibility
               of Future Relief After Protracted and Expensive Litigation ...15

            4.    The Parties Deem the Settlement Fair and Reasonable...........17

      B.  The Proposed Notice of Settlement is Reasonable and Satisfies
         Due Process............................................................................17

II.    THE COURT SHOULD APPROVE CLASS COUNSEL'S ATTORNEYS' FEES, COSTS,
     AND THE SERVICE AWARDS ...........................................................18

A.  Standard for Award of Attorneys' Fees ........................................................18

B.  The Court Should Approve the Attorneys' Fees Sought ...........................19

    1.   **Class Counsel Expended Considerable Time and Labor
on Behalf of the Class** ....................................................................19

    2.   **The Case Presented Difficult and Novel Questions and
Required Skilled and Experienced Counsel** ...........................22

    3.   **The Requested Fee is Customary and Reasonable** ..................24

    4.   **Class Counsel Undertook Significant Risk Litigating
This Expensive and Lengthy Case on a Contingent-Fee
Basis** .................................................................................................31

    5.   **Preclusion of Other Employment** ...............................................31

    6.   **Counsel Obtained a Fair Result on Behalf of the Class** ..........32

    7.   **Reaction of the Class** ....................................................................32

C.  The Requested Expenses are Reasonable and Should be
Approved .........................................................................................................33

D.  The Requested Service Awards are Justified ..............................................35

CONCLUSION ...........................................................................................................37

## INTRODUCTION

Plaintiffs, Roxie Sibley, Jeanne Noel, Ernesto Bennett, Jamie Williams, Greg St. Julien, Tracie Hernandez, John Jaskinski, and Teisha King, individually and on behalf of the class ("Plaintiffs"), by and through their counsel Nichols Kaster, PLLP ("Class Counsel") bring this motion for preliminary settlement approval.  Plaintiffs, Class Counsel, and Defendants Sprint Nextel Corporation and Sprint/United Management Co. (collectively, "Sprint"), by and through their counsel, Proskauer Rose LLP, reached a non-reversionary settlement in the total amount of $30,500,000.00, and agreed that the Settlement Class consists of 27,366 members.  The parties agreed to this settlement just over four months from the start of a complex jury trial, where the amount of recovery, if any, was uncertain, and the likelihood of a lengthy appeals process was certain.  The parties believe the settlement to be a fair and reasonable resolution to this matter.

Accordingly, Plaintiffs respectfully request that the Court grant their motion for preliminary approval of settlement and schedule a final approval hearing for approximately 4.5 months after granting this motion.  Sprint does not oppose Plaintiffs' motion.

## BACKGROUND

### I.   NATURE OF CLAIMS ASSERTED

On February 7, 2008, Plaintiffs, who worked as Sprint retail store employees, initiated this action.  (Compl., Filing No. 1, at CM/ECF p. 1.)  Their claims include unpaid commissions pursuant to the Kansas Wage Payment Act ("KWPA") (Count I) and breach of contract (Count II).  (*See* First Am. Compl., Filing No. 8, at CM/ECF p. 1.)

Plaintiffs asserted that due to problems within Sprint's commissions-related systems (collectively referred to as the "commission system"), Sprint failed to pay the class all the commissions due for the Sprint products and services they sold.  (*See id.*)

Sprint denies the allegations, asserting that Plaintiffs were at all times paid commissions in accordance with the operative commission contracts and, therefore, Plaintiffs cannot establish their claims for breach of contract or violation of the KWPA.  (Filing No. 436, p. 10–13.)  In addition, Sprint asserted that the case could not proceed on a class basis as no class member was underpaid any commissions he or she was due as a result of a systematic computer problem with Sprint's commission systems, and that commission determinations for class members would not be done on a representative basis.  (*Id.*)

## II.   PROCEDURAL HISTORY

The history of this case spans over ten years, a glimpse of which can be seen by reviewing the over 800 entries on the Court's docket.  In bringing this motion, the parties provide a summary of the most relevant history.

Early in the case, Sprint moved to dismiss certain claims.  (*Se*e Defs.' Mem. to Dismiss, Filing No. 16, at CM/ECF p. 1.)  The Court granted Sprint's motion in part and denied it in part. (Order 7, Filing No. 77.)  The Court granted Sprint's motion to dismiss Plaintiffs' quantum meruit claims under Arizona and Louisiana law and the promissory estoppel claims under Tennessee, Ohio and Arizona law. (Order 7, Filing No. 77, at CM/ECF p. 7.)[1]  The Court denied Sprint's motion to dismiss Plaintiffs' KWPA claim (Count I).

On May 2, 2008, Plaintiffs moved for class certification under Rule 23 on their KWPA (Count I) and breach of contract (Count II) claims.  (Pls.' Mot. for Class Cert., Filing No. 36, at CM/ECF p. 1.)  On November 24, 2008, the Court certified the following class:

> All persons nationwide who worked for Defendants' retail stores since their merger with Nextel, including Retail Store District Managers, Retail Store Managers, Assistant Retail Store Managers, Lead Retail Consultants, Retail Consultants, Retail Sales Representatives, and other retail employees whose compensation was based in full or in part on commissions.

---

[1] Plaintiffs did not oppose this dismissal.  (*Id.*)

(Class Cert. Mem. and Order 10, Filing No. 99, at CM/ECF p. 10.)  The Tenth Circuit denied Sprint's petition to appeal.  *Sprint Nextel Corp. v. Sibley*, No. 08–604, Filing No. 01017588146 (10th Cir. Jan. 23, 2009).  The parties agreed to a class liability and damages period of August 12, 2005 through September 30, 2009.  (Pretrial Order 5, Filing No. 436, at CM/ECF p. 5; Class Notice 5, Filing No. 503-1, at CM/ECF p. 6.)

The parties engaged in significant discovery, with multiple rounds of interrogatories, requests for admission, and document and data requests and productions. (*See, e.g.*, Filing Nos. 24, 25, 29, 115, 116, 117, 118, 119, 120, 131, 132, 141, 144, 155, 156, 166, 172, 182, 185, 226, 228, 231, 235, 237, 249, 250, 251, 252, 266, 273, 275, 277, 287, 293, 303, 304, 306, 309, 313, 328, 329, 330, 335, 336, 337, 338, 339, 343, 345, 346, 349, 364, 368, 377, 384, 387, 393, 394, 401, 403, 404, 405, 406, 407, 412, 414, 415, 417, 418, 422, 425, 426, 429, 430, 431, 459.) Sprint produced over 18 million pages of documents.  (*See* Defs.' Decert. Mem. 9, Filing No. 620, at CM/ECF p. 13.)  In addition, Plaintiffs took the depositions of 27 of Sprint's corporate representatives, executives, and employees with knowledge of Sprint's commissions and systems, while Sprint deposed the 9 class representatives.  (*See* Pls.' Mem. to Exclude Expert 6, Filing No. 616, at CM/ECF p. 6.)  Furthermore, Class Counsel hired several document review and research attorneys to, among other things, review, analyze, and code documents Sprint produced, and research issues as they arose.  (Fisher Decl. ¶ 8.)

Class Counsel engaged in extensive efforts to reach class members during discovery to discuss their claims, resulting in Class Counsel making contact with over 30,000 class members. (Fisher Decl. ¶ 5.)  Class Counsel maintained contact by providing update letters and emails, website updates, and maintaining staff to respond to class member communications.  (*Id.*)

Sprint produced commissions-related data for all class members, which included data from its point-of-sale, billing, commissions, and payroll systems.  This production was the result of a lengthy meet and confer and negotiation process.  (*See* Sched. Order ¶¶ 2.e-g, Filing No. 114, at CM/ECF p. 5.)  Sprint's data production consisted of "more than 6–7 billion sales transactions and billing records, equating to more than 8 terabytes of data" necessary to calculate damages for the class.  (*See* Defs.' Opp'n to 2d Mot. to Exclude Expert 9, Filing No. 514, at CM/ECF p. 15.)

Due to the complexity of analyzing this large data set, the parties had to retain experts. (*See* Order of Appt. 2, Filing No. 532, at CM/ECF p. 2 (explaining "the ultimate issue" "depends heavily on expert testimony").  As correctly described by the Special Master, "[t]he amount of work required of the experts to undertake this determination was massive."  (Decert Report 3, Filing No. 663, at CM/ECF p. 3.)  Plaintiffs hired two sets of experts: (1) Balance Engines LLC ("Balance Engines"), to perform a wireless carrier commissions reconciliation; and (2) Dr. Margaret Dunham ("Dr. Dunham") to perform a technical review of Balance Engines' system. (*See* BE Report ¶ 1, Filing No. 616–85, at CM/ECF p. 2; Dunham Report 2, 9, Filing No. 616–86, at CM/ECF p. 3, 10.)  Sprint retained Dr. Janet Thornton ("Dr. Thornton"), a labor and employment economist at the Berkeley Research Group, who claims she was tasked with examining the Stage 3 Data and the commission contracts in order to determine whether there was any pattern or systemic flaw that resulted in the underpayment to class members for purposes of defending against class certification. (Thornton Report ¶ 1 and App. A, Filing No. 616–87, at CM/ECF p. 2; *see* Rule 26a Expert Discl., Filing No. 616–91, at CM/ECF p. 2–3.)

The parties' experts analyzed the class commissions data and Sprint's commission plans and issued several reports.  These reports were revised over the years.  (*See* Pls.' Resp. to Defs.'

Mot. To Exclude 6, Filing No. 621, at CM/ECF p. 6.)  Plaintiffs' experts ultimately concluded that 27,366 class members were overall *under*paid commissions by $95,584,122.27 (or approximately $3,492 per person), (*See* BE 7/25/17 Expert Report, Filing No. 749–2; BE Class Member Analysis, Filing No. 749–14 at Ex. 10), and Sprint's expert concluded that 27,366 class members were overall *over*paid by $75,004,761.00, (Thornton Rebuttal 59 n. 106, Filing No. 616–90, at CM/ECF p. 60).  Furthermore, the experts recently provided additional criticisms of each other's methodologies and calculations in quantification reports and quantification rebuttal reports ordered by the Court.  (Filing Nos. 788–2, 791–3, 797–1, 796–1.)  In these reports, the experts provided criticisms of errors they allege were present in the opposing party's methodology and attempted to quantify them.  (*Id.*)  This case has involved extensive, complex, and time consuming motion practice.  For instance, in early 2013 the parties filed cross-motions for summary judgment,[2] (Filing Nos. 444, 448, 464, 467, 478, 474), cross-*Daubert* motions, (Filing Nos. 446, 454, 461, 463, 476, 477), and Sprint filed a decertification motion, (Filing Nos. 451, 462, 480).  The parties also filed renewed cross-*Daubert* motions in 2014 at the Court's request, (Filing Nos. 507, 510, 512, 513, 514, 516, 518, 520).

While the parties attended a hearing on March 3, 2014 on these motions, the Court did not rule on them.  Rather, the Court appointed a Special Master, David Cohen, (Order of Appt., Filing No. 532, at CM/ECF p. 2), and subsequently a Technical Advisor, Dr. Chen Song, (Order, Filing No. 559, at CM/ECF p. 1), and all pending motions were vacated.  (Order, Filing No. 557 at CM/ECF p. 1 (text only); Am. Sched. Order 4 n.2, Filing No. 579, at CM/ECF p. 1.)  The Special Master set new deadlines for the parties to update/consolidate their prior summary judgment, *Daubert*, and decertification motions.  (Am. Sched. Order 3, Filing No. 579, at

---

[2] In December 2011, Sprint brought an early motion for summary judgment.  (Filing No. 284, at CM/ECF p. 1.)  After briefing, the Court overruled it as premature.  (Order, Filing No. 334.)

CM/ECF p. 1.)  The Special Master also held two, two-day expert summits where the parties and their experts met first in December 2014, and later in November 2015, to discuss their damages models and reports.  The parties and their experts each met separately with the Special Master and Technical Advisor in mid-2016 for further discussions.

The parties redrafted and re-filed their summary judgment, *Daubert* and decertification motions in late 2015 and 2016.  (Filing Nos. 616, 622, 630, 618, 621, 631, 620, 626, 632, 638, 647, 651, 652, 639, 646, 646–1, 650.)  After a hearing on the motions, the Special Master issued reports denying Sprint's decertification motion, denying Plaintiffs' *Daubert* motion, granting in part and denying in part Sprint's *Daubert* motion, granting in part and denying in part Plaintiffs' first summary judgment motion, denying Plaintiffs' second summary judgment motion, and denying Sprint's summary judgment motion.  (Filing Nos. 663, 682, 701, 712.)  The parties then briefed their objections to these reports, (Filing Nos. 670, 675, 677, 685, 687, 715, 721, 717, 724, 713, 718), and the Court adopted the Special Master's rulings, (Filing Nos. 727, 728, 729).

In 2017, after previously briefing the issue, the parties stipulated to dismissal of class members for whom Plaintiffs' experts found no damages.  (Stip. for Dismissal Without Prejudice, Filing No. 785; Stip. for Dismissal With Prejudice, Filing No. 786.)  The Court suggested in an Order to Show Cause, (Filing No. 808), that when the parties send notice of dismissal to those class members, they be given an opportunity to be heard.  The parties agree and filed revised notices that give these class members an opportunity to object to dismissal, request exclusion, and be heard at the final fairness hearing.  (Filing No. 812.)

## III.   ATTORNEYS' TIME AND COSTS

Litigating this case has required significant attorney time and litigation costs.  As of January 2018, Class Counsel has expended more than 39,614 hours on the matter.  (Fisher Decl.

¶ 3.)[3]  Based on Class Counsel's standard hourly rates, the value of this time (on a lodestar basis) is $13,918,213.75.  (*Id.*)  Class Counsel will also spend additional time finalizing the preliminary approval briefing and exhibits for filing, finalizing the settlement agreement, preparing for and attending the preliminary approval hearing, and if the Court grants the motion, drafting the final approval papers, preparing for and attending the final approval hearing, working with the Claims Administrator and Sprint to ensure the settlement is administered correctly, and answering questions from class members for years to come.  (*Id.* ¶ 6.)   With respect to litigation costs, Class Counsel has advanced $6,449,293.12 to prosecute this case and anticipates spending approximately $123,854.04 more, for a total of approximately $6,573,147.16.  (*Id.* ¶ 18; Costs Detail, Ex. 4.)  These fees and costs are discussed in more detail below.

## IV.   MEDIATION HISTORY

On January 8 and 9, 2018, the parties attended a settlement conference with the Honorable Judge Daniel Crabtree of the District of Kansas.  Class representative Jay Ritchie also attended.   While the parties did not reach a settlement at that time, they continued their discussions, and with further assistance from Judge Crabtree, reached a settlement on January 18, 2018.[4]

## V.   SUMMARY OF SETTLEMENT TERMS

### A.   Settlement Class

The Settlement Agreement defines the Settlement Class as follows:

---

[3] Class Counsel also retained Stueve Siegel Hanson LLP as local counsel.  Their time has been minimal so is not included.  (Fisher Decl. ¶ 3.)

[4] This was not the first mediation effort.  The parties mediated unsuccessfully with retired New Jersey State Supreme Court Chief Justice James Zazzali over the course of five mediations between May 3, 2010 and March 25, 2011.

> All persons nationwide who worked in Sprint's retail stores during the Class Period of August 12, 2005 through September 30, 2009, including Retail Store District Managers, Retail Store Managers, Assistant Retail Store Managers, Lead Retail Consultants, Retail Consultants, Retail Sales Representatives, and other retail employees for whom the class's experts calculated were overall underpaid commissions during the Class Period.

(Settlement Agmt. ¶ 4, Ex. 1.)  There are 27,366 individuals in the Settlement Class.  (*Id.*)  The Settlement Agreement does not include the 12,330 individuals subject to the parties' pending stipulations to dismiss, (*see* Stip. for Dismissal Without Prejudice, Filing No. 785; Stip. for Dismissal With Prejudice, Filing No. 786), as those individuals will be sent a notice informing them of their dismissal once those stipulations are approved by the Court.

### B.     Monetary Relief

The Settlement Agreement provides for a Total Settlement Amount of $30,500,000.00, which will be used to compensate the Settlement Class and pay any amounts approved by the Court for Class Counsel's fees, expenses, class representative service awards, and settlement administration.  (Settlement Agmt. ¶ 2, Ex. 1.)  As previously noted, none of this money will revert to Sprint.  (*Id.* ¶ 6.)  Prior to the payment of Class Counsel's fees and expenses, the settlement is the equivalent of $1,114.52 per class member ($30,500,000/27,366).

Consistent with the class representatives' fee agreement with Class Counsel,[5] the Settlement Agreement provides for attorneys' fees of one-third (33.33%) of the Total Settlement Amount ($10,166,666.87) and reimbursement for costs of up to $7,000,000.00.  (*Id.* ¶ 8.)  Even so, Class Counsel has reduced the amount of attorneys' fees they are seeking to $8,614,528.84 to ensure the total fees, when added to the $6,573,147.16 in costs, do not exceed the amount paid to the Settlement Class.  After deductions for fees, costs, and other settlement related expenses

---

[5] (Fisher Decl. ¶ 17.)

outlined in the table below, $15,187,676.00 remains for distribution to the class.  A benefit of this settlement is that any unclaimed funds will be redistributed to participating members of the Settlement Class who timely return their claim form.  (*Id.* ¶ 6.)  Thus, once Class Counsel's fees, costs, and other settlement related expenses are deducted and assuming a 50% return rate (which Class Counsel believes to be a reasonable estimation for a case of this nature and duration), the average settlement payment would be $1,109.97.  A summary of these calculations is below:

| Settlement | $30,500,000.00 |
|---|---|
| Avg. Per Person Prior to Fees/Costs | $1,114.52 |
| Fees (Reduced) | $8,614,528.84 |
| Current Costs[6] | $6,449,293.12 |
| Future Estimated Costs[7] | $123,854.04 |
| Settlement Administration[8] | $124,648.00 |
| To Distribute | $15,187,676.00 |
| 15k Service Payments to Named Ps (9)[9] | $135,000.00 |
| 5k Service Payments to others involved (11)[10] | $55,000.00 |

---

[6] (*See* Fisher Decl. ¶ 18; Costs Detail, Ex. 4.)

[7] (*See* Fisher Decl. ¶ 18; Costs Detail, Ex. 4.)

[8] The Settlement Agreement states that reasonable funds shall be set aside from the Total Settlement Amount for settlement administration.  (Settlement Agmt. ¶ 10(i), Ex. 1.)  The Claims Administrator provided a bid of $124,648.00.  (Rust Bid, Ex. 5.)  The Settlement Agreement provides that any funds remaining from settlement administration shall be reallocated to members of the  Settlement Class who timely return their claim form.  (Settlement Agmt. ¶ 6, Ex. 1.)  However, if the Claims Administrator's Fees and Costs exceed $124,648.00, any additional amounts will be paid from the Total Settlement Amount, and Sprint will not pay any additional amounts to cover the additional fees and costs.

[9] Consistent with the Settlement Agreement, $15,000.00 was allocated to each of the nine class representatives (identified in the case caption to this memorandum) as a service payment.  (Settlement Agmt. ¶ 9, Ex. 1; Prelim. Allocations, Ex. 2.)

[10] The Settlement Agreement provides for the allocation of $5,000.00 to each additional class member identified by Class Counsel who prepared to testify at trial.  (Settlement Agmt ¶ 9, Ex. 1.)  Class Counsel identified eleven such individuals: Veronica Batarseh (Borrego), Christopher Giardina, Jonathan Housknecht, Jimmie Kelley, Ryan Maier, Sameer Mohammad (Sam Salma), Kyle Neubauer, William Ray, Jason Renner, Alden Smith, and Michael Tallon.   (Prelim. Allocations, Ex. 2.)

| | |
|---|---|
| Reserve Fund[11] | $60,000.00 |

| | |
|---|---|
| Minimum Allocation[12] | $25.00 |
| Funds for Minimum | $28,823.17 |

| | |
|---|---|
| Total to Class Counsel for Fees and Costs | $15,187,676.00 |
| Average Pro Rata Allocation if 100% Sign Up (Including Service Payments) | $554.98 |
| Average Pro Rata Allocation if 50% Sign Up (Including Service Payments) | $1,109.97 |

A spreadsheet showing these calculations and each individual preliminary minimum allocation to the Settlement Class is provided as Exhibit 2.

### C.    Notice of Settlement & Release of Claims

Within twenty days of preliminary approval, the Settlement Agreement contemplates that the Claims Administrator, Rust Consulting, will send a notice of settlement and claim form to the Settlement Class explaining the allocations and informing them of a 90-day period to either return a claim form, object to the settlement, or request exclusion.   (Settlement Agmt. ¶ 11, Ex. 1.)  The proposed notice and claim form are attached as Exhibit 6.   Any notice returned to the Claims Administrator with a forwarding address will be re-sent to the forwarding address, and any returned as undeliverable shall be re-mailed by the Claims Administrator if it can locate another address.[13]   (Settlement Agmt.  ¶ 11(e), Ex. 1.)  Only those members of the Settlement Class who timely return their claim form will receive a settlement check.  Following the 90-day

---

[11]  The Settlement Agreement sets aside $60,000.00 from the Total Settlement Amount as a reserve fund to correct any errors relating to the allocations.  (Settlement Agmt. ¶ 10(c), Ex. 1; *see* Prelim. Allocations, Ex. 2.)  Any funds remaining from the reserve fund will be reallocated to members of the Settlement Class who timely return a claim form.  (*Id.*)

[12]  Each member of the Settlement Class was allocated a minimum of $25.  (*See* Prelim. Allocations, Ex. 2.)

[13]  For notices returned as undeliverable and re-mailed, the notice period ends either at the end of the regular 90-day notice period or twenty days after the remailing of the notice, whichever is later.  No notices will be re-mailed after the regular 90-day notice period expires.  (Settlement Agmt. ¶ 11(e), Ex. 1.)

claim form submission period, any unclaimed settlement funds will be reallocated on a pro rata basis to members of the Settlement Class who timely returned a completed claim form.   (*Id.* ¶ 6.)

The scope of the release is narrowly tailored to the claims asserted and limited to the class liability and damages period.   The notice explains:

> All Settlement Class members who do not timely request exclusion will release any and all claims for, or related to, commissions due, under state (including but not limited to the Kansas Wage Payment Act), federal, or common law (including but not limited to breach of contract), that they have, or may have brought, against Sprint and Sprint's past, present and future subsidiaries and affiliates and their past, present and future owners, partners,  predecessor companies, members, managers, legal representatives, employees, fiduciaries, trustees, employee benefit plan administrators, agents, insurers, re-insurers, successors and assigns, each whether acting in his or her official or individual capacity, and all persons and/or entities acting by, through, under or in concert with any of them and any individual or entity which could be jointly liable with any of them, each whether acting in his or her official or individual capacity (the "Released Parties) from August 12, 2005 through September 30, 2009.  Any member of the Settlement Class who timely requests exclusion will not release any claims.

(Settlement Agmt. at Ex. A, Ex. 1.)

## D.  Distribution of Settlement Funds

The parties agreed that within ten days of the deadline to return a claim form, Class Counsel will file a motion with the Court for final approval of the settlement and dismissal. (Settlement Agmt. ¶ 14(b), Ex. 1.)  Within thirty-one days of a final approval order, Sprint will deliver the Total Settlement Amount to the Claims Administrator.  (*Id.* ¶¶ 1(n), 7.)  Within fourteen days of receipt, the Claims Administrator will send settlement checks to participating members of the Settlement Class and wire any attorneys' fees and costs approved to Class Counsel.  (*Id.*)   Settlement checks will be void after 180 days, and Sprint will cooperate with Class Counsel to reissue lost or damaged checks for a 190-day period.  (*Id.* ¶ 15(b).)  However,

no settlement checks will be reissued more than 190 days after the first settlement check was issued to the Settlement Class. (*Id.*)   Because submission of a claim form is required to receive a settlement check, and in light of the lengthy check cashing period, the parties do not expect many uncashed checks.   To the extent any such funds remain, the Claims Administrator will donate them to the March of Dimes. (*Id.*)

## LEGAL ANALYSIS

## I.   THE PROPOSED SETTLEMENT SATISFIES THE STANDARD FOR COURT APPROVAL

### A.   Standard for Settlement Approval

Under Rule 23, court approval is required for the settlement of any certified class. *Fed. R. Civ. P. 23(e)*.  This typically involves a two-step process. *See In re Motor Fuel Temperature Sales Practices Litig.*, 286 F.R.D. 488 (D. Kan. 2012).  The first step is a preliminary evaluation of the fairness, reasonableness, and adequacy of the proposed settlement. *See In re Motor Fuel Temperature Sales Practices Litig.*, 258 F.R.D. 671, 675 (D. Kan. 2009).  At the first stage, the Court makes a preliminary evaluation of the fairness of the proposed settlement and determines whether it has any reason to not notify the class of the settlement or to not hold a fairness hearing. *In re Motor Fuel*, 286 F.R.D. at 492.  In the second stage, if the Court grants preliminary approval, it directs notice to class members and sets a hearing at which it will make a final determination on the fairness of the class settlement. *Id.*

The decision whether to grant court approval is committed to the sound discretion of the trial court. *Jones v. Nuclear Pharmacy, Inc.*, 741 F.2d 322, 324 (10th Cir. 1984).  However, this discretion is exercised somewhat differently, depending on whether preliminary or final approval is being sought.  Because the primary objective of preliminary approval is for the Court to determine whether notice should be sent to the class, rather than make a final determination of the settlement's fairness, the standard for preliminary approval is less stringent

than the standard that applies at the final approval stage. *Rhodes v. Olson Assoc., P.C.*, 308 F.R.D. 664, 666 (D. Colo. 2015) (citing Newberg on Class Actions § 13:12 (5th ed.)). "Preliminary approval of a class action settlement, in contrast to final approval, is at most a determination that there is what might be termed 'probable cause' to submit the proposal to class members and hold a full-scale hearing as to its fairness." *Davis v. J.P. Morgan Chase & Co.*, 775 F. Supp. 2d 601, 607 (W.D.N.Y. 2011).

The Tenth Circuit applies a four-factor test to determine whether a class action settlement is fair, reasonable, and adequate. *See Rutter & Wilbanks Corp. v. Shell Oil Co.*, 314 F.3d 1180, 1188 (10th Cir. 2002). These factors include:

(1) whether the proposed settlement was fairly and honestly negotiated;

(2) whether serious questions of law and fact exist, placing the ultimate outcome of the litigation in doubt;

(3) whether the value of an immediate recovery outweighs the mere possibility of future relief after protracted and expensive litigation; and

(4) the judgment of the parties that the settlement is fair and reasonable.

*Id.* Although the Court typically considers these factors at the final approval hearing, "they are a useful guide at the preliminary stage as well." *In re Motor Fuel Litig.*, 258 F.R.D. at 680. Because the settlement here satisfies all four factors, it meets the standard for preliminary approval.

### 1.   The Settlement Was Negotiated Fairly and Honestly

There should be no question that the settlement was negotiated fairly and honestly. As described above, the parties litigated for over ten years, zealously advocating for their clients. The negotiations that led to settlement were conducted at arm's length through a well-respected and neutral federal judge, the Honorable Daniel D. Crabtree. *See In re Crocs, Inc. Sec. Litig.*,

13

306 F.R.D. 672, 679, 689 (D. Colo. 2014) (approving settlement and noting parties engaged in extensive negotiations and mediation sessions before a retired district court judge).  In fact, the parties left that settlement conference without a settlement, and it was only through continued effort over the following weeks and with the assistance of Judge Crabtree, that they finally reached agreement.  Prior to that, the parties engaged in five unsuccessful mediations with another mediator, ten years of adversarial litigation, extensive motion practice, discovery, multiple rounds of expert reports, and preparation for trial.  Accordingly, the settlement is entitled to a presumption of fairness. *Marcus v. Kansas Dep't of Revenue*, 209 F. Supp. 2d 1179, 1182 (D. Kan. 2002) ("When a settlement is reached by experienced counsel after negotiations in an adversarial setting, there is an initial presumption that the settlement is fair and reasonable.").

### 2. There Were Disputed Questions of Fact and Law that Made the Outcome of the Litigation Uncertain

It was reasonable for the parties to reach a settlement because there are disputed questions of fact and law that made the outcome, and the timeframe for a post-appeal resolution, uncertain.  Both parties prevailed in part with respect to their motion practice; accordingly significant issues of liability and damages remained for trial and appeal.

With respect to trial, the primary issue for liability and damages was whether Sprint overall underpaid each class member commissions under the terms of the operative commission plans.  The jury's decision would rely heavily on the parties' respective expert methodologies and.[14]  Trial would have lasted many weeks, perhaps even months, with much of that time consumed with expert testimony.  There is no way of knowing whether liability would be found by the jury, and, if so, the amount of damages that would have been awarded.

---

[14] The parties had also planned to bring several motions in limine, and Sprint sought to compel Plaintiffs to provide a more complete "trial plan."  (9/1/2017 Hearing Tr. 69–74, Ex. 3.)

14

If liability was found and if there was an award, the jury would also have to decide if Sprint's conduct was willful in order to award penalties under the KWPA, which the parties also disputed.  (*See* 2d Summ. J. Report 14, Filing No. 712, at CM/ECF p. 14.)  At the conclusion of trial, the Court would have to decide whether pre-judgment interest was appropriate under the KWPA; and whether any commissions owed here met the definition of "liquidated."  The parties disputed these issues.  *Compare Edward Kraemer & Sons, Inc. v. City of Overland Park*, 880 P.2d 789, 796 (Kan. Ct. Pa. 1994) (affirming award of prejudgment interest on liquidated amount) and *Royal Coll. Shop, Inc. v. N. Ins. Co. of N.Y.,* 895 F.2d 670, 674 (10th Cir. 1990) (affirming denial of prejudgment interest on contested damages).

In addition to the uncertainty of trial, several unsettled legal issues remained that would emerge post-trial.  Sprint contended in its motion to dismiss that the KWPA cannot apply to class members who did not live or work in Kansas.  While the Court rejected that argument, Sprint maintained its right to appeal.  Next, Sprint contested the Court's orders granting class certification and denying decertification, twice attempting interlocutory appeal.  Sprint also disputed Plaintiffs' experts satisfied *Daubert's* reliability standards.  Additionally, Sprint disputed the Court's ruling in Plaintiffs' favor on summary judgment, such as the meaning of certain contractual provisions and the dismissal of several of its defenses.  Sprint would have pursued all of these arguments post-trial on appeal.  Sprint also contended that thousands of class members previously released their claims and should be dismissed.  (Defs.' Offer of Proof, Filing No. 770, at CM/ECF p. 1.)  That motion was pending at the time of settlement, and settlement permits those class members to remain in the Settlement Class.

Given these uncertainties, and the risk of continued litigation and appeal, it was reasonable and prudent for the parties to settle this matter now.

15

**3.** **The Value of the Recovery Outweighs the Mere Possibility of Future Relief After Protracted and Expensive Litigation**

The value of the recovery, when weighed against the possibility of future relief after further litigation, also favors a finding that the settlement is fair, reasonable, and adequate. Assuming a 50% claim form return rate, those participating members of the Settlement Class will receive a payment of approximately $1,109.97 on average after the deduction of fees, costs, and settlement administration.[15]  This is a fair resolution considering the disparity in the conclusions reached by the parties' experts, with Plaintiffs' experts concluding that 27,366 class members were overall underpaid on average $3,492, and Sprint's expert concluding that the majority of the 27,366 class members were overall overpaid.  The settlement reflects a reasonable compromise to damages calculations that a jury could find were not certain or difficult to determine, even assuming the jury found Sprint liable.

A settlement now also prevents significant litigation costs from continuing to accrue. There is no question that due to the nature of the issues and the data involved, this case was expensive to litigate.  In addition to the typical costs such as filing fees, copies, class mailings, transcripts, travel, etc., it required regular attention from experts throughout the life of the case, and included the expense of the Special Master and Technical Advisor who have worked on the case for over three and a half years.  The experts were involved, among other things, in discovery, the Stage 3 data production, building and revising their respective methodologies to process numerous disparate data sets, issuing multiple reports, analyzing and critiquing the other

---

[15] Neither the KWPA claim nor the Kansas breach of contract claim provides for the recovery of attorneys' fees for prevailing plaintiffs.  *Compare Shelley v. State, Dep't of Hum. Res.*, 8 P.3d 33, 27 Kan. App. 2d 715 (Kan. Ct. App. 2000) (the KWPA "makes no provision for attorney fees for a private cause of action") *with* Minn. Stat. § 181.171 (remedial provision of the Minnesota wage statutes allowing for the recovery of attorneys' fees).  This is significant considering that before fees, the recovery is $2,229.04 on average per person, assuming a 50% return rate, compared to the $3,492 per plaintiff calculated by Plaintiffs' experts.

expert's methodologies and reports, participating in expert and witness depositions, and attending several expert meetings, meetings with counsel, court hearings, and mediations. The expense for these professionals would have continued through a lengthy trial and likely beyond. All of these out-of-pocket expenses, plus the anticipated costs typical of a trial such as this one would have reduced the value of any potential jury award, assuming a jury would have found Sprint liable. It was prudent to cut off these mounting costs by reaching a settlement.

Further, any jury verdict would be subject to many years of appeal. Complex litigation "can occupy a court's docket for years on end, depleting the resources of the parties and taxpayers while rendering meaningful relief increasingly elusive." *In re U.S. Oil & Gas Litig.*, 967 F.2d 489, 493 (11th Cir. 1992). By entering into a settlement now, the parties saved additional time and costs, and avoided the risks associated with further litigation.

### 4.      The Parties Deem the Settlement Fair and Reasonable

The final settlement factor—the judgment of the parties— also supports approval. The Court should "hesitate to substitute its own judgment for that of counsel." *Ingram v. The Coca-Cola Co.*, 200 F.R.D. 685, 691 (N.D. Ga. 2001) (quoting *Warren v. City of Tampa*, 693 F. Supp. 1051, 1060 (M.D. Fla. 1988)); *see also In re BankAmerica Corp. Secs. Litig.*, 210 F.R.D. 694, 702 (E.D. Mo. 2002). Moreover, the fact that Judge Crabtree assisted the parties to reach this settlement is further indication of its fairness.

### B.      The Proposed Notice of Settlement is Reasonable and Satisfies Due Process

In addition to reviewing the substance of the parties' settlement, the Court must ensure that it directs notice in a reasonable manner to all class members who would be bound by the proposed settlement. Fed. R. Civ. P. 23(e)(1).

The notice proposed by the parties and the manner of distribution does that.  The proposed notice clearly spells out the nature of the action, the claims and period at issue, the terms of the proposed settlement, the claim form requirement, the minimum amount the class member will receive, and provides information regarding how to objection, opt out, or obtain further information.  Furthermore, the settlement has procedures in place to ensure Settlement Class Members receive their notice.  As previously discussed, the Claims Administrator will make efforts to find current addresses and re-mail returned mail.  This is sufficient to provide class members with adequate notice.

## II.   THE COURT SHOULD APPROVE CLASS COUNSEL'S ATTORNEYS' FEES, COSTS, AND THE SERVICE AWARDS

The Settlement Agreement provides for attorneys' fees, costs, and class representative service awards.  (Settlement Agmt. ¶¶ 8, 9, Ex. 1.)  Class Counsel seeks (1) attorneys' fees in the amount of $8,614,528.84; (2) reimbursement of litigation costs in the amount of $6,573,147.16; (3) a service award of $15,000.00 to each of the nine class representatives; and (4) a service award of $5,000.00 to each of the eleven class members who assisted with trial preparation.  As discussed below, the requested fees, expenses, and service awards are reasonable and should be approved.  While Class Counsel provides the requests made in this section, Sprint does not oppose them.

### A.   Standard for Award of Attorneys' Fees

It is well established that when counsel obtain a common fund settlement on behalf of a class, they may seek a reasonable attorneys' fee from the fund as a whole.  *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980); *Rosenbaum v. MacAllister*, 64 F.3d 1439, 1444 (10th Cir. 1995).  In common fund cases, courts typically apply one of two methods to determine reasonable attorney's fee awards: the "percentage of the fund" method, or the "lodestar" method.

18

*Rosenbaum*, 64 F.3d at 1445. Although Class Counsel's fee request is reasonable under either method, the Tenth Circuit has expressed a preference for the percentage method. *Id.* (citing *Gottlieb v. Barry*, 43 F.3d 474, 483 (10th Cir. 1994)).

The Tenth Circuit utilizes a hybrid approach to the percentage method, which combines the percentage-of-the-fund analysis with the factors traditionally used to calculate the lodestar (hereinafter, the "*Johnson* factors"). *See In re: Motor Fuel Temperature Sales Practices Litig.*, 2016 WL 4445438, at *2 (D. Kan. Aug. 24, 2016) (citing *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974)). The *Johnson* factors require the Court to consider the following in determining the reasonableness of a fee request, as applicable: (1) the time and labor required; (2) the novelty and difficulty of the questions presented in the case; (3) the skill required; (4) the preclusion of other employment by the attorneys due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) any time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases." *Rosenbaum*, 64 F.3d at 1445 n.3. All of the *Johnson* factors applicable to this case[16] support the requested fee.

## B.   The Court Should Approve the Attorneys' Fees Sought

### 1.   <u>Class Counsel Expended Considerable Time and Labor on Behalf of the Class</u>

Courts consider the time and labor required to litigate on behalf of the class (the first *Johnson* factor). As discussed below, this factor supports that the requested fee of $8,614,528.84 is reasonable.

---

[16] The seventh factor—time limitations—does not really apply here, although this case has consumed over a decade of time.

The Court has already recognized the significant time and labor this case demanded.   As the Court explained, litigating this complex case "has not been cheap or fast."  (9/1/2017 Hearing Tr. 79, Ex. 3.)  It took six years of extensive factual and expert related discovery and motion practice before the parties had their first dispositive motion hearing.  Even then, the Court found the case was too complicated for a ruling and engaged the assistance of a Special Master and Technical Advisor.  While that was a valuable decision, it added over three years of additional time and expenses, and as the Court concisely put it: "hard work" by the parties.  (*Id.*)

Class  Counsel  has  expended  more  than  39,614  hours  of  attorney  and  staff  time prosecuting this action over the past ten years.[17]  A summary of those hours is below:[18]

| Name | Hours | Rate | Total |
|------|-------|------|-------|
| Michele Fisher (Partner) | 6,105.65 | $550.00 | $3,358,107.50 |
| Paul Lukas (Partner) | 3,684.40 | $650.00 | $2,394,860.00 |
| Alex Baggio (Associate) | 4,704.82 | $375.00 | $1,764,307.50 |
| Charles Frohman (Associate) | 2,752.20 | $375.00 | $1,032,075.00 |
| Rebekah Bailey (Partner) | 1,403.40 | $450.00 | $631,530.00 |
| Donald Nichols (Partner) | 446.30 | $600.00 | $267,780.00 |
| Robert Schug (Partner) | 95.62 | $475.00 | $45,419.50 |
| Doc. Review & Research Attorneys | 11,337.31 | $250.00 | $2,834,327.50 |
| Staff | 9,084.61 | $175.00 | $1,589,806.75 |
| **Total** | **39,614.31** | | **$13,918,213.75** |

(Fisher Decl. ¶ 3.)  Based on Class Counsel's standard hourly rates, the reasonable value of this time (on a lodestar basis) is $13,918,213.75.  (*Id.*)  The requested fee of $8,614,528.84 (approximately  28%  of  the  common  fund)  is  substantially  less,  strongly  supporting  the reasonableness of the request.

---

[17] Class Counsel exercised billing judgment and omitted time for those who performed less than 20 hours of work and two associates and a partner who only worked on the case a couple of weeks or less.  (Fisher Decl. ¶ 5.)
[18] If requested, Class Counsel can provide detailed daily time entries for inspection *in camera* to protect the privileged and work product nature of the information.

The hours Class Counsel and their staff worked on this case included many tasks, such as investigating claims, interviewing and communicating with class members, preparing and responding to discovery, preparing for taking and defending depositions, analyzing data, damages, and documents, working with and meeting with experts, expert reports, preparing for and meeting with clients, drafting and responding to numerous non-dispositive and dispositive motions, responding to motions for interlocutory appeal, preparing and responding to objections to reports and recommendations, meetings with the Special Master and Technical Advisor, hearings, travel, file organization and management, legal research, management of client database and data, case strategy and trial preparation, and mediation.  (*Id.* ¶ 4.)

The significant effort Class Counsel and their staff invested was crucial to the case's success.  Class Counsel engaged in extensive briefing on complex issues, prevailing in part on Sprint's motion to dismiss, prevailing in part on Plaintiffs' motion for summary judgment with respect to the meaning of several important contractual provisions and on certain of Sprint's defenses, on class certification and Sprint's motion for decertification, and they survived in part Sprint's attempt to disqualify the class's experts.   The quality of the briefing and the development of the record for the motions took significant time, skill and effort by Class Counsel and their staff.

Two partners, Michele Fisher ("Fisher") and Paul Lukas ("Lukas"), shared primary reasonability for the case.  (*Id.* ¶ 7)  Earlier, they received assistance from a third partner, Donald Nichols ("Nichols"), who has since retired, and they also received assistance from another partner, Robert Schug ("Schug"), when preparing for trial.  (*Id.*)

Class Counsel has had three associates on the matter over the years, and also staffed it with document review and research attorneys who spent considerable time reviewing, coding,

and summarizing Sprint's production of over 18 million pages of documents, researching legal issues, and investigating witnesses. (*Id.* ¶¶ 7–8.)  Document review and research played a central role in this case, as the attorneys carefully worked through millions of pages of often very technical documents, coding them according to a matrix of many issues, identifying and analyzing "hot" documents, summarizing key documents, drafting detailed analyses on specified topics based on targets searches, and providing critical exhibit identification assistance for depositions.  (*Id.*)  That work was instrumental, as it permitted Class Counsel to decide who to depose, locate key exhibits for depositions, obtain the facts to support the extensive briefing they performed, and was crucial to Class Counsel's ability to tell the story of Sprint's alleged commission problems to support Plaintiffs' claims.  (*Id.*)  It also helped Class Counsel locate documents related to complex technical questions the experts had about Sprint's data and systems for the expert calculations and reports.  (*Id.*)  It allowed the attorneys managing the case to focus their time on, among other things, case strategy, discovery, motion practice, expert damages models and reports, and preparing for trial. (*Id.*)

Class Counsel also relied extensively on highly-skilled non-attorneys, such as paralegals, class action clerks, law clerks, and damages clerks to perform other important day-to-day administrative functions and legal research.  (*Id.* ¶ 9.)

There should be no question that Class Counsel expended considerable time and valuable effort effectively litigating this case.

### 2.  The Case Presented Difficult and Novel Questions and Required Skilled and Experienced Counsel

The second, third, and ninth factors—the novelty and difficulty of the questions presented, the skill required, and the experience, reputation, and ability of counsel, are necessarily intertwined and demonstrate the reasonableness of the requested fee.

Class actions are inherently complex. *Johnson v. Brennan,* 2011 WL 4357376, at *17 (S.D.N.Y. Sept. 16, 2011) (explaining wage and hour cases involve complex legal issues). Compared to individual cases, class actions by their very nature involve unique procedural hurdles, more extensive discovery, and larger stakes.  Several factors rendered this case so complex that it required skilled and dedicated class-action counsel.  First, it required extensive work with data experts over many years to understand Sprint's commission plans, data, and systems, in order to develop a methodology to calculate commissions for each class member. This involved time consuming discovery, multiple rounds of expert calculations and reports, review of volumes of Sprint's technical documents and data, expert hearings, expert disqualification motions, and other court proceedings.  Notably, Class Counsel funded this expert work throughout the case, and ensured their experts remained engaged and available to testify at trial.  The subject matter was difficult to understand, with Class Counsel demonstrating the ability to manage it and present it to the Court.

Second, the case involved novel issues of contract interpretation specific to Sprint's commission plans that hinged on statutory and common law arguments with little to no case law directly on point.

Third, the question of whether the case should be, and remain, certified for trial was complex and a constant area of dispute between the parties in their briefing on many motions, not just the certification and decertification motions.  Class Counsel successfully navigated that topic, keeping the case certified for trial.

The Court recognized the complexity of the matter when it appointed a Special Master, and subsequently a Technical Advisor, to assist six years after the case started.  It explained that the ultimate issue, whether Sprint's systems caused it to pay accurate amounts to the class, was

"highly technical and complex" subject matter that "depends heavily on expert testimony." (Order of Appt. 2, Filing No. 532, at CM/ECF p. 2.)  The Special Master also confirmed this in his report on Sprint's decertification motion.  (Decert. Report 3–4, 6–15 (describing the complexity of the commission plans, data, and systems), Filing No. 663, at CM/ECF p. 3–4, 6–15.)  More recently, the Court commented on the difficult nature of the case when it commended the parties for "putting their shoulder to the wheel and really putting in some very hard work." (9/1/2017 Hearing Tr. 4–5, Ex. 3.)  The Court stated that it knew it would be "expensive and very time-consuming" but that the parties' work resulted in "light years of progress" toward understanding the issues.  (*Id.*)

In sum, given the difficulties involved and skill required to litigate this case, and the novelty of the claims, legal arguments, and expert analyses, the fee sought is reasonable.

### 3. The Requested Fee is Customary and Reasonable

The fifth and twelfth *Johnson* factors—the customary fee and awards in similar cases—demonstrate the reasonableness of the requested fee.  As discussed above, Class Counsel's requested fee of $8,614,528.84 equates to approximately 28% of the common fund, which Class Counsel voluntarily reduced from the 33.33% contemplated in the Settlement Agreement and the contingency fee agreement with the class representatives.

"The customary fee awarded to class counsel in a common fund settlement is approximately one third of the total economic benefit bestowed on the class."  *Shaw v. Interthinx, Inc.*, 2015 WL 1867861, at *6 (D. Colo. Apr. 22, 2015) (quoting *Lucken Family Ltd. P'shp, LLP v. Ultra Res., Inc.*, 2010 WL 5387559, at *6 (D. Colo. Dec. 22, 2010)).  Courts in this district, including this Court, have recognized that a request of at least one-third of the common fund falls within the customary range awarded in class action settlements. *See, e.g.*,

*Cook v. Rockwell Int'l Corp.*, 2017 WL 5076498, at *1–2 (D. Colo. Apr. 28, 2017) (explaining forty percent fee falls within acceptable range in Tenth Circuit, and awarding $150,000,000 in fees for case litigated for three decades); *Shaw*, 2015 WL 1867861, at *6 (approving one-third fee and stating "other courts have similarly recognized that '[t]he percentages awarded in common fund cases typically range from 20 to 50 percent of the common fund created [,]'"); *Hoffman v. Poulsen Pizza LLC*, 2017 WL 25386, at *8 (D. Kan. Jan. 3, 2017) (wage case noting one-third is customary); *Williams v. Sprint/United Mgmt. Co.*, 2007 WL 2694029, at *6 (D. Kan. Sept. 11, 2007) (approving 35% fee in employment class action); *Cimmaron Pipeline Const., Inc., v. Nat'l Council on Compensation Ins.*, 1993 WL 355466, at *2 (W.D. Okla. June 8, 1993) (recognizing fees in the range of 30 to 40% are common in complex contingent fee cases); *see also Lengel v. HomeAdvisor, Inc.*, No. 15-2198-KHV, Order 4 (approving fees for Nichols Kaster attorneys in a consumer case of one-third) (D. Kan. Oct. 31, 2017), Ex. 6; *In re: Motor Fuel*, 2016 WL 4445438, at *9 (D. Kan. Aug. 24, 2016) (explaining courts routinely award attorneys' fees ranging from 20 to 30 per cent of settlement funds).

Moreover, courts in other districts routinely award attorneys' fees of one-third of the common fund in wage cases.  *See, e.g.*, *Netzel v. West Shore Group, Inc.*, 2017 WL 1906955, at *8–9 (D. Minn. May 8, 2017) (approving 33.33% request from Nichols Kaster, and collecting cases where percentage approved was consistent, or more than one-third); *Torres v. Gristede's Op. Corp.*, 519 F. App'x 1, 5 (2d Cir. 2013) (affirming attorney's fee of 52.2% of $7.39 million total recovery wage case); *Beckman v. KeyBank, N.A.*, 293 F.R.D. 467, 481 (S.D.N.Y. Apr. 29, 2013) (noting 33% recovery was consistent with the norms of class litigation in the Second Circuit); *Burkholder v. City of Fort Wayne*, 750 F. Supp. 2d 990, 997 (N.D. Ind. 2010) (finding 33.3% reasonable in wage case); *Yarrington v. Solvay Pharm., Inc.*, 697 F. Supp. 2d 1057, 1064–

65 (D. Minn. 2010) (collecting cases and granting award of 33%); *Faican v. Rapid Park Holding Corp.*, 2010 WL 2679903 (E.D.N.Y. July 1, 2010) (approving 33 1/3% in wage action); *Clark v. Ecolab, Inc.*, 2010 WL 1948198, at *9 (S.D.N.Y. May 11, 2010) (approving attorneys' fees of one-third in wage case).

Class Counsel's fee request of approximately 28% of the common fund is within the customary range and well within the range approved by this Court and others.  Furthermore, the $8,614,528.84 fee requested is significantly lower than $13,918,213.75 in time Class Counsel expended, representing a 38% reduction in that value.  Thus, unlike cases where attorneys are requesting a lodestar multiplier, here Class Counsel seeks fees that are significantly less than their lodestar.  *See in re Motor*, 2016 WL 4445438, at *9 (approving settlement where lodestar cross check demonstrated fees sought were significantly less than value of hours expended).  On these facts, the Court should find the fee to be reasonable.

With respect to the hourly rates from which the value of the lodestar was derived, courts often look "to the prevailing market rates in the relevant community."  *Blum v. Stenson*, 465 U.S. 886, 895 (1984); *Case v. Unified Sch. Distr. No. 233, Johnson Cty., Kansas*, 157 F.3d 1243, 1256 (10th Cir. 1998).  However, when special skills are required for litigation, the market for reasonable hourly rates may be expanded beyond the area where the district court resides.  *See, e.g.*, *Jeffboat LLC. v. Director, Office of Workers' Comp Programs*, 553 F.3d 487, 490 (7th Cir. 2009) (holding that it is appropriate to view a relevant community as a community of practitioners, particularly when "the subject matter of the litigation is one where the attorneys practicing are highly specialized and the market for legal services in that area is a national market.").  When viewed from any one of the relevant benchmarks, the rates for Class Counsel are reasonable for lodestar cross check purposes.

26

Class Counsel's qualifications are set forth in their firm resume, their attorney webpage bios, and in the supporting declaration of Michele Fisher. (Fisher Decl. ¶¶ 2–16.) Class Counsel's firm, Nichols Kaster, PLLP, is a nationally recognized plaintiffs' firm that has existed for over forty years and is focused on advocating for employee and consumer rights. (*Id.* ¶ 2; Firm Resume, Ex. 7.) With offices in Minneapolis, Minnesota and San Francisco, California, the firm has represented thousands of workers in hundreds of cases. (Fisher Decl. ¶ 2.) The firm has 34 attorneys and 37 support staff. (*Id.*) As their qualifications demonstrate, Class Counsel is highly skilled in handling major complex litigation and has extensive experience litigating wage and hour class actions.

Lukas is a partner at Nichols Kaster, PLLP. He has been practicing law since 1991 and has close to 30 years of litigation experience. (*Id.* ¶ 11; *see* Lukas Bio, Ex. 9.) His time is billed at $650 per hour. (Fisher Decl. ¶ 11.) Since starting with the firm as a law clerk during law school, Lukas has worked his entire career at the firm. (*Id.*) In addition to his role as a leader in the firm's Wage and Hour litigation group, he is also a leader in the firm's consumer and ERISA litigation group. (*Id.*) Lukas has extensive trial experience, having tried nearly 50 cases to verdict, including large wage and hour and ERISA class actions. (*Id.*) He has obtained favorable verdicts for employees in overtime and minimum wage, age, race, national origin, sex discrimination, sex harassment, whistleblower, sexual assault, retaliation, and minority shareholder cases. (*Id.*) His experience and energy toward the practice of law have made him a popular lecturer nationally on employment and consumer law issues and on civil litigation strategies. (*Id.*) Lukas has been recognized as one of "The Best Lawyers in America" and is consistently named to the Super Lawyers list. (*Id.*)

Fisher was admitted to practice law over 17 years ago in 2000, and has been a partner at Nichols Kaster, PLLP since 2008.  (*Id.* ¶ 10; *see* Fisher Bio, Ex. 8.)  Fisher's hourly rate is $550.  (Fisher Decl. ¶ 10.)   Fisher's practice during these 17 years has been primarily dedicated to national wage and hour class and collective action litigation, and she has represented over a hundred thousand employees seeking to recover overtime pay, minimum wages and commission payments in hundreds of cases.  (*Id.*)  Fisher has successfully handled numerous jury trials and arbitrations.  (*Id.*)  She is a member of the firm's management committee and the chair of its Business Development and Marketing Groups, which originate class and collective actions and market the firm.  (*Id.*)  She is also one of the leaders of its Wage and Hour Litigation group.  (*Id.*)  She is a regular speaker at local and national conferences, routinely acts as an author and editor for wage and hour publications, and is active in several organizations.  (*Id.*)  She is the co-chair and a faculty member of the Practicing Law Institute's Wage & Hour Litigation and Compliance conference, and the Co-Chair of the ABA Federal Labor Standards Legislation Committee.  (*Id.*)  She has also served as the Co-Editor-in-Chief of the ABA Federal Labor Standards Legislation Committee's Midwinter Report, a chapter editor for BNA's Wage and Hour Laws: A State-by-State Survey, and an editorial board member for BNA's the Fair Labor Standard Act Treatise.  (*Id.*)  She has been named to the Super Lawyers, Top Women Attorneys, and Rising Star lists repeatedly, is a member of the Top 100 National Trial Lawyers, and Top 10 Wage and Hour Lawyers, and a Lawyer of Distinction.  (*Id.*)  She also provides pro bono representation for the Children's Law Center.  (*Id.*)

Rebekah Bailey ("Bailey") was one of the associates on this case for a period of time, who moved to the status of partner 2017.  (*Id.* ¶ 12.)  Bailey is a 2008 law school graduate, and has been litigating wage and hour class and collective actions for nearly 10 years.  (*Id.*; Bailey

Bio, Ex. 10.)  Her time is billed at $450 per hour.  (Fisher Decl. ¶ 12.)  She is a member of the firm's ESI and Discovery Committee and is also active in organizations and publications nationally.  (*Id.*)

Alex Baggio ("Baggio") is the associate currently assigned to this case.  (*Id.* ¶ 13.)  He is a 2009 law school graduate and has focused on wage and hour litigation since joining the firm's wage and hour group in 2012.  (*Id.*)  His time is billed at $375 per hour.  (*Id.*)  Baggio has represented thousands of employees seeking unpaid wages in class and collective actions.  (*Id.*; Baggio Bio, Ex. 12.)  He is a contributor to BNA's The Fair Labor Standards Act treatise and a chapter editor for BNA's Wage and Hour Laws, a State-by-State Survey.  (Fisher Decl. ¶ 13.)  Prior to joining the firm, he clerked for two Minnesota state court judges.  (*Id.*)

Charles Frohman ("Frohman"), a 2006 law school graduate, also served as an associate on this case.  (*Id.* ¶ 14.)  While he is no longer with the firm, he dedicated his practice with us to wage and hour litigation.  (*Id.*)  His time is billed at $375 per hour.  (*Id.*)  Frohman currently works as a partner at a business litigation law firm in Minneapolis.  (*Id.*)

Nichols founded the firm in 1974 and was one of the partners involved in the management and strategy of this matter for many years, until his retirement.  (*Id.* ¶ 15.)  Nichols has over 40 years of experience in the practice of law, was a MSBA Certified Trial Specialist, has tried over 100 cases to verdict, and frequently lectured at seminars across the country.  (*Id.*; Nichols Bio, Ex. 11.)  He has litigated close to 50 overtime and minimum wage class and collective actions.  (Fisher Decl. ¶ 15.)  Nichols' time is billed at $600 per hour.  (*Id.*)

Schug was admitted to the bar in 2006 and is a partner at the firm.  (Fisher Decl. ¶ 16.)  His billable rate is $475 per hour.  (*Id.*)  He has dedicated his career to workers' rights in complex class action litigation.  (*Id.*; Schug Bio, Ex. 13.)  Schug has over a decade of

experience litigating cases through trial in both court and arbitration and has represented thousands of workers in areas such as employee misclassification, gender discrimination, and unpaid wages.  (Fisher Decl. ¶ 16.)  He previously served as the Director of Litigation at the Impact Fund, a nationally recognized non-profit law firm.  (*Id.*)

Attorneys hired for document review and research are billed at $250 per hour, and non-attorneys such as law clerks, and other staff, including paralegals, class action clerks, and damages clerks, are billed at $175 per hour.  (*Id.* ¶ 9.)  These employees are integral to the success of a case such as this with a massive record, numerous filings, and a large class of employees to manage.  (*Id.*)

Rates similar to those of Class Counsel have been approved in this district and are commensurate with Class Counsel's experience and national wage and hour class action practice. *See, e.g.*, *Hoffman*, 2017 WL 25386, at *6–7 (approving rates of $600 for managing partner, $450 for attorney with 23 years of experience when 7 of those years were concentrated on class and collective actions); *In re Bank of Am. Wage and Hour Employment Litig.*, 2013 WL 6670602, at *3 (D. Kan. Dec. 18, 2013) (approving blended hourly rate for lodestar crosscheck of $488 as reasonable); *Garcia v. Tyson Foods, Inc.*, 2012 WL 5985561, at *3–4 (D. Kan. Nov. 29, 2012) (approving rates ranging from $325 to $600 for attorneys and $125 to $175 for staff), *aff'd* 770 F3d 1300 (10th Cir. Aug. 19, 2014).

Courts in other districts have also approved hourly rates similar to, or higher, than those here, providing further support to the reasonableness of Class Counsel's rates.  *See, e.g.*, *Barbosa v. Cargill Meat Sols. Corp.,* 297 F.R.D. 431, 452 (E.D. Cal. 2013) (awarding between $280 and $560 per hour for attorneys with two to eight years of experience, and $720 per hour for attorney with 21 years of experience); *Gong-Chun v. Aetna Inc.*, 2012 WL 2872788, at *23 (E.D. Cal.

July 12, 2012) (awarding between $300 and $420 per hour for associates, and between $490 and $695 per hour for senior counsel and partners).  A court recently approved Class Counsel's rates in another wage and hour as well.  *See, e.g.*, *McCulloch v. Baker Hughes*, 2017 WL 5665848, *8 (E.D. Cal. Nov. 27, 2017)* (approving rate of $525 for Fisher, and $350 for associate with six years of experience); *see generally Walls v. JPMorgan Chase Bank, N.A.*, 2016 WL 6078297, at *5 (W.D. Ky. Oct. 14, 2016) (concluding that Nichols Kaster's hourly rates are "commensurate with market rates and the attorneys' skill and experience" in consumer class actions).

Because the requested fee is reasonable both under the percentage of the common fund approach, and under a lodestar cross-check, Class Counsel respectfully requests approval.

### 4.    Class Counsel Undertook Significant Risk Litigating This Expensive and Lengthy Case on a Contingent-Fee Basis

The requested fee is even more reasonable considering the risks Class Counsel assumed in undertaking the representation on a contingent fee basis (the sixth *Johnson* factor).  Class Counsel did not receive any payment for the enormous task they undertook that consumed many years of their practice, nor did they receive reimbursement for close to $7 million in litigation costs they advanced.  Accordingly, Class Counsel alone bore the financial risk of unsuccessful litigation, advancing significant funds with a real risk of nonpayment.[19]  Class Counsel should be compensated for shouldering this risk.  *See Pointer v. Bank of America, N.A*, 2016 WL 7404759 at *15 (E.D. Cal. Dec. 21, 2016)* ("courts have long recognized the public policy of rewarding attorneys for accepting contingent representation in appropriate cases."); *see also In re: Motor Fuel*, 2016 WL 4445438, at *9 (recognizing the risk of contingency fee work in large class actions).

---

[19] The expense and duration of the case also relate to the tenth and eleventh *Johnson* factors—the "undesirability" of the case, and the nature and length of the professional relationship with the client.

### 5.      Preclusion of Other Employment

The fourth factor, preclusion of other employment, supports the fee request.  As reflected in the hours summary, Class Counsel dedicated significant time and resources to litigating this case for over ten years.  Notably, this case often occupied the constant attention of two partners nearly full-time, who are essential to originating and litigating other cases, training and supervising associates, and running the firm.  (Fisher Decl. ¶ 7.)  Further, the advancement of over $6.5 million in costs was invariably a financial drain on the firm, and detracted from Class Counsel's ability to take on, and expend financial resources, on other matters they might otherwise pursue.  (*Id.* ¶ 19.)  This factor weighs in favor of approval of the requested fee.

### 6.      Counsel Obtained a Fair Result on Behalf of the Class

The "amount involved and the results obtained"—the eighth *Johnson* factor—strongly supports the requested fee, as the settlement provides a fair result when measured against the possible outcomes had the case proceeded to trial.

When evaluating the reasonableness of attorneys' fees, "the most critical factor is the degree of success obtained." *Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983).  Here, Plaintiffs' experts calculated monthly commission shortages of approximately $3,492 per class member.  Sprint's expert calculated the class was overpaid by over $75 million.  Even after reaching these conclusions, the parties' experts issued additional reports providing further criticism of the opposing party's work, and attempted to quantify errors they alleged permeated the calculations.  The precise amount of commissions owed, if any, was uncertain.  The settlement, assuming a 50% claim form return rate, will provide a settlement of approximately $1,109.97 per participating class member, which is a reasonable resolution to a complicated claim.

### 7.      Reaction of the Class

The reasonableness of the requested fee may be evidenced by the reaction of the Settlement Class to the settlement.  The Court will be able to assess this factor at the final approval hearing, after notice has been issued and the Settlement Class have had the opportunity to object to the settlement.  The nine class representatives have, however, all approved of the settlement, thus providing evidence of its reasonableness for purposes of preliminary approval.

### C.   The Requested Expenses are Reasonable and Should be Approved

Class Counsel seeks approval of their out-of-pocket litigation expenses in the amount of $6,573,147.16.  This includes $6,449,293.12 already expended and an additional $123,854.04 for future estimated costs.[20]  (*See* Fisher Decl. ¶ 18; Costs Detail, Ex. 4.)  Spreadsheets detailing these costs is provided as Exhibit 4.

"As with attorneys' fees, an attorney who creates or preserves a common fund for the benefit of a class is entitled to receive reimbursement of all reasonable costs incurred." *Vaszlavik v. Storage Corp.*, 2000 WL 1268824, at *4 (D. Colo. Mar. 9, 2000); *accord In re Qwest Commc'ns Int'l, Inc. Sec. Litig.*, 625 F. Supp. 2d 1143, 1154 (D. Colo. 2009).  Here, all of the requested expenses are reasonable and should be approved.

The largest portion of the current costs, $5,325,282.02, is for the service of the class's experts, Balance Engines ($4,235,230.40) and Dr. Dunham ($1,092,515.20).  (*See* Fisher Decl. ¶ 18; Costs Detail, Ex. 4.)  As mentioned previously, the work performed by the experts was complex, time consuming, and critical to prosecuting this large class action.  The Special Master summarized some of the reasons for the "massive" amount of work this case demanded of the experts:

---

[20]  (*See* Costs Detail, Ex. 4.)  Class Counsel will update the Court in the final approval briefing as to whether these future costs were incurred.  Any requested costs not incurred will be redistributed to the participating members of the Settlement Class who timely return their claim form.  (Fisher Decl. ¶ 18.)

> [D]uring the class period: (1) Sprint employed over 30,000 class members; (2) these class members engaged in a total of over 350 million potentially-commissionable sales transactions, which were documented by over 6 billion computerized records; (3) Sprint's compensation scheme changed several times, creating over a dozen variations on how commissions were calculated; (4) each one of these compensation scheme was complicated, involving intricate assessments of sales and also different commission measures for different product categories; (5) the information necessary for the experts to calculate and reconcile historic commissions came from numerous sources—for example, the expert had to match information contained in (a) retail sales databased, (b) customer billing databases, (c) databases defining which products and services were commissionable, and (d) payroll databases, among others; (6) the relevant data was generated by and flowed through many different computer programs, which were not necessarily designed to "talk to each other;" and (7) as Sprint and Nextel merged their operations, Sprint changed the computer programs it used to calculate employee compensation.

This required multiple attempts by the experts at their damages models and reports, which the Special Master explained was unsurprising, given the scope of the task.  (Decert. Report 3, Filing No. 663, at CM/ECF p. 3.)  The class's experts' work spanned the lifetime of the case as they not only spent their time building and modifying their methodology and issuing expert and rebuttal reports, but also participating in the case throughout discovery,  and attending many expert and court hearings, mediations, and meetings.

Further evidence of the reasonableness of the expert fees is demonstrated by comparing them to the fees of the Technical Advisor, who was tasked by the Court with reviewing the experts' methodologies and trying to understand them.   In just three years, the Technical Advisor's services cost the parties over $2,996,345.23.  (Fisher Decl. ¶ 20; Costs Detail, Ex. 4.) Class Counsel was responsible for 15% of those charges, which totaled $449,451.85.  (Fisher Decl. ¶ 20; Costs Detail, Ex. 4.)  Class Counsel was also responsible for 15% of the $554,910.86 total cost of the Special Master's services, which is $83,236.63.  (Fisher Decl. ¶ 21; Costs Detail, Ex. 4.)

Class Counsel also incurred expenses for printing, advertising, courier and overnight services, copies, postage, transcripts, court costs, office supplies, conference calls, equipment and software, computerized research and Pacer charges, data practices requests, mock trial, press releases, and travel related expenses for numerous court hearings, expert meetings, expert summits, depositions, mediations, mock trial, and witness deposition and trial preparation. (Fisher Decl. ¶ ¶18, 22; Costs Detail, Ex. 4.) These types of expenses are generally standard costs in class action litigation that are recoverable under common fund principles. *See* William B. Rubenstein, *Newberg on Class Actions* § 16:5 (5th ed., 2017 supp.).

Accordingly, Class Counsel respectfully request reimbursement for their costs.

**D.      The Requested Service Awards are Justified**

Finally, Plaintiffs' request for a service award of $15,000.00 for each of the nine class representatives and $5,000.00 for each class member who assisted by preparing for trial, is reasonable and should be approved.

Service awards are appropriate to induce individuals to become named representatives or in order to award class members for the additional effort they provide for the benefit of the class. *UFCW Local 880-Retail Food Employers Joint Pension Fund v. Newmont Min. Corp.*, 352 Fed. App'x 232, 235 (10th Cir. 2009). Such awards are "an efficient and productive way to encourage members of a class to become class representatives, and to reward the efforts they make on behalf of the class." *Lucken*, 2010 WL 5387559, at *6.

The settlement provides that Plaintiffs may seek an award of $15,000.00 for each of the nine class representatives. These class representatives conferred a substantial benefit on the Settlement Class by bringing the instant lawsuit, without which this settlement would not exist. The requested award is appropriate to compensate them for the time and effort they expended to

35

benefit the Settlement Class, including meetings with Class Counsel, reviewing case filings, producing documents, responding to written discovery, preparing for and attending their deposition, and assisting Class Counsel with the prosecution of this case for over ten years. (Fisher Decl. ¶ 23.)  Class Counsel has provided a detailed description of the efforts and time expended by the class representatives to justify the $15,000 service award.  (*Id.*)  For all nine class representatives, this totals $135,000.00, which is only 0.004% of the common fund and is fair compared to service awards approved in other wage and hour class action settlements. *See, e.g.*, *Lucken*, 2010 WL 5387559, at *6 (approving $10,000 award); *see also Hernandez v. Merrill Lynch & Co., Inc.*, 2013 WL 1209563, at *10 (S.D.N.Y. Mar. 21, 2013) (approving service awards of $15,000 and $12,500 to class representatives and $4,000 to opt in plaintiffs); *Yuzary v. HSBC Bank USA, N.A.*, 2013 WL 5492998, at *11 (S.D.N.Y. Oct. 2, 2013) (approving $10,000 service awards); *Dorn v. Eddington Sec., Inc.*, 2011 WL 9380874, at *7 (S.D.N.Y. Sept. 21, 2011) (approving $10,000 service award); *Torres v. Gristede's Operating Corp.*, 2010 WL 5507892, at *7 (S.D.N.Y. Dec. 21, 2010) *aff'd*, 519 Fed. App'x. 1 (2d Cir. 2013) (finding service award of $15,000 to each of 15 named plaintiffs reasonable; *Clark*, 2010 WL 1948198, at *9 (granting service awards of $10,000 to each of 7 named plaintiffs); *Khait v. Whirlpool Corp.*, 2010 WL 2025106, at *9 (E.D.N.Y. Jan. 20, 2010) (approving service awards of $15,000 and $10,000 in wage case).

The settlement also provides for a service award of $5,000 to each of the eleven class members who were instrumental to Class Counsel in preparing for trial.  They met with Class Counsel, reviewed documents and briefing, and spoke with Class Counsel several times in preparation to testify at trial.  (Fisher Decl. ¶ 24.)  Details of their participation is also provided.  (*Id.*)  Their willingness to prepare for and testify at trial was greatly beneficial to the class.  For

36

these eleven individuals, the service awards total $55,000.00, just .002% of the common fund and Class Counsel respectfully requests their approval.  *See, e.g., Droegemueller v. Petroleum Dev. Corp.*, 2009 WL 961539, at *5 (approving $5,000 service awards); *Bruner v. Sprint/United Mgmt. Co.*, 2009 WL 2058762, at *11 (D. Kan. July 14, 2009) (approving a $5,000 service award).

Although the requested service awards are larger than the amount other members of the Settlement Class will receive, that is due to the nature of the damages. Whenever class members' damages are small, service payments will inevitably result in a larger payment than those designated for class members who did not perform such services on behalf of the class.  Yet it is in these very circumstances that it is most important to separately incentivize these class members to invest the time and effort required to pursue the litigation to a successful conclusion. Accordingly, the class representative service awards are reasonable and should be approved.

## CONCLUSION

For the forgoing reasons, Plaintiffs respectfully request that the Court:

(1) grant preliminary approval of the settlement;

(2) approve the parties' pending stipulations, (Filing Nos. 785, 786), which narrow the class to 27,366 individuals, subject to notice and an opportunity to be heard;

(3) find Plaintiffs' request for attorneys' fees to Class Counsel in the amount of $8,614,528.84 to be fair and reasonable;

(4) approve Plaintiffs' request for costs to Class Counsel in the amount of $6,573,147.16;

(5) approve class representative service awards of $15,000.00 each for Roxie Sibley, Jeanne Noel, Ernest Bennett, Jamie Williams, Greg St. Julien, Tracie Hernandez, John Jasinski, and Teisha King;

(6) approve service awards of $5,000 each for class members Veronica Batarseh (Borrego), Christopher Giardina, Jonathan Housknecht, Jimmie Kelley, Ryan Maier, Sameer Mohammad (Sam Salma), Kyle Neubauer, William Ray, Jason Renner, Alden Smith, and Michael Tallon; and

(7) set a final approval hearing for approximately 4.5 months following the Court's preliminary approval order.

Dated: <u>March 2, 2018</u>

**STUEVE SIEGEL HANSON LLP**
<u>/s/ George A. Hanson</u>
George A. Hanson, KS Bar No. 16805
Email: hanson@stuevesiegel.com
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
Tel: 816-714-7100

**NICHOLS KASTER, PLLP**
<u>/s/ Michele R. Fisher</u>
Michele R. Fisher*
Email: fisher@nka.com
Paul J. Lukas*
Email: lukas@nka.com
4600 IDS Center, 80 South 8th Street
Minneapolis, Minnesota 55402
Tel: 612-256-3200
 (*Admitted *Pro Hac Vice*)

*Attorneys for the Class*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 2, 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will automatically send an email notification to the following attorneys of record:

Gregory T. Wolf
SNR Denton US LLP
4520 Main Street, Suite 1100
Kansas City, MO 64111
gregory.wolf@snrdenton.com

Michael Blumenthal
Seyferth, Blumenthal & Harris, LLC
Michael L. Blumenthal, KS Bar No. 18582
300 Wyandotte Street, Suite 430
Kansas City, MO  64105

Elise M. Bloom
Steven D. Hurd
Mark W. Batten
Nicole A. Eichberger
Proskauer Rose LLP
Eleven Times Square
New York, New York 10036–8299
ebloom@proskauer.com
shurd@proskauer.com
mbatten@proskauer.com
neichberger@proskauer.com

Dated: <u>March 2, 2018</u>

*/s/George A. Hanson*
Attorney for the Class

1