## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

|  |  |  |
|---|---|---|
| ROXIE SIBLEY, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | **CIVIL ACTION** |
| v. | ) | |
| | ) | **No. 08-2063-KHV** |
| SPRINT NEXTEL CORPORATION, et al., | ) | |
| | ) | |
| Defendants | ) | |
| _____ | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court on Plaintiffs' Amended Motion For Preliminary Approval Of Settlement (Doc. #817) filed March 7, 2018.[1] Plaintiffs' unopposed motion seeks (1) preliminary approval of the parties' settlement agreement; (2) approval of the parties' Stipulation For Dismissal Without Prejudice And Revisions To Class List (Doc. #785) filed October 24, 2017 and Stipulation For Dismissal With Prejudice Of Certain Class Members (Doc. #786) filed October 24, 2017; (3) a finding that plaintiffs' requests for attorneys' fees are fair and reasonable; (4) approval of plaintiffs' requests for costs to class counsel and service awards to class representatives and class members who prepared to testify at trial; and (5) a final settlement approval hearing. Plaintiffs' Amended Motion (Doc. #817), ¶¶ 1-7. For reasons below, the Court sustains plaintiffs' motion in part.

## Factual And Procedural Background

On February 7, 2008, nine plaintiffs – former Sprint retail store employees – filed suit against their employers Sprint Nextel Corporation and Sprint/United Management Company (collectively,

---

[1]     On March 2, 2018, plaintiffs filed Plaintiffs' Motion For Preliminary Approval Of Settlement (Doc. #814). Plaintiffs' amended motion corrected typographical errors and provided additional information.

"Sprint").  <u>Complaint</u> (Doc. #1).  Plaintiffs alleged that when Sprint acquired Nextel, it failed to properly integrate the companies' payroll systems and routinely failed to pay commissions that plaintiffs had earned.  <u>Id.</u>  On behalf of a nationwide class of similarly-situated Sprint employees, plaintiffs asserted claims for violations of the Kansas Wage Payment Act ("KWPA"), K.S.A. § 44-313 <u>et seq.</u>, and breach of contract.

On November 24, 2008, the Court certified a class pursuant to Rule 23(b)(3), Fed. R. Civ. P., composed of "[a]ll persons nationwide who worked for Sprint's retail stores since their merger with Nextel [in August of 2005] . . . whose compensation was based in full or in part on commissions." <u>Memorandum And Order</u> (Doc. #99) at 10-21.  It also appointed Nichols Kaster, PLLP and Stueve Siegle Hanson LLP as class counsel.  <u>Id.</u>  On March 13, 2009, the Court directed class counsel to mail potential class members a letter to place them on notice of the suit and their ability to opt out of it.  <u>Memorandum And Order</u> (Doc. #124) at 5.  On January 15, 2014, the parties stipulated that the class would be limited to employees who held specific retail positions from August 12, 2005 through September 30, 2009.  <u>Joint Stipulation Specifying Class Membership And Class Period</u> (Doc. #503).  In early 2014, the parties sent a letter which described these limitations to individuals who had received the 2009 certification letter and to new potential class members.  <u>Order</u> (Doc. #504) filed January 27, 2014; <u>see</u> Doc. #503-1 filed January 15, 2014 (notice letter); <u>see</u> Doc. #503-2 (same).

Throughout the past ten years, the parties have engaged in extensive discovery and motion practice.  Because this case involved an extraordinary amount of highly technical data, the Court appointed a Special Master and a Technical Advisor to assist with pending motions.  <u>Order Of Appointment</u> (Doc. #532) filed April 14, 2014 at 1; <u>Appointment Of Neutral Technical Advisor</u>

(Doc. #559) filed October 1, 2014 at 1.  Sprint alone produced more than 18 million pages of documents.  Amended Memorandum In Support Of Plaintiffs' Motion For Preliminary Approval Of Settlement (Doc. #818) filed March 7, 2018 at 6 (citing Memorandum Of Law In Support Of Defendants' Motion To Decertify The Class (Doc. #620) filed March 7, 2016 at 13).

Both parties relied heavily on experts who examined Sprint's computerized commissions system.  The Special Master summarized the experts' challenge as follows:

> The amount of work required of the experts . . . was massive.  That is because, during the class period: (1) Sprint employed over 30,000 class members; (2) these class members engaged in a total of over 350 million potentially-commissionable sales transactions, which were documented by over 6 billion computerized records; (3) Sprint's compensation scheme changed several times, creating over a dozen variations on how commissions were calculated; (4) each one of these compensation schemes was complicated, involving intricate assessments of sales and also different commission measures for different product categories; (5) the information necessary for the experts to calculate and reconcile historic commissions came from numerous sources — for example, the experts had to match information contained in (a) retail sales databases, (b) customer billing databases, (c) databases defining which products and services were commissionable, and (d) payroll databases, among others; (6) the relevant data was generated by and flowed through many different computer programs, which were not necessarily designed to "talk to each other;" and (7) as  Sprint and Nextel merged their operations, Sprint changed the computer programs it used to calculate employee compensation.

Report Regarding Cross-Motions To Exclude Expert Testimony (Doc. #701) filed April 7, 2017 at 4-5.  The experts analyzed Sprint's payroll system and produced reports which summarized various errors in it, along with amendments to their reports and criticism of opposing expert analysis and methodology.  See id. at 5.  The experts reached dramatically different conclusions.  Plaintiffs' experts concluded that Sprint had underpaid the class by $95,584,122.27.  Memorandum In Support (Doc. #818) at 8 (citing Balance Engines LLC Supplement To Expert Report To Exclude Ramp-Up Months (Doc. #749-2) filed July 26, 2017 at 3).  On the other hand, Sprint experts calculated that Sprint had overpaid the class by $75,004,761.  Id. (citing January 28, 2016 Rebuttal Report Of Janet

R. Thornton, Ph.D. (Doc. #616-90) filed February 29, 2016 at 60 n.106).

The parties also engaged in protracted motion practice. Shortly after plaintiffs commenced this action, Sprint successfully moved the Court to dismiss some of plaintiffs' claims. Memorandum And Order (Doc. #77) filed July 30, 2008 at 7-11. Sprint twice moved to decertify the class. Defendants' Motion To Decertify (Doc. #450) March 25, 2013; Defendants' Motion To Decertify (Doc. #619) March 3, 2016. When the Court overruled its second motion for decertification, Sprint attempted an interlocutory appeal, which the Tenth Circuit denied. Order (Doc. #727) filed June 8, 2017; Doc. #735 filed June 23, 2017; Order (Doc. #752) filed August 7, 2017. Throughout the pendency of this case, the parties filed and briefed numerous motions, including but not limited to multiple rounds of motions to exclude expert testimony under Daubert v. Merrell Dow Pharm. Inc., 509 U.S. 579 (1993), cross-motions for summary judgment and objections to the Special Master's reports on these motions. See Memorandum In Support (Doc. #818) at 8-9.

On September 1, 2017, the Court ordered the parties to engage in mediation before the Honorable Daniel D. Crabtree. Order Referring The Parties To Mediation (Doc. #762). On January 8 and 9, 2018, approximately five months before trial, the parties attended mediation sessions with Judge Crabtree. ADR Report (Doc. #798) filed January 10, 2018; Third Amended Scheduling Order (Doc. #771) at 2 (trial set for June of 2018). The parties did not settle during these sessions, but on January 18, 2018 – with the continued aid of Judge Crabtree – the parties reached a settlement which resolved this action. ADR Report (Doc. #798); see Memorandum In Support (Doc. #818) at 10.

I.    **Preliminary Settlement Approval**

On March 7, 2018, plaintiffs moved for preliminary approval of their settlement agreement. Plaintiffs' Amended Motion (Doc. #817).   On March 8, 2018, the Court held a preliminary settlement approval hearing.  At the hearing, the Court voiced concerns about certain aspects of the proposed settlement agreement.  On March 16, 2018, plaintiffs filed a Supplemental Memorandum In Support Of Plaintiffs' Motion For Preliminary Approval Of Settlement (Doc. #821).  Plaintiffs' supplemental memorandum provided additional information concerning (1) revisions to the class definition; (2) revisions to the settlement process; (3) the reasonableness of the settlement amount; (4) the parties' efforts to ensure the most practicable notice of settlement; and (5) a new cy pres recipient.  See generally id.

On April 5, 2018, the Court ordered the parties to submit additional information and show cause why they should not revise certain provisions of the proposed settlement.  Order To Show Cause (Doc. #823) at 1-8.  On April 16, 2018, the parties responded and submitted for preliminary approval the revised settlement agreement.   Plaintiffs' Response To Order To Show Cause (Doc. #824); Defendants' Response To The Court's Order To Show Cause [] Regarding The Supplemental Memorandum In Support Of Plaintiffs' Motion For Preliminary Approval Of Settlement (Doc. #826).  On May 2, 2018, plaintiffs submitted a revised settlement agreement which corrected typographical errors and revised one provision of the prior draft.  See Settlement Agreement (Doc. #828-1).

II.    **Proposed Settlement (Doc. #828-1)**

The settlement agreement defines the settlement class as follows:

All persons nationwide who did not opt out of the Class Litigation and worked in Sprint's retail stores during the Class Period of August 12, 2005 through

September 30, 2009, including Retail Store District Managers, Retail Store Managers, Assistant Retail Store Managers, Lead Retail Consultants, Retail Consultants, Retail Sales Representatives, and other retail employees (all of whom held at least one of the job titles set forth in Exhibit A to the Expert Stipulation entered at Docket No. 357-1 in the Class Litigation) and whose compensation was based in full or in part on commissions. The parties have agreed there are 34,909 individuals in the Settlement Class.

Settlement Agreement (Doc. #828-1), ¶ 4.

A.      Settlement Payments

The settlement agreement provides that Sprint will pay a total settlement amount of $30,500,000. Id., ¶ 1.ll. From the settlement fund, class counsel will receive attorneys' fees up to $7,015,000 and up to $7,000,000 in litigation costs. Id., ¶ 8.a. After fees and litigation and settlement costs, the class will receive approximately 54 per cent of the fund – or $16,550,129. Doc. #824-12 at 2 (16,550,129/30,500,000 = .543). The claims administrator will allocate the fund among class members. Settlement Agreement (Doc. #828-1), ¶ 6. To calculate most of the allocations, the administrator will use plaintiffs' expert calculations performed to determine each class member's net underpayment during the class period. Id. The administrator will allocate each member a pro rata share of his or her calculated underpayment. Id. Under this allocation process, if Sprint underpaid a class member by less than $25, he or she will receive a flat payment of $25. Id.

Certain class members will not receive allocations in the manner described above: (1) 4,482 class members who were correctly paid or overpaid, (2) 274 class members who only worked in Period 65 and (3) 2,787 class members for whom the record contains insufficient data to calculate overpayment or underpayment. Id.; see Plaintiffs' Response To Order To Show Cause (Doc. #824) at 6-7. Class members who were correctly paid or overpaid under the expert

-6-

calculation will receive no allocation. Settlement Agreement (Doc. #828-1), ¶ 6. Class members who only worked in Period 65 (August of 2005) – which is only partially covered by the class period – will receive the minimum recovery of $25. Id. Finally, because Sprint did not produce individualized data for 2,787 class members, the experts could not calculate their damages. Plaintiffs' Supplemental Submission On The Court's Order To Show Cause Regarding Judgment As A Matter Of Law [] (Doc. #749) filed July 26, 2017 at 4. The parties refer to these individuals as "insufficient data" class members. Id. Under the settlement agreement, insufficient data class members will receive the average class allocation of approximately $541.73. Settlement Agreement (Doc. #828-1), ¶ 6; Plaintiffs' Response To Order To Show Cause (Doc. #824) at 7.

In addition to their settlement allocations, nine class representatives will receive $10,000 service payments and 11 class members who prepared to testify at trial will receive $3,000 service payments. Settlement Agreement (Doc. #828-1), ¶ 9.a. Notably, none of the class representatives are in the correctly paid or overpaid group, Period 65 group or insufficient data group. Plaintiffs' Response To Order To Show Cause (Doc. #824) at 23-25.

B.      Notice Process

Within 30 days of preliminary approval, class counsel will mail postcards to class members and issue a national press release concerning the settlement. Id., ¶¶ 11.b-d; Plaintiffs' Response To Order To Show Cause (Doc. #824) at 10-11, 14 (press release disseminated to more than 4,500 websites); see Doc. #824-13 (sample postcard). The administrator will send the postcards to class member addresses on file with class counsel. Plaintiffs' Response To Order To Show Cause (Doc. #824) at 10-11. According to class counsel's National Change of Address contractor, they have current addresses for all but 47 of the 34,909 class members. Id. at 15. The postcards will

place class members on notice of (1) forthcoming notices of settlement, (2) forthcoming settlement checks, (3) their ability to opt out, (4) their duty to update or confirm contact information on the class website  (http://www.nka.com/case/sprintretailsettlement) and (5) where more information concerning the settlement can be found.  Settlement Agreement (Doc. #828-1), ¶ 11.b.  Thirty days after the administrator sends the postcards, the parties will provide the Court a report which outlines the number of class members who updated their contact information, the number of notice cards which were returned undeliverable or mailed to the wrong address and other relevant data to confirm the adequacy of the address records.  Plaintiffs' Response To Order To Show Cause (Doc. #824) at 11.[2]

Within 45 days of mailing the postcards, the administrator will send notices of settlement by first-class mail.  Settlement Agreement (Doc. #828-1), ¶ 11.e.  Within 14 days of mailing the notices of settlement, class counsel will send e-mail notice to the class members for whom they have e-mail addresses.  Id., ¶ 11.f; see Plaintiffs' Response To Order To Show Cause (Doc. #824) at 12 (counsel have e-mail addresses for 7,574 class members).  The notices of settlement will include (1) a lawsuit summary; (2) the class definition; (3) material settlement terms, including the total settlement amount, the amount of attorneys' fees and litigation costs, the settlement allocation formula and the recipient's estimated allocation amount; (4) instructions on how to opt out or file an objection and relevant deadlines; (5) contact information for class counsel; (6) instructions

---

[2]    Although plaintiffs have represented to the Court that they plan to send out a press release, the settlement agreement does not include any provisions concerning issuance of this notice.  Plaintiffs' Response To Order To Show Cause (Doc. #824) at 14.  Similarly, the settlement agreement states that the parties will provide the Court a report summarizing the results from the postcard mailing.  Settlement Agreement (Doc. #828-1), ¶ 11.j.  It does not however, require that the parties incorporate any potential feedback from the Court or wait for Court approval before mailing notices of settlement to class members.  Id., ¶ 11.e.

on how class members can update their contact information; and (7) where to find more settlement information.  See Settlement Agreement (Doc. #828-1) at 32-36 (sample notice of settlement).  Further, the notice will inform class members that they do not need to fill out a claim form or take any action to receive their settlement check.  See Settlement Agreement (Doc. #828-1) at 34.

      C.    Settlement Execution

In general, class members will have 60 days after the administrator mails the first notice of settlement to file objections or to opt out.  Id., ¶¶ 1.t, 12.b, 13.  Class members can dispute their settlement eligibility or allocation amount by filing an objection.  Id., ¶ 11.g.iv.

After the Court grants final settlement approval, the administrator will send settlement checks which expire 90 days from the date of issuance.  Id., ¶¶ 1.m, 15.  After the initial check-cashing period, the administrator will redistribute pro rata the value of uncashed checks and any remaining settlement funds to participating class members.  Id., ¶15.e.  Settlement funds remaining after this redistribution will be donated to the cy pres beneficiary.  Id., ¶15.f.  In exchange for the settlement payments, class members (including those who did not cash or receive checks) will release "any and all claims for unpaid commissions under state law (including but not limited to under the Kansas Wage Payment Act), federal, or common law (including but not limited to breach of contract)" against Sprint which arose during the class period.  Id., ¶¶ 11.g.iii, 19.

**Analysis**

As stated, this motion seeks (1) preliminary approval of the settlement agreement; (2) approval of the parties' Stipulation For Dismissal Without Prejudice And Revisions To Class List (Doc. #785) and Stipulation For Dismissal With Prejudice Of Certain Class Members

(Doc. #786);[3] (3) a finding that plaintiffs' requests for attorneys' fees are fair and reasonable; (4) approval of plaintiffs' requests for costs to class counsel and service awards to class representatives and class members who prepared to testify at trial; and (5) a final settlement approval hearing.  See Plaintiffs' Amended Motion (Doc. #817).

## I.    Preliminary Approval

Under Rule 23(e), Fed. R. Civ. P., once a class is certified, the action may not be settled, dismissed or compromised without Court approval.  Preliminary approval of a proposed settlement is the first of two steps required before a class action may be settled.  In re Motor Fuel Temp. Sales Practices Litig., 258 F.R.D. 671, 675 (D. Kan. 2009).  If the Court grants preliminary approval, it directs notice to class members and sets a hearing to determine the fairness of the class settlement. Id.

At the preliminary approval stage, the Court makes a preliminary evaluation of the fairness of the proposed settlement and determines whether the proposed settlement is within the range of possible approval, i.e. whether there is any reason not to notify class members of the proposed

---

[3]    In the Stipulation For Dismissal Without Prejudice And Revisions To Class List (Doc. #785), the parties seek to dismiss without prejudice 4,749 class members who (1) opted out, (2) did not hold positions which the parties agreed were covered by the action or (3) did not have sufficient data to calculate damages.  In the Stipulation For Dismissal With Prejudice Of Certain Class Members (Doc. #786), the parties seek to dismiss with prejudice 7,581 class members who (1) plaintiffs' experts found were correctly paid or overpaid, (2) only worked in positions excluded from the expert analysis, (3) did not work in commissions-based positions or (4) only worked during Period 65.

Because the settlement class includes many individuals whom the parties sought to dismiss through these stipulations, the Court overrules these stipulations as moot.  See Settlement Agreement (Doc. #828-1), ¶ 4.  Further, the parties need not send notice to individuals who are not included in the settlement class because the notice letter sent in early 2014 sufficiently described the limitations of the class. Fed. R. Civ. P. 23(e)(1); see Order (Doc. #504); see Doc. #503-1 (notice letter); see Doc. #503-2 (notice letter).

settlement and proceed with a fairness hearing.  See Gautreaux v. Pierce, 690 F.2d 616, 621 n.3 (7th Cir. 1982); Freebird, Inc. v. Merit Energy Co., No. 10-1154-KHV, 2012 WL 6085135, at *4-5 (D. Kan. Dec. 6, 2012); In re Motor Fuel Temp. Sales Practices Litig., 258 F.R.D. at 675-76.  The Court will ordinarily grant preliminary approval where the proposed settlement appears to be the product of serious, informed, non-collusive negotiations; has no obvious deficiencies; does not improperly grant preferential treatment to class representatives or segments of the class; and falls within the range of possible approval.  The standards for preliminary approval of a class settlement are not as stringent as the requirements for final approval.  Freebird, 2012 WL 6085135, at *5.

In deciding whether to approve a proposed settlement, the Court assesses the reasonableness of the compromise, taking into account the context in which the parties reached the settlement.  See id. (citing Nat'l Treasury Emps. Union v. United States, 54 Fed. Cl. 791, 797 (2002)).  Although the Court must assess the strength of plaintiffs' claims, it should "not decide the merits of the case or resolve unsettled legal questions."  Id. (citing Carson v. Am. Brands, Inc., 450 U.S. 79, 88 n.14 (1981)).

In determining whether a proposed settlement is fair, reasonable and adequate, the Court considers the following factors:

> (1) whether the proposed settlement was fairly and honestly negotiated;
> (2) whether serious questions of law and fact exist, placing the ultimate outcome of the litigation in doubt;
> (3) whether the value of an immediate recovery outweighs the mere possibility of future relief after protracted and expensive litigation; and
> (4) the judgment of the parties that the settlement is fair and reasonable.

Rutter & Wilbanks Corp. v. Shell Oil Co., 314 F.3d 1180, 1188 (10th Cir. 2002).  While the Court will consider these factors in greater depth at the final approval hearing, they are a useful guide at the preliminary approval stage.  See In re Motor Fuel Temp. Sales Practices Litig., 258 F.R.D. at

675; Lucas v. Kmart Corp., 234 F.R.D. 688, 693 (D. Colo. 2006); Am. Med. Ass'n v. United Healthcare Corp., No. 00-2800(LMM), 2009 WL 1437819, at *3 (S.D.N.Y. May 19, 2009). To receive preliminary approval, the settlement proponents must provide sufficient evidence that the settlement is fair. See Gottlieb v. Wiles, 11 F.3d 1004, 1015 (10th Cir. 1993), overruled on other grounds by Devlin v. Scardelletti, 536 U.S. 1, 122 (2002); In re Sprint Corp. ERISA Litig., 443 F. Supp. 2d 1249, 1256 (D. Kan. 2006).

A.    Fair And Honest Negotiation

Over the course of this action, the parties unsuccessfully attempted mediation five times. See Memorandum In Support (Doc. #818) at 10 n.4. The court-ordered mediation with Judge Crabtree initially failed to resolve this matter. ADR Report (Doc. #798). In the following days, the continued efforts of Judge Crabtree and the parties led to settlement. Memorandum In Support (Doc. #818) at 16-17. Counsel for each party has class action experience and zealously defended their respective clients' interest for more than a decade. The record supports a finding that extensive arms-length negotiation produced the settlement agreement. Accordingly, the first factor weighs in favor of preliminary approval.

B.    Questions Of Law And Fact

Approximately five months before trial, the central questions of this case remained unresolved – i.e. whether Sprint was liable for KWPA violations and breach of contract and if so, the amount of unpaid commissions. As noted, the parties' experts reached remarkably different conclusions concerning Sprint's potential liability. Plaintiffs' experts calculated a net underpayment of more than $95 million, while Sprint contended that it overpaid the class members more than $75 million. Memorandum In Support (Doc. #818) at 8. These calculations demonstrate the

-12-

uncertainty concerning Sprint's liability and potential damages heading into trial.  Other pending

legal and factual questions included whether the jury would find Sprint's actions willful and thus,

subject to doubled damages under the KWPA; whether releases from previous cases prevented

certain class members from bringing claims; and whether the Court would assess prejudgment

interest.  See Second Report Regarding Cross-Motions For Summary Judgment (Doc. #712) filed

April 21, 2017 at 13 (citing K.S.A. § 44-315); see Order (Doc. #761) filed September 1, 2017

(setting schedule to brief release issue); see K.S.A. § 44-323 (prejudgment interest under KWPA).

Further, as shown below, this case involved many disputed legal issues which would have likely

resulted in appeals.  Because material questions of law and fact remained when the parties settled,

the second factor supports preliminary approval.

C.    Immediate Recovery Compared To Future Relief

Courts judge the fairness of a proposed compromise by weighing plaintiffs' likelihood of

success on the merits against the amount and form of the relief offered in the settlement.  Carson,

450 U.S. at 88 n.14.  In the past, the Court voiced concern whether a jury could possibly understand

Sprint's complex computer systems and the methodologies of each expert.  The Court questioned

whether "the jury will be forced simply to guess whether plaintiffs' expert is correct . . . or

defendants' expert is correct . . . or something in between."  Order Of Appointment (Doc. #532)

at 2.  The wide variance between the expert damage calculations exacerbated the unpredictability

of a potential jury verdict.  These factors make it difficult to determine plaintiffs' likelihood of

success on the merits or to accurately predict plaintiffs' potential recovery at trial.

Because Sprint disputed many legal rulings in this action, such as the Court's decision to

certify a class, it would likely appeal an unfavorable verdict.  Sprint illustrated its willingness to

appeal by seeking interlocutory review of the Court's refusal to decertify the class. Doc. #735. Among other things, Sprint could appeal whether the Court erred when it (1) overruled its motion for decertification; (2) overruled in part its motion to dismiss and stated that the KWPA may apply to non-resident class members; (3) overruled Sprint's motion to exclude plaintiffs' expert testimony under Daubert; and (4) overruled Sprint's motion for summary judgment. See Memorandum And Order (Doc. #77) at 8-10 (overruling motion to dismiss); see Order (Doc. #727) filed June 8, 2017 (overruling motion to decertify); see Order (Doc. #728) filed June 8, 2017 (overruling motion to exclude); see Order (Doc. #729) filed June 8, 2017 (overruling motion for summary judgment). Such appeals would delay recovery that class members have already waited more than a decade to receive.

The total settlement fund ($30,500,000) equals approximately 32 per cent of how much plaintiffs' experts concluded Sprint underpaid the class. Compare Settlement Agreement (Doc. #828-1), ¶ 1.ll, with Memorandum In Support (Doc. #818) at 8 (30,500,000/95,584,122.27 = .319). Although class members could have recovered more by proceeding to trial and through potential appeals, they also could have recovered less (or nothing). If the case proceeded to trial, class counsel would have been entitled to 33 per cent of any recovery and incurred increased litigation costs, whereas under the settlement, they only seek 23 per cent. Compare Legal Services Agreement (Doc. #824-2) (class counsel fee agreement), with Settlement Agreement (Doc. #828-1), ¶ 8.a. Finally, the settlement agreement will provide class members payments that are proportional to their injuries. Each class member's settlement allocation represents a pro rata share of his or her individual underpayment and thus, the agreement avoids arbitrary allocations. In sum, the immediacy, certainty and proportionality of the settlement agreement outweigh the possibility of

a larger recovery after trial and subsequent appeals.  Thus, the third factor weighs in favor of preliminary approval.

> D.    Parties Deem The Settlement Fair And Reasonable

The final factor asks whether the parties deem the settlement fair and reasonable.  Because the class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only," the Court should consider whether all class members will consider the settlement fair and reasonable.  Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 348 (2011) (quoting Califano v. Yamasaki, 442 U.S. 682, 700-01 (1979)).  Although most of the terms of the settlement appear fair and reasonable, the Court remains uncertain concerning certain aspects of the settlement agreement.

Although class counsel have represented to the Court that they will submit an executed agreement after preliminary approval, no parties have signed the revised settlement agreement.  See Settlement Agreement (Doc. #828-1) at 21-30; Supplemental Declaration Of Michele R. Fisher (Doc. #828) filed May 2, 2018, ¶ 5.  The class representatives and counsel signed prior drafts, but the Court should withhold preliminary approval until all parties endorse the current agreement.  See Settlement Agreement (Doc. #822) filed March 28, 2018 at 21-30 (prior draft with representatives' signatures).  The Court cannot merely presume that the parties will approve the revisions and agree to the revised settlement agreement.

The Court also questions whether the named class representatives adequately represent all of the diverse interests of the class.[4]    Rule 23(a)(4), Fed. R. Civ. P., requires that class

---

[4]    The Court analyzes this under the fourth factor because it cannot determine whether class members think the settlement is fair and reasonable when the class representatives do not
(continued...)

representatives "fairly and adequately protect the interests of the class." To assure adequate representation of class members, a class may be divided into subclasses when appropriate. Fed. R. Civ. P. 23(c)(5); see Amchem Prods. v. Windsor, 521 U.S. 591, 625-27 (1997) (class representative must share same interests and injury as class members). In certain circumstances, a discrete subgroup of a class "cannot be bound to a settlement except by consents given by those who understand that their role is to represent solely the members of their respective subgroups." In re Joint E. & S. Dist. Asbestos Litig., 982 F.2d 721, 743 (2d Cir. 1992); see also Dewey v. Volkswagen Aktiengesellschaft, 681 F.3d 170, 187-90 (3d Cir. 2012).

Because none of the current class representatives belong to the groups that (1) were correctly paid or overpaid, (2) represented employees who only worked in Period 65 or (3) were composed of insufficient data class members, the Court previously ordered the parties to show cause why class counsel should not identify new class representatives to represent the respective interests of these distinct groups. See Order To Show Cause (Doc. #823) at 7. In response, plaintiffs stated that current class representatives adequately represent these groups because they were correctly paid or overpaid, worked in Period 65 or had insufficient data for certain months of the class period. See Plaintiffs' Response To Order To Show Cause (Doc. #824) at 24-25.

Plaintiffs' argument does not persuade the Court that the current class representatives adequately represent these subclasses. The settlement agreement singles out individuals who fall exclusively into certain subcategories, and no class representatives fall exclusively in those groups.

---

[4](...continued)
adequately represent the interests of the entire class. See Alexander v. BF Labs Inc., No. 14-2159-KHV, 2016 WL 5243412, at *10 (D. Kan. Sept. 22, 2016) (lack of subclass representation analyzed under fourth factor). Without representation, the Court cannot discern whether members of distinct subclasses find the agreement fair and reasonable. Id.

For example, class members who only worked in Period 65 receive a settlement allocation of $25, while class members who worked in Period 65 in addition to other months of the settlement period will receive allocations pursuant to plaintiffs' damage calculation.  Settlement Agreement (Doc. #828-1), ¶ 6.  Insufficient data class members will receive the average allocation of approximately $541. Id.  Class members with insufficient data for portions of the class period will receive their individual average underpayment for any missing data period in addition to an amount pursuant to plaintiffs' damage calculation.  Plaintiffs' Response To Order To Show Cause (Doc. #824) at 25.  Class members who were correctly paid or overpaid for the whole class period will not receive any allocation, but will release their claims against Sprint.  Settlement Agreement (Doc. #828-1), ¶¶ 6, 19.  All other class members will receive a payment in exchange for releasing their claims.

The fact that the current class representatives are similarly-situated to members of the subgroups for portions of the class period does not align their interests.  In fact, the class representatives' monetary interests conflict with that of the correctly paid or overpaid and Period 65 class members because every dollar allocated to the subgroups diminishes the remaining settlement pool from which the class representatives and all other class members will receive their pro rata allocation.  Class counsel must identify class representatives to represent the interests of these subgroups.  Until that occurs, the fourth factor does not support preliminary approval.

## II.    Reasonableness Of Attorneys' Fees, Costs And Service Awards

Plaintiffs urge the Court to make preliminary findings concerning the reasonableness of the requested attorneys' fees, litigation costs and service awards.  See Plaintiffs' Amended Motion

(Doc. #817), ¶¶ 3-6.[5]  Under Rule 23(h), Fed. R. Civ. P., the Court has broad authority to award reasonable attorneys' fees and nontaxable costs which are authorized by law or the parties' agreement.  Fed. R. Civ. P. 23(h); Law v. N.C.A.A., 4 F. App'x 749, 751 (10th Cir. 2001) (quoting In re FPI/Agretech Sec. Litig., 105 F.3d 469, 472 (9th Cir. 1997)).  When a settlement creates a common fund, courts apply one of two methods to determine reasonable attorneys' fees: a percentage of the fund or the lodestar method.  See Rosenbaum v. MacAllister, 64 F.3d 1439, 1445 (10th Cir. 1995).  The Tenth Circuit applies a hybrid approach, which combines the percentage fee method with the specific factors traditionally used to calculate the lodestar.  See Johnson v. Ga. Highway Express, Inc., 488 F.2d 714 (5th Cir. 1974), overruled on other grounds by Blanchard v. Bergeron, 489 U.S. 87, 93 (1989); see Gottlieb v. Barry, 43 F.3d 474, 483 (10th Cir. 1994).

Counsel requests approximately 23 per cent of the common fund ($7,015,000) – significantly less than the 33 per cent contingency fee which plaintiffs agreed to pay.  Compare Legal Services Agreement (Doc. #824-2), with Settlement Agreement (Doc. #828-1), ¶ 8.a.  While seeking preliminary approval, counsel have voluntarily decreased their fee request on two occasions to prevent increased costs from adversely affecting class members.  See Plaintiffs' Response To Order To Show Cause (Doc. #824) at 7 (reducing requested fee); see Supplemental Memorandum In Support (Doc. #821) at 8 (same).  To justify their fee under a lodestar analysis, counsel have submitted information concerning the time they expended on this action (39,614 hours), their standard hourly rates and affidavits from attorneys who aver that such hourly rates are reasonable in the relevant legal community.  See Memorandum In Support (Doc. #818) at 23; see Doc. #824-3

---

[5]       The Court substitutes specific fee amounts included in Plaintiffs' Amended Motion (Doc. #817) with fees in the parties' revised settlement agreement.

(attorney affidavit), Doc. #824-4 (same), Doc. #824-5 (same), Doc. #824-6 (same), Doc. #824-7 (same), Doc. #824-8 (same).  Subject to objections and the more searching inquiry at final approval, the Court finds that on its face, the requested attorneys' fee appears to be reasonable.  See In re Motor Fuel Temperature Sales Practices Litig., No. 07-MD-1840-KHV, 2016 WL 4445438, at *7 (D. Kan. Aug. 24, 2016) (23 per cent fee request reasonable).

Plaintiffs also ask the Court to make specific findings with respect to their requested litigation costs.  See Plaintiffs' Amended Motion (Doc. #817), ¶ 4.  Under the settlement agreement, counsel may request reimbursement of litigation expenses up to $7,000,000.  Settlement Agreement (Doc. 828-1), ¶ 8.a.  Class counsel have provided a detailed accounting of their past and estimated future expenses.  See Doc. #815-5 filed March 2, 2017; see Doc. #824-12 at 2.  The technical and complex nature of this case justifies expert-related expenditures of $5,325,282.  (Doc. #818) at 36.  Further, the court-appointed technical advisor and special master cost an additional $525,000.  See Doc. #815-5.  Subject to objections and the more searching inquiry at final approval, the Court finds that the litigation expenses appear to be reasonable.

Finally, plaintiffs request preliminary approval of proposed service payments of $10,000 to the nine class representatives and $3,000 to eleven class members who prepared to testify at trial.  See Plaintiffs' Amended Motion (Doc. #817), ¶¶ 5-6; see Plaintiffs' Response To Order To Show Cause (Doc. #824) at 20 (reducing service awards).  Service payments induce individuals to become class representatives and reward them for time sacrificed and personal risk incurred on behalf of the class.  See UFCW Local 880-Retail Food Emp'r Joint Pension Fund v. Newmont Mining Corp., 352 F. App'x 232, 235 (10th Cir. 2009).  Here, class representatives expended significant time meeting with class counsel, reviewing case filings, producing documents, responding to written discovery,

preparing for and attending depositions and assisting class counsel for ten years. Declaration Of Michele R. Fisher In Support Of Preliminary Approval Of Settlement (Doc. #815-1), ¶ 23. Similarly, the other service payment recipients spent time communicating with counsel and preparing to testify at trial. Id., ¶ 24. All service payment recipients incurred significant risk by opposing their former or current employer. The total service payments ($123,000) account for just 0.4 per cent of the settlement fund. See Doc. #824-12 at 2 (123,000/30,500,000 = .004). Subject to objections and the more searching inquiry at final approval, the Court finds that the service awards appear to be reasonable. See William B. Rubenstein, 5 Newberg on Class Actions § 17:1 (5th ed. 2017) (average incentive awards between $10,000 through $15,000).

### III.    Notice

The Court does not address plaintiffs' proposed class notice plan. On or before **Monday, May 21**, **2018,** the parties shall file a motion for the Court to approve the adequacy of its proposed notice plan.

**IT IS THEREFORE ORDERED** that Plaintiffs' Amended Motion For Preliminary Approval Of Settlement (Doc. #817) filed March 7, 2018 is **SUSTAINED in part**.

**IT IS FURTHER ORDERED** that the parties' Stipulation For Dismissal Without Prejudice And Revisions To Class List (Doc. #785) filed October 24, 2017 and Stipulation For Dismissal With Prejudice Of Certain Class Members (Doc. #786) filed October 24, 2017 are **OVERRULED** as moot in light of the parties' pending settlement agreement.

**IT IS FURTHER ORDERED** that **on or before Monday, May 21, 2018**, the parties shall file (1) a motion for preliminary approval of a revised settlement; (2) a motion for approval of the proposed class notice; (3) a motion to join additional class representatives to represent class

members who were correctly paid or overpaid, class members who only worked in Period 65 and class members who had insufficient data to calculate underpayment and (4) a joint proposed amendment to the pretrial order which sets forth these new claims.

Dated this 9th day of May, 2018 at Kansas City, Kansas.

s/ Kathryn H. Vratil
Kathryn H. Vratil
United States District Judge

-21-