# THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

|  |  |
|---|---|
| ROXIE SIBLEY, JEANNE NOEL, ERNESTO BENNETT, JAMIE WILLIAMS, GREG ST. JULIEN, TRACIE HERNANDEZ, JOHN JASINSKI, JAY RICHIE, and TEISHA KING, individually and on behalf of the class,<br><br>Plaintiffs,<br><br>v.<br><br>SPRINT NEXTEL CORPORATION, and SPRINT/UNITED MANAGEMENT COMPANY,<br><br>Defendants. | Case No. 02:08–CV–2063–KHV |

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF UNOPPOSED MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................1

BACKGROUND ............................................................................................................1

I.      LITIGATION HISTORY AND CLASS CERTIFICATION NOTICE ...........................................1

II.     SUMMARY OF SETTLEMENT TERMS AND TIMELINE ....................................................5

        A.      Settlement Class ...........................................................................................5

        B.      Monetary Relief ...........................................................................................6

        C.      Timeline for Distribution of Settlement Funds Upon Court Approval ..........11

III.    PRELIMINARY APPROVAL OF SETTLEMENT & NOTICE PLAN ......................................11

IV.     THE SETTLEMENT NOTICE PROCESS WAS SUCCESSFUL ...............................................14

        A.      The Class Received Effective Notice Through Multiple Forms......................14

                1.      Settlement Postcards ...........................................................................14

                2.      Notices of Settlement ...........................................................................14

                3.      Posting on Websites ...........................................................................16

                4.      Email Notice ...........................................................................................16

                5.      National Press Release ...........................................................................16

        B.      Four Settlement Class Members Requested Exclusion and Two Settlement
                Class Members Objected to the Settlement .......................................................16

V.      ATTORNEY TIME AND LITIGATION COSTS EXPENDED BY CLASS COUNSEL...................18

        A.      Attorneys' Time ...........................................................................................18

        B.      Litigation Costs ...........................................................................................20

ANALYSIS ............................................................................................................22

I.      FINAL APPROVAL SHOULD BE GRANTED BECAUSE THE SETTLEMENT IS FAIR
        AND REASONABLE ...........................................................................................22

        A.      The Settlement Was Negotiated Fairly and Honestly.......................................23

**B.**   **There Are Disputed Questions of Fact and Law that Made the Outcome of the Litigation Uncertain** ........................................................................23

**C.**   **The Value of the Recovery Outweighs the Mere Possibility of Future Relief After Protracted and Expensive Litigation** .............................25

**D.**   **The Parties Deem the Settlement to be Fair and Reasonable** ...........................27

**II.**   **THE ATTORNEYS' FEES SOUGHT ARE REASONABLE** .......................................................28

**A.**   **Standard for Award of Attorneys' Fees** ...........................................................28

**B.**   **The Attorneys' Fee Request Should Be Approved** ...........................................29

   **1.**   *Class Counsel Expended Considerable Time and Labor on Behalf of the Class* ....................................................................................................29

   **2.**   *The Case Presented Difficult and Novel Questions and Required Skilled and Experienced Counsel* ...............................................................30

   **3.**   *The Requested Fee is Customary and Reasonable* ..................................32

   **4.**   *Class Counsel Undertook Significant Risk Litigating This Expensive and Lengthy Case on a Contingent-Fee Basis* ........................................37

   **5.**   *This Case Precluded Class Counsel from Taking on More Matters* ......38

   **6.**   *Class Counsel Obtained a Fair Result on Behalf of the Class* ..............38

   **7.**   *The Class's Reaction to the Settlement is Positive* ..................................39

**III.**   **THE REQUESTED COSTS ARE REASONABLE** .....................................................................39

**IV.**   **THE SERVICE PAYMENTS SHOULD BE APPROVED AS FAIR** ............................................41

**CONCLUSION** ...........................................................................................................................44

## INTRODUCTION

Plaintiffs, by and through their counsel Nichols Kaster, PLLP ("Class Counsel"), seek final settlement approval of this Rule 23 certified class action.  The $30,500,000.00 settlement will resolve claims asserted against Defendants Sprint Nextel Corporation and Sprint/United Management Co. (collectively, "Sprint") in a case that has spanned nearly eleven years.

In preliminarily approving the settlement, the Court found it to be fair, reasonable and adequate.  That remains true today and is further supported by the success of the settlement notice process at reaching the 34,909 Settlement Class Members, and their generally positive response to it.

Plaintiffs respectfully request that the Court grant their motion, so checks can be disbursed to the Settlement Class Members in early 2019.  Defendants do not oppose the motion.[1]

## BACKGROUND

### I.    LITIGATION HISTORY AND CLASS CERTIFICATION NOTICE

On February 7, 2008, Plaintiffs, who worked as Sprint retail store employees, initiated this action. (Compl., Filing No. 1, at CM/ECF p. 1.) Their remaining claims include unpaid commissions pursuant to the Kansas Wage Payment Act ("KWPA") (Count I) and breach of contract.  (*See* First Am. Compl., Filing No. 8, at CM/ECF p. 1.)  Plaintiffs asserted that due to problems within Sprint's commissions-related systems, Sprint failed to pay the class commissions due for the products and services they sold.  (*See id.*)

On November 24, 2008, the Court certified a class consisting of:

All persons nationwide who worked for Defendants' retail stores since their merger with Nextel, including Retail Store District Managers, Retail Store Managers, Assistant Retail Store managers, Lead Retail Consultants, Retail Consultants, Retail Sales Representatives, and other retail employees whose compensation was based in full or in part on commissions.

---

[1] Fisher Decl. ¶ 1.

(Class Cert. Mem. and Order 10, Filing No. 99, at CM/ECF p. 10.)  The Tenth Circuit denied Sprint's petition to appeal. *Sprint Nextel Corp. v. Sibley*, No. 08–604, Filing No. 01017588146 (10th Cir. Jan. 23, 2009).

On March 13, 2009, the Court ordered notice to be sent to potential class members to inform them of certification of the action and to give them the ability to opt out.  (Mem. & Order 2, Filing No. 829 at CM/ECF p. 2.)  Class Counsel mailed that notice.  (Fisher Decl. ¶ 2.)  On January 15, 2014, the parties stipulated the class would be limited to employees who held specific retail positions from August 12, 2005 to September 30, 2009.  (*See* Jt. Stip. Specifying Class Membership and Class Period, Filing No. 503.)  In 2014, Class Counsel sent notices which described these limitations to individuals who had received the 2009 certification letter and to new potential class members.  (*See* Mem. & Order 2, Filing No. 829, at CM/ECF p. 2; Fisher Decl. ¶ 3.)

As Plaintiffs detailed in their preliminary approval briefing, the parties engaged in many years of litigation, including extensive discovery.  (*See* Pls.' Mem. for Preliminary Approval 3–6, Filing No. 815, at CM/ECF p. 6–9.)  The parties engaged in multiple rounds of interrogatories, requests for admission, and document and data requests and productions. (*See, e.g.*, Filing Nos. 24, 25, 29, 115, 116, 117, 118, 119, 120, 131, 132, 141, 144, 155, 156, 166, 172, 182, 185, 226, 228, 231, 235, 237, 249, 250, 251, 252, 266, 273, 275, 277, 287, 293, 303, 304, 306, 309, 313, 328, 329, 330, 335, 336, 337, 338, 339, 343, 345, 346, 349, 364, 368, 377, 384, 387, 393, 394, 401, 403, 404, 405, 406, 407, 412, 414, 415, 417, 418, 422, 425, 426, 429, 430, 431, 459.)  Sprint produced over 18 million pages of documents.  (*See* Defs.' Decert. Mem. 9, Filing No. 620, at CM/ECF p. 13.)  Plaintiffs deposed 27 of Sprint's corporate representatives, executives, and employees with knowledge of Sprint's commissions and systems, while Sprint deposed the 9 class

representatives.   (*See* Pls.' Mem. to Exclude Expert 6, Filing No. 616, at CM/ECF p. 6.) Furthermore, Class Counsel hired several document review and research attorneys to, among other things, review, analyze, and code documents Sprint produced, and research issues as they arose. (Pls.' Am. Mem. for Prelim. Approval 3, Filing No. 818, at CM/ECF p. 6.)

Class Counsel engaged in extensive efforts to reach class members during discovery to discuss their claims, resulting in Class Counsel contacting over 30,000 class members.  (*Id.* ¶ 5.) Class Counsel maintained contact by providing update letters and emails, website updates, and maintaining staff to respond to class member communications.  (*Id.*)

Sprint produced commissions-related data for all class members, which included data from its point-of-sale, billing, commissions, and payroll systems.  This production was the result of a lengthy meet and confer and negotiation process.  (*See* Sched. Order ¶¶ 2.e-g, Filing No. 114, at CM/ECF p. 5.)  Sprint's data production consisted of "more than 6–7 billion sales transactions and billing records, equating to more than 8 terabytes of data" necessary to calculate damages for the class.  (*See* Defs.' Opp'n to 2d Mot. to Exclude Expert 9, Filing No. 514, at CM/ECF p. 15.)

Due to the complexity of such a large data set, the parties retained experts who analyzed the class commissions data and Sprint's commission plans and issued several reports, and revised reports, over many years.  (Pls.' Am. Mem. for Prelim. Approval 4–5, Filing No. 818, at CM/ECF p. 7–8.)  As succinctly described by the Special Master, "[t]he amount of work required of the experts to undertake this determination was massive."  (*See* Mem. & Order 3, Filing No. 829, at CM/ECF p. 3.)

The Class Expert ultimately concluded that 27,366 of the class members were overall *under*paid commissions by $95,584,122.27 (or approximately $3,492 per person), and Sprint's expert concluded that the class members were overall *over*paid by $75,004,761.00.  (Pls.' Am.

Mem. for Prelim. Approval 5, Filing No. 818, at CM/ECF p. 8.) The experts subsequently provided additional criticisms of each other's methodologies and calculations in quantification reports and quantification rebuttal reports. (*Id.*) In these reports, the experts provided criticisms of errors they allege were still present in the opposing party's methodology, despite the refinements over the years, and attempted to quantify them. (*Id.*)

This case involved extensive, complex, and time-consuming motion practice. For instance, in early 2013 the parties filed cross-motions for summary judgment,[2] (Filing Nos. 444, 448, 464, 467, 478, 474), cross-*Daubert* motions, (Filing Nos. 446, 454, 461, 463, 476, 477), and Sprint filed a decertification motion, (Filing Nos. 451, 462, 480). The parties also filed renewed cross-*Daubert* motions in 2014 at the Court's request, (Filing Nos. 507, 510, 512, 513, 514, 516, 518, 520).

While the parties attended a hearing on March 3, 2014 on these motions, the Court did not rule on them. Rather, it appointed a Special Master, David Cohen, (Order of Appt., Filing No. 532, at CM/ECF p. 2), and a Technical Advisor, Dr. Chen Song, (Order, Filing No. 559, at CM/ECF p. 1), and all pending motions were vacated. (Order, Filing No. 557 at CM/ECF p. 1 (text only); Am. Sched. Order 4 n.2, Filing No. 579, at CM/ECF p. 1.) The Special Master set new deadlines for the parties to update/consolidate their prior summary judgment, *Daubert*, and decertification motions. (Am. Sched. Order 3, Filing No. 579, at CM/ECF p. 1.) The Special Master also held two, two-day expert summits where the parties and their experts met first in December 2014, and later in November 2015, to discuss their damages models and reports. The parties and their experts each met separately with the Special Master and Technical Advisor in mid-2016 for further discussions.

---

[2] In December 2011, Sprint brought an early motion for summary judgment. (Filing No. 284, at CM/ECF p. 1.) After briefing, the Court overruled it as premature. (Order, Filing No. 334.)

The parties redrafted and re-filed their summary judgment, *Daubert* and decertification motions in late 2015 and 2016.  (Filing Nos. 616, 622, 630, 618, 621, 631, 620, 626, 632, 638, 647, 651, 652, 639, 646, 646–1, 650.)  After a hearing on the motions, the Special Master issued reports denying Sprint's decertification motion, denying Plaintiffs' *Daubert* motion, granting in part and denying in part Sprint's *Daubert* motion, granting in part and denying in part Plaintiffs' first summary judgment motion, denying Plaintiffs' second summary judgment motion, and denying Sprint's summary judgment motion.  (Filing Nos. 663, 682, 701, 712.)  The parties then briefed their objections to these reports, (Filing Nos. 670, 675, 677, 685, 687, 715, 721, 717, 724, 713, 718), and the Court adopted the Special Master's rulings, (Filing Nos. 727, 728, 729).

The parties attempted mediation five times without success.  (Pls.' Am. Mem. for Prelim. Approval 7 n.4, Filing No. 818, at CM/ECF p. 10.)  In January 2018, the parties finally reached a settlement of this case, and the related case, *Harlow et al v. Sprint Nextel Corp.*, File No. 2:08-CV-02222-KHV (D. Kan.) ("*Harlow*"), with the aid of the Honorable Judge Crabtree.  (*See* Mem. & Order 4, Filing No. 829, at CM/ECF p. 4.)  In addition to Class Counsel and the Class's three experts, class representative Jay Richie (who worked as a Sprint retail district manager) attended the two-day mediation.  (*See* Fisher Decl. ¶ 11.)

## II.   SUMMARY OF SETTLEMENT TERMS AND TIMELINE

### A.   Settlement Class

The Settlement Agreement defines the Settlement Class as follows:

All persons nationwide who did not opt out of the Class Litigation and worked in Sprint's retail stores during the Class Period of August 12, 2005 through September 30, 2009, including Retail Store District Managers, Retail Store Managers, Assistant Retail Store Managers, Lead Retail Consultants, Retail Consultants, Retail Sales Representatives, and other retail employees (all of whom held at least one of the job titles set forth in Exhibit A to the Expert Stipulation entered at Docket No. 357–1 in the Class Litigation) and whose compensation was based in full or in part on commissions.

(5/2018 Settlement Agmt. ¶ 4, Filing No. 842–1, at CM/ECF p. 7.)  The class representatives for the Settlement Class are the nine named Plaintiffs identified in the case caption above.  At the Court's request, for settlement purposes the parties also created Settlement Subclasses within the Settlement Class, which are defined as:

> Settlement Class Members who, according to the Class Expert calculations, were (1) correctly paid or overpaid (4,482 Class Members); (2) only worked in Period 65 (August 2005) (274 Class Members); or (3) had insufficient data to calculate an underpayment (2,787 Class Members).

(*Id.* ¶¶ 1(ll); 4.)  The class representative for the first Settlement Subclass is Henry Goins, the second Settlement Subclass is Clayton Johnson, and the third Settlement Subclass is Anthony Scarpelli.  (*Id.* ¶ 1(ll).)  The parties agree there are 34,909 individuals in the Settlement Class, including those in the Settlement Subclasses.  (*See id.* ¶¶ 1(ll), 4.)  The identification of which Settlement Class Members are generally within the Settlement Class, and the others who are in the Settle Subclasses, is provided in the 5/2018 Settlement Allocations spreadsheet at Filing No. 832–1.[3]

### B.   Monetary Relief

The Settlement Agreement provides for a Total Settlement Amount of $30,500,000.00, which will be used to compensate the Settlement Class and pay any amounts approved by the Court for Class Counsel's fees, expenses, class representative service awards, and settlement administration.  (5/2018 Settlement Agmt. ¶ 2, Filing No. 842–1, at CM/ECF p. 6.)  None of this money will revert to Sprint.  (*Id.* ¶ 6.)

---

[3] It is also located at the following websites: www.nka.com/case/sprintretailsettlement/ and www.sprintretailsettlement.com.

While Class Counsel's fee agreement with the class representatives provides for a recovery of attorneys' fees of 33% of the settlement ($10,065,000.00),[4] Class Counsel only seeks $7,014,250.00, which is approximately 23% of the Total Settlement Amount.  This is less than half of the $14,288,084.50 in attorneys' fees Class Counsel has expended litigating this case.  (*See* Section V, *infra*.)  Moreover, Class Counsel voluntarily reduced their fee request multiple times during the settlement process, first, to ensure the fees and costs sought did not exceed the funds for distribution to the Settlement Class, and later, to prevent increased costs from the restructuring of the settlement from adversely affecting Settlement Class Members.  (*See* Pls.' Mem. for Prelim. Approval 8 (seeking a reduced amount of fees of $8,614,528.84 to ensure fees and costs requested did not exceed Settlement Class distribution), Filing No. 818, at CM/ECF p. 11; Pls.' Supp. Mem. in Support of Prelim. Approval 8 (reducing fee request to $8,510,966.34 so addition of Settlement Class Members did not decrease allocations), Filing No. 821, at CM/ECF p. 8; Pls.' Resp. to Order to Show Cause 5 (lowering fee request to $7,015,000.00 so additional allocations would not have adverse impact), Filing No. 824, at CM/ECF p. 7; Pls.' 2d Supp. Mem. in Support of Prelim. Approval 6 (lowering fee request to $7,014,250.00 so Settlement Subclass representative service payments would not impact other Settlement Class Members), Filing No. 832, at CM/ECF p. 6.)

After deductions for fees, costs, and settlement administration expenses outlined in the table below, $16,733,879.84 will ultimately be allocated to the Settlement Class (inclusive of class representative service payments, and the class reserve fund).  Any uncashed, unapproved, or unused funds will be redistributed, via a second distribution of settlement checks, to participating members of the Settlement Class who timely cashed their settlement checks.  (5/2018 Settlement Agmt. ¶¶ 6, 10(c), Filing No. 842–1, at CM/ECF p. 8, 10.)  The settlement results in an average

---

[4] (*See* Class Representative Fee Agreements, Filing No. 824–2.)

allocation to those Settlement Class Members receiving an allocation of $1,002.40, and an average net allocation after fees and expenses (excluding service payments) of approximately $545.91.[5]   A summary of these calculations is below:

| | |
|---|---|
| Settlement | $30,500,000.00 |
| Average Per Class Member Participating in Gross Settlement[6] | $1,002.40 |
| Attorneys' Fees | $7,014,250.00 |
| Current Costs[7] | $6,449,293.12 |
| Future Estimated Costs[8] | $123,854.04 |
| Settlement Administration[9] | $178,723.00 |
| To Distribute | $16,733,879.84 |
| $10,000 Service Payments to Named Ps (9) | $90,000.00 |
| $3,000 Service Payments to others involved (11) | $33,000.00 |
| $250 to Class Reps (3) | $750.00 |
| Class Reserve Fund[10] | $60,000.00 |
| Pro Rata Allocable Funds | $16,550,129.84 |

| | |
|---|---|
| Minimum Allocation[11] | $25.00 |
| Funds for Minimum | $28,661.65 |

| | |
|---|---|
| Flat Allocation for Period 65 | $25.00 |
| Funds for Period 65 | $6,850.00 |

---

[5] $16,550,129.84 initial distribution + 60,000 class reserve fund=$16,610,129.80 then divided by 30,427 Settlement Class Members with damages allocations greater than $0.

[6] $30,500,000 divided by 30,427 Settlement Class Members with damages allocations greater than $0. 27,366 Settlement Class Members with damages + 272 Period 65 Class Members + 2,787 Insufficient Data Class Members=30,427 Settlement Class Members with damages allocations greater than $0.

[7] (*See* Fisher Decl. ¶ 10; 12/2018 Costs Detail, Ex. 4.)

[8] Class Counsel only seeks $123,854.04 for "future estimated costs," although these costs are no longer estimates and exceeded the estimate. (*See* 12/2018 Costs Detail, Ex. 4.)

[9] (*See* Revised Rust Consulting Bid, Filing No. 821–9, at CM/ECF p. 1.)

[10] The Settlement Agreement sets aside $60,000.00 from the Total Settlement Amount as a class reserve fund to correct any errors relating to the allocations. (5/2018 Settlement Agmt. ¶ 10(c), Filing No. 842–1, at CM/ECF p. 10; *see* 5/2018 *Sibley* Settlement Allocations, Filing No. 832–1, at CM/ECF p. 2.) Any funds remaining from the reserve fund will be reallocated to Participating Settlement Class Members via a second check distribution. (5/2018 Settlement Agmt. ¶ 10(c), Filing No. 842–1, at CM/ECF p. 10.)

[11] Each member of the Settlement Class was allocated a minimum of $25. (*See* 5/2018 *Sibley* Settlement Allocations, Filing No. 832–1, at CM/ECF p. 56.)

| Flat Pro Rata Allocation for Insufficient Data | $543.93 |
|---|---|
| Funds for Insufficient Data | $1,515,932.91 |

| Funds for Pro Rata Disbursement | $14,998,685.28 |
|---|---|

| Average Pro Rata Allocation if 100% Participation (Including Class Reserve Fund, Excluding Service Payments) | $545.91 |
|---|---|

(*See* 5/2018 Settlement Allocations, Filing No. 832–1, at CM/ECF p. 56.)  A graph reflecting the distributions is below:



(Pls.' Resp. to Order to Show Cause 5, Filing No. 824, at CM/ECF p. 7.)

The Settlement Agreement provides that the settlement allocations will rely on the calculations performed by the Class Expert using Sprint's data. (5/2018 Settlement Amgt. ¶ 6, Filing No. 832–1, at CM/ECF p. 9.)  If the Class Expert calculated a Settlement Class Member was overall correctly paid or overpaid commissions, the Settlement Class Member was allocated $0; if they determined a Settlement Class Member only worked during the partial month of August 2005 (Period 65), the Settlement Class Member was allocated $25;[12] and if they determined a

---

[12] The Class Expert was unable to perform a calculation for *any* Settlement Class Member for Period 65.  Even so, the settlement allocation provides those Class Members who worked exclusively in Period 65 will receive the $25 minimum allocation.  (5/2018 *Sibley* Settlement Allocations, Filing No. 832–1, at CM/ECF p. 56.)

Settlement Class Member had insufficient data to calculate commissions, the Settlement Class Member was allocated $543.93, which is based on the initial average settlement allocation for those Settlement Class Members receiving an allocation.  (*See id.*; *see also* 5/2018 Settlement Allocations, Filing No. 832–1, at CM/ECF p. 56.)  All other Settlement Class Members were allocated their *pro rata* share of the Net Settlement Fund, using the Class Expert damages calculations.  (5/2018 Settlement Amgt. ¶ 6, Filing No. 832–1, at CM/ECF p. 9.)  Thus, 30,427 of the 34,909 Settlement Class Members will receive settlement funds pursuant to the settlement (27,366 Settlement Class Members with damages + 274 Period 65 Settlement Class Members + 2,787 Insufficient Data Class Members).  The 4,482 who the Class Expert found were over or correctly paid did not receive a settlement allocation.  (*Id.*)

This is a fair resolution considering the disparity in the damages conclusions reached by the experts, with the Class Expert concluding class members were overall underpaid on average $3,492, and Sprint's expert concluding most of the class members were overall <u>overpaid</u>.  (*See* Pls.' Am. Mem. for Prelim. Approval 16, Filing No. 818, at CM/ECF p. 19.)  Further, Sprint's expert raised challenges to the Class Expert calculations, that if believed by the jury, would significantly reduce the damages.  (*See generally* Pls.' Am. Mem. for Prelim. Approval 5 (citing expert quantification reports and rebuttal reports), Filing No. 818, at CM/ECF p. 8.)  Due to the nature and complexity of this case and the data, and the class' burden of proving damages by a preponderance of the evidence, the settlement is a fair and reasonable resolution.[13]  (*See id.* 5–9, 14–17.)  Resolving the matter now eliminates the significant risks remaining, and the inevitable additional costs and time required to litigate through pretrial motions, trial, and appeal.

---

[13] The court-appointed Special Master and Technical Advisor, who have been working closely with the parties and their experts regarding the calculations since their appointment in 2014, could confirm this as well.

### C.      Timeline for Distribution of Settlement Funds Upon Court Approval

Within thirty-one days of a final approval order, Sprint will deliver the Total Settlement Amount to the Settlement Administrator.  (5/2018 Settlement Agmt. ¶¶ 1(m), 7, Filing No. 842–1, at CM/ECF p. 3, 8.)  Within fourteen days of receipt, the Settlement Administrator will make the first distribution of settlement checks to the Settlement Class and wire any attorneys' fees and costs approved by the Court to Class Counsel.  (*See generally id.* ¶ 15(a).)  Settlement checks will be void after 90 days of issuance.  (*Id.* ¶ 15(b).)  Within 145 days of issuance of the initial settlement checks, the Settlement Administrator will send the second distribution of settlement checks (for unused, unapproved, or uncashed funds) to those Settlement Class Members who cashed their initial settlement check.  (*Id.* ¶ 15(e).)  To the extent any funds remain after the void date of the second round of settlement checks, they will be donated to the *cy pres* beneficiary.  (*Id.* ¶ 15(f).)

## III.    PRELIMINARY APPROVAL OF SETTLEMENT & NOTICE PLAN

On March 2, 2018, Plaintiffs sought preliminary approval of the settlement.  (Pls.' Mem. in Support of Prelim. Approval, Filing No. 815.)  On March 7, 2018, Plaintiffs amended that briefing to provide additional information and fix typographical errors.  (Pls.' Am. Mem. for Prelim. Approval, Filing No. 818.)  On March 8, 2018, the Court held a preliminary settlement approval hearing, where it expressed concerns about certain aspects of the proposed Settlement Agreement.  (*See* Order to Show Cause 1, Filing No. 823, at CM/ECF p. 1.)  In response, on March 16, 2018 Plaintiffs supplemented their briefing and revised the settlement agreement.  (Pls.' Supp. Mem. in Support of Prelim. Approval, Filing No. 821; *see* Order to Show Cause 1, Filing No. 823, at CM/ECF p. 1.)

On April 5, 2018, the Court issued an Order to Show Cause, requesting additional information regarding attorneys' fees, information about class member allocations and contact information, and suggested further revisions to the settlement agreement and notice process. (Order to Show Cause, Filing No. 823.)  On April 16, 2018, Plaintiffs responded, providing additional information and revisions to the settlement agreement.  (Pls.' Resp. to Show Cause Order, Filing No. 824.)

On May 9, 2018, the Court issued a Memorandum and Order sustaining Plaintiffs' motion for preliminary settlement approval, in part.  (Mem. & Order, Filing No. 829.)  In doing so, it ordered Class Counsel to identify class representatives to represent the interests of Settlement Subclasses, revise the settlement agreement to include issuance of a nationwide press release, and allow time for the Court to review the adequacy of the Settlement Postcard mailing prior to mailing the Notice of Settlement.  (*Id.* 8 n.2, 15–17.)  It also stated it could not determine whether the parties deem the settlement fair and reasonable until all the class representatives signed the settlement agreement.  (*Id.* 15.)  On May 21, 2018, Plaintiffs submitted a second supplemental memorandum in support of preliminary approval, which addressed the Court's concerns and included another revised settlement agreement.  (Pls.' 2d Supp. Mem. in Support of Prelim. Approval, Filing No. 832.)  At the same time, Plaintiffs sought approval of their settlement notice plan.  (Pls.' Mem. for Approval of Settlement Notice Plan, Filing No. 834.)

On June 4, 2018, the Court issued a Memorandum and Order to Show Cause ordering the parties to revise the settlement agreement and notice of settlement regarding the subclasses and allocations, and to submit briefing for the Rule 23 certification of the Settlement Subclasses. (Mem. & Order to Show Cause, Filing No. 836.)  On June 18, 2018, Plaintiffs filed a memorandum in support of certification of the Settlement Subclasses.  (Pls.' Mem. in Support of Mot. To Certify

Subclasses, Filing No. 840.)  On June 21, 2018, Plaintiffs filed the settlement agreement signed by all class representatives.  (Settlement Agmt., Filing No. 842–1.)

On June 27, 2018, the Court issued a Memorandum and Order approving Rule 23 class certification of the Settlement Subclasses.  (Mem. & Order, Filing No. 844.)  However, it ordered Class Counsel to more clearly define the Settlement Subclasses in the Notice of Settlement.  (*Id.*)

On June 28, 2018, the Court found that the final factor for preliminary approval was met with the addition of three Subclass Representatives and a settlement agreement signed by all class representatives.  (Mem. & Order, Filing No. 845.)  It also preliminarily approved the requested service payments of $250.00 to each to the three Settlement Subclass representatives.  (*Id.*)  On July 17, 2018, it issued a similar order, *Nunc Pro Tunc*.  (Mem. & Order, Filing No. 847.)

On July 17, 2018, the Court also issued a Memorandum and Order sustaining, in part, Plaintiffs' request for approval of the settlement notice plan.  (Mem. & Order, Filing No. 848.)  In doing so, it asked for revisions to the Notice of Settlement to identify where class members can obtain settlement information for free on the websites dedicated to the case.  (*Id.*)  On July 22, 2018, Plaintiffs filed the revised Notice of Settlement, (*see* 7.20.18 Notice of Settlement, Filing No. 849–1), and on August 1, 2018, the Court approved of the settlement notice plan.  (Mem. & Order, Filing No. 850.)

On August 28, 2018, Plaintiffs provided the Court with details about the Settlement Postcard mailing and requested permission to continue with the settlement notice process.  (Pls.' Mem. in Support of Mot. for Permission to Continue with Settlement Notice Plan, Filing No. 852.)  On August 31, 2018, the Court granted that motion and permitted the parties to send the Notice of Settlement.  (Order, Filing No. 853.)

IV.    **THE SETTLEMENT NOTICE PROCESS WAS SUCCESSFUL**

A.    **The Class Received Effective Notice Through Multiple Forms.**

1.    *Settlement Postcards*

On July 27, 2018, the Settlement Administrator mailed Settlement Postcards to 34,909 Settlement Class Members.  (*See* Mem. & Order 1, Filing No. 853, at CM/ECF p. 1.)  The Settlement Postcards permitted Settlement Class Members to update their contact information and informed them of the Notices of Settlement that would be forthcoming.  (*See id.*)  The mailing was a success, with Settlement Postcards reaching the mailing address of over 99% of the Settlement Class Members.  (*See id.*)  As a result, the Court gave the parties permission to continue with the notice process.  (Mem. & Order 2, Filing No. 853, at CM/ECF p. 2.)

2.    *Notices of Settlement*

On September 7, 2018, the Settlement Administrator mailed the Notices of Settlement to the 34,909 Settlement Class Members.  (Hughes Decl. ¶ 8, Ex. 13; *see* 8/2018 Notice of Settlement Template, Ex. 1.)

102 Notices of Settlement were returned as undeliverable for the first time on or before the November 6, 2018 deadline.  (Hughes Decl. ¶ 9, Ex. 13.)  The Settlement Administrator performed address traces on all of them.  (*Id.*)  The address trace utilizes the Settlement Class Member's name, previous address and Social Security Number for locating a current address.  (*Id.*)  Of the 102 traces performed, the Settlement Administrator obtained updated addresses for all but 15.  (*Id.*)  Of the 87 Notices of Settlement mailed to a more current address identified from the trace, 7 were returned as undeliverable a second time.  (*Id.*)  There were 23 additional undeliverable Notices of Settlement that were previously sent to trace during the Settlement Postcard mailing as their respective Settlement Postcard was returned as undeliverable.  (*Id.*)

14

Of the 45 undeliverable Notices of Settlement (15+7+23=45), Class Counsel was able to locate 9 updated addresses.  (*Id.* ¶ 10.)  The 9 updated addresses were found using Accurint or were confirmed via phone.  (*Id.*)  The Settlement Administrator promptly re-mailed Notices of Settlement to those 9 Settlement Class Members.  (*Id.*)  Class Counsel found that 6 of the 45 individuals with undeliverable addresses were deceased.  (*Id.*; Fisher Decl. ¶ 6.)  Beneficiary forms were promptly mailed to their next of kin.[14]  (Hughes Decl. ¶ 10, Ex. 13.)  Of the 45 undeliverable Notices of Settlement, Class Counsel was only unable to locate an updated address for 30 people.  (*Id.*)

541 Notices of Settlement were returned with a forwarding address attached and were either automatically forwarded by the post office to a new address, or promptly re-mailed by the Settlement Administrator to the Settlement Class Members.  (*Id.* ¶ 12.)

Since the Settlement Administrator mailed the Notices of Settlement, 670 Settlement Class Members contacted Class Counsel regarding their addresses.  (Fisher Decl. ¶ 6.)  211 confirmed that their address was correct, and 459 provided an updated address.  (*Id.*)  This is in addition to the 1,712 Settlement Class Members who previously contacted Class Counsel regarding their addresses in response to the Settlement Postcard mailing.  (*See* Pls.' Mem. for Permission to Continue With the Settlement Notice Plan 4, Filing No. 852, at CM/ECF p. 4.)  Class Counsel provided all the updated addresses to the Settlement Administrator.  (*See* Fisher Decl. ¶ 6.)

---

[14] The Settlement Administrator identified a total of 66 deceased Settlement Class Members and mailed beneficiary forms to their last known addresses.  The Settlement Administrator received 5 completed beneficiary forms from the following next of kin: Eric Bowman on behalf of Brittany Bowman, Mary Hazelton on behalf of Robert Hazelton, Consandra Jo Joyner on behalf of Decarlo Joyner, Luz Nereida Guzman Santana on behalf of Joseph M. Olivo Guzman, and Penelope Smith on behalf of Neal Smith.  (Hughes Decl. ¶ 11, Ex. 12.) Settlement funds will be sent to the last known address of the deceased, or to the next of kin, and to the extent they are not deposited, they will be reallocated to Participating Settlement Class Members. (Fisher Decl. ¶ 6; 5/2018 Settlement Agmt. 15(e), ECF No. 842–1, at CM/ECF p. 15.)

### 3.    *Posting on Websites*

Class Counsel maintains two websites with details about the settlement, one on their firm website (www.nka.com/case/sprintretailsettlement/) and the other on a neutral website (www.sprintretailsettlement.com). (*Id.* ¶ 7.) The websites contain information about the settlement, how to request exclusion or object, and how Settlement Class Members can update their contact information. (*Id.*) The websites also provide links to settlement related documents, including a spreadsheet with the settlement allocations for each Settlement Class Member. (*Id.*)

### 4.    *Email Notice*

On September 21, 2018, fourteen days after the Notice of Settlement mailing, Class Counsel sent an email to Settlement Class Members for whom they had collected an email address, notifying them of the settlement. (*Id.* ¶ 4.) This resulted in 9,870 emails being delivered. (*Id.*; Email Report, Ex. 2; Email Notice, Ex. 3.)

### 5.    *National Press Release*

On July 6, 2018, Class Counsel issued a nationwide press release regarding the settlement. (*See* Fisher Decl. ¶ 5; Press Release & Report, Ex. 5.)

### B.    Four Settlement Class Members Timely Requested Exclusion and Two Settlement Class Members Objected to the Settlement.

The Notice of Settlement provided instructions on how Settlement Class Members could object, or request exclusion from the settlement, by November 6, 2018. (*See* 8/2018 Notice of Settlement Template, Ex. 1.) Four Settlement Class Members requested exclusion: Eman Fakhori, Robert Gonzales, Brian Howard and Bret Larsen. (Hughes Decl. ¶ 13, Ex. 13.)[15] Two settlement

---

[15] The settlement allocations for the four Settlement Class Members who requested exclusion have since been reallocated to the Settlement Class Members with allocations greater than $0. (*See* 12/2018 Reallocations for First Check Distribution, Ex. 12.)

members objected to the settlement, James Williams and Jerome Daniels.  Mr. Williams' objection was timely received, whereas Mr. Daniels' objection was not mailed until November 20, 2018, which was after the deadline.  (Hughes Decl. ¶ 14; Williams Objection, Ex. 8; Daniels Objection, Ex. 9.)

In Mr. Williams' objection, he complained about his $0 damages allocation and that the Class Expert only performed a calculation for him for four months although he worked for Sprint for over a year.  (Williams Objection, Ex. 8.)  He explained he was a "legacy Nextel Store Manager[]", and described how he "managed 2 Legacy Nextel Retail stores from September 2005-May 2006, and then managed 1 store from May 2006 – August 2006." (*Id.*)  While Mr. Williams was indeed a store manager from July 5, 2005 to August 18, 2006, (*see* Williams Employment Detail, Ex. 10), "this case does not seek commissions related to sales entered through the Triversity legacy Nextel point-of-sale system, which was used in some stores after the merger and before those stores converted to the Sprint RMS point-of-sale system."  (*See* Notice, Filing No. 503–1; Notice, Filing No. 503–2.)  This is because the issues asserted in this case arose not with the Legacy Nextel commission system, but with the implementation of the Sprint system after the merger.  (*See generally* First Am. Compl. ¶ 3, Filing No. 8, at CM/ECF p. 2.)  The class, including Mr. Williams, was informed of this in early 2014.  (Order, Filing No. 504, at CM/ECF p. 1; Fisher Decl. ¶¶ 3, 13.)  Consistent with this limitation, Sprint produced the Sprint RMS point-of-sale data for Mr. Williams, which was from May 2006 to August 2006 (consistent with the dates Mr. Williams said he worked in the last store of his employment, and not the prior legacy Nextel stores), and the Class Expert found Mr. Williams was overall overpaid during that time:

| Employee UEID | Employee Name | Period | Month | Position | Class Member Damages (Under, Correctly & Overpaid) |
|---|---|---|---|---|---|
| 38488 | Williams,James B. | 147 | 6-May | RM-B | 379.27 |
| 38488 | Williams,James B. | 148 | 6-Jun | RM-B | 200.97 |
| 38488 | Williams,James B. | 149 | 6-Jul | RM-B | 204.85 |
| 38488 | Williams,James B. | 150 | 6-Aug | RM-B | -573.77 |
| | | | | | **211.32** |

(Fisher Decl. ¶ 13.)  Mr. Williams' objection is based on damages he seeks that are outside the scope of this case.

Jerome Daniel's objection is untimely.  In his letter, Mr. Daniels claims to have worked for Sprint at some point during the class period of August 12, 2005 through September 30, 2009 but does not specify when.  (Daniel's Objection, Ex. 9.)  He stated, "I 'Do' want to be included in this Class Litigation", but that his $25 allocation is an "insufficient net settlement share payment" and that he would like to be contacted by Class Counsel.  (*Id.*)  Sprint's Employee Status History reflects Mr. Daniels worked from May 17, 2005 to October 20, 2005, only the last two months of which are within the class period.  (Fisher Decl. ¶ 12)   The Class Expert found Mr. Daniels was shorted only $141.14 in commissions for those months.  (*Id.*)  Because this resulted in Mr. Daniels' *pro rata* share of the settlement being less than $25 ($22.15), he was allocated the $25 minimum under the settlement.  (5/2018 Settlement Allocations, Filing No. 832–1, at CM/ECF p. 125.)  Class Counsel tried to contact Mr. Daniels but could not reach him.  (Fisher Decl. ¶ 12.)

**V.   ATTORNEY TIME AND LITIGATION COSTS EXPENDED BY CLASS COUNSEL**

**A.   Attorneys' Time**

As of December 3, 2018, Class Counsel has expended more than 40,527.33 hours on this case.  (Fisher Decl. ¶ 8.)[16]  A summary of the hours is below:

| Name | Hours | Rate | Total |
|---|---|---|---|
| Michele Fisher (Partner) | 6,466 | $550.00 | $3,556,300.00 |
| Paul Lukas (Partner) | 3,797.1 | $650.00 | $2,468,115.00 |
| Alex Baggio (Associate) | 4,946.9 | $375.00 | $1,855,087.50 |
| Charles Frohman (Associate) | 2,753.3 | $375.00 | $1,032,487.50 |
| Rebekah Bailey (Partner) | 1,403.6 | $450.00 | $631,620.00 |
| Donald Nichols (Partner) | 459.6 | $600.00 | $275,760.00 |
| Robert Schug (Partner) | 95.62 | $475.00 | $45,419.50 |
| Doc. Review & Research Attorneys | 11,337.31 | $250.00 | $2,834,327.50 |
| Staff | 9,267.90 | $175.00 | $1,621,882.50 |
| **Total:** | **40,527.33** | | **$14,320,999.50** |

(*Id.*)

Based on Class Counsel's hourly rates, the reasonable value of this time (on a lodestar basis) is $14,320,999.50.  (*Id.*)  The requested fee of $7,014,250.00 (approximately 23% of the common fund) is substantially less.  The hours Class Counsel and their staff dedicated to this case included many tasks, such as investigating claims, interviewing and communicating with class members, preparing and responding to discovery, preparing for taking and defending depositions, analyzing data, damages, and documents, working with and meeting with experts, drafting and responding to motions, responding to a motion for interlocutory appeal, hearings, travel, file organization and management, legal research, management of the client database and data, case strategy, and mediation.  (*Id.* ¶ 9.)

---

[16] Class Counsel also retained Stueve Siegel Hanson LLP as local counsel.  Their time was minimal, so is not included.  (Fisher Decl. ¶ 8.)

Finally, at the Court's request, Class Counsel previously provided affidavits from five other attorneys with similar qualifications and experience to support Class Counsel's rates, cited other cases supporting their rates, and submitted an accounting of bills that were invoiced and paid by hourly clients of Class Counsel's law firm.  (*See* Pls.' Resp. to Order to Show Cause 1–4, Filing No. 824, at CM/ECF p. 3–6.)  Class Counsel also provided details about their experience and qualifications to support their rates.  (Fisher Decl.  ¶¶ 7–16, Filing No. 818–1, at CM/ECF p. 3–7.)

**B.     Litigation Costs**

At the time of briefing preliminary approval of the settlement, Class Counsel had spent $6,449,293.12 in costs to prosecute this case and anticipated spending $123,854.04 more (most of which was for outstanding expert invoices), for a total of $6,573,147.16 in requested costs reimbursement.  (*See* Fisher Decl. ¶ 18, Filing No. 818–1, at CM/ECF p. 7–8.)  Since then, Class Counsel has incurred more than what was estimated for future costs, but only seek reimbursement for the $6,573,147.16 in costs previously requested at preliminary approval.  (*See* Fisher Decl. ¶ 10 (showing $48,502.28 more in costs expended than sought); 12/2018 Costs Detail, Ex. 4.)  A summary of costs expended is below:

| Costs at Preliminary Approval | |
|---|---:|
| Printing | $25,650.03 |
| Advertising | $4,184.87 |
| Photocopies | $21,616.04 |
| Postage Mailings | $59,163.67 |
| Travel | $269,716.26 |
| Depositions/Transcripts | $84,146.89 |
| Balance Engines | $4,235,230.40 |
| Margaret Dunham | $1,092,515.20 |
| Federal Express/Courier | $12,281.93 |
| Court Costs | $1,436.67 |
| Office Supplies | $372.10 |

| | |
|---|---|
| Conference Calls | $1,777.94 |
| Equipment/Software | $33,942.47 |
| Westlaw | $11,249.80 |
| Pacer | $1,165.92 |
| FOIA | $339.35 |
| Mock Trial | $33,046.40 |
| Press Release/PR News | $2,070.00 |
| Special Master | $83,236.63 |
| Technical Advisor | $449,451.85 |
| Miscellaneous | $1,443.70 |
| Technical Support | $255.00 |
| Mediation | $25,000.00 |
| **Total** | **$6,449,293.12** |
| **Costs Post-Preliminary Approval** | |
| Photocopies | $207.69 |
| Postage | $0.47 |
| Travel | $1,747.79 |
| Transcript | $27.45 |
| Balance Engines | $110,629.31 |
| Westlaw | $484.42 |
| Lexis Nexis | $1,337.75 |
| Pacer | $37.40 |
| Federal Express | $212.94 |
| Press Release/PR News | $2,335.00 |
| Technical Advisor | $29,734.88 |
| Sibley/Harlow Postcard Mailing | $24,638.00 |
| Miscellaneous | $413.00 |
| Hotel Final Approval | $258.00 |
| Cab/Meals Final Approval | $175.00 |
| Expert Closing Costs | TBD |
| Web Domain Charges | $117.22 |
| **Total Add'l Costs** | **$172,356.32** |
| **Grand Total** | **$6,621,649.44** |

(Fisher Decl. ¶ 10; 12/2018 Costs Detail, Ex. 4.)  An itemization of costs is provided for the Court

as well.  (*See* 12/2018 Costs Detail, Ex. 4.)

# ANALYSIS

## I.   FINAL APPROVAL SHOULD BE GRANTED BECAUSE THE SETTLEMENT IS FAIR AND REASONABLE.

Under Rule 23, court approval is required for the settlement of a certified class. Fed. R. Civ. P. 23(e). This typically involves a two-step process. *See In Re Motor Fuel Temperature Sales Practices Litig.*, 286 F.R.D. 488 (D. Kan. 2012). The first step is a preliminary evaluation of the fairness, reasonableness, and adequacy of the proposed settlement. *See In Re Motor Fuel Temperature Sales Practices Litig.*, 258 F.R.D. 671, 675 (D. Kan. 2009). At the first stage, the court makes a preliminary evaluation of the fairness of the proposed settlement and determines whether it has any reason to not notify the class of the settlement or to not hold a fairness hearing. *In re Motor Fuel*, 286 F.R.D. at 492. If the court grants preliminary approval, it directs notice to class members and sets a hearing at which it will make a final determination on the fairness of the class settlement. *Id.*

The Tenth Circuit applies a four-factor test to determine whether a class action settlement is fair, reasonable, and adequate. *See Rutter & Wilbanks Corp. v. Shell Oil Co.*, 314 F.3d 1180, 1188 (10th Cir. 2002). These factors include:

> (1) whether the proposed settlement was fairly and honestly negotiated;
>
> (2) whether serious questions of law and fact exist, placing the ultimate outcome of the litigation in doubt;
>
> (3) whether the value of an immediate recovery outweighs the mere possibility of future relief after protracted and expensive litigation; and
>
> (4) the judgment of the parties that the settlement is fair and reasonable.

*Id.* The court previously found these factors to be met for preliminary approval and settlement notice, and now reviews those factors to assess the fairness of the settlement for final approval. Because the settlement here satisfies all four factors, the Court should grant final approval.

22

A.    **The Settlement Was Negotiated Fairly and Honestly.**

There should be no question that the settlement was negotiated fairly and honestly.  The parties litigated for over ten years, zealously advocating for their clients. (Mem. & Order 12 (stating "Counsel for each party have class action experience and zealously defendant their respective clients' interest for more than a decade."), Filing No. 829, at CM/ECF p. 12.)

The parties attempted mediation with a private mediator five times without success.  It was not until Judge Crabtree offered his mediation services that the parties finally reached an arm's length settlement through the help of this well-respected and neutral federal judge.  *See, e.g.*, *In Re Crocs, Inc. Sec. Litig.*, 306 F.R.D. 672, 679, 689 (D. Colo. 2014) (approving settlement and noting parties engaged in extensive negotiations and mediation sessions before a retired district court judge).  Accordingly, the settlement is entitled to a presumption of fairness.  *See Marcus v. Kansas Dep't of Revenue*, 209 F. Supp. 2d 1179, 1182 (D. Kan. 2002) ("When a settlement is reached by experienced counsel after negotiations in an adversarial setting, there is an initial presumption that the settlement is fair and reasonable.").

B.    **There Are Disputed Questions of Fact and Law that Made the Outcome of the Litigation Uncertain.**

It was reasonable for the parties to reach a settlement because there are disputed questions of fact and law that made the outcome, and the timeframe for a post-appeal resolution, uncertain.  Both parties prevailed in part with respect to their motion practice; accordingly, significant issues of liability and damages remained for trial and appeal.

With respect to trial, the primary issue for liability and damages was whether Sprint overall underpaid each class member commissions under the terms of the operative commission plans.

The jury's decision would rely heavily on the parties' respective expert methodologies.[17]   Trial would have lasted many weeks, perhaps even months, with much of that time consumed with mind numbing and complex technical expert testimony.   As noted by the Court, "Plaintiffs' experts calculated a net underpayment of more than $95 million, while Sprint contended that it overpaid the class members more than $75 million." (Mem. & Order 12, Filing No. 829, at CM/ECF p. 12.) There is no way of knowing whether the jury would find Plaintiffs met their burden of establishing liability by a preponderance of the evidence, and, if so, the amount of damages that would have been awarded.

If liability was found and if there was an award, the jury would also have to decide if Sprint's conduct was willful to award penalties under the KWPA, which was an issue Plaintiffs were unable to establish at the summary judgment stage in *Sibley* and most likely would have been the result here as well.  (*See* 2d Summ. J. Report 14, Filing No. 712, at CM/ECF p. 14.) Post-trial, the Court would have to decide whether pre-judgment interest was appropriate under the KWPA, K.S.A. § 44–323, which the parties also disputed.  *Compare Edward Kraemer & Sons, Inc. v. City of Overland Park*, 880 P.2d 789, 796 (Kan. Ct. Pa. 1994) (affirming award of prejudgment interest on liquidated amount) and *Royal Coll. Shop, Inc. v. N. Ins. Co. of N.Y.,* 895 F.2d 670, 674 (10th Cir. 1990) (affirming denial of prejudgment interest on contested damages).

In addition to the uncertainty of trial, several unsettled legal issues remained that would emerge post-trial.  Sprint contended in its motion to dismiss that the KWPA cannot apply to class members who did not live or work in Kansas.  While the Court rejected that argument, Sprint maintained its right to appeal.  Next, Sprint contested the Court's orders granting class

---

[17] The parties also planned to bring motions in limine and Sprint sought to compel Plaintiffs to provide a more complete "trial plan."  (9/1/2017 Hearing Tr. 69–74, Filing No. 815–4, at CM/ECF p. 70–75.)

certification and denying decertification, twice attempting interlocutory appeal. Sprint also disputed Plaintiffs' experts satisfied *Daubert's* reliability standards. Additionally, Sprint disputed the Court's ruling in Plaintiffs' favor on summary judgment, such as the meaning of certain contractual provisions and the dismissal of several of its defenses. Sprint would have pursued these arguments post-trial on appeal. Sprint also contended that thousands of class members previously released their claims and should be dismissed. (Defs.' Offer of Proof, Filing No. 770, at CM/ECF p. 1.) That motion was pending at the time of settlement, and settlement permits those class members to remain in the Settlement Class.

Given these uncertainties, and the risk of continued litigation and appeal, it was reasonable and prudent for the parties to settle this matter now.

### C. The Value of the Recovery Outweighs the Mere Possibility of Future Relief After Protracted and Expensive Litigation.

The value of the recovery, when weighed against the possibility of future relief after further litigation, also favors settlement approval.

In granting preliminary approval of the settlement, the Court recognized the importance of the immediate recovery provided by this settlement compared to any potential future relief. It discussed the wide variance between the expert damage calculations and how this exacerbated the unpredictability of a potential jury verdict, making it difficult to determine Plaintiffs' likelihood of success on the merits or to predict Plaintiffs' potential recovery at trial. (*See* Mem. & Order 13, Filing No. 829, at CM/ECF p. 13.) The Court has expressed concern as to whether a jury could even understand the complexities of the expert methodologies, or if the jury would be forced to simply guess which expert was correct. (*See id.*)

The Total Settlement Amount of $30,500,000.00 equals approximately 32 percent of what Plaintiffs' experts calculated Sprint underpaid the class. While there is a possibility the class could

have recovered more at trial, there is also a distinct possibility the jury would have awarded them less, or nothing at all.  The settlement is the equivalent of $1,002.40 on average per Settlement Class Member.  While that number decreases to an average of $545.91 after fees and costs reimbursements, an award at trial would be similarly subject to reduction.  This is because neither the KWPA nor the Kansas breach of contract claims provide the right to an additional award for attorneys' fees for prevailing plaintiffs at trial.  *Compare* *Shelley v. State, Dep't of Human Res.,* *8 P.3d 33, 27 Kan. App. 2d 715 (Kan. Ct. App. 2000)* (the KWPA "makes no provision for attorney fees for a private cause of action") *with* Minn. Stat. § 181.171 (remedial provision of the Minnesota wage statutes allowing for the recovery of attorneys' fees).  Furthermore, if the case went to trial Class Counsel would have been entitled to 33% of any recovery, plus costs, whereas in settlement Class Counsel has voluntarily reduced their requested fee to 23%.

A settlement now prevents significant litigation costs from continuing to accrue.  There is no question that due to the nature and complexity of the issues and the data involved, this case was expensive to litigate.  In addition to the typical costs such as filing fees, copies, class mailings, transcripts, travel, etc., it required regular attention from experts throughout the case and included the expense of the Special Master and Technical Advisor who worked on the case for over three and a half years.  The experts were involved, among other things, in discovery, the Stage 3 data production, building and revising their respective methodologies to process numerous disparate data sets, issuing multiple reports, analyzing and critiquing the other expert's methodologies and reports, participating in expert and witness depositions, and attending several expert meetings, meetings with counsel, court hearings, and mediations.  The expense for these professionals would have continued through a lengthy trial and likely beyond.  All these out-of-pocket expenses, plus the anticipated costs typical of a trial such as this one would have reduced the value of any potential

jury award.  It was prudent to cut off these mounting costs by reaching a settlement.

Further, any jury verdict would be subject to many years of appeal.  Complex litigation "can occupy a court's docket for years on end, depleting the resources of the parties and taxpayers while rendering meaningful relief increasingly elusive." *In re U.S. Oil & Gas Litig.*, 967 F.2d 489, 493 (11th Cir. 1992).  By entering into a settlement now, the parties saved additional time and costs, and avoided the risks associated with further litigation.

> **D.      The Parties Deem the Settlement to be Fair and Reasonable.**

The final settlement factor—the judgment of the parties—supports approval.  First, the reaction of the class to the settlement supports approval.  All nine class representatives and the three Settlement Subclass representatives signed the Settlement Agreement.  Just four Settlement Class Members requested exclusion.  While two Settlement Class Members objected to the settlement, one sought compensation for sales that are outside the scope of the case, and the other's objection was too vague to challenge the reasonableness of the settlement for the two months he worked within the class period.  *See In Re Sprint Corp. ERISA Litig.*, 443 F. Supp.2d 1249, 1263 (D. Kan. 2006) (overruling objection that was outside the scope of allegations in case); Fed. R. Civ. P. 23(e)(5) (objectors "must state with specificity the grounds for the objection.").

Second, Class Counsel, who has zealously litigated this case for many years, finds the settlement to be reasonable.  *See Ingram v. The Coca-Cola Co.*, 200 F.R.D. 685, 691 (N.D. Ga. 2001) (explaining the court should "hesitate to substitute its own judgment for that of counsel.") (quoting *Warren v. City of Tampa*, 693 F. Supp. 1051, 1060 (M.D. Fla. 1988)); *see also In re BankAmerica Corp. Secs. Litig.*, 210 F.R.D. 694, 702 (E.D. Mo. 2002).

Third, the fact that an active district court judge oversaw the settlement negotiations further weighs in favor of approval.

## II.   THE ATTORNEYS' FEES SOUGHT ARE REASONABLE.

Class Counsel respectfully seeks attorneys' fees in the amount of $7,014,250.00.   As discussed below, the requested fees are reasonable and should be approved.

### A.   Standard for Award of Attorneys' Fees.

It is well established that when counsel obtain a common fund settlement on behalf of a class, they may seek a reasonable attorneys' fee from the fund as a whole. *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980); *Rosenbaum v. MacAllister*, 64 F.3d 1439, 1444 (10th Cir. 1995).  In common fund cases, courts typically apply one of two methods to determine reasonable attorney's fee awards: the "percentage of the fund" method, or the "lodestar" method. *Rosenbaum*, 64 F.3d at 1445.  Although Class Counsel's fee request is reasonable under either method, the Tenth Circuit has expressed a preference for the percentage method. *Id.* (citing *Gottlieb v. Barry*, 43 F.3d 474, 483 (10th Cir. 1994)).

The Tenth Circuit utilizes a hybrid approach to the percentage method, which combines the percentage-of-the-fund analysis with the factors traditionally used to calculate the lodestar (hereinafter, the "*Johnson* factors"). *See In Re Motor Fuel Temperature Sales Practices Litig.*, 2016 WL 4445438, at *2 (D. Kan. Aug. 24, 2016) (citing *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974)).  The *Johnson* factors require the Court to consider the following in determining the reasonableness of a fee request, as applicable: (1) the time and labor required; (2) the novelty and difficulty of the questions presented in the case; (3) the skill required; (4) the preclusion of other employment by the attorneys due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) any time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the

professional relationship with the client; and (12) awards in similar cases." *Rosenbaum*, 64 F.3d at 1445 n.3. All the *Johnson* factors applicable to this case[18] support the requested fee.

**B.     The Attorneys' Fee Request Should Be Approved.**

> ***1.     Class Counsel Expended Considerable Time and Labor on Behalf of the Class.***

Courts consider the time and labor required to litigate on behalf of the class (the first *Johnson* factor). This factor supports that the requested fee of $7,014,250.00 is reasonable.

The Court recognized the significant time and labor this case demanded. It explained that litigating this complex case "has not been cheap or fast." (9/1/2017 Hearing Tr. 79, Filing No. 815–4, at CM/ECF p. 79.) It took six years of extensive factual and expert related discovery and motion practice before the parties had their first dispositive motion hearing. Even then, the Court found the case was too complicated for a ruling and engaged the assistance of a Special Master and Technical Advisor. While that was a valuable decision, it added over three years of additional time and significant expenses, and as the Court concisely put it: "hard work" by the parties. (*Id.*)

Class Counsel expended more than 40,527.33 hours prosecuting this action, which equates to a lodestar of $14,320,999.50 of attorney and staff time. As previously mentioned, the hours Class Counsel and their staff worked on this case included many tasks, such as investigating claims, interviewing and communicating with class members, preparing and responding to discovery, preparing for taking and defending depositions, analyzing data, damages, and documents, working with and meeting with experts, expert reports, preparing for and meeting with clients, drafting and responding to numerous non-dispositive and dispositive motions, responding to motions for interlocutory appeal, preparing and responding to objections to reports and

---

[18] The seventh factor—time limitations—does not really apply here, although this case has consumed over a decade of time.

recommendations, meetings with the Special Master and Technical Advisor, hearings, travel, file organization and management, legal research, management of client database and data, case strategy and trial preparation, and mediation.

The significant effort Class Counsel and their staff invested was crucial to the case's success. Class Counsel engaged in extensive briefing on complex issues, prevailing in part on Sprint's motion to dismiss, prevailing in part on Plaintiffs' motion for summary judgment with respect to the meaning of several important contractual provisions and on certain of Sprint's defenses, on class certification and Sprint's motion for decertification, and survived Sprint's attempt to disqualify the class's experts. The quality of the briefing and the development of the record for the motions took significant time, skill and effort by Class Counsel and their staff.

There should be no question that Class Counsel expended considerable time and valuable effort effectively litigating this case.

### 2. The Case Presented Difficult and Novel Questions and Required Skilled and Experienced Counsel.

The second, third, and ninth factors—the novelty and difficulty of the questions presented, the skill required, and the experience, reputation, and ability of counsel, are necessarily intertwined and demonstrate the reasonableness of the requested fee.

Class actions are inherently complex. *Johnson v. Brennan*, 2011 WL 4357376, at *17 (S.D.N.Y. Sept. 16, 2011) (explaining wage and hour cases involve complex legal issues). Compared to individual cases, class actions by their very nature involve unique procedural hurdles, more extensive discovery, and larger stakes. Several factors made this case so complex that it required skilled and dedicated class action counsel. First, it required intensive work with data experts over many years to understand Sprint's commission plans, data, and systems, and to develop a methodology to reconcile commissions for each class member. This involved time

consuming discovery, review of volumes of Sprint's technical documents and data, analysis of Sprint's data and plans, and working on the damages calculations through many years of refinements. It also involved preparing for, attending, and presenting at, hearings with the Special Master and Technical Advisor on this complex subject matter and preparing their experts to do the same. The Special Master correctly characterized the hearings as "a massive amount of very difficult work from everybody." (Tr. 134, Filing No. 616–72, at CM/ECF p. 35.) Notably, Class Counsel funded this costly expert work and ensured their experts remained engaged through routine calls and meetings during an extremely lengthy process. The subject matter was difficult to understand, with Class Counsel demonstrating the ability to manage and present it.

Second, the case involved novel issues of contract interpretation specific to Sprint's commission plans that hinged on statutory and common law arguments with little to no case law directly on point, and summary judgment briefing by both parties.

Third, whether the case should remain certified for trial was complex and a constant area of dispute between the parties in their briefing on many motions, not just the certification and decertification motions. Class Counsel successfully navigated that topic, keeping the Rule 23 class certification intact for trial.

Indeed, the Court recognized the complexity when it appointed a Special Master, and subsequently a Technical Advisor, to assist six years after the case started. It explained that the ultimate issue, whether Sprint's systems caused it to pay accurate amounts to the class, was "highly technical and complex" subject matter that "depends heavily on expert testimony." (Order of Appt. 2, Filing No. 532, at CM/ECF p. 2.) The Special Master also confirmed this in his report on Sprint's decertification motion. (Decert. Report 3–4, 6–15 (describing the complexity of the commission plans, data, and systems), Filing No. 663, at CM/ECF p. 3–4, 6–15.) The Court

commented on the difficult nature of the case when it commended the parties for "putting their shoulder to the wheel and really putting in some very hard work." (9/1/2017 Hearing Tr. 4–5, Filing No. 815–4, at CM/ECF p. 5–6.) The Court stated that it knew it would be "expensive and very time-consuming" but that the parties' work resulted in "light years of progress" toward understanding the issues. (*Id.*)

In sum, given the difficulties involved and skill required to litigate this case, and the novelty of the claims, legal arguments, and expert analyses, the fee sought is reasonable.

### 3.     *The Requested Fee is Customary and Reasonable.*

The fifth and twelfth *Johnson* factors—the customary fee and awards in similar cases—demonstrate the reasonableness of the requested fee. As discussed above, Class Counsel's requested fee of $7,014,250,00 is approximately 23% of the common fund, which Class Counsel voluntarily reduced from the 33% contemplated in the contingency fee agreement with the class representatives.

"The customary fee awarded to class counsel in a common fund settlement is approximately one third of the total economic benefit bestowed on the class." *Shaw v. Interthinx, Inc.*, 2015 WL 1867861, at *6 (D. Colo. Apr. 22, 2015) (quoting *Lucken Family Ltd. P'shp, LLP v. Ultra Res., Inc.*, 2010 WL 5387559, at *6 (D. Colo. Dec. 22, 2010)). Courts in this district, including this Court, have recognized that a request of at least one-third of the common fund falls within the customary range awarded in class action settlements. *See, e.g.*, *Shaulis v. Falcon Subsidiary LLC*, 2018 WL 4620388, at 1 (D. Colo. Sept. 26, 2018) (approving 33.33% fee as reasonable under common fund method and stating it is consistent with rule followed by courts in Tenth Circuit); *Cook v. Rockwell Int'l Corp.*, 2017 WL 5076498, at *1–2 (D. Colo. Apr. 28, 2017) (explaining forty percent fee falls within acceptable range in Tenth Circuit, and awarding

32

$150,000,000 in fees for case litigated for three decades); *Hoffman v. Poulsen Pizza LLC*, 2017 WL 25386, at *8 (D. Kan. Jan. 3, 2017) (wage case noting one-third is customary); *Shaw*, 2015 WL 1867861, at *6 (approving one-third fee and stating "other courts have similarly recognized that '[t]he percentages awarded in common fund cases typically range from 20 to 50 percent of the common fund created [,]'"); *Williams v. Sprint/United Mgmt. Co.*, 2007 WL 2694029, at *6 (D. Kan. Sept. 11, 2007) (approving 35% fee in employment class action); *Cimmaron Pipeline Const., Inc., v. Nat'l Council on Compensation Ins.*, 1993 WL 355466, at *2 (W.D. Okla. June 8, 1993) (recognizing fees in the range of 30 to 40% are common in complex contingent fee cases); *see also Lengel v. HomeAdvisor, Inc.*, No. 15-2198-KHV, Order 4 (approving fees for Nichols Kaster attorneys in a consumer case of one-third) (D. Kan. Oct. 31, 2017), Filing No. 815–7; *In Re Motor Fuel*, 2016 WL 4445438, at *9 (D. Kan. Aug. 24, 2016) (explaining courts routinely award attorneys' fees ranging from 20 to 30% of settlement funds).

Moreover, courts in other districts routinely award attorneys' fees of one-third of the common fund in wage cases. *See, e.g., Netzel v. West Shore Group, Inc.*, 2017 WL 1906955, at *8–9 (D. Minn. May 8, 2017) (approving 33.33% request from Nichols Kaster, and collecting cases where percentage approved was consistent, or more than one-third); *Torres v. Gristede's Op. Corp.*, 519 F. App'x 1, 5 (2d Cir. 2013) (affirming attorney's fee of 52.2% of $7.39 million total recovery wage case); *Beckman v. KeyBank, N.A.*, 293 F.R.D. 467, 481 (S.D.N.Y. Apr. 29, 2013) (noting 33% recovery was consistent with the norms of class litigation in the Second Circuit); *Burkholder v. City of Fort Wayne*, 750 F. Supp. 2d 990, 997 (N.D. Ind. 2010) (finding 33.3% reasonable in wage case); *Yarrington v. Solvay Pharm., Inc.*, 697 F. Supp. 2d 1057, 1064–65 (D. Minn. 2010) (collecting cases and granting award of 33%); *Faican v. Rapid Park Holding Corp.*, 2010 WL 2679903 (E.D.N.Y. July 1, 2010) (approving 33 1/3% in wage action); *Clark v. Ecolab,*

*Inc.*, 2010 WL 1948198, at *9 (S.D.N.Y. May 11, 2010) (approving attorneys' fees of one-third in wage case).

Class Counsel's fee request of approximately 23% is at the low end of the customary range approved by this Court and others. Furthermore, the $7,014,250.00 fee requested is less than half of the $14,320,999.50 in time Class Counsel expended. Thus, unlike cases where attorneys are routinely requesting a lodestar multiplier, here Class Counsel seeks fees that are significantly less than their lodestar. *See In Re Motor Fuel*, 2016 WL 4445438, at *9 (approving settlement where lodestar cross check demonstrated fees sought were significantly less than value of hours expended); *see generally Shaulis*, 2018 WL 4620388, at *2 (explaining courts routinely approve lodestar multiplier in complex common fund cases). On these facts, the Court should find the requested fee to be reasonable.

With respect to the hourly rates from which the value of the lodestar was derived, courts often look "to the prevailing market rates in the relevant community." *Blum v. Stenson*, 465 U.S. 886, 895 (1984); *Case v. Unified Sch. Distr. No. 233, Johnson Cty., Kansas*, 157 F.3d 1243, 1256 (10th Cir. 1998). However, when special skills are required for litigation, the market for reasonable hourly rates may be expanded beyond the area where the district court resides. *See, e.g., Jeffboat LLC. v. Director, Office of Workers' Comp Programs*, 553 F.3d 487, 490 (7th Cir. 2009) (holding that it is appropriate to view a relevant community as a community of practitioners, particularly when "the subject matter of the litigation is one where the attorneys practicing are highly specialized and the market for legal services in that area is a national market."). In addition, the Court previously requested, and Plaintiffs provided, support from attorneys in the Minneapolis, Minnesota community where Class Counsel resides. When viewed from any one of the benchmarks, the rates for Class Counsel are reasonable for lodestar cross check purposes.

Class Counsel's firm, Nichols Kaster, PLLP, is a nationally recognized plaintiffs' firm that has existed for over forty years and is focused on advocating for employee and consumer rights. (*See* Pls.' Am. Mem. for Preliminary Approval 27, Filing No. 818, at CM/ECF p. 30.)  With offices in Minneapolis, Minnesota and San Francisco, California, the firm has represented thousands of workers in hundreds of cases.  (*Id.*)  As their qualifications demonstrate, Class Counsel is highly skilled in handling major complex litigation and has extensive experience litigating wage and hour class actions.  (*Id.* 27–30.)

Rates like those of Class Counsel, set forth in Section V.A, *supra*, have been approved in this district and are commensurate with Class Counsel's experience and national wage and hour class action practice.  *See, e.g.*, *Hoffman v. Poulsen Pizza LLC*, 2017 WL 25386, at *6–7 (D. Kan. Jan. 3, 2017 (approving rates of $600 for managing partner, $450 for attorney with 23 years of experience when 7 of those years were concentrated on class and collective actions); *In Re Bank of Am. Wage and Hour Employment Litig.*, 2013 WL 6670602, at *3 (D. Kan. Dec. 18, 2013) (approving blended hourly rate for lodestar crosscheck of $488 as reasonable); *Garcia v. Tyson Foods, Inc.*, 2012 WL 5985561, at *3–4 (D. Kan. Nov. 29, 2012) (approving rates ranging from $325 to $600 for attorneys and $125 to $175 for staff), *aff'd* 770 F.3d 1300 (10th Cir. Aug. 19, 2014).

Courts in other districts have also approved hourly rates similar to, or higher, than those here, providing further support to the reasonableness of Class Counsel's rates.  *See, e.g.*, *Barbosa v. Cargill Meat Sols. Corp.,* 297 F.R.D. 431, 452 (E.D. Cal. 2013) (awarding between $280 and $560 per hour for attorneys with two to eight years of experience, and $720 per hour for attorney with 21 years of experience); *Gong-Chun v. Aetna Inc.*, 2012 WL 2872788, at *23 (E.D. Cal. July 12, 2012) (awarding between $300 and $420 per hour for associates, and between $490 and $695

per hour for senior counsel and partners).  Just last year, a court specifically approved Class Counsel's rates in another wage and hour as well.  *See, e.g.*, *McCulloch v. Baker Hughes*, 2017 WL 5665848, *8 (E.D. Cal. Nov. 27, 2017) (approving rate of $525 for Fisher, and $350 for associate with six years of experience); *see generally* *Walls v. JPMorgan Chase Bank, N.A.*, 2016 WL 6078297, at *5 (W.D. Ky. Oct. 14, 2016) (concluding that Nichols Kaster's hourly rates are "commensurate with market rates and the attorneys' skill and experience" in consumer class actions).

Notably, Minnesota courts have recognized the reputation of Nichols Kaster, PLLP, which further supports the rates requested. As the court in *Netzel* acknowledged when approving a settlement reached by Class Counsel Paul Lukas and Alex Baggio, "other Courts in this District . . . have previously noted that the Nichols Kaster firm is well known for its experience in wage and hour litigation, and the Courts have found the firm competent and capable of representing a class or collective." 2017 WL 1906955, at *6 (finding Nichols Kaster "possesses sufficient experience to fairly and adequately represent [p]laintiffs in reaching a fair and equitable settlement agreement") (citing *Burch v. Qwest Comm. Int'l, Inc.*, No. 6-cv-3523 (MJD/AJB), Dkt. Nos. 520, 521 (D. Minn. Sept. 14, 2012); *Seipel v. Safety Signs, Inc.*, No. 15-cv-71 (JRT/LIB), Dkt. No. 64 (D. Minn. Aug. 27, 2015); *Bryana Bible v. General Revenue Corp.*, No. 12-cv-1236 (RHK/JSM), Dkt. No. 77 at 3 (D. Minn. Jan. 7, 2014)).  In *Mayfield-Dillard v. Direct Home Health Care, Inc.*, a district court in Minnesota described Class Counsel Michele Fisher as "highly competent and reputable." *See Dillard* Order at 15, Filing No. 824–19, at CM/ECF p.16; *see also Monroe v. FTS USA, LLC*, 2014 WL 4472720, at *11 (W.D. Tenn. July 28, 2014) (finding rate of $175 for support staff reasonable, and approving then current rates four years ago of $600 for Donald Nichols, $550 for Paul Lukas, and $450 for Michele Fisher).  As one court in Minnesota explained, it is also fair

to consider the contingency nature of the case and the quality of the work performed when approving rates.  *See Roeser v. Best Buy Co., Inc*, 2015 WL 4094052, at *12 (D. Minn. July 7, 2015) (approving rates of $775 and $780).  Moreover, pursuant to the Court's request, Class Counsel submitted declarations from five other Minnesota attorneys further supporting the reasonableness of Class Counsel's rates.  (*See* Pls.' Resp. to Order to Show Cause 2, Filing No. 824, at CM/ECF p. 4.)

Lastly, and also at the Court's request, Class Counsel submitted for *in camera* review, an accounting of bills that were invoiced and paid by hourly clients of the Nichols Kaster, PLLP firm. (*See id.* 4.)

Because the requested fee is reasonable both under the percentage of the common fund approach and under a lodestar cross-check, is lower than the fee customarily approved, and is less than half of the fees expended, the attorneys' fees sought should be approved as reasonable.

### 4.    *Class Counsel Undertook Significant Risk Litigating This Expensive and Lengthy Case on a Contingent-Fee Basis.*

The requested fee is even more reasonable considering the risks Class Counsel assumed in undertaking the representation on a contingent fee basis (the sixth *Johnson* factor).  Class Counsel did not receive any payment for the enormous task they undertook that consumed many years of their practice, nor did they receive reimbursement for close to the over $6.5 million in litigation costs they advanced in this case, or the nearly $1 million in costs they advanced in *Harlow*. Accordingly, Class Counsel alone bore the financial risk of unsuccessful litigation, advancing significant funds with a real risk of nonpayment.[19]  Class Counsel should be compensated for

---

[19] The expense and duration of the case also relate to the tenth and eleventh *Johnson* factors—the "undesirability" of the case, and the nature and length of the professional relationship with the client.

shouldering this risk on behalf of the class.  *See Pointer v. Bank of America, N.A*, 2016 WL 7404759 at *15 (E.D. Cal. Dec. 21, 2016) ("[C]ourts have long recognized the public policy of rewarding attorneys for accepting contingent representation in appropriate cases."); *see also In Re Motor Fuel*, 2016 WL 4445438, at *9 (recognizing the risk of contingency fee work in large class actions).

### 5.    *This Case Precluded Class Counsel from Taking on More Matters.*

The fourth factor, preclusion of other employment, supports the fee request.  As reflected in the hours summary, Class Counsel dedicated significant time and resources to litigating this case for over ten years, in addition to *Harlow* for ten years.  Notably, these cases occupied time from several attorneys at the firm.  Further, the advancement of substantial costs in both the retail and business channel cases, was invariably a financial drain on the firm, and detracted from Class Counsel's ability to take on and expend financial resources on other matters they might otherwise pursue.  (*See* Fisher Decl. ¶ 19, Filing No. 818–1, at CM/ECF p. 8.)  This factor weighs in favor of approval of the requested fee.

### 6.    *Class Counsel Obtained a Fair Result on Behalf of the Class.*

The "amount involved and the results obtained"—the eighth *Johnson* factor—supports the requested fee, as the settlement provides a fair result when measured against the possible outcomes had the case proceeded to trial.

When evaluating the reasonableness of attorneys' fees, "the most critical factor is the degree of success obtained." *Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983).  The Class Expert calculated monthly commission shortages of approximately $3,492 per class member.  Sprint's expert calculated that most of the class was overall overpaid by over $75 million.  The Total Settlement Amount is the equivalent of an average award of $1,102 per Settlement Class Member,

which is a reasonable resolution to complicated claims, and provides the certainty of relief now, rather than the uncertainty of more years of expert discovery and reports, dispositive motions, trial, and appeal.

### 7. *The Class's Reaction to the Settlement is Positive.*

The reasonableness of the requested fee is evidenced by the generally positive reaction of the Settlement Class Members.  There were only two objections which, as explained above, do not warrant a finding of an unreasonable settlement.  Nor do the objections take issue with the attorneys' fees or costs requested.

### III.   THE REQUESTED COSTS ARE REASONABLE.

Plaintiffs seek approval for Class Counsel's litigation expenses incurred in the amount of $6,573,147.16.  As previously explained, Class Counsel seeks less than the costs they incurred, and Class Counsel does not seek reimbursement for additional costs they will incur in the future to close out this matter with the experts.

"As with attorneys' fees, an attorney who creates or preserves a common fund for the benefit of a class is entitled to receive reimbursement of all reasonable costs incurred." *Vaszlavik v. Storage Corp.*, 2000 WL 1268824, at *4 (D. Colo. Mar. 9, 2000); *accord In Re Qwest Commc'ns Int'l, Inc. Sec. Litig.*, 625 F. Supp. 2d 1143, 1154 (D. Colo. 2009).  Here, the requested expenses are reasonable and should be approved.

The largest portion of the costs is for the services of the class's commission reconciliation expert, Balance Engines LLC.  (*See* 12/2018 Costs Detail, Ex. 4.)  The work performed by the experts was complex, time consuming, and critical to prosecuting this large class action.  The Special Master summarized some of the reasons for the "massive" amount of work the case demanded of the experts:

> [D]uring the class period: (1) Sprint employed over 30,000 class members; (2) these class members engaged in a total of over 350 million potentially-commissionable sales transactions, which were documented by over 6 billion computerized records; (3) Sprint's compensation scheme changed several times, creating over a dozen variations on how commissions were calculated; (4) each one of these compensation scheme was complicated, involving intricate assessments of sales and also different commission measures for different product categories; (5) the information necessary for the experts to calculate and reconcile historic commissions came from numerous sources—for example, the expert had to match information contained in (a) retail sales databased, (b) customer billing databases, (c) databases defining which products and services were commissionable, and (d) payroll databases, among others; (6) the relevant data was generated by and flowed through many different computer programs, which were not necessarily designed to "talk to each other;" and (7) as Sprint and Nextel merged their operations, Sprint changed the computer programs it used to calculate employee compensation.

(*Daubert* Report 4–5, Filing No. 701, at CM/ECF p. 4–53.)  The expert work spanned the lifetime of the case, as they not only spent their time working on their damages methodology, but also participating throughout discovery, routinely communicating and meeting with Class Counsel, and attending many technical depositions, meetings, court hearings, and the settlement conference.

Class Counsel also incurred expenses for advertising, photocopies, press releases, travel, depositions, courier and overnight services, court costs, office supplies, postage, equipment and software, and computerized research and Pacer charges.  (*See* 12/2018 Costs Detail, Ex. 4.)  The fee agreement with the class representatives provides for the reimbursement of reasonable costs. (*See* Class Representative Fee Agreements, Filing No. 824–2.)  These expenses are generally standard costs in class action litigation that are recoverable under common fund principles.  *See generally* William B. Rubenstein, *Newberg on Class Actions* § 16:5 (5th ed., 2017 supp.); *Kansas Penn Gaming, LLC v. HV Prop. of Kansas, LLA*, 790 F. Supp. 2d 1307, 1320–21 (D. Kan. 2011).

Accordingly, Class Counsel respectfully requests reimbursement for these costs.

## IV.   THE SERVICE PAYMENTS SHOULD BE APPROVED AS FAIR.

Lastly, the Court should approve the requested service awards of $10,000.00 for each of the nine class representatives,[20] $3,000.00 for each of the eleven class members who assisted by preparing for trial,[21] and $250.00 for each of the three Settlement Subclass class representatives.[22]

Service awards are appropriate to induce individuals to become named representatives or to award class members for the additional effort they provide for the benefit of the class.  *UFCW Local 880-Retail Food Employers Joint Pension Fund v. Newmont Min. Corp.*, 352 Fed. App'x 232, 235 (10th Cir. 2009).   Such awards are "an efficient and productive way to encourage members of a class to become class representatives, and to reward the efforts they make on behalf of the class." *Lucken*, 2010 WL 5387559, at *6.   These payments are particularly appropriate in the employment context, where the plaintiff is often a former or current employee, and thus has, for the benefit of the class, undertaken the risks of adverse action by the employer and co-workers. They also incentivize individuals to come forward and become named representatives and compensate them for personal risk incurred or additional efforts provided for the benefit of the class.  *See generally Hershey v. ExxonMobil Oil Corp.*, 2012 WL 5306260, at *12 (D. Kan. Oct. 26, 2012) (explaining incentive awards perform the legitimate function of encouraging individuals to undertake the frequently onerous responsibility of named class representatives); *In Re Motor Fuel Temperature Sales Practices Litig.*, 271 F.R.D. 263, 293 (D. Kan. 2010) (rejecting objection to incentive payment where settlement did not require it, but left it to Court's discretion).

---

[20] They are Roxie Sibley, Jeanne Noel, Ernesto Bennett, Jamie Williams, Greg St. Julien, Tracie Hernandez, John Jasinski, Jay Richie, and Teisha King.
[21] They are Veronica Batarseh (Borrego), Christopher Giardina, Jonathan Housknecht, Jimmie Kelley, Ryan Maier, Sameer Mohammad (Sam Salma), Kyle Neubauer, William Ray, Jason Renner, Alden Smith, and Michael Tallon.
[22] They are Henry Goins, Clayton Johnson, and Anthony Scarpelli.

The class representatives conferred a substantial benefit on the Settlement Class by bringing this lawsuit, without which a settlement would not exist. The requested award is appropriate to compensate them for the time and effort they expended to benefit the Settlement Class, including, meetings with Class Counsel, reviewing case filings, producing documents, responding to written discovery, preparing for and attending their deposition, and assisting Class Counsel with the prosecution of this case for over ten years. (*See* Pls.' Am. Mem. for Prelim. Approval 35–36, Filing No 818, at CM/ECF p. 38–39.) Class Counsel previously provided a detailed description of the effort and time expended by the class representatives to justify the service awards. (*Id.*) *See, e.g., Lucken*, 2010 WL 5387559, at *6 (approving $10,000 award); *see also Shaulis*, 2018 WL 4620388, at *1 (approving service awards of $7,500); *Hernandez v. Merrill Lynch & Co., Inc.*, 2013 WL 1209563, at *10 (S.D.N.Y. Mar. 21, 2013) (approving service awards of $15,000 and $12,500 to class representatives and $4,000 to opt in plaintiffs); *Yuzary v. HSBC Bank USA, N.A.*, 2013 WL 5492998, at *11 (S.D.N.Y. Oct. 2, 2013) (approving $10,000 service awards); *Dorn v. Eddington Sec., Inc.*, 2011 WL 9380874, at *7 (S.D.N.Y. Sept. 21, 2011) (approving $10,000 service award); *Torres v. Gristede's Operating Corp.*, 2010 WL 5507892, at *7 (S.D.N.Y. Dec. 21, 2010) *aff'd*, 519 Fed. App'x. 1 (2d Cir. 2013) (finding service award of $15,000 to each of 15 named plaintiffs reasonable); *Clark,* 2010 WL 1948198, at *9 (granting service awards of $10,000 to each of 7 named plaintiffs); *Khait v. Whirlpool Corp.*, 2010 WL 2025106, at *9 (E.D.N.Y. Jan. 20, 2010) (approving service awards of $15,000 and $10,000 in wage case). The requested service award for the class representatives was reduced, at the Court's recommendation, from $15,000.00 to $10,000.00. (*See* Pls.' Resp. to Show Cause Order 20–21, Filing No. 824, at CM/ECF p. 22–23.) These individuals showed a genuine dedication to this case

and the awards sought are consistent with other awards in similar cases, many of which lasted fewer years than this one.

The settlement also provides for a service award of $3,000.00 to each of the eleven class members who were instrumental to Class Counsel in preparing for trial. They met with Class Counsel, reviewed documents and briefing, and spoke with Class Counsel several times in preparation to testify at trial. (Pls.' Am. Mem. for Prelim. Approval 36–37, Filing No. 818, at CM/ECF p. 39–40.) Details of their participation was also provided. (*Id.*) Their willingness to prepare for and testify at trial was greatly beneficial to the class. *See, e.g., Droegemueller v. Petroleum Dev. Corp.*, 2009 WL 961539, at *5 (approving $5,000 service awards); *Bruner v. Sprint/United Mgmt. Co.*, 2009 WL 2058762, at *11 (D. Kan. July 14, 2009) (approving a $5,000 service award). Similarly, their requested service award was reduced at the Court's recommendation from $5,000.00 to $3,000.00. (*See* Pls.' Resp. to Show Cause Order 20–21, Filing No. 824, at CM/ECF p. 22–23.)

Last, Plaintiffs subsequently requested a service award of $250.00 for each of the three Settlement Class Members who agreed to be class representatives for the Settlement Subclasses. (*See* 5/2018 Settlement Agmt. ¶ 1(ff), Filing No. 842–1, at CM/ECF p. 5–6.) Their participation in reviewing the settlement for fairness, speaking with Class Counsel, reviewing court filings, and reviewing and signing several versions of the settlement agreement as the Court assisted the parties in refining it, made a fair settlement possible. (*See* Pls.' 2d Supp. Mem. in Support of Prelim. Approval 3–4, Filing No. 832, at CM/ECF p. 5–6.)

The Court preliminarily approved the service payments as reasonable based on the work they did for this case, and because "[a]ll service payment recipients incurred significant risk by opposing their former or current employer." (Mem. & Order 19–20, Filing No. 829, at CM/ECF

p. 19–20; *see* Mem. & Order 4 n.3, Filing No. 845, at CM/ECF p. 4.)  There were no objections to the service awards, and accordingly the Court should sustain its finding that the service awards requested are reasonable.

## **CONCLUSION**

For the forgoing reasons, Plaintiffs respectfully request that the Court:

(1)      grant final approval of the settlement;

(2)      find the request for attorneys' fees to Class Counsel in the amount of $7,014,250.00 to be fair and reasonable;

(3)      approve the request for costs to Class Counsel in the amount of $6,573,147.16;

(4)      approve service awards of $10,000.00 each for Roxie Sibley, Jeanne Noel, Ernesto Bennett, Jamie Williams, Greg St. Julien, Tracie Hernandez, John Jasinski, Jay Richie, and Teisha King;

(5)      approve service awards of $3,000.00 each for Settlement Class Members Veronica Batarseh (Borrego), Christopher Giardina, Jonathan Housknecht, Jimmie Kelley, Ryan Maier, Sameer Mohammad (Sam Salma), Kyle Neubauer, William Ray, Jason Renner, Alden Smith, and Michael Tallon;

(6)      approve service awards of $250.00 each for Settlement Subclass representatives Henry Goins, Clayton Johnson, and Anthony Scarpelli;

(7) dismiss without prejudice the claims of Eman Fakhori, Robert Gonzales, Brian Howard and Bret Larsen, who requested exclusion from the settlement;

(8) dismiss this case with prejudice for the remaining 34,905 Settlement Class Members identified in the 5/2018 Settlement Allocations, Filing No. 832–1; and

(9)  let judgment be entered accordingly.

Dated: 12/6/18

**STUEVE SIEGEL HANSON LLP**
*/s/ George A. Hanson*
George A. Hanson, KS Bar No. 16805
Email: hanson@stuevesiegel.com
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
Tel: 816-714-7100

**NICHOLS KASTER, PLLP**
/s/ *Michele R. Fisher*
Michele R. Fisher*
Email: fisher@nka.com
Paul J. Lukas*
Email: lukas@nka.com
4600 IDS Center, 80 South 8th Street
Minneapolis, Minnesota 55402
Tel: 612-256-3200
 (*Admitted *Pro Hac Vice*)

*Attorneys for the Class*

## CERTIFICATE OF SERVICE

I hereby certify that on December 6, 2018, I electronically filed the foregoing **Plaintiffs' Memorandum in Support of Unopposed Motion for Final Approval of Class Action Settlement** with the Clerk of the Court using the CM/ECF system, which will automatically send an email notification to the following attorneys of record:

Gregory T. Wolf
Dentons US LLP
4520 Main Street, Suite 1100
Kansas City, MO 64111
gregory.wolf@snrdenton.com

Michael Blumenthal
Seyferth, Blumenthal & Harris, LLC
Michael L. Blumenthal, KS Bar No. 18582
300 Wyandotte Street, Suite 430
Kansas City, MO  64105

Elise M. Bloom
Steven D. Hurd
Mark W. Batten
Nicole A. Eichberger
Proskauer Rose LLP
Eleven Times Square
New York, New York 10036–8299
ebloom@proskauer.com
shurd@proskauer.com
mbatten@proskauer.com
neichberger@proskauer.com

Dated: 12/6/18

*/s/George Hanson*
Attorney for the Class